1  **BERNSTEIN LITOWITZ BERGER**
    **& GROSSMANN LLP**
2  JONATHAN D. USLANER (Bar No. 256898)
   (jonathanu@blbglaw.com)
3  2121 Avenue of the Stars, Suite 2575
   Los Angeles, CA 90067
4  Tel:    (310) 819-3481

5  *Counsel for Plaintiff City of Coral Springs*
   *Police Officers' Pension Plan*

6
   [Additional counsel on signature page]
7

8

9

10                **UNITED STATES DISTRICT COURT**

11              **NORTHERN DISTRICT OF CALIFORNIA**

12  CITY OF CORAL SPRINGS POLICE          Case No.  3:25-cv-6252
    OFFICERS' PENSION PLAN, on behalf of
13  itself and all others similarly situated,   **COMPLAINT FOR VIOLATIONS OF**
                                                **THE FEDERAL SECURITIES LAWS**
14            Plaintiff,
                                                CLASS ACTION
15       v.
                                                DEMAND FOR JURY TRIAL
16  APPLE INC., TIMOTHY D. COOK, LUCA
    MAESTRI, and KEVAN PAREKH,
17
              Defendants.
18

19

20

21

22

23

24

25

26

27

28

Plaintiff City of Coral Springs Police Officers' Pension Plan ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, inter alia, counsel's investigation, which included review and analysis of: (a) regulatory filings made by Apple Inc. ("Apple" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning Apple; and (d) other public information regarding the Company.

## I.    INTRODUCTION

1.    Plaintiff brings this securities class action on behalf of all persons or entities that purchased or otherwise acquired Apple common stock between June 10, 2024, and June 9, 2025, inclusive (the "Class Period").

2.    The claims asserted herein are alleged against Apple and certain of the Company's former and current senior officers (collectively, "Defendants") and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

3.    Apple is a multinational technology company most well-known for its iPhone.  It also sells a range of other smart technology products, personal computers, and related accessories. It also offers a variety of integrated software and services through the operation of various platforms, including the App Store.

4.    Since 2011, iPhones and other Apple smart devices have contained software for the Company's digital personal assistant, called "Siri."  In recent years, a number of Apple's competitors have introduced artificial intelligence ("AI") capabilities, which put pressure on Apple to incorporate generative-AI technology into its iPhones and especially to introduce advanced AI-based Siri features.

5.    In 2020, Epic Games, Inc. ("Epic") sued Apple, challenging Apple's restrictions on app developers' ability to communicate with consumers, and direct them to purchasing

mechanisms outside of those offered by Apple's App Store (the "Epic Action"). Apple takes a 30% commission on all revenues generated from its App Store, and Epic's efforts to open other avenues for app-related payments posed a threat to one of Apple's major revenue streams. After the companies initially went to trial in 2021, the court presiding over the action issued a 180-page order enjoining Apple's "anti-steering" rules, which the court found were anti-competitive (the "Epic Injunction"). *See generally Epic Games, Inc. v. Apple Inc*., 559 F. Supp. 3d 898 (N.D. Cal. 2021), *aff'd in part, rev'd in part and remanded*, 67 F.4th 946 (9th Cir. 2023). This injunction went into effect on January 17, 2024, after Apple had exhausted its appeals.

6.     The claims against Defendants arise from their misrepresentations and omissions that fall into two categories: (i) statements regarding the launch of new generative-AI based Siri features; and (ii) statements concerning Apple's compliance with the Epic Injunction, including statements relating to any impacts on revenue from this compliance.

7.     Throughout the Class Period, starting with the Company's 2024 Worldwide Developers Conference (the "2024 WWDC"), Defendants represented to investors that the Company would be rolling out a number of AI-supported features for Siri in the first half of 2025, promising that "over the next year" or "in the coming months," Siri would gain AI functionality that would enable it to "take hundreds of new actions in and across Apple and third-party apps," and "deliver intelligence that's tailored to the user and their on-device information." The Company also repeatedly represented that it had implemented a plan to comply with the Epic Injunction. As a result of these representations, the price of Apple common stock traded at artificially inflated prices throughout the Class Period.

8.     The truth began to emerge during a series of evidentiary hearings held by the court in the Epic Action from February 24 through February 26, 2025, in response to a motion from Epic seeking to enforce the injunction and hold Apple in civil contempt. On February 25, 2025, a senior Apple employee testified that the impact on the Company's finances was a key factor in its decision to implement a particular anti-competitive aspect of its "compliance plan," and that eliminating

this would cost the Company "hundreds of millions if not billions," in App Store revenue.  As a result of these disclosures, the price of Apple common stock declined by $6.68 per share, or 2.7%.

9.    On March 7, 2025, an Apple spokesperson was quoted by multiple news outlets, disclosing that the launch of the Siri generative-AI features would be delayed.  Specifically, the spokesperson stated that "[i]t's going to take us longer than we thought to deliver on these features and we anticipate rolling them out in the coming year."  In response to this news, the price of Apple common stock declined by $11.59 per share, or 4.8%, the following trading day.

10.    The following week, on March 12, 2025, Morgan Stanley published a report, stating that "[t]he delayed rollout of a more advanced Siri means Apple will have fewer features to accelerate iPhone upgrade rates in FY26."  The report presented evidence that around 50% of iPhone owners who did not upgrade to an iPhone 16 said that the delayed Apple Intelligence rollout impacted their decision not to upgrade.  As a result of these disclosures, the price of Apple common stock declined by $11.16 per share, or 5.1% over the following two trading sessions.

11.    On April 3, 2025, *The Wall Street Journal* published an article criticizing Apple for overpromising on its AI capabilities and chiding the Company that it "shouldn't announce products until they're sure they can deliver them."  On this news, the price of Apple common stock declined by $20.70 per share, or 9.2%.

12.    Then, on June 9, 2025, Apple held its annual Worldwide Developer Conference (the "2025 WWDC") where it notably failed to announce any updates regarding advanced Siri features beyond that the Company "needed more time to reach a high quality bar."  Industry commentators were underwhelmed with this news, with *CNN* commenting that "it's unlikely that any of the announcements made at Monday's event will change the perception that Apple is behind its competitors in AI."  These disclosures caused the price of Apple common stock to decline by $2.47 per share, or 1.2%.

13.    As a result of Defendants' actions detailed herein, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

14.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

15.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

16.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Apple's principal executive office is located in Cupertino, California, which is situated in this District, and many of the acts giving rise to the violations complained of in this action, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.

17.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Plaintiff

18.    Plaintiff City of Coral Springs Police Officers' Pension Plan is a defined benefit pension plan providing retirement benefits to full-time law enforcement officers employed by the City of Coral Springs.  As indicated in the certification submitted herewith, Plaintiff purchased Apple common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B.    Defendants

19.    Defendant Apple is a technology company, and maintains its headquarters at One Apple Park Way, Cupertino, California.  Apple common stock trades on NASDAQ under the ticker symbol "AAPL."  As of April 18, 2025, Apple had almost 15 billion shares of common stock outstanding, owned by thousands of investors.

20. Defendant Timothy D. Cook ("Cook") is, and was at all relevant times, Apple's Chief Executive Officer and a Director of the Company.

21. Defendant Luca Maestri ("Maestri") served as Apple's Senior Vice President and Chief Financial Officer ("CFO") from prior to the start of the Class Period until January 2025.

22. Defendant Kevan Parekh ("Parekh") has served as Apple's CFO since January 2025.

23. Defendants Cook, Maestri, and Parekh are collectively referred to herein as the "Officer Defendants." The Officer Defendants, because of their positions with Apple, possessed the power and authority to control the contents of Apple's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV.   BACKGROUND

24. Apple is a multinational technology company that designs, manufactures, and markets a wide range of hardware products and sells integrated software and services. Its key products include smartphones, personal computers, tablets and wearables. The Company also generates "Services" revenue through the operation of various platforms, including the App Store, which allow customers to discover and download applications and digital content, and by offering its own digital content through subscription-based services such as Apple Music and Apple TV+.

25. Apple's most well-known and highest revenue product is the iPhone, the Company's line of smartphones based on its iOS operating system. The latest model of the iPhone, the iPhone 16, was released in September of 2024. Since 2011, iPhones and other Apple smart

devices have contained software for the Company's digital personal assistant, called "Siri."  In recent years, a number of Apple's competitors have introduced AI capabilities and have launched generative-AI chatbots.  As a result, Apple felt pressure to incorporate generative-AI technology into its iPhones and especially to introduce advanced AI-based Siri features.

26.     On August 13, 2020, Epic sued Apple in federal court in California, alleging that Apple was using a "series of anti-competitive restraints and monopolistic practices" in markets for the distribution of software applications and the processing of consumers' payments for digital content used within those mobile apps.  Epic is a video game app developer affected by Apple's anti-competitive practices and sought an injunction prohibiting such conduct.

27.     Following a bench trial, the district court entered a 180-page order on September 10, 2021.  *Apple*, 559 F. Supp. 3d 898 (N.D. Cal. 2021), *aff'd in part, rev'd in part and remanded*, 67 F.4th 946.  While the court found in Apple's favor regarding a majority of the challenges to conduct, it also found that certain of Apple's "anti-steering" rules violated the California Unfair Competition Law.  *Id.* at 1056.  These anti-steering provisions prohibited apps from including "buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase," and from "encourag[ing] users to use a purchasing method other than in-app purchase" either "within the app or through communications sent to points of contact obtained from account registrations within the app (like email or text)."  *Id.* at 1055.  The court concluded that these restrictions prevented developers from communicating lower prices on other platforms either in-app or to users obtained through Apple and "threaten an incipient violation of an antitrust law by preventing informed choice among users."  *Id.*  Concurrent with this order, the court also entered the Epic Injunction, enjoining Apple's anti-steering provisions.  *Id.* at 1058.  The Epic Injunction went into effect on January 17, 2024, after it had been affirmed by the Ninth Court and the Supreme Court of the United States declined to review the case.

28.     On January 16, 2024, Apple filed a notice of compliance with the Epic Injunction. However, on March 13, 2024, Epic moved to enforce the Epic Injunction and hold Apple in civil contempt, alleging that Apple's "new App Store policies continue to impose prohibitions on

developers that this Court found unlawful" and "introduce new restrictions and burdens that frustrate and effectively nullify the relief the Court ordered."  In May of 2024, the court held an evidentiary hearing, lasting eight days, where it heard testimony from a number of witnesses, including senior executives at Apple responsible for the App Store.  According to a later order by the court, over the course of this evidentiary hearing she became "increasingly concerned that Apple was not only withholding critical information about its business decision for complying with the Injunction, but also that it had likely presented a reverse-engineered, litigation-ready justification for actions which on their face looked to be anticompetitive."  *Epic Games, Inc. v. Apple Inc.*, 2025 WL 1260190, at *8 (N.D. Cal. Apr. 30, 2025).  As a result, the court then ordered Apple to produce all Epic Injunction-compliance related documents.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

29.    The Class Period begins on June 10, 2024, during the Company's 2024 WWDC. During the 2024 WWDC, Kelsey Peterson ("Peterson"), a senior member of Apple's AI and Machine Learning team, announced new AI upgrades to Siri, stating that "over the course of the next year, we'll be rolling out more features that make Siri even more personal and capable." Among those features was "Apple Intelligence," which, according to Peterson, "will provide Siri with onscreen awareness, so that it will be able to understand and take action with things on your screen."  Among other things, Peterson explained that with Apple Intelligence "say a friend texts you his new address, right from the messages thread, you can say add this address to his contact card and Siri will take care of it.  Siri will also understand more of the things you get done in your apps and with new orchestration capabilities provided by Apple Intelligence, Siri will take actions inside apps on your behalf.  Siri will have the ability to take hundreds of new actions in and across apps, including some that leverage our new writing and image generation capabilities."

30.    During this presentation, Peterson gave a number of demonstrations of these new Siri capabilities, purporting to show the digital assistant in action finding and enhancing photos,

finding the user's drivers license number, and locating flight details and lunch plans across the user's apps.

31.     Also on June 10, 2024, following the 2024 WWDC, Apple published a press release entitled "Introducing Apple Intelligence, the personal intelligence system that puts powerful generative models at the core of iPhone, iPad, and Mac."  This press release also highlighted the new Siri capabilities, stating that "Siri will be able to understand and take action with users' content in more apps over time."  The press release gave a number of examples of this functionality, such as "if a friend texts a user their new address in Messages, the receiver can say, 'Add this address to his contact card,'" and "a user can say, 'Play that podcast that Jamie recommended,' and Siri will locate and play the episode, without the user having to remember whether it was mentioned in a text or an email."

32.     On August 1, 2024, Apple issued a press release announcing its financial results for the third quarter of 2024.  In the press release, which was also filed with the SEC on Form 8-K, Apple reported "a new June quarter revenue record of $85.8 billion, up 5 percent from a year ago."  The Company also stated that "we were excited to announce incredible updates to our software platforms at our Worldwide Developers Conference, including Apple Intelligence, a breakthrough personal intelligence system that puts powerful, private generative AI models at the core of iPhone, iPad, and Mac."

33.     Later that same day, Apple held a conference call with analysts and investors to discuss the Company's financial results.  During that call, Defendant Cook again discussed the Apple Intelligence features announced at the 2024 WWDC, stating that "Siri also becomes more natural, more useful and more personal than ever."

34.     On the same call, Defendant Maestri was asked about what was driving the Company's impressive and accelerating Services revenue growth.  In response, Defendant Maestri attributed the revenue growth to "a combination of a number of factors" including "install base growth," "continued growth in the level of engagement that our customers have with our

ecosystem," "more transacting accounts every quarter," "paid accounts growing double digits," and growth of "paid subscriptions."

35.    The next day, on August 2, 2024, the Company filed its Form 10-Q with the SEC. In this filing, Apple discussed its compliance with the Epic Injunction, stating that "On January 16, 2024, the Company implemented a plan to comply with the injunction and filed a statement of compliance with the California District Court." The filing also disclosed that "[a] motion by Epic disputing the Company's compliance plan and seeking to enforce the injunction, which the Company has opposed, is pending before the California District Court. The Company believes it has substantial defenses and intends to vigorously defend itself."

36.    On September 9, 2024, the Company published a press release titled "Apple Intelligence comes to iPhone, iPad, and Mac starting next month." This press release claimed that "More Apple Intelligence features will roll out later this year and in the months following." The press release also stated that "Siri will be even more capable, with the ability to draw on a user's personal context to deliver intelligence that is tailored to them. It will also gain onscreen awareness, as well as take hundreds of new actions in and across Apple and third-party apps."

37.    In September 2024, Apple began running a television advertisement which purported to show Siri's AI capabilities and labeled the digital assistant a "more personal Siri." The advertisement featured actor Bella Ramsey seeing someone familiar approaching and then asking Siri the name of the person they had a meeting with the previous month at a specific café. Siri immediately responds with the name of the individual.

38.    On October 28, 2024, Apple published a press release titled "Apple Intelligence is available today on iPhone, iPad, and Mac." This press release announced the first set of Apple Intelligence features available and also promoted that there were many more features to come, claiming that "[i]n the months to come, Priority Notifications will surface what's most important, and Siri will become even more capable, with the ability to draw on a user's personal context to deliver intelligence that's tailored to them. Siri will also gain onscreen awareness, as well as be able to take hundreds of new actions in and across Apple and third-party apps."

39.     On November 1, 2024, the Company filed its Form 10-K with the SEC.  In the 10-K, Apple addressed its compliance with the Epic Injunction, stating that "On January 16, 2024, the Company implemented a plan to comply with the injunction and filed a statement of compliance with the California District Court."  The 10-K also disclosed that "[a] motion by Epic disputing the Company's compliance plan and seeking to enforce the injunction, which the Company has opposed, is pending before the California District Court," and represented that "[t]he Company believes it has substantial defenses and intends to vigorously defend itself."

40.     On December 11, 2024, the Company issued a press release titled "Apple Intelligence now features Image Playground, Genmoji, Writing Tools enhancements, seamless support for ChatGPT, and visual intelligence."  It promoted these new features and also claimed that "[a]dditional Apple Intelligence capabilities will be available in the months to come.  Siri will be even more capable, with the ability to draw on a user's personal context to deliver intelligence that's tailored to them.  Siri will also gain onscreen awareness, and will be able to take hundreds of new actions in and across Apple and third-party apps."

41.     On January 30, 2025, Apple issued a press release, which was also filed with the SEC on Form 8-K, announcing the Company's first quarter results for 2025.  That same day, the Company hosted a conference call with analysts and investors to discuss the Company's financial results.  During that call, Defendant Cook was asked whether "the upgraded Siri expected in April as something that will, let's say, be the killer application among the suite of features that you have announced in Apple Intelligence?"  Defendant Cook responded that "I think the killer feature is different for people.  But I think most, they're going to find that they're going to use many of the features every day.  And certainly, one of those is the – is Siri, and that will be coming over the next several months."

42.     The following day, on January 31, 2025, the Company filed its Form 10-Q with the SEC.  In the 10-Q, Apple addressed its compliance with the Epic Injunction, stating that "On January 16, 2024, the Company implemented a plan to comply with the injunction and filed a statement of compliance with the California District Court."  The 10-Q also disclosed that "[a]

motion by Epic disputing the Company's compliance plan and seeking to enforce the injunction, which the Company has opposed, is pending before the California District Court," and represented that "[t]he Company believes it has substantial defenses and intends to vigorously defend itself."

43.     The statements in paragraphs 29-42 were materially false and misleading and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading.  In truth, Apple was willfully violating the Epic Injunction and was never on track to launch the promoted Siri generative-AI features on the timeline promised to customers and investors.  As a result, Defendants' statements concerning its plan of compliance with the Epic Injunction was materially misleading, as were their statements regarding the cause of Service revenue growth that did not mention that this growth was being propped up by the Company's noncompliance.  In addition, Defendants' positive statements about the launch of the Siri generative-AI features "in the coming months" were materially misleading and/or lacked a reasonable basis.

## VI.     THE TRUTH EMERGES

44.     The truth began to emerge in late February 2025, when the court in the Epic Action resumed evidentiary hearings regarding Apple's compliance with the Epic Injunction.   On February 24, the first day of testimony, Philip Schiller, a long-time Apple executive who helped develop the App Store, told the court that he had been concerned that the decision to implement a new 27% commission on purchases made outside of the App Store would not comply with the Epic Injunction.  The next day, Carson Oliver, Senior Director of Business Management, App Store, testified that the impact on Apple's finances were a key factor in the Company's decision to charge developers the 27% commission, despite the conflict with the Epic Injunction. According to this testimony, internal estimates were that a program allowing alternatives to in-app purchases but charging no commission or a much lower commission would cost Apple "hundreds of millions if not billions" per year in App Store revenue.

45.     This testimony was contemporaneously reported on, with *Bloomberg News* publishing an article on the evening of February 25, 2025, titled "Apple Prioritized Revenue for

App Fee Change Despite Legal Risk," reporting that the company "considered several options", including "impos[ing] restrictions on links to alternative payments and charg[ing] no commission", or "a 27% commission with fewer limits", before "ultimately cho[osing] the commission alongside stringent restrictions." The article also noted the court's "skepticism that Apple is doing enough to promote competition." Analysts for *Washington Analysis* also published a report on February 26, 2025, recounting the first two days of the hearing and commenting that they thought that the figures from Oliver's testimony "may low-ball the impact if Apple is both barred from collecting commissions on link-outs and also forced to allow a more developer/user-friendly link-out interface." This report also opined that there was "a 90% probability that Apple will be found to have violated the injunction and a 65% probability that Apple will be prohibited from charging commission on linked-out purchases, with higher confidence now on both fronts."

46.    As a result of these disclosures, the price of Apple common stock declined by $6.68 per share, or 2.7%, from a closing price of $247.04 on February 25, 2025, to a closing price of $240.36 on February 26, 2025.

47.    On March 7, 2025, an Apple spokesperson revealed that the rollout of Apple's Siri generative-AI features would be indefinitely delayed. Specifically, several news outlets quoted an Apple spokesperson as stating with regard to the "more personalized Siri" that "[i]t's going to take us longer than we thought to deliver on these features and we anticipate rolling them out in the coming year."

48.    On this news, the price of Apple common stock declined by $11.59 per share, or 4.8%, from a closing price of $239.07 on March 7, 2025, to a closing price of $227.48 on March 10, 2025.

49.    The following week, on March 12, 2025, Morgan Stanley published a report, explaining that "[t]he delayed rollout of a more advanced Siri means Apple will have fewer features to accelerate iPhone upgrade rates in FY26." The report presented evidence that " ~50% of iPhone owners that didn't upgrade to an iPhone 16 acknowledged that the delayed Apple Intelligence rollout had an impact on their decision not to upgrade." As a result of this disclosure,

the price of Apple common stock declined by $11.16 per share, or 5.1% over the following two trading sessions, from a closing price of $220.84 on March 11, 2025, to a closing price of $209.68 on March 13, 2025.

50.    On April 3, 2025, *The Wall Street Journal* published an article titled "Apple and Amazon Promised Us Revolutionary AI. We're Still Waiting."  The article detailed the 2024 WWDC announcement of the Siri generative-AI features and the television advertisement highlighting these capabilities, before surmising that "[w]e have been misled," and chiding the Company that it "shouldn't announce products until they're sure they can deliver them." Following this disclosure, the price of Apple common stock declined by $20.70 per share, or 9.2%, from a closing price of $223.89 on April 2, 2025, to a closing price of $203.19 on April 3, 2025.

51.    On April 30, 2025, the court presiding over the injunction hearing issued an order finding Apple in willful violation of the injunction, holding Apple in civil contempt, and referring the matter to the United States Attorney for the Northern District of California to investigate whether criminal contempt proceedings were appropriate.  *Apple*, 2025 WL 1260190, at *1.  The court explained that its order "required that Apple not impose restrictions in its iOS marketplace which would prohibit consumer access to and awareness of competitive alternatives to [in-app purchases]." *Id.* at *38.  It found that "Apple intentionally devised a compliance scheme to prevent developers from deploying competitive alternatives to [in-app purchases]." *Id.*   The court further found that "[t]he non-compliance was far from technical or de minimis," and that "Apple's lack of adequate justification, knowledge of the economic non-viability of its compliance program, motive to protect its illegal revenue stream and institute a new de facto anticompetitive structure, and then create a reverse-engineered justification to proffer to the Court cannot, in any universe, real or virtual, be viewed as product of good faith or a reasonable interpretation of the Court's orders." *Id.*

52.    Then, on June 9, 2025, Apple held the 2025 WWDC where the only statement that the Company made about Siri's generative-AI functionality was that "And as we've shared, we're continuing our work to deliver the features that make Siri even more personal.  This work needed

more time to reach a high quality bar and we look forward to sharing more about it in the coming year." Industry commentators were underwhelmed with this news, with *CNN* commenting that "it's unlikely that any of the announcements made at Monday's event will change the perception that Apple is behind its competitors in AI." These disclosures caused the price of Apple common stock to decline by $2.47 per share, or 1.2%, from a closing price of $203.92 on June 6, 2025, to a closing price of $201.45 on June 9, 2025.

## VII. LOSS CAUSATION

53. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. These misleading statements and omissions artificially inflated the price of Apple common stock and operated as a fraud or deceit on the Class (as defined below). Later, when the alleged misrepresentations and fraudulent conduct were disclosed to the market on February 25, 2025, March 7, 2025, March 12, 2025, April 3, 2025, and June 9, 2025, the price of Apple common stock fell precipitously as the prior artificial inflation came out of the price over time. As a result of their purchases of Apple common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VIII. CLASS ACTION ALLEGATIONS

54. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired Apple common stock during the Class Period (collectively, the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Apple and their families and affiliates.

55. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of April 18, 2025, Apple had almost 15 billion shares of common stock outstanding, owned by thousands of investors.

56.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

      (a)     Whether Defendants violated the Exchange Act;

      (b)     Whether Defendants omitted and/or misrepresented material facts;

      (c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

      (d)     Whether the Officer Defendants are personally liable for the alleged misrepresentations and omissions described herein;

      (e)     Whether the Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

      (f)     Whether Defendants' conduct impacted the price of Apple common stock;

      (g)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

      (h)     The extent of damage sustained by Class members and the appropriate measure of damages.

57.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

58.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

59.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## IX.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

60.    Apple's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

61.    The Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Apple who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## X.    PRESUMPTION OF RELIANCE

62.    At all relevant times, the market for Apple common stock was an efficient market for the following reasons, among others:

(a)    Apple common stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Apple filed periodic public reports with the SEC and NASDAQ;

(c)    Apple regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Apple was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales

force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

63.    As a result of the foregoing, the market for Apple common stock promptly digested current information regarding Apple from all publicly available sources and reflected such information in the price of Apple common stock.  Under these circumstances, all purchasers of Apple common stock during the Class Period suffered similar injury through their purchase of Apple common stock at artificially inflated prices and the presumption of reliance applies.

64.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Apple's business operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the significance of Apple's progress on rolling out AI capabilities and its compliance with a court-ordered injunction, that requirement is satisfied here.

## XI.    SCIENTER ALLEGATIONS

65.    As alleged herein, the Defendants acted with scienter since the Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Officer Defendants, by virtue of their receipt of information reflecting the true facts regarding Apple, their control over, and/or receipt and/or modification of Apple's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Apple, participated in the fraudulent scheme alleged herein.

1  **XII.    CLAIMS FOR RELIEF**

2  <u>**COUNT I**</u>

3  **For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**

4  **(Against All Defendants)**

5  66.    Plaintiff repeats, incorporates, and realleges each and every allegation contained

6  above as if fully set forth herein.

7  67.    During the Class Period, the Defendants carried out a plan, scheme, and course of

8  conduct which intended to and, throughout the Class Period, did: (a) deceive the investing public,

9  including Plaintiff and other Class members, as alleged herein; and (b) cause Plaintiff and other

10  members of the Class to purchase Apple common stock at artificially inflated prices.

11  68.    The Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made

12  untrue statements of material fact and/or omitted to state material facts necessary to make the

13  statements not misleading; and (c) engaged in acts, practices, and a course of business which

14  operated as a fraud and deceit upon the purchasers of the Company's common stock in violation

15  of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

16  69.    The Defendants, individually and in concert, directly and indirectly, by the use,

17  means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and

18  participated in a continuous course of conduct to conceal adverse material information about the

19  Company's financial well-being, operations, and prospects.

20  70.    During the Class Period, the Defendants made the false statements specified above,

21  which they knew or recklessly disregarded to be false or misleading in that they contained

22  misrepresentations and failed to disclose material facts necessary in order to make the statements

23  made, in light of the circumstances under which they were made, not misleading.

24  71.    The Defendants had actual knowledge of the misrepresentations and omissions of

25  material facts set forth herein, or recklessly disregarded the true facts that were available to them.

26  The Defendants engaged in this misconduct to conceal Apple's true condition from the investing

27  public and to support the artificially inflated prices of the Company's common stock.

28

72.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Apple common stock at artificially inflated prices and were harmed when the truth about Apple negatively impacted the price of the Company's common stock. Plaintiff and the Class would not have purchased Apple common stock at the prices they paid, or at all, had they been aware that the market prices for Apple common stock had been artificially inflated by the Defendants' fraudulent course of conduct.

73.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

74.     By virtue of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## <u>COUNT II</u>

### For Violations of Section 20(a) of the Exchange Act

### (Against the Officer Defendants)

75.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

76.     The Officer Defendants acted as controlling persons of Apple within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about Apple, the Officer Defendants had the power and ability to control the actions of Apple and its employees.  By reason of this conduct, the Officer Defendants are liable under Section 20(a) of the Exchange Act.

## XIII.  PRAYER FOR RELIEF

77.     WHEREFORE, Plaintiff prays for judgment as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)  Awarding compensation to Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)  Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIV.  JURY DEMAND

78.  Plaintiff demands a trial by jury.

DATED: July 25, 2025

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:    (310) 819-3481

-and-

HANNAH ROSS
(hannah@blbglaw.com)
AVI JOSEFSON
(avi@blbglaw.com)
SCOTT R. FOGLIETTA
(scott.foglietta@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:    (212) 554-1400
Fax:    (212) 554-1444

*Counsel for Plaintiff City of Coral Springs Police Officers' Pension Plan*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Scott Myers, on behalf of City of Coral Springs Police Officers' Pension Plan ("Coral Springs Police"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chairman of Coral Springs Police. I have reviewed the complaint with Coral Springs Police's legal counsel. Based on legal counsel's knowledge and advice, Coral Springs Police has authorized the filing of the complaint.

2. Coral Springs Police did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Coral Springs Police is willing to serve as a lead plaintiff and representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. Coral Springs Police fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act of 1995, including the selection and retention of counsel and overseeing the prosecution of the action for the class.

4. Coral Springs Police's transactions in the Apple Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Coral Springs Police has sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for appointment as lead plaintiff or was not appointed lead plaintiff:

    *Skolnick v. Evolution AB (publ)*, No. 24-cv-326 (E.D. Pa.)

6. Coral Springs Police will not accept any payment for serving as a representative party on behalf of the class beyond Coral Springs Police's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24 day of July, 2025.

_____
Scott Myers
Chairman
*Coral Springs Police Officers' Pension Plan*

**City of Coral Springs Police Officers' Pension Plan**
**Transactions in Apple Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 7/9/2024 | 199 | 227.9800 |
| Purchase | 7/9/2024 | 1,223 | 228.4855 |
| Purchase | 7/10/2024 | 2,281 | 231.7849 |
| Purchase | 10/18/2024 | 3,100 | 234.8279 |
| Sale | 10/29/2024 | (190) | 233.2241 |
| Sale | 2/26/2025 | (3,703) | 240.3600 |