# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| IN RE KRAFT HEINZ SECURITIES LITIGATION | Case No. 1:19-cv-01339 |
|  | Honorable Robert M. Dow Jr. |
|  | **ORAL ARGUMENT REQUESTED** |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND .................................................................................................................. 5

ARGUMENT ........................................................................................................................ 8

I.      Plaintiffs' Damages Theory Fails to Measure Losses Attributable to Their Theory of
        Liability ...................................................................................................................... 8

     A.      Plaintiffs Fail to Specify Their Theory of Liability and Do Not Provide a Theory
                of Damages That Matches ................................................................................ 10

         1.     Inflation Introduction ............................................................................... 10

         2.     Inflation Maintenance .............................................................................. 11

         3.     Materialization of a Concealed Risk ....................................................... 15

     B.      Plaintiffs Fail to Show They Can Account for Confounding Information under
                Any Theory of Liability ................................................................................... 16

II.     Union's Section 20A Claim Must Be Litigated Individually ......................................... 18

III.    Plaintiffs Are Not Adequate or Typical Class Representatives ..................................... 20

     A.      Union Is Not Adequate or Typical .................................................................. 21

     B.      AP7 Is Not Adequate or Typical ..................................................................... 29

     C.      Booker Is Not Adequate or Typical ................................................................ 32

     D.      The Plaintiffs Are Not Functioning as a Group ............................................... 34

CONCLUSION ................................................................................................................... 35

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Allstate Corp. Sec. Litig.*,
966 F.3d 595 (7th Cir. 2020) ...................................................................................11

*Astor Chauffeured Limousine Co.* v. *Runnfeldt Inv. Corp.*,
910 F.2d 1540 (7th Cir. 1990) .................................................................................20

*Bentel & Co., LLC* v. *Schraubenwerk Zerbst GmbH*,
2017 WL 3278324 (N.D. Ill. Aug. 2, 2017) ...........................................................31

*Berger* v. *Compaq Comput. Corp.*,
257 F.3d 475 (5th Cir. 2001) ...................................................................................35

*In re Boeing Co. Aircraft Sec. Litig.*,
2019 WL 6052399 (N.D. Ill. Nov. 15, 2019) ....................................................28, 32

*Carbajal* v. *Capital One*,
219 F.R.D. 437 (N.D. Ill. 2004)...............................................................................20

*CE Design Ltd.* v. *King Architectural Metals, Inc.*,
637 F.3d 721 (7th Cir. 2011) ...................................................................................28

*Comcast Corp.* v. *Behrend*,
569 U.S. 27 (2013)..................................................................................1, 8, 9, 18

*Constr. Workers Pension Trust Fund* v. *Navistar Int'l Corp.*,
2013 WL 3934243 (N.D. Ill. July 30, 2013)...........................................................25

*DCD Programs, Ltd.* v. *Leighton*,
90 F.3d 1442 (9th Cir. 1996) ...................................................................................20

*Dollens* v. *Zionts*,
2001 WL 1543524 (N.D. Ill. Dec. 4, 2001)............................................................33

*Doshi* v. *General Cable*,
2017 WL 5178673 (E.D. Ky. Nov. 7, 2017)...........................................................25

*Eli Lilly and Co.* v. *Teva Parenteral Medicines, Inc.*,
2013 WL 12291616 (S.D. Ind. Apr. 26, 2013) .......................................................31

*Epstein* v. *Am. Rsrv. Corp.*,
1988 WL 40500 (N.D. Ill. Apr. 21, 1988) .........................................................24, 33

*Feldman* v. *Motorola*,
    1993 WL 497228 (N.D. Ill. Oct. 14, 1993)................................................................18

*In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*,
    2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) (Dow, J.)...............................................8, 18, 19

*George* v. *China Auto Sys., Inc.*,
    2013 WL 3357170 (S.D.N.Y. July 3, 2013) ..............................................21, 23, 24, 34

*Goldman Sachs Grp., Inc.* v. *Ark. Teacher Ret. Sys.*,
    141 S. Ct. 1951 (2021)..................................................................................11, 13, 15

*Hedick* v. *Kraft Heinz Co.*,
    2019 WL 4958238 (N.D. Ill. Oct. 8, 2019)................................................................35

*In re IKO Roofing Shingle Prod. Liab. Litig.*,
    757 F.3d 599 (7th Cir. 2014) .....................................................................................8

*J.H. Cohn & Co.* v. *Am. Appraisal Assocs., Inc.*,
    628 F.2d 994 (7th Cir. 1980) ...................................................................................21

*Kleen Prod. LLC* v. *Int'l Paper Co.*,
    831 F.3d 919 (7th Cir. 2016) ......................................................................................8

*Lacy* v. *Cook Cnty., Illinois*,
    897 F.3d 847 (7th Cir. 2018) ...............................................................................18, 19

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018).......................................................................16

*Ludlow* v. *BP, P.L.C.*,
    800 F.3d 674 (5th Cir. 2015) ......................................................................................9

*Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*,
    256 F.R.D. 586 (N.D. Ill. 2009)................................................................................23

*Ohio Pub. Emps. Ret. Sys.* v. *Fed. Home Loan Mortg. Corp.*,
    2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ...........................................................9

*In re Petrobras Sec. Litig.*,
    104 F. Supp. 3d 618 (S.D.N.Y. 2015)........................................................................35

*In re Pfizer Inc. Sec. Litig.*,
    282 F.R.D. 38 (S.D.N.Y. 2012) ................................................................................19

*Pine Top Receivables of Illinois, LLC* v. *Banco De Seguros Del Estado*,
    2013 WL 3776971 (N.D. Ill. July 18, 2013)...............................................................31

iii

*Plumlee* v. *Pfizer, Inc¸*
2014 WL 4275553 (N.D. Cal. Aug. 29, 2014) ...................................................................35

*Pub. Emps. Ret. Sys. of Miss.* v. *TreeHouse Foods, Inc.*,
2020 WL 919249 (N.D. Ill. Feb. 26, 2020) (Dow, J.) ..................................................17, 25

*Rahim* v. *Sheahan*,
2001 WL 1263493 (N.D. Ill. Oct. 19, 2001)......................................................................19

*Rocco* v. *Nam Tai Elecs., Inc.*,
245 F.R.D. 131 (S.D.N.Y. 2007) ................................................................................21, 24

*Ross* v. *Abercrombie & Fitch Co.*,
257 F.R.D. 435 (S.D. Ohio 2009) .....................................................................................16

*Rush* v. *GreatBanc Trust Co.*,
2021 WL 2453070 (N.D. Ill. June 16, 2021) ....................................................................28

*Sakhrani* v. *Brightpoint, Inc.*,
78 F. Supp. 2d 845 (S.D. Ind. 1999) .................................................................................33

*Sicav* v. *Wang*,
2015 WL 268855 (S.D.N.Y. July 21, 2015) .......................................................................9

*Sokolow* v. *LJM Funds Mgmt., Ltd.*,
2018 WL 3141814 (N.D. Ill. June 26, 2018) (Dow, J.) ......................................................33

*In re Tarragon Corp. Sec. Litig.*,
2007 WL 4302732 (S.D.N.Y. Dec. 6, 2007) .....................................................................35

*In re UTStarcom, Inc. Sec. Litig.*,
2010 WL 1945737 (N.D. Cal. May 12, 2010) ...................................................................23

*Villella* v. *Chem. & Mining Co. of Chile Inc.*,
2018 WL 2958361 (S.D.N.Y. June 13, 2018) ...................................................................29

*In re Williams Sec. Litig.*,
558 F.3d 1130 (10th Cir. 2009) ........................................................................................16

*Wilson* v. *Comtech Telecomms. Corp.*,
648 F.2d 88 (2d Cir. 1981)...............................................................................................18

**Statutes**

15 U.S.C. § 78t-1(a).............................................................................................................18

**Other Authorities**

Fed. R. Civ. P. 23...............................................................................................4, 9, 19, 20

Case 1:25-cv-01382-DLB  Document 359  Filed 05/27/12  Page 7 of 42  PageID #: 6315

Fed. R. Civ. P. 30 .......................................................................................................... *passim*

Defendants The Kraft Heinz Company ("KHC"), 3G Capital, Inc. ("3G"), Paulo Basilio, Alexandre Behring, Bernardo Hees, David Knopf, Rafael Oliveira, and George Zoghbi (collectively, "Defendants") respectfully submit this memorandum of law in opposition to the motion for class certification (the "Motion") filed by lead plaintiffs Sjunde AP-Fonden ("AP7") and Union Asset Management Holding AG ("Union"), together with additional named plaintiff Booker Enterprises Pty Ltd. ("Booker," and together with AP7 and Union, "Plaintiffs").

## PRELIMINARY STATEMENT

Plaintiffs fail to meet their burden to certify a class in this securities class action. It is Plaintiffs' burden, under *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 35 (2013), to offer a theory of loss that aligns with a theory of liability—concretely, that means they must identify a damages methodology that allows damages to be calculated on a class-wide basis if Plaintiffs prevail on their theory of liability. But Plaintiffs even at this late date have not settled on a theory of liability. Instead, they offer a vague, opportunistic, kitchen-sink approach. Plaintiffs identify three dates with stock price declines, on which KHC made disclosures to the market about a host of unrelated topics. Plaintiffs then work backwards over a four-year period to identify more than 100 alleged misstatements about all aspects of KHC's diverse business that the later disclosures supposedly corrected. The alleged misstatements feature topics as disparate as relationships with retailers, marketing investments, factory footprint, layoffs, and more—many of them made years before the supposed corrections, and many on their face unrelated to those "corrections."

The complexities inherent in Plaintiffs' pleading necessarily make it challenging to advance a damages methodology tailored to their theory of liability. But Plaintiffs do not really even try. Instead, Plaintiffs seek to sustain their theory of stock drop damages through three pages of expert report that could have been—and admittedly were—copied from a report served in any securities class action and offers only platitudes and generalities about the application of "out of

pocket damages." Plaintiffs say to this Court, in essence, that in any securities class action, merely invoking the magic words "out of pocket damages" is sufficient to sustain a class, no matter the diversity of the alleged misstatements, the mismatch with the alleged disclosures, the duration of the class period, or the theory of liability. That cannot be, and indeed is not, the law.

Plaintiffs admit that they have three possible theories of liability. But they make no showing of how *any* theory of liability connects to a theory of damages.

*First*, Plaintiffs' theory of liability must be predicated, at least in part, on a claim that there was artificial price inflation in KHC common stock on the first day of the class period, and that alleged misstatements maintained that inflation until the alleged corrective disclosures. But Plaintiffs make no showing of how the so-called "inflation maintenance theory" could apply here. Indeed, the complexity and breadth of their allegations render any damages calculation uniquely challenging. Plaintiffs have not shown an ability to parse the individual statements (often several on one day, on different topics) and their effect on the stock price, nor have they shown they can account for the multiple pieces of information revealed on each of the dates of the alleged corrective disclosures. In addition, Plaintiffs and their expert have not done *any* work to match the alleged misstatements to the disclosures to show that the disclosures actually corrected the misstatements. Supreme Court precedent from just this past Term makes plain that a mismatch between misstatements and disclosures undermines any inference that the stock drop is attributable to the "correction." Given the numbers and topics of alleged misstatements and disclosures, not just one but many mismatches exist here, and Plaintiffs have not shown they can address them.

*Second*, to the extent Plaintiffs proceed in whole or in part under the theory that misstatements introduced artificial inflation into KHC stock, they will have to show that the stock price experienced a statistically significant increase at the time of the alleged misstatements. But

Plaintiffs cannot do so. For the vast majority of the dates of the alleged misstatements, there is no statistically significant price increase. And for the few dates on which there is such an increase, it cannot be attributed to the alleged misstatement, because the information included was previously disclosed and therefore stale. Plaintiffs cannot both contend that the market for KHC stock is efficient, and fail to account for their own allegations, which show that on days where there is statistically significant stock price movement, no new information was introduced into the market.

*Third*, to the extent Plaintiffs' theory of liability depends on a materialization of a concealed risk, Plaintiffs and their expert have not shown that they will be able to determine the level (or even existence) of the risk throughout the class period or account for its change over time. For instance, one of the key alleged undisclosed risks is the impairment risk that materialized when the company announced a write-down of goodwill and brand values in February 2019. Surely such a risk was not constant over the four-year class period, and Plaintiffs offer no methodology for quantifying how that supposedly undisclosed risk affected the stock price at any given time— a proposition that Plaintiffs' own expert has recognized elsewhere is necessary to have an appropriate damages methodology in a class action like this one.

What is more, for any theory of liability, Plaintiffs would have to account for the effect of confounding information—an issue that is exacerbated by the number of alleged misstatements, the number of alleged corrective disclosures that included multiple pieces of information, and the apparent mismatch between the two categories. Saying that a methodology would have to do so, without more, does not pass muster.

In short, regardless of whatever theory of liability Plaintiffs may settle on, they have pleaded an extraordinarily complex and incoherent claim, for which they have not shown that damages can be accurately calculated on a class-wide basis. Class certification should be denied

on that basis alone. And even if the Court were to certify Plaintiffs' proposed class as to their Section 10(b) claim, the proposed class is wildly overinclusive for Plaintiffs' Section 20A claim. Having failed to move to certify a subclass as to that claim, any such claim arising under Section 20A must proceed on an individual basis only.

Separately, Plaintiffs have failed to identify representatives who are adequate or typical of the class as is required under Rule 23, as each of Union, AP7, and Booker is subject to unique defenses that will distract from class-wide issues. In particular:

*First*, Union is a highly sophisticated German investment manager that produced documents concerning 22 of its funds that engaged in roughly 100 purchases and sales of KHC stock during the class period. Those trades raise serious questions concerning Union's reliance on the alleged misstatements and will require substantial additional discovery and attention. For example, more than half of the 22 funds engaged in "in-and-out" transactions and sold off their KHC stock before the first alleged corrective disclosure, others bought additional KHC stock after the first two alleged corrective disclosures, and all 22 funds sold off all KHC stock months before Plaintiffs allege that the "truth" was finally revealed in August 2019. Union's Rule 30(b)(6) designees were unable to explain any of this trading, which was done by numerous portfolio managers on the basis of undisclosed, proprietary research. Discovery has revealed that other Union-managed funds may have also bought or sold KHC stock or options during the class period, but Union and lead counsel have improperly shielded those funds from discovery.

*Second*, AP7 is a Swedish pension fund that outsourced all of its trading in KHC stock to three foreign investment managers. Despite AP7's contractual rights to audit their investment managers' books and records, AP7 refused to facilitate discovery of their investment managers. Instead, AP7 directed Defendants to pursue discovery through the Hague Evidence Convention,

which is no substitute for typical class certification discovery.  And, while Plaintiffs had represented that AP7's trades in KHC were done solely to mimic various indexes, discovery has revealed that is not the full picture, and the investment managers set up bespoke indices in which they bought or sold KHC stock on AP7's behalf.

*Third*, Booker is an individual investor with a relatively small financial stake in the outcome of this litigation and no prior experience whatsoever with the American legal system or class action lawsuits.  Booker purchased KHC call options during a three-month window, and nearly half of those purchases occurred immediately following the first alleged corrective disclosure.  While Booker did not memorialize any of its trading decisions and could not explain a single one of its purchases, the timing of its purchases also raises serious questions.

In addition, discovery has revealed that Union and AP7 have not communicated in over three years, and neither has ever communicated with Booker.  There is no evidence whatsoever that Plaintiffs are collectively supervising lead counsel, frustrating the aim of the PSLRA to have investor-driven, rather than lawyer-driven, class actions.

For all of these reasons, Plaintiffs' motion for class certification should be denied.

## BACKGROUND[1]

Plaintiffs assert securities fraud claims under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 on behalf of a putative class of persons and entities who acquired KHC common stock and options during a 45-month period between November 5, 2015 to

---

[1]     Citations to "¶ __" refer to paragraphs in the Consolidated Amended Class Action Complaint (ECF No. 274) (the "Complaint").  Citations to "Pls. Br. __" refer to pages of the Memorandum of Law in Support of Plaintiffs' Motion for Class Certification (ECF No. 346-1) (the "Motion").  Citations to "Ex. __" refer to exhibits to the Declaration of Andrew J. Ehrlich in support of Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification.  Citations to exhibits without pagination refer to the pdf page number inclusive of the exhibit slip sheet.  Unless otherwise noted, all emphasis is added and all internal citations and quotation marks are omitted.

August 7, 2019.  Plaintiffs' allegations stem from the 2015 merger of Kraft and Heinz and the associated cost-savings strategy Defendants implemented in the years that followed.

Plaintiffs' overarching theory is that, almost immediately following the merger, KHC purportedly knew its cost savings strategy would fail and thus had to "implement[] extreme and indiscriminate cost-cutting measures" to achieve promised savings.  ¶ 2.  Plaintiffs allege that Defendants made more than 100 misstatements on 22 separate dates that span more than four years.  ¶¶ 339–544.  The alleged misstatements cover a broad range of topics, including, but not limited to, KHC's cost savings strategy, realized cost savings, supply chain issues, investment in brands, goodwill and intangible asset impairment accounting, case fill rates, the Canada retail division, promotional budgets, optimism about KHC's financial outlook, generic statements regarding innovation, efficiency, and investment in brands, financial statements filed with the SEC, and internal controls disclosures.  Examples of the alleged misstatements that illustrate their breadth include:

- **November 5, 2015**:  KHC stated it had "already made significant progress" in "maintaining best-in-class margins through zero-based budgeting and making our manufacturing distribution footprint more efficient." ¶ 342.

- **November 6, 2015**:  "Additionally, we test indefinite-lived intangible assets for impairment at least annually in the second quarter or when a triggering event occurs . . . No events occurred during the [reported period] that indicated it was more likely than not that our indefinite-lived intangible assets were impaired." ¶ 503.

- **May 5, 2016**:  KHC "reported $55.8 billion in intangible assets and $43.5 billion in goodwill" and disclosed that KHC performed its "annual impairment testing in the second quarter of [the reported year]" and "[t]here were no accumulated impairment losses to goodwill as of [the end of the reported period]." ¶¶ 506-07.

- **November 3, 2016**:  "The final piece of my update is our integration program where we are well underway and, more importantly, on plan.  During Q3, we maintained 98% case per rate despite some service issues that continued to negatively impact cold cuts and Lunchables and held back our sales in those two parts of the business.  That being said, we are improving those service issues in Q4." ¶ 360.

- **May 3, 2017**: "As Bernardo mentioned, Canada's Q1 results versus the prior year were significantly impacted by later-than-usual go-to-market agreements with key retailers . . . [We] have already been seeing a restoration of normal go-to-market activity in Canada, including our innovation and marketing agendas in light of having completed all agreements with key retailers." ¶ 400.

- **August 3, 2017**: "We remain on track with our cost savings initiatives. Our total savings so far in 2017 have been stronger than expected. Cumulative savings from our integration program were approximately $1.45 billion at the end of the second quarter[.]" ¶ 386.

- **February 16, 2018**: "We could have foregone the $250 million to $300 million of investment and grown at a faster clip this year. But as Bernardo said, we decisively chose to make these investments." ¶ 452.

Despite earlier announcements in 2017 that KHC would have to make significant additional investments in its supply chain and multiple quarters of earnings misses in 2017 and the first half of 2018, ¶¶ 168, 187, 191, Plaintiffs allege that KHC made corrective disclosures that revealed the "truth" to the market on three occasions beginning in the fourth quarter of 2018 and ending in the third quarter of 2019. ¶ 546. Plaintiffs allege that the price of KHC's stock declined following each of these alleged corrective disclosures:

- **November 1, 2018**: Plaintiffs allege that after market close, KHC announced "dismal third quarter 2018 financial results" and "disclosed that the Company's shrinking margins and declining profitability were driven by its inability to achieve targeted cost cuts and ramped up investment that had been necessary to support its brands." ¶ 231. Plaintiffs claim that Defendants' statements on this date, such as "Cost is one area we are falling short this year" attributable to KHC's "desire to invest and protect customer service as we ramp up volumes as well as related decisions to delay some savings projects to avoid operational disruption" and that KHC "stepped up [its] investment levels in the second half of the year," partially revealed the "truth" to the market. ¶¶ 232–33.

- **February 21, 2019**: Plaintiffs allege that after the market's close, KHC disclosed a $15.4 billion impairment charge to "to lower the carrying amount of goodwill in certain reporting units (primarily U.S. Refrigerated and Canada Retail units) and the value of certain intangible assets, primarily the Kraft and Oscar Mayer trademarks," and an investigation into its accounting practices by the SEC. ¶¶ 242–47.

- **August 8, 2019**: Plaintiffs allege that KHC announced preliminary results for the first half of 2019, including additional significant sales and earnings misses, and an additional $1.2 billion goodwill impairment. ¶¶ 267–73. On this day, Miguel Patricio, KHC's new CEO, made statements that, according to Plaintiffs, related to KHC's "culpability and hidden

7

practices that led directly to its negative results." ¶ 33.  For example, Patricio stated that he "shared many of the concerns" that others had expressed concerning "brand support, supply chain execution, the sustainability of our profits," and that KHC's "supply chain losses have been increasing actually double digits in the last years." ¶ 268.

Plaintiffs claim that when the alleged misrepresentations and misstatements were corrected or the risk concealed by them materialized, investors suffered losses as the price of KHC common stock declined. ¶ 546.

## ARGUMENT

### I. Plaintiffs' Damages Theory Fails to Measure Losses Attributable to Their Theory of Liability

To certify the proposed class, Plaintiffs must show that common questions predominate over individual questions. *See Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33 (2013).  To do so, the Seventh Circuit requires that Plaintiffs' "theory of loss" match the "theory of liability." *In re IKO Roofing Shingle Prod. Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014).  Such a match ensures that a proposed damages model "measure[s] only those damages attributable to [Plaintiffs'] theory," and does not "identif[y] damages that are not the result of the wrong." *Comcast*, 569 U.S. at 35, 37.  Without that match, "the class could not get anywhere." *IKO Roofing*, 757 F.3d at 602.  Courts thus "must conduct a rigorous analysis" to determine whether the Plaintiffs' theory of loss aligns with their theory of liability, *Comcast*, 596 U.S. at 35, and "if not, whether individual damage determinations will overwhelm the common questions on liability and impact." *Kleen Prod. LLC* v. *Int'l Paper Co.*, 831 F.3d 919, 929 (7th Cir. 2016).

Applying *Comcast*, this Court has previously denied class certification based in part on the difficulty of "pinning down exactly what Plaintiffs' . . . theory of liability is" and the related failure to provide a damages model connected to that theory. *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, 2017 WL 1196990, at *54, 56–58 (N.D. Ill. Mar. 31, 2017)

8

(Dow, J.).[2] The same result is required here. Because Plaintiffs do "not even attempt" to connect the measure of damages attributable to any of their possible theories of liability, they "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S at 35.

In support of the Motion, Plaintiffs submitted the expert report of Dr. David Tabak, who opined that damages "can be calculated on a class-wide basis based on a common methodology." Tabak Rpt. ¶ 3.[3] Without actually completing any calculations, Dr. Tabak opines that he would determine "out-of-pocket" damages based on "the amount of artificial inflation in a security at the time of their purchase less the inflation in that security when sold," and adjusted "if the amount of inflation declines for reasons other than a corrective disclosure." Tabak Rpt. ¶¶ 74, 75. Dr. Tabak expresses confidence in his ability to remove "unrelated, confounding information" and to "disaggregat[e] the effects of different components of earnings announcements," aided by "[d]iscovery regarding the Company's views" of certain subjects related to the alleged misstatements. Tabak Rpt. ¶ 77 & n.56. In speaking in such generalities, Dr. Tabak admitted that ███████████████████████████████████████████████████ Ex. A at 94:9–25. He merely provides a general description of tools that could purportedly be used to address particular issues that might complicate the quantification of artificial inflation. Although Plaintiffs' damages "[c]alculations need not be exact" at class certification, *Comcast*, 569 U.S. at 35, Dr. Tabak's minimal efforts are insufficient here.

---

[2] Other courts have similarly denied class certification in securities fraud class actions based on a plaintiff's failure to comply with *Comcast*'s demands. *See, e.g.*, *Ludlow* v. *BP, P.L.C.*, 800 F.3d 674, 690–91 (5th Cir. 2015); *Ohio Pub. Emps. Ret. Sys.* v. *Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19–20 (N.D. Ohio Aug. 14, 2018); *Sicav* v. *Wang*, 2015 WL 268855, at *6-7 (S.D.N.Y. July 21, 2015).

[3] Citations to "Tabak Rpt. ¶ __" refer to paragraphs in the Expert Report of David I. Tabak, Ph.D. (ECF No. 346-3).

## A. Plaintiffs Fail to Specify Their Theory of Liability and Do Not Provide a Theory of Damages That Matches

As an initial matter, Dr. Tabak does not specify the theory of liability that he assumes in his damages methodology. He claims that his methodology will measure artificial inflation but, as he has recognized, ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Ex. A at 52:20–53:12. And while he has opined ████████████████████████████, *id.* at 59:22–62:22, he has not opined as to which theory is relevant to which statements, how he would make that assessment, and how that would affect his damages methodology.

Nor do the Complaint or Motion provide clarity on the appropriate theory here. Rather, Plaintiffs point to three alleged corrective disclosures and more than 100 alleged misrepresentations, without ever connecting particular misstatements to particular disclosures or to particular theories of liability. *See, e.g.*, ¶ 546. Regardless of the theory, however, Dr. Tabak has failed to show that his model will accurately measure damages attributable only to that theory.

### 1. Inflation Introduction

If Plaintiffs' theory of liability is that KHC made affirmative misstatements that introduced inflation into its stock price, Dr. Tabak would have to show that KHC's stock price experienced a statistically significant increase when the alleged misstatements were made. Ex. B ¶ 33. Out of the 22 dates with alleged false and misleading statements, however, only six have statistically significant increases unexplained by market or industry factors. *Id.* ¶ 45. And for all six of those dates, the alleged misstatements were stale: they disclosed information that had previously been published, and all on dates when KHC stock did *not* have a statistically significant positive stock price change. *Id.* ¶¶ 46–69.

For example, on February 25, 2016, KHC's stock showed a positive, statistically significant reaction. *Id.* ¶ 45. On that date, Plaintiffs allege that during an earnings call, KHC "*continued* to assure investors" that the company was "investing strongly in brand support and infrastructure," and that the company was "pushing this agenda of innovation, of go-to-market capabilities . . ., and higher marketing dollars in a much faster pace." ¶ 365. As Plaintiffs' own language implicitly recognizes, those statements are not novel revelations. In fact, KHC had discussed its "innovation," "investments," and "go-to-market capabilities," as well as its dedication to "investing" and "growth" in an earnings call months earlier. Ex. B ¶ 48. Following that earlier call, however, KHC's stock price "did not elicit a positive and significant reaction." *Id.* Because that information had been previously disclosed without an increase, Dr. Tabak cannot attribute the later price increase to the repeated disclosure of the information. Ex. A at 90:9–12 (acknowledging that ███████████████████████████████████████████████ ███████████████████████). The same conclusion applies to the remaining five dates with a statistically significant increase. Ex. B ¶¶ 50–69. Thus, Dr. Tabak fails to show that he can measure damages under this theory of liability.

### 2. Inflation Maintenance

Under a theory of inflation maintenance, "misrepresentation causes a stock price to remain inflated by preventing preexisting inflation from dissipating from the stock price." *Goldman Sachs Grp., Inc.* v. *Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1959 (2021). Although the Supreme Court recently expressly noted it has not endorsed that theory, *see id.* at 1959 n.1, the Seventh Circuit has accepted it, *see In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 612 (7th Cir. 2020).[4] But Dr.

---

[4] This Circuit's existing inflation-maintenance theory is flawed in multiple respects that warrant further review by the *en banc* Seventh Circuit or the Supreme Court. The inflation-maintenance theory should at least be limited to specific misstatements about a discrete, financial, operational, or performance metric that are directly contradicted by a later corrective disclosure. Without such a rule, and as the grab-

Tabak has failed to show that he will be able to account the number of alleged misstatements, the breadth of the alleged corrective disclosures, and the mismatch between the two, and measure only damages resulting from inflation maintenance.

In pointing to a large number of alleged misstatements discussing a broad variety of different topics, Plaintiffs necessarily complicate their damages analysis. A jury may, for example, find that certain categories of alleged misrepresentations are not false or misleading and therefore should not be included in the damages calculus. But because Dr. Tabak focuses his analysis only on the residual declines on the corrective disclosure dates, he has not suggested any method of apportioning the declines among the alleged misstatements. Tabak Rpt. ¶¶ 75, 76. Indeed, Dr. Tabak claimed that under the inflation-maintenance theory, ██████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████ Ex. A at 96:2–8. But that admission suggests that the damages calculation is completely untethered from the alleged misstatements and depends only on the stock drop. Dr. Tabak has not explained how a factfinder would determine whether or how conclusions as to the truth of any particular alleged misstatement should affect damages.

In addition, some of the alleged misrepresentations could not have been disclosed at the beginning of the class period. For example, Plaintiffs claim that one of the alleged corrective disclosures on February 21, 2019, was KHC's receipt of a subpoena from the SEC. ¶ 246. But KHC received that subpoena in October 2018. ¶ 23. Dr. Tabak does not explain how he would determine when receipt of that subpoena should have been disclosed or the effect of that determination on damages. Ex. B ¶ 74.

---

bag pleading here demonstrates with particular force, the inflation-maintenance theory essentially converts securities litigation into a mechanism for recovering for *any* corporate failings, regardless of whether the failing is connected to an actual misrepresentation.

The damages analysis is further complicated by the fact that each of the alleged corrective disclosures included multiple alleged corrections. *Id.* ¶ 72. A factfinder could not simply omit the stock drop from a certain date upon a determination that one category of alleged misrepresentations was not, in fact, false or that a certain disclosure was made in a timely manner. For example, the disclosure on February 21, 2019, dealt with realized cost savings, cost savings strategy, brand investment, goodwill impairment, and SEC filings and internal controls. ¶¶ 242–254. A factfinder could easily determine that the statements related to goodwill impairment in prior statements were not misstatements, that the February 21, 2019, impairment was taken at the appropriate time, and that it was in no way "corrective" of earlier statements. Yet Dr. Tabak has not suggested how he would remove the effects of that impairment from the stock drop when calculating damages from the remaining alleged misstatements.

The goodwill impairment in particular presents another, more fundamental problem: there is a mismatch between the contents of the alleged misstatements connected to the goodwill impairment and the impairment itself as a purported corrective disclosure. That mismatch matters because, as the Supreme Court has recently explained, the inference that underlies Plaintiffs' damages calculations—that "the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman*, 141 S. Ct. at 1961. The Court noted that such a mismatch can occur "when the earlier misrepresentation is generic" whereas "the later corrective disclosure is specific." *Id*. Although the Court's opinion was framed in terms of price impact, the same logic applies here and undermines Plaintiffs' ability to calculate damages.

Take, for example, the alleged misstatements throughout the class period that KHC had "followed a detailed and rigorous process" for impairment testing and that "[n]o events occurred

13

during the reporting period that indicated it was more likely than not that either its goodwill or intangible assets were impaired." ¶ 493. Plaintiffs contend that those were misstatements because, in truth, KHC's impairment testing was afflicted by material weaknesses. ¶¶ 494–96. But those "material weaknesses" were not revealed in any of the three alleged "corrective disclosures." Rather, as Plaintiffs concede, KHC admitted to weaknesses in its impairment testing in June 2019. ¶ 496. Plaintiffs have not cited that statement as a corrective disclosure because there was no accompanying stock drop. ¶ 546. Nor can Plaintiffs tie the June 2019 disclosure to the goodwill impairments in February or August 2019. Plaintiffs claim that the events are connected because the weaknesses in its impairment testing must mean that KHC should have taken an impairment earlier. ¶¶ 498, 501. But in fact, as explained in detail by Lawrence W. Smith, CPA, under the relevant accounting standards, none of the alleged corrective disclosures mean that KHC's goodwill and intangible assets were materially misstated in any periods within the class period. Ex. C ¶¶ 63–73. Rather, accounting principles recognize a significant distinction between a change in the estimated value of assets resulting from new information and an error in previously issued financial statements. *Id.* ¶ 56–58. In reporting the impairment, KHC disclosed a change in estimate reflecting new information that *could not have been reported* in earlier periods—not an error in prior reports. *Id.* at ¶ 59.[5] KHC expressly stated that the "material weakness did not result in any misstatement of any previously issued financial statements." *Id.* ¶ 59 n.101. And KHC consistently disclosed the risk of future impairment throughout the class period. *Id.* at ¶¶ 65–69.

---

[5] In fact, an internal investigation conducted by KHC's independent directors, with the assistance of outside counsel and forensic accountants, found that the impairments were timely recorded under GAAP. Ex. C ¶ 50. Notably, KHC' auditors did not require it to restate its goodwill or indefinite-lived intangible asset values in earlier quarters, undermining Plaintiffs' claims that the disclosed weaknesses in impairment testing affected the date that the impairment was taken. *Id.* at 45.

14

There is thus a significant mismatch between the alleged misstatement—generic representations about KHC's goodwill, intangible assets, and impairment testing in earlier reporting periods—and the corrective disclosure—a specific disclosure of an impairment during a later reporting period. That mismatch undermines any claim that the disclosure "actually corrected" the alleged misrepresentation, and provides "less reason to infer front-end price inflation . . . from the back-end price drop." *Goldman*, 141 S. Ct. at 1961. In other words, the mismatch suggests that the market's reaction to the alleged corrective disclosures is not a reasonable approximation of the market's hypothetical reaction to an earlier truthful disclosure, which is a necessary condition to calculate inflation using the price decline following the alleged corrective disclosure. The mismatch must therefore be taken into account in calculating damages. Yet, Dr. Tabak



Ex. A at 131:5–14.

*Id.* at 132:3–14.

### 3. Materialization of a Concealed Risk

Finally, if Plaintiffs' theory depends on materialization of a concealed risk, Dr. Tabak's methodology does not offer analysis to support it. This theory would apply to claims that KHC, by making statements as to the sustainability of cost savings, had lulled the market into believing that the risks of a failed merger were lower than they actually were. But rather than using the entire residual decline to estimate inflation, measuring damages under this theory requires: (1) quantifying by how much the probability of an impairment would have changed in the but-for world in which KHC took account of the allegedly unsustainable cost savings; and (2) estimating by how much the increased probability would have affected KHC's stock price on dates prior to

15

the disclosures. In addition, prior to the start of the class period, investors knew that 3G's cost-cutting strategy posed risks. Indeed, a report published at the time of the merger acknowledged that "few, if any, will be able to forecast" the way the merger would affect the company. Ex. B ¶ 77 n.128. Yet while Dr. Tabak acknowledges ██████████████████████

████████████████████████████████████████████

████ Ex. A at 60:17–24, ████████████████████████

████████████████████████████████████████████

████████████████ *id.* at 120:13–25.[6]

## B. Plaintiffs Fail to Show They Can Account for Confounding Information under Any Theory of Liability

Regardless of the theory under which Plaintiffs proceed, Dr. Tabak admits that he will need to parse the effect of the disclosures from confounding information, Tabak Rpt. ¶ 77—the "same-day disclosure[] of information other than what was alleged" to have revealed the fraud that may also have negatively impacted the share price. *See, e.g.*, *Ross* v. *Abercrombie & Fitch Co.*, 257 F.R.D. 435, 454 (S.D. Ohio 2009). Courts regularly exclude experts for failing to evaluate confounding factors. *See, e.g.*, *In re Williams Sec. Litig.*, 558 F.3d 1130, 1137 (10th Cir. 2009) (excluding expert who did not "separate fraud-related from nonfraud-related losses" and "assumed any and all losses were of the former variety"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.,* 299 F. Supp. 3d 430, 486–87 (S.D.N.Y. 2018) (excluding expert at class certification in commodity manipulation case for "offer[ing] no means of controlling for . . . confounding variables"). Dr. Tabak claims to need "[d]iscovery regarding the Company's views" of synergies

---

[6] What is more, Dr. Tabak has previously criticized plaintiffs' experts in other matters for failing to "indicate[] whether the price drop . . . would be adjusted downward to account" for the fact that previously only the risks could have been have disclosed. Ex. D at ¶ 31. Yet Dr. Tabak has not done so here, despite the additional complexities inherent in accounting for changes in risk over time with such a lengthy class period and so many alleged misstatements.

and cost-cutting measures. Tabak Rpt. ¶ 77 & n.56. But he does not explain what discovery would be necessary or how that information could inform the disaggregation analysis.

Indeed, the facts of this case present clear confounding information that would have to be sorted out to use any of the price declines on the dates of the corrective disclosures as a basis for determining damages. On November 1, 2018, for example, KHC reported a disproportionate impact from commercial investments and unanticipated one-off supply chain costs from the Middle East that KHC moved to Europe. Ex. B ¶ 82. On February 21, 2019, KHC reported a 36% reduction in annual dividends, divestitures, and variable compensation on 2019 guidance. *Id.* ¶ 83. And on August 8, 2019, KHC reported higher input costs due to the African Swine Flu, and worse-than-expected Adjusted EBITA, which included a negative impact from currency. *Id.* ¶ 84. But while claiming that he "will account for that," Ex. A at 100:8–9, Dr. Tabak has not described how his methodology would do so.

To be sure, this Court has previously certified a securities class action in which a plaintiffs' expert proposed using an "out-of-pocket" measure of damages and rejected defendants' claim that the analysis did not account for confounding information or variable inflation. *See Pub. Emps. Ret. Sys. of Miss.* v. *TreeHouse Foods, Inc.*, 2020 WL 919249, at *9 (N.D. Ill. Feb. 26, 2020) (Dow, J.). But that case dealt with a relatively short class period (less than 10 months), a single corrective disclosure, and approximately three dozen fairly homogenous alleged misstatements. Consistent with those features of the complaint and the simpler accompanying theory of liability, defendants disputed only the ability to account for confounding news or variable inflation. *Id.* at *8–9. Here, by contrast, while Dr. Tabak's proposed methodology suffers from those flaws, the more fundamental problem here stems from the vastly more complex Complaint, with its multiplicity of alleged misstatements and disclosures, lack of apparent connection between many

17

of them, and vagueness of liability theory. In these circumstances, Dr. Tabak's minimal analysis cannot withstand the "rigorous analysis" that *Comcast* requires. *See* 569 U.S. at 35.

* * * * *

In sum, Dr. Tabak has failed to present a viable methodology that measures damages for any of Plaintiffs' theories of liability. His repeated refrain that out-of-pocket damages based on the back-end stock drop will be able to account for any and all of those factors rings hollow, given the complex and unwieldy nature of the alleged misstatements and the complete dearth of analysis in his report. And because each of these flaws identified infect both the Section 10(b) claims relevant to stock and options, as well as the Section 20A claims, Plaintiffs have not proposed a suitable damages methodology for any of Plaintiffs' claims. Class certification should be denied.

## II. Union's Section 20A Claim Must Be Litigated Individually

Plaintiffs' proposed class should not be certified for the reasons set forth above, but even if it were certified for purposes of Plaintiffs' Section 10(b) claim, it cannot be used to litigate Union's Section 20A claim on a class-wide basis.

It is black letter law that a class cannot be certified if it "would sweep in countless people who would never have standing." *In re Fluidmaster*, 2017 WL 1196990, at *46; *Lacy* v. *Cook Cnty., Illinois*, 897 F.3d 847, 864 (7th Cir. 2018) ("[A] class should not be certified if 'it sweeps within it persons who could not have been injured by the defendant's conduct.'"). Standing to assert a Section 20A claim is limited to plaintiffs who traded "contemporaneously" with the alleged insider. 15 U.S.C. § 78t-1(a); *Wilson* v. *Comtech Telecomms. Corp.*, 648 F.2d 88, 95 (2d Cir. 1981). "Generally, the contemporaneity requirement is not met if a plaintiff's trades occurred more than a few days apart from a defendant's transactions." *Feldman* v. *Motorola*, 1993 WL 497228, at *13 (N.D. Ill. Oct. 14, 1993). Further, the plaintiff bears the "burden of proposing and constructing subclasses that will make the disposition of any individual damages 'fair and

18

efficient' under Rule 23(b)(3)." *Rahim* v. *Sheahan*, 2001 WL 1263493, *14 n.5 (N.D. Ill. Oct. 19, 2001) (citing *U.S. Parole Comm'n* v. *Geraghty*, 445 U.S. 388, 407–08 (1980)). And even if "refinement of Plaintiffs' opaque liability theories and indefinite class contours [could] ultimately show that a class *is* in here somewhere," the Court may only decide whether "on the present motion, Plaintiffs have failed to meet their burden to show that *these* proposed classes satisfy every requirement of Rule 23." *In re Fluidmaster*, 2017 WL 1196990, at *65.

Plaintiffs' proposed class of nearly four years is wildly overinclusive for a Section 20A claim, as the vast majority of putative class members did not trade "contemporaneously" with 3G on August 7, 2018. Given that Plaintiffs have never suggested a Section 20A subclass, there is certainly no basis for this Court to define such a subclass and determine whether it would satisfy the requirements of Rule 23. *See id.*[7]

In any event, Union's Section 20A claim would not be capable of proceeding on a class-wide basis for many of the same reasons Plaintiffs' Section 10(b) claim cannot proceed on a class-wide basis. As explained in detail by Dr. Ferrell, Dr. Tabak would face a variety of obstacles in attempting to calculate Section 20A damages on a class-wide basis. Most importantly, having devoted just two cursory paragraphs to Section 20A in his report, Dr. Tabak has not set forth a reliable methodology for calculating Section 20A damages on a class-wide basis, nor did he explain how he would identify the amount of artificial inflation that was present in KHC's stock price on the date of 3G's sale. Ex. B ¶ 87.

---

[7] Indeed, courts have held that Section 20A plaintiffs "must prove additional, distinct legal elements, beyond those which the Section 10(b) plaintiffs must prove." *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 54 (S.D.N.Y. 2012). In failing to move to certify a Section 20A subclass, Plaintiffs have not even attempted to assert "a common injury that is 'capable of classwide resolution'" as to the Section 20A claim. *Lacy*, 897 F.3d at 865.

Dr. Tabak suggests that he can sidestep those problems by avoiding an inflation inquiry altogether. He appears to suggest that he can measure Section 20A damages by calculating the difference in KHC's stock price between the date on which 3G sold, and the date on which 3G was "legally permitted to sell," and then multiplying that difference by the number of shares 3G sold. Tabak Rpt. ¶ 79. Dr. Tabak is wrong as a matter of law, because the securities laws "limit victims to 'actual damage', which courts routinely understand to mean 'out of pocket loss'." *Astor Chauffeured Limousine Co.* v. *Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1551 (7th Cir. 1990). Nothing about Section 20A changes that rule. It follows that any Section 20A plaintiffs here would be required to calculate the "actual value" of KHC's stock on the date they traded "contemporaneously" with 3G, which in turn would require calculating the amount of inflation present in KHC's stock price on the date of 3G's sale. *See, e.g.*, *DCD Programs, Ltd.* v. *Leighton*, 90 F.3d 1442, 1447 (9th Cir. 1996) ("[U]nder the out-of-pocket standard a defrauded purchaser is entitled to recover the difference between the price he or she paid for a security and the actual value of that security at the time of the purchase."). Just as Dr. Tabak has no reliable methodology for performing that inflation analysis throughout the Class Period, he has no reliable methodology for pinpointing the amount of inflation in KHC's stock on the precise date of 3G's sale. Ex. B ¶ 87. That defect independently precludes certification of any class with respect to Union's Section 20A claim, which must proceed on an individual basis only.

III. **Plaintiffs Are Not Adequate or Typical Class Representatives**

Rule 23(a) requires that a class representative's claims or defenses be "typical" of those of the class and that the representative "adequately" protect the class's interests. Fed. R. Civ. P. 23(a)(3)–(4). "The claims of a proposed class representative are considered atypical if the representative is subject to a unique defense that is reasonably likely to be a major focus of the litigation," *Carbajal* v. *Capital One*, 219 F.R.D. 437, 440 (N.D. Ill. 2004), and the Seventh Circuit

20

has made clear that "the presence of even an *arguable defense* peculiar to the named plaintiff" can "bring into question the adequacy of the named plaintiff's representation," *J.H. Cohn & Co.* v. *Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980).

For the reasons described below, each of Union, AP7, and Booker is atypical and inadequate, and they have collectively failed to supervise the litigation.

### A. Union Is Not Adequate or Typical

Courts have refused to certify a class where the proposed class representative's trading would subject it "to unique inquiries regarding their trading patterns and why they made investment decisions" and "whether the fraud was in fact irrelevant to their purchasing and sale decisions." *George* v. *China Auto Sys., Inc.*, 2013 WL 3357170, at *7 (S.D.N.Y. July 3, 2013); *Rocco* v. *Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (denying class certification where plaintiff's trading indicated it "was relying not on the market, but on his own assessment of the value of the stock"). The Seventh Circuit has explained that "[t]he fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer." *J.H. Cohn*, 628 F.2d at 999. Discovery has shown that Union engaged in a substantial volume of unexplained trading in KHC stock that raises precisely these questions, will require substantial additional discovery and attention, will predominate the evidentiary presentation at any trial regarding Union's claims, and will undoubtedly distract significantly from class-wide issues.

Union is a highly sophisticated investment manager that seeks to outperform the market through proprietary research and confidential trading strategies. Its website advertises its investment philosophy as "***based on our belief that markets are inefficient***," and that long-term outperformance of the market is "best achieved through a combination of fundamental research, actively managed security selection and robust risk management." Ex. E at 2. Union's document

21

production and Rule 30(b)(6) witnesses further described

Ex. F at 162:5–16; 163:5–165:4; 168:15–169:10; *see also* Ex. G at 1–2; Ex. H at 3–6. Ex. I at 64:20–69:2—

*Id*. at 63:19–68:15.

Ex. G at 1–2.

Ex. F at 114:10–117:21.

Ex. I at 63:19–64:18.

There are 22 Union funds participating in this case.[8] *See* Ex. J. They made approximately 100 buys and sells of KHC stock between July 2015 and May 2019, and traded in aggregate well over one million shares. *See id.* Those 22 funds each had separate portfolio managers and pursued a variety of idiosyncratic trading strategies which Union's Rule 30(b)(6) witness was overwhelmingly unable to explain, and which render Union's claims atypical of the class.

---

[8] As noted below, these 22 Union-managed funds may not be the only Union-managed funds that traded KHC stock or options during the class period. Other Union-managed funds have been excluded from this litigation, and have not produced their trade data despite repeated requests. The decision to exclude certain funds from this litigation (and from discovery) was made entirely by counsel, for reasons Union's Rule 30(b)(6) designee could not explain. Ex. I at 108:25–113:22.

*First*, the majority of the Union funds and portfolio managers involved in this case—in total, *14 of the 22 funds*—were entirely "in-and-out" traders that bought and sold all of their KHC shares before any alleged corrective disclosures were made.[9] *See id*. These types of trades give rise to unique defenses because the "in-and-out" nature of the trades reflects (i) that the shares are unharmed and (ii) "that the alleged misstatements or omissions were really not a factor in the purchasing decision but rather that other investment considerations drove the decision." *George*, 2013 WL 3357170, at *6. For example:

- The UniFavorit: Aktien fund sold 463,600 shares—its entire position—of KHC stock on January 22, 2018, nearly 10 months before the first alleged corrective disclosure. Ex. J at 2.

- The GenoAS: 1 fund purchased 12,200 shares on March 2, 2018, and sold those same shares two months later, on May 25, 2018, nearly six months before the first alleged corrective disclosure. *Id*.

- The LIGA Multi Asset Income fund purchased a total of 3,420 shares on July 3, 2017, October 2, 2017, and November 24, 2017, and then sold all of those shares on February 26, 2018, nine months before the first alleged corrective disclosure. *Id*. at 3.

- The Union-Fonds Nr. 581 fund bought 9,700 shares of KHC stock on July 5, 2018, only to sell the same number of shares less than 30 days later, on July 24, 2018. It purchased 10,100 shares on September 13, 2018, only to sell the same number of shares on October 12, 2018. None of those dates correspond with the dates of the alleged misstatements. *Id*.

These trading strategies are representative of the majority of Union's portfolios, and strongly suggest that the alleged misstatements or omissions did not drive Union's purchasing decisions. *George*, 2013 WL 3357170, at *6. In *George*, the court denied class certification because "[a]s in-and-out traders, the named plaintiffs again subject themselves to unique inquiries regarding their trading patterns and why they made investment decisions [and] whether the fraud was in fact irrelevant to their purchasing and sale decisions." *Id.; In re UTStarcom, Inc. Sec. Litig.*, 2010 WL

---

[9] "In-and-out" traders are those "who bought and sold their shares before allegedly corrective information became public." *Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*, 256 F.R.D. 586, 596 (N.D. Ill. 2009).

1945737, at *11 (N.D. Cal. May 12, 2010) (excluding from the class in-and-out traders who "sold their stock before the first corrective disclosure"). The same is true of Union here.

*Second*, certain Union-managed funds bought KHC stock *after* the first and second corrective disclosures, raising further questions about Union's investment decisions and its reliance on alleged misstatements. *See* Ex. J. For example:

- The UIN-Fonds Nr. 682 fund bought 2,900 shares of KHC stock on February 22, 2019—the day following the second corrective disclosure—only to sell those same shares on May 2, 2019. *Id.* at 3.

- The UniValueFonds: Global fund purchased 15,700 shares on November 14, 2018 (less than one week after the first corrective disclosure), 29,600 shares on February 19, 2019 (two days *before* the second corrective disclosure), 35,500 shares on February 22, 2019 (the day *after* the second corrective disclosure), and 50,000 shares on February 28, 2019 (seven days *after* the second corrective disclosure). The fund then sold *all* of its KHC stock in two transactions on May 29, 2019 and May 31, 2019. The vast majority of the shares purchased by this fund were purchased *after* the second alleged corrective disclosure, and *all* of its shares were then sold before the third alleged corrective disclosure. *Id.* at 4.

Courts have held that post-disclosure purchases undermine a plaintiff's claim that allegedly false or misleading statements factored into its investing decisions. *See, e.g.*, *George*, 2013 WL 3357170, at *6 ("A named plaintiff who has engaged in a post-disclosure purchase is subject to the defense that the alleged misstatements or omissions were really not a factor in the purchasing decision but rather that other investment considerations drove the decision."); *Epstein* v. *Am. Rsrv. Corp.*, 1988 WL 40500, at *4 (N.D. Ill. Apr. 21, 1988) ("the fact that purchases of ARC securities were made . . . after the alleged fraudulent information had become known" is "commonly held to create a unique defense vitiating typicality"); *see also Rocco*, 245 F.R.D. at 136 (denying class certification because plaintiff's "numerous post-class purchases" indicated plaintiff "was relying not on the market, but on his own assessment of the value of the stock"). Union's traders will be called upon to explain the basis for these trading decisions, which, coupled with the other evidence

24

that Union made investment decisions on the basis of considerations *other than* the public stock price, will give rise to distractions unrelated to class-wide issues.[10]

*Third*, Union's trading is atypical because *all* 22 of Union's funds sold *all* of their KHC stock by May 2019, three months before the last alleged corrective disclosure on August 8, 2019. *See* Ex. J; Ex. I at 33:19–34:21. By that time, Union's funds held no shares, and therefore suffered no losses, and cannot claim to have been misled after the second corrective disclosure in February 2019. *See* Ex. J; Ex. I at 91:13–92:4. Union's claims thus diverge from the putative class, which alleges that the truth was not revealed in its entirety until August 2019. *E.g.*, ¶ 546. A proposed class representative that sold off its stock before the last corrective disclosure "has no incentive to fairly and adequately protect the interests of the class as to the later disclosures," and should not be approved as a class representative. *Constr. Workers Pension Trust Fund* v. *Navistar Int'l Corp.*, 2013 WL 3934243, at *5 (N.D. Ill. July 30, 2013); *see also Doshi* v. *General Cable*, 2017 WL 5178673, at *3 (E.D. Ky. Nov. 7, 2017) (noting that a plaintiff "cannot show it was injured by disclosures that occurred after it divested itself of all of [the company's] stock").

Not only did Union engage in a substantial volume of trading that gives rise to significant individual issues, but Union's Rule 30(b)(6) witness—designated to testify regarding Union's trading in KHC stock[11]—was almost entirely unable to explain the trading decisions at issue. Ex. I

---

[10]    In *TreeHouse*, this Court noted that "purchasing stock after a corrective disclosure does not, *on its own*, subject a Plaintiff to a unique defense." 2020 WL 919249, at *5. There, the plaintiff was a pension fund that outsourced its investment decisions to an investment manager who bought additional stock following the corrective disclosure. *Id.* This Court held that the post-disclosure purchase did not render the plaintiff atypical because there was no evidence that the plaintiff or its broker "employed a trading strategy independent of market price." *Id.* Here, by contrast, Union is a highly sophisticated investment manager who advertises its ability to outperform markets that it believes are inefficient, and deploys confidential, proprietary research to achieve outperformance in a manner that its 30(b)(6) designees could not explain, but that provide strong circumstantial evidence of reliance on factors other than market price.

[11]    Union designated its head of corporate law to testify on Union's behalf regarding (i) "[a]ny purchase, sale, or other transaction in Kraft Heinz Securities by or for the benefit of Union" (Topic 8); (ii) "[a]ny decision to purchase, sell, hold, or otherwise transact in Kraft Heinz Securities by or for the benefit

at 37:7–18; 46:5–47:6; 56:5–13; 68:17–22.



*Id.* at 49:7–52:6; 47:2–6

; 56:5–15

; 70:21–23

[12]

Union's Rule 30(b)(6) designee also could not explain why Union-managed funds

---

of Union, including any information considered or relied upon in making such decision" (Topic 9), among other subjects. Ex. K at 9; Ex. I at 8:16–10:2. Union agreed to provide testimony concerning its "purchases or sales of Kraft Heinz common stock and/or options at issue in this case during the period from July 2, 2015 to October 31, 2019." Ex. K at 9.

[12] For example, the portfolio manager for UniKonzept: Dividenden reached the conclusion, Ex. I at 50:3–9. The portfolio manager for UniValueFonds: Global similarly Id. at 50:10–22; 83:10–21. The portfolio manager for UniRak claimed to have purchased KHC stock because he Id. at 49:15–50:2; 81:23–82:10.



Ex. I at 46:5–49:2.  Prior to his deposition, Union's designee ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 58:17–59:3 ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ He was similarly unaware ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 92:5–92:21.  He of course could not explain ▮▮▮▮▮▮▮ *See, e.g., id.* at 37:7–18; 46:5–47:6; 57:8–21; 57:22–58:4; 77:23–78:8; 78:15–23).  Union's Rule 30(b)(6) witness was not familiar ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 84:20–24; 85:2–25.  Nor could he explain how, if at all, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ *Id.* at 63:19–64:18.  He could not explain ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 167:3–169:18.

The issues described above pertain only to the trade data that Union has produced in this case.  Union has refused to produce any trading records for KHC stock or options for its funds *other* than those 22 selected for inclusion in this case.  *Id.* at 103:19–110:25. ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 103:10–113:22.  Union's counsel has sought to justify this gerrymandering of Union's trades by insisting that discovery concerning other Union-affiliated funds is irrelevant, because Union itself—the lead

plaintiff and proposed class representative—did not do any trading. Ex. L at 3. According to Union's counsel, "distinct and separate funds—with distinct and separate investors—traded in KHC securities and are alleged to have suffered damages," and assigned their claims to Union. *Id.*[13] But this distinction is artificial—Union's counsel freely selected and assigned trades executed by Union's subsidiaries on behalf of the funds and assigned them to Union. ████████

████████████████████████████████████████—indeed,

according to Union's Rule 30(b)(6) witness, ███████████████████

Ex. F at 23:9–24:13. All of Union's trades were executed by Union's management companies, but only some of those trades have been disclosed and included in this case for reasons that have not been explained.

There should be no question that "in advance of a motion to certify the class," proposed class representatives are "subject to searching discovery as to their financial condition and experience, investing methodologies, and transactions in [the company's] securities." *In re Boeing Co. Aircraft Sec. Litig.*, 2019 WL 6052399, at *7 (N.D. Ill. Nov. 15, 2019). "Even arguable defenses may preclude a finding of typicality or adequacy." *Rush* v. *GreatBanc Trust Co.*, 2021 WL 2453070, at *8 (N.D. Ill. June 16, 2021); *CE Design Ltd.* v. *King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011). Here, the 22 funds that have been the subject of discovery engaged in a substantial volume of trading that raises significant questions about Union's reliance on the alleged misstatements and omissions in this case—and there may be other trading that will only compound these questions. These questions are all the more important because Union's Rule

---

[13] According to lead counsel, discovery from other Union funds is not appropriate because the funds' trading "cannot somehow be aggregated together." Ex. L at 3. Yet that is precisely what Union's counsel did in seeking to have Union appointed as lead plaintiff and now a class representative.

30(b)(6) representative could not answer any of them, and will require more discovery and depositions to confirm the complete absence of affirmative testimony about the reasons for the trading decisions at issue here. None of the ███████████████████████████████ ███████████████████████████████ has been produced, nor has ████████████ ███████████████████████████ This significant hole in the record will not only require additional discovery, but if these questions cannot be answered, a jury would be permitted to draw adverse inferences and negative credibility findings about Union's 19 or more portfolio managers who say they recall nothing.

**B.   AP7 Is Not Adequate or Typical**

AP7 is a Swedish pension fund that did not do any of its own trading and completely outsourced its investing decisions to three investment managers located in the United Kingdom: BlackRock, State Street, and Northern Trust. Ex. M at 1 n.1. Documents from those investment managers are critically important as they are directly related to AP7's claim that it purchased KHC stock in reliance on Defendants' alleged misrepresentation and omissions. *See, e.g.*, *Villella* v. *Chem. & Mining Co. of Chile Inc.*, 2018 WL 2958361, at *4–5 (S.D.N.Y. June 13, 2018) (noting that "courts may look to a nonparty investment adviser's knowledge in determining reliance, where that investment adviser invests on behalf of institutional plaintiffs" and that when "a plaintiff wholly outsources their decision making to an investment adviser who acts as their agent, that agent's decision-making calculus is relevant to the reliance inquiry"). AP7 has been unwilling to do anything to make its outside investment advisors—who had sole discretion over the trades at issue in this case—available for discovery in this case. This deficiency in AP7's participation in discovery renders AP7 an inappropriate class representative.

Its counsel represented that AP7's trades in KHC were done by its investment managers pursuant to an index strategy in which the basis for buying or selling stock was to mimic various

29

indices. *See, e.g.*, Ex. M at 2.[14] Defendants sought to test that assertion by taking discovery.

Despite the suggestion that AP7's trading merely tracked existing indices in a way that involved no discretion, that turned out to be false. AP7's 30(b)(6) designee revealed for the first time at his deposition that ███████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████ Ex. N at 66:15–69:10. ████████████████████████████

██████████████████████████████ Ex. O at 171, Schedule 5.3. AP7's designee

stated that ██████████████████████████████████████████████████████████████

████████████████████ Ex. N at 82:4–9; 187:2–16; 190:2 –25. However, this also turned

out to be untrue; subsequent to the deposition, AP7 produced additional documents ████████

████████████████████████████████ on AP7's behalf. Ex. P at 8, cl. 6.1. AP7

has not produced any discovery concerning this strategy or how it was executed, and claims ███

██████████████████████████████████ Ex. N at 69:2–70:3. Nor can AP7

confirm ██████████████████████████████████████████████████████████████ —

that information is also solely in the possession of its foreign investment advisors, from whom

only limited discovery has been made available. *Id.* at 74:16–75:3.

AP7 disclaimed any responsibility for facilitating discovery from its outside investment managers, from whom it has a right to obtain documents and information, while simultaneously

███████████████████████████████████████████████████ *Id.* at 116:25–117:6;

119:6–19. Instead, Plaintiffs' counsel insisted that Defendants seek discovery from the foreign investment managers through letters of request under the Hague Evidence Convention, or by

---

[14]   For example, ██████████████████████████████████████████████████

████████████████████ *See, e.g.*, Ex. O at 45, appx. 5, cl. 1.2.

serving subpoenas on the branches of those investment advisors that are located in the United States (which are not the branches that actually did any of the relevant trading). Ex. Q at 6. While Defendants have expended substantial time and money to pursue discovery through both avenues in light of AP7's refusal to cooperate, neither has proved to be an adequate substitute for the type of discovery one would obtain from a party.

Defendants sought letters of request from this Court, which the Court granted on March 17, 2022, ECF No. 340, but the scope of those requests is necessarily limited, and the process lengthy.[15] *See Bentel & Co., LLC* v. *Schraubenwerk Zerbst GmbH*, 2017 WL 3278324, at \*12 (N.D. Ill. Aug. 2, 2017) (describing the "obstacles" and the delay involved in "navigat[ing] the Rube Goldberg contraption of the Hague Convention"); *Eli Lilly and Co.* v. *Teva Parenteral Medicines, Inc.*, 2013 WL 12291616, at \*2 (S.D. Ind. Apr. 26, 2013) (noting that the United Kingdom has "limited the scope that may be obtained pursuant to Letters of Requests"). And while Defendants served subpoenas on a domestic branch of Northern Trust on February 18, 2022, and on BlackRock and State Street on February 22, 2022, those non-parties have produced between them only a handful of high-level documents, most of which were duplicative of AP7's production.

Plaintiffs' unwillingness to facilitate critical discovery from its outside investment managers is all the more inexcusable given AP7's clear contractual right to access and audit the books and records of all three investment managers. *See Pine Top Receivables of Illinois, LLC* v.

---

[15]     AP7 also refused to provide basic information regarding its investment advisors that would have enabled Defendants to more effectively pursue discovery through the Hague Convention. For example, AP7 declined to answer straight-forward Interrogatories that sought the names of persons at each investment manager who made investing decisions or implemented actual trades in KHC stock. Ex. R at 5–6. Plaintiffs clung to the position that AP7 has no one to identify because it only interacts with "relationship managers," not "portfolio managers." Ex. M at 1–2; Ex. S at 2–3. Only after AP7's deposition did Plaintiffs finally identify persons at each of AP7's investment managers. Ex. T at 1. Lead counsel's representations concerning AP7's purported ignorance as to information clearly within its possession is yet another example of  AP7's failure to supervise its counsel, *see infra* section III.D., further rendering it an inadequate representative.

31

*Banco De Seguros Del Estado*, 2013 WL 3776971, at *3 (N.D. Ill. July 18, 2013) ("Courts have routinely held that a party controls records within the meaning of the rules of discovery if it has a contractual right to access those records."). For example, AP7's external managers are required to ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████ Ex. O at 14, cl. 6.2.3.[16] AP7 could not explain why ████████████████ ██████████████████████████████████████████████████████████████████ Ex. N at 119:21–120:19. AP7 also has the ████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████ *See, e.g.*, Ex. O at 8. AP7 was plainly itself obligated to—and able to— facilitate discovery from its outside investment managers, and its unwillingness to do so renders it an inadequate representative of the class. *See Boeing*, 2019 WL 6052399, at *7.

## C. Booker Is Not Adequate or Typical

Booker was added as a named plaintiff because neither Union nor AP7 bought or sold KHC options. Ex. N at 147:13–17. Although Booker may have traded KHC options, it is an inadequate and atypical class representative. Booker is an Australian private investment vehicle through which Mr. Booker invested his family's funds. Ex. U at 115:12–17. Over a three-month period in late 2018, Booker spent ████████ on KHC call options. Ex. V. Booker has ████████████████ ██████████████████████████████████████████████████████████████████

---

[16] AP7's investment management agreements with its three outside investment managers are all substantially the same. Ex. N at 117:7–16.

Ex. U at 43:5–8; 66:8–25; 63:25–64:6. Booker's inclusion in this suit is entirely pro forma; it has no real role in the litigation.

"Congress expressed its desire for institutional investors to take control of private class action securities litigation" because "institutional investors are most likely to have the largest financial interest in the case." *Dollens* v. *Zionts*, 2001 WL 1543524, at *4 (N.D. Ill. Dec. 4, 2001). In essence, the "provisions of the PSLRA were designed to avoid situations in which a named class representative has a minimal financial stake in the case and acts primarily as a tool of the lawyers who may well have recruited him." *Sakhrani* v. *Brightpoint, Inc.*, 78 F. Supp. 2d 845, 850 (S.D. Ind. 1999). That is precisely the situation that would arise if Booker were appointed a class representative. And, while appointing a plaintiff group that includes an individual investor may "help[] ensure that there is a check on the investment advisor" because the individual can provide a "unique perspective" as well as the "benefits of joint decision-making," *Sokolow* v. *LJM Funds Mgmt., Ltd.*, 2018 WL 3141814, at *5 (N.D. Ill. June 26, 2018) (Dow, J.), Booker is not acting as a check on either Union or AP7 ██████████████████████████████ ████████████████████████ *See* Ex. U at 43:5–8; 66:8–25, 63:25–64:6.

Booker is also subject to unique defenses stemming from its trading strategy and the timing of its purchases of KHC options. *See Epstein*, 1988 WL 40500, at *4 (post-disclosure purchases are "commonly held to create a unique defense vitiating typicality"). In particular, Mr. Booker testified that he ████████████████████████████████ ████████ Ex. U at 33:19–25; 36:16–38:3. He then undertakes ███████████████ ████████████████████████████████████████████ ███████████████████████████████ *Id.* at 38:18–41:21. Booker bought 40 call options contracts on two dates in October 2018. ECF No. 274-1 at 13. It then bought 35 call options

33

contracts on five dates after the first alleged corrective disclosure, including 10 options on the very next day, November 2, 2018. *Id.* While the rest of the class will seek to establish that the alleged fraud was partially revealed on November 1, 2018, ¶ 546, ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████ Ex. U at 102:3–10; 132:19–133:7. Mr. Booker also testified that he ██████████████████████████████████████, *id.* at 138:10–25, though no such records reflecting such transactions were produced in discovery.

The fact that all of Booker's transactions in KHC occurred over such a short period of time towards the end of the class period, with nearly half of Booker's call options purchased in the six weeks *after* the first alleged corrective disclosure suggests strongly "that the alleged misstatements or omissions were really not a factor in the purchasing decision," which will require that Booker "expend considerable time on unique defenses—precisely the situation the case law does not condone." *George*, 2013 WL 3357170, at *6–7. For all of these reasons, Booker should be disqualified from representing the proposed class here.

### D. The Plaintiffs Are Not Functioning as a Group

The class should not be certified for the separate, additional reason that Plaintiffs as a group have utterly failed to act together to supervise lead counsel in this case, making it abundantly clear that the litigation is entirely lawyer-driven. Despite Union and AP7's representations to the Court that they "took numerous steps to coordinate their activities and formalize their oversight of this litigation," and that they "participated in numerous discussions with counsel and each other," ECF No. 59 at 2–3, AP7 testified that it had spoken to Union on only one occasion regarding this lawsuit, and all other calls have been between the lawyers only. Ex. N at 166:5–15. And while Union testified that it had spoken to AP7 twice regarding this lawsuit, they have not spoken in

34

over three years.  Ex. I at 134:16–135:14.  In appointing Union and AP7 as co-lead plaintiffs, this Court noted that "there must be some evidence that the members of the group will act collectively and separately from their lawyers."  *Hedick* v. *Kraft Heinz Co.*, 2019 WL 4958238, at \*7 (N.D. Ill. Oct. 8, 2019).  This Court also noted that "the AP7/Union Group contains only two institutional investors who previously have worked together" and that there was "no indication" that they would be "unable to operate effectively as a unit."  *Id.*  That is no longer the case with the addition of Booker, with whom neither AP7 nor Union has ever spoken.  *See In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 625 (S.D.N.Y. 2015) (appointing an additional lead plaintiff "would risk creating the very problems of duplication and coordination that the Court seeks to avoid").[17]

In light of Plaintiffs' failure to act cohesively, two large plaintiffs' firms appear to be left to their own devices in supervising the litigation, rendering Plaintiffs inadequate class representatives.  *See Berger* v. *Compaq Comput. Corp.*, 257 F.3d 475, 484 (5th Cir. 2001) (holding that at the class certifications stage, "the adequacy standard must reflect the governing principles of [the PSLRA] and, particularly, Congress's emphatic command that competent plaintiffs, rather than lawyers, direct such cases").[18]  As such, Plaintiffs' proposed class should not be certified.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for class certification. Defendants respectfully request oral argument on this motion.

---

[17]  While Bernstein Litowitz and Kessler Topaz have represented that they themselves entered in a Joint Prosecution Agreement (which they have refused to produce or even log), the proposed class representatives are not overseeing whether class counsel is adhering to the terms of that agreement. *See, e.g.*, Ex. I at 137:25–138:23.

[18]  *See also In re Tarragon Corp. Sec. Litig.*, 2007 WL 4302732, at \*1–2 (S.D.N.Y. Dec. 6, 2007) (absent a showing "that the members of [a] 'group' have, in fact, functioned as a group," it is not reasonable to assume that the group will be "in a position to direct and control counsel"); *Plumlee* v. *Pfizer, Inc.*, 2014 WL 4275553, at \*3 (N.D. Cal. Aug. 29, 2014) (noting that a "class representative's duties include supervising counsel").

Dated: May 20, 2022

Respectfully submitted,

/s/ Andrew J. Ehrlich

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Daniel J. Kramer (*pro hac vice*)
Andrew Ehrlich (*pro hac vice*)
William A. Clareman (*pro hac vice*)
Alison R. Benedon (*pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
dkramer@paulweiss.com
aehrlich@paulweiss.com
wclareman@paulweiss.com
abenedon@paulweiss.com

-and-


**JENNER & BLOCK LLP**
Howard S. Suskin (Il. ARDC # 6185999)
Dean N. Panos (Il. ARDC # 6203600)
Gabriel K. Gillett (Il. ARDC # 6328233)
353 N. Clark Street
Chicago, Illinois 60654
Telephone: (312) 222-9350
hsuskin@jenner.com
dpanos@jenner.com
ggillett@jenner.com

*Counsel for Defendants The Kraft Heinz Company, Bernardo Hees, Paulo Basilio, David Knopf, Alexandre Behring, George Zoghbi, and Rafael Oliveira*

/s/ Kevin M. Neylan, Jr.            .

**KIRKLAND & ELLIS LLP**
Sandra C. Goldstein (*pro hac vice)*
Stefan Atkinson, P.C. (*pro hac vice*)
Kevin M. Neylan, Jr. (*pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
sandra.goldstein@kirkland.com
stefan.atkinson@kirkland.com
kevin.neylan@kirkland.com

Brenton Rogers, P.C. (Il. ARDC #6291926)
300 North Lasalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Email: brogers@kirkland.com


*Counsel for Defendant 3G Capital Partners, 3G Capital, Inc., 3G Global Food Holdings, L.P., 3G Global Food Holdings GP LP, 3G Capital Partners LP, 3G Capital Partners II LP, and 3G Capital Partners Ltd.*

36