**KESSLER TOPAZ MELTZER**
  **& CHECK, LLP**
STACEY M. KAPLAN (Bar No. 241989)
skaplan@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:     (415) 400-3000
Fax:     (415) 400-3001

*Counsel for Proposed Lead Plaintiff National Pension*
*Service, on behalf of the National Pension Fund, and*
*Proposed Lead Counsel for the Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| CITY OF CORAL SPRINGS POLICE OFFICERS' PENSION PLAN, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC., TIMOTHY D. COOK, LUCA MAESTRI, and KEVAN PAREKH,<br><br>Defendants. | Case No. 5:25-cv-06252-NW<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THE MOTION OF NATIONAL PENSION SERVICE, ON BEHALF OF THE NATIONAL PENSION FUND, FOR CONSOLIDATION OF RELATED ACTIONS, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF SELECTION OF LEAD COUNSEL**<br><br>**CLASS ACTION**<br><br>Date: December 3, 2025<br>Time: 9:00 a.m.<br>Place: Courtroom 3 – 5th Floor<br>Judge: Hon. Noël Wise |

1

## **TABLE OF CONTENTS**

2

STATEMENT OF ISSUES ............................................................................................. 1

3

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 1

4

I.       PRELIMINARY STATEMENT ...................................................................... 1

5

II.      ARGUMENT ..................................................................................................... 3

6

         A.      NPS Has the Largest Financial Interest of Any Movant ............................ 3

7

                 1.      NPS Properly Detailed Its Transfers ................................................ 3

8

                 2.      NPS Properly Accounted for *Pre*-Class Period Transactions ......................... 5

9

                 3.      NPS Properly Offset Its Losses with Gains During the Class Period ............ 7

10

                 4.      NPS Properly Accounted for Class Period Transfers ................................... 8

11

                 5.      KBC's Arguments Based on an Alternative Reality Fail Under *Mersho* ........ 9

12

         B.      NPS Has Standing to Represent the National Pension Fund .................................... 11

13

III.     CONCLUSION ................................................................................................. 15

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*In re: Beyond Meat, Inc. Derivative Litig.*,
5        2020 WL 6826482 (C.D. Cal. May 18, 2020).......................................................... 12

6

*In re Boeing Co. Aircraft Sec. Litig.*,
7        2019 WL 6052399 (N.D. Ill. Nov. 15, 2019).......................................................... 10

*Cambridge Ret. Sys. v. Mednax, Inc.*,
8        2018 WL 8804814 (S.D. Fla. Dec. 6, 2018) ............................................................ 7

9

*Cavanaugh v. U.S. Dist. Court for N. Dist. of Cal.*,
10       306 F.3d 726 (9th Cir. 2002) ................................................................................. 11

11

*Christian v. BT Grp. PLC*,
        2017 WL 3705804 (D.N.J. Aug. 28, 2017) ............................................................. 9

12

*City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp.*,
13       269 F.R.D. 291 (S.D.N.Y. 2010) ......................................................................... 6, 8

14

*City of Taylor Police & Fire Ret. Sys. v. W. Union Co.*,
        2014 WL 4799659 (D. Colo. Sep. 26, 2014) .................................................... 12, 13

15

*Di Scala v. ProShares Ultra Bloomberg Crude Oil*,
16       2020 WL 7698321 (S.D.N.Y. Dec. 28, 2020)........................................................ 10

17

*Dura Pharms., Inc. v. Broudo*,
18       544 U.S. 336 (2005) .............................................................................................. 10

19

*In re eSpeed, Inc. Sec. Litig.*,
        232 F.R.D. 95 (S.D.N.Y. 2005)............................................................................... 3

20

*Foley v. Transocean Ltd.*,
21       272 F.R.D. 126 (S.D.N.Y. 2011) ......................................................................... 3, 6

22

*Glavan v. Revolution Lighting Techs., Inc.*,
23       2019 WL 3406582 (S.D.N.Y. July 29, 2019)........................................................... 6

24

*Gonsalves v. Block, Inc.*,
        2025 WL 1274127 (N.D. Cal. Apr. 30, 2025)..................................................... 3, 11

25

*Gross v. AT & T Inc.*,
26       2019 WL 3500496 (S.D.N.Y. July 31, 2019)......................................................... 14

27

*Hayes v. Enphase Energy, Inc.*,
        2025 WL 986469 (N.D. Cal. Mar. 31, 2025) ........................................................... 7

28

*Ind. Pub. Ret. Sys. v. Rivian Auto., Inc.*,
    2024 WL 5279156 (C.D. Cal. Oct. 24, 2024) .............................................................. 14, 15

*Kangas v. Illumina, Inc.*,
    2024 WL 1587463 (S.D. Cal. Apr. 11, 2024) ................................................................. 9, 10

*Karp v. Diebold Nixdorf, Inc.*,
    2019 WL 5587148 (S.D.N.Y. Oct. 30, 2019) ................................................................ 10, 11

*Leventhal v. Chegg, Inc.*,
    2022 WL 4099454 (N.D. Cal. Sep. 7, 2022) ....................................................................... 11

*Lewis v. CytoDyn, Inc.*,
    2021 WL 3709291 (W.D. Wash. Aug. 19, 2021) ....................................................... 3, 5, 6, 8

*Mersho v. U.S. Dist. Ct. for D. of Ariz.*,
    6 F.4th 891 (9th Cir. 2021) ...................................................................................... 1, 11, 14

*Nicolow v. Hewlett Packard Co.*,
    2013 WL 792642 (N.D. Cal. Mar. 4, 2013) ......................................................................... 7

*In re Nike, Inc. Sec. Litig.*,
    2024 WL 4579499 (D. Or. Oct. 25, 2024) ........................................................... 5, 11, 12, 13

*OFI Risk Arbitrages v. Cooper Tire & Rubber Co.*,
    63 F. Supp. 3d 394 (D. Del. 2014) ............................................................................... 11, 14

*Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*,
    2022 WL 3571995 (N.D. Cal. July 26, 2022) ..................................................................... 12

*Plumbers & Pipefitters Loc. 562 Pension Fund v. MGIC Inv. Corp.*,
    256 F.R.D. 620 (E.D. Wis. 2009) ........................................................................................ 9

*Ruland v. InfoSonics Corp.*,
    2006 WL 3746716 (S.D. Cal. Oct. 23, 2006) ....................................................................... 7

*In re Schering-Plough Corp. Sec. Litig.*,
    2003 WL 25547564 (D.N.J. Oct. 10, 2003) ......................................................................... 6

*In re Snap Inc. Sec. Litig.*,
    2019 WL 2223800 (C.D. Cal. Apr. 1, 2019) ................................................................. 14, 15

*Sun v. TAL Educ. Grp.*,
    2022 WL 6994479 (S.D.N.Y. Oct. 12, 2022) ..................................................................... 15

*In re SVB Fin. Grp. Sec. Litig.*,
    2023 WL 8367938 (N.D. Cal. Nov. 30, 2023) ............................................................*passim*

*Trustees of Welfare & Pension Funds of Loc. 464A Pension Fund v. Enphase Energy, Inc.*,
   2025 WL 2410521 (N.D. Cal. Aug. 20, 2025) ................................................................ 3, 11

*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*,
   549 F.3d 100 (2d Cir. 2008) ................................................................................................ 12

*In re Watchguard Sec. Litig.*,
   2005 WL 8188936 (W.D. Wash. July 13, 2005) ................................................................. 10

*Weston v. DocuSign, Inc.*,
   2022 WL 1301770 (N.D. Cal. Apr. 18, 2022) ........................................................... 3, 11, 12

**Statutes**

15 U.S.C. § 78u-4(a) ................................................................................................................ 11

**Other Authorities**

Fed. R. Civ. P. 44.1 ................................................................................................................... 14

1    NPS, on behalf of the National Pension Fund, respectfully submits this Reply in further

2    support of its motion for appointment as Lead Plaintiff and approval of Lead Counsel.[1]

3                              **STATEMENT OF ISSUES**

4        1.    Whether NPS is the "most adequate plaintiff" and should be appointed Lead Plaintiff,

5    pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(i).

6        2.    Whether this Court should approve NPS's selection of Kessler Topaz as Lead Counsel,

7    pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(v).

8                     **MEMORANDUM OF POINTS AND AUTHORITIES**

9    **I.    PRELIMINARY STATEMENT**

10        NPS is the only movant before the Court meeting all the PSLRA's requirements for

11    appointment as Lead Plaintiff.

12        The only opposition to NPS's motion comes from KBC, which advances nothing more than

13    meritless arguments.  KBC—which did not file a timely motion and possesses only the third-largest

14    loss—is no stranger to making arguments that are devoid of proof and legal support.  In *In re SVB*

15    *Financial Group Securities Litigation*, Judge Donato dismissed KBC's attacks against the

16    presumptive lead plaintiff because KBC "offer[ed] no evidence in support of" its arguments while

17    reminding KBC that, under Ninth Circuit law, "mere conjecture will not rebut the presumption."

18    2023 WL 8367938, at *2 (N.D. Cal. Nov. 30, 2023) (citing *Mersho v. U.S. Dist. Ct. for D. of Ariz.*, 6

19    F.4th 891, 901 (9th Cir. 2021)).  KBC has apparently learned nothing from its experience in *SVB*.

20    Rather than present actual "proof" rebutting NPS's presumptive status, KBC offers only hypothetical

21    speculation, claims refuted by facts, inconsistent arguments, distinguishable case law, and conspiracy

22    theories.  None of this meets the PSLRA's standard of "proof."  *Mersho*, 6 F.4th at 899.

23        Contrary to KBC's arguments, the actual record before the Court establishes that:

24        •   NPS—one of the largest pension funds in the world—asserts a LIFO loss of $87 million,

25

26    ---
      [1]    Unless otherwise noted, all citations to "Dkt. No. __" are to filings in the above-captioned

27    action, all capitalized terms are defined in NPS's opening and opposition briefs, *see* Dkt. Nos. 12 &
      13, all emphasis is added, and all internal citations and quotation marks are omitted.  Citations to the
28    docket in *Tucker* refer to *Tucker v. Apple Inc., et al.*, No. 5:25-cv-05197-NW (N.D. Cal.).

---

which is by far the largest before the Court;

- NPS provided detailed trading data showing exactly how it calculated its losses under the preferred LIFO methodology; and

- KBC has not provided any evidence or analysis establishing that NPS's LIFO losses are inaccurate or were not properly calculated.

In fact, KBC does not present any analysis suggesting that it can actually claim the largest loss under a legitimate application of LIFO, nor does it share how its own losses would be impacted by its alternative non-LIFO methodologies (such as considering gains from pre-Class Period purchases). KBC's opposition is devoid of proof.

Likewise, KBC's musings about NPS's standing to represent the National Pension Fund have no merit.  KBC admits that the "prudential exception," something it ironically claims for itself (*Tucker*, Dkt. No. 38 at 7-8), allows non-U.S. based investment managers to assert claims on behalf of their funds.  KBC also concedes that the National Pension Fund "***lack[s] legal personality and capacity to sue***" and that the "NPS [is] a 'juridical person' with the legal capacity to sue and be sued." Dkt. No. 15 at 5.  Despite these express acknowledgments, KBC inexplicably and hypocritically suggests that NPS might not have standing to seek redress for losses suffered by the National Pension Fund.  KBC's own brief recognizes all of the legal and factual elements needed for NPS to claim standing under the prudential exception. Nevertheless, to remove any doubt, NPS respectfully submits the declaration of Mr. Hoeyoung Chung, Foreign Attorney (U.S.) of the Risk Management & Legal / Investment Legal Team of NPS, to confirm that: (1) NPS is ***required*** to manage all of the affairs of the National Pension Fund under the National Pension Act; (2) NPS is the ***only*** entity able to represent the National Pension Fund in litigation; and (3) the National Pension Fund has ***no employees or legal capacity*** and would be unable to recover losses if NPS does not act on its behalf. *See* Kaplan Reply Decl., Ex. A ("Chung Declaration").  NPS's standing under the prudential exception is conclusively established.

There is nothing before the Court to rebut NPS's presumptive status, which is acknowledged by the movant asserting the second-largest loss—Union.  *See* Dkt. No. 14.  Accordingly, NPS's

1    respectfully requests the Court grant its motion.

2    **II.    ARGUMENT**

3        **A.    NPS Has the Largest Financial Interest of Any Movant**

4        NPS's $87 million LIFO loss is the largest before the Court.  Courts in this District and across

5    the country have consistently held that the LIFO methodology is the "preferred approach" to calculate

6    a movant's financial interest.  *Trustees of Welfare & Pension Funds of Loc. 464A Pension Fund v.*

7    *Enphase Energy, Inc*., 2025 WL 2410521, at *2 (N.D. Cal. Aug. 20, 2025) ("*Enphase*"); *see also,*

8    *e.g.*, *Gonsalves v. Block, Inc*., 2025 WL 1274127, at *2-3 (N.D. Cal. Apr. 30, 2025) (Wise, J.)

9    (appointing movant with largest LIFO losses); *Lewis v. CytoDyn, Inc.*, 2021 WL 3709291, at *4

10    (W.D. Wash. Aug. 19, 2021) (adopting LIFO because the alternative first-in, first-out methodology

11    "may exaggerate losses"); *Weston v. DocuSign, Inc.*, 2022 WL 1301770, at *2 (N.D. Cal. Apr. 18,

12    2022) ("Most courts within this district use the LIFO method to calculate estimated losses. . . .

13    Mindful of the Ninth Circuit's desire for consistent application, I will do the same.").  Calculation of

14    LIFO losses—which KBC submitted with its untimely motion—is straightforward: it "matches the

15    last purchases made ***during the class period*** with the first sales made ***during the class period***."  *In re*

16    *eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 102 (S.D.N.Y. 2005).  Because LIFO focuses on class period

17    transactions, "sales matched with ***pre-class period*** purchases ***are not included*** in the calculation of

18    class period losses."  *Foley v. Transocean Ltd.*, 272 F.R.D. 126, 129 (S.D.N.Y. 2011).  NPS's $87

19    million LIFO loss is more than four times the size of KBC's financial interest and more than two and

20    a half times the size of Union's.  *See* Dkt. No. 13 at 4-5; Dkt. No. 14 at 1 ("NPS has a larger financial

21    interest than Union" under LIFO).

22        Despite not pointing to any actual errors in NPS's LIFO calculation, KBC manufactures a

23    series of speculative and legally unsupported claims.  Each of KBC's objections is inconsistent both

24    with what is required under LIFO and with KBC's calculation of its own LIFO losses.

25            **1.    NPS Properly Detailed Its Transfers**

26        KBC's claim that NPS's loss calculation "is riddled with unexplained intra-account transfers,"

27    Dkt. No. 15 at 3, is false.

28

1    *All* of NPS's transactions in Apple securities during the Class Period were set forth in its

2    certification.  *Contrast* Chung Decl., ¶ 8 (attesting that NPS provided all transactions) *with* Dkt. No.

3    15 at 4 n.3 (KBC baselessly speculating that NPS omitted some transactions).  This information—as

4    transparently set forth in NPS's certification (*Tucker*, Dkt. No. 26-2) and loss chart (*Tucker*, Dkt. No.

5    26-3)—allows competing movants to independently confirm NPS's LIFO calculations.

6    Indeed, NPS's certification explicitly identifies the date, quantity, origin account, and

7    destination account of each transfer between accounts during the Class Period.  *See, e.g.*, *Tucker*, Dkt.

8    No. 26-2 at 5 (detailing transfer in of 101,210 shares on June 14, 2024, from Account NQ9F to

9    Account NP22); *id.* at 15 (detailing corresponding transfer out of 101,210 shares on June 14, 2024,

10   from Account NQ9F to Account NP22).  NPS's data also identifies whether transferred shares were

11   originally purchased during the Class Period and details whether the transferred shares were later

12   sold.  For example, if transferred shares were purchased during the Class Period in one account (e.g.,

13   Account NQ9F) and then transferred to another account (e.g., Account NP22), NPS's loss chart lists

14   the transferred shares as a buy in the receiving account at the actual, original purchase price during

15   the Class Period.  *See, e.g.*, *Tucker*, Dkt. No. 26-3 at 21 (detailing transfer ***out*** of 76,643 shares from

16   Account NQ9F to Account NP22 on June 14, 2024); Kaplan Reply Decl., Ex. B (excerpt from NPS's

17   loss chart highlighting the foregoing); *Tucker*, Dkt. No. 26-3 at 3 (detailing transfer ***in*** of 76,643

18   shares from Account NQ9F to Account NP22 on June 14, 2024, and using the original Class Period

19   purchase price of $194.7761); Kaplan Reply Decl., Ex. C (excerpt from NPS's loss chart highlighting

20   the foregoing).  The transferred shares are then matched under LIFO to subsequent Class Period sales

21   or, if there are no matching sales, categorized as retained shares.  *See, e.g.*, *Tucker*, Dkt. No. 26-3 at

22   3 (showing 76,643 shares transferred from Account NQ9F to Account NP22 on June 14, 2024, were

23   retained through the end of the Class Period); Kaplan Reply Decl., Ex. C (excerpt from NPS's loss

24   chart highlighting the foregoing).  Gains or losses on transferred shares originally purchased during

25   the Class Period are only recorded ***once***—in the receiving account.  *Contrast* Kaplan Reply Decl.,

26   Ex. B *with* Ex. C.  As discussed in detail below, gains or losses on transferred shares originally

27   purchased before the Class Period are excluded under the standard LIFO analysis.

28

1    KBC knows how to calculate LIFO losses.  *See Tucker*, Dkt. No. 38-4 at 8-16; *SVB*, 2023 WL

2    8367938, at *1 (citing KBC's LIFO loss).  However, its unwillingness to conduct a basic LIFO

3    analysis here—when NPS provided all of the necessary transaction details regarding its purchases,

4    sales, and transfers (which are commonplace with institutional investors, *see, e.g.*, *In re Nike, Inc.*

5    *Sec. Litig.*, 2024 WL 4579499, at *5-8 (D. Or. Oct. 25, 2024) (appointing movant with transfers))—

6    undermines KBC's complaints.  As KBC knows, relying "solely on critiquing" without providing

7    "independent evidence" is insufficient to rebut NPS's presumptive lead plaintiff status.  *SVB*, 2023

8    WL 8367938, at *2.

9    ### 2.    NPS Properly Accounted for *Pre*-Class Period Transactions

10    KBC misleadingly claims that "NPS has made it impossible for the Court to offset NPS's

11    claimed loss with gains experienced by selling Apple securities **purchased before** the Class Period

12    and sold during the Class Period" because it did not provide pre-Class Period transaction information.

13    4Dkt. No. 15 at 3.  This is not the law.  As numerous courts have made clear, gains or losses on **pre-**

14    **Class Period** purchases are irrelevant when calculating a movant's **Class Period** financial interest

15    under LIFO.  This exact issue was extensively litigated in another case in the Ninth Circuit, *CytoDyn*,

16    where a movant with a smaller loss (like KBC) argued that the presumptive lead plaintiff's "true

17    financial interest" could not be determined because the presumptive lead plaintiff "did not disclose

18    the cost basis for his large pre-Class Period position in CytoDyn securities that he sold during the

19    Class Period."  2021 WL 3709291, at *4.  The court rejected this argument, explaining:

20         But the Court can calculate [the presumptive lead plaintiff's] actual
21         loss based on LIFO methodology.  When using LIFO to calculate the
           class period, ***courts do not typically offset the loss with pre-class***
22         ***period purchases and sales***.  As the Southern District of New York
           explained, "losses or gains on pre-class period holdings are typically
23         not compensable, ***so should not be a focus*** of this determination." *City*
           *of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp.*, 269 F.R.D.
24         291, 295 (S.D.N.Y. 2010); *see also Johnson v. Dana Corp.*, 236 F.R.D.
           349, 352 (N.D. Ohio 2006) (sales matched to pre-existing holdings are
25         excluded from the damage calculation*); In re Comdisco Securities*
           *Litig.*, No. 01 C 2110, 2004 WL 905938, at *3 (N.D. Ill. Apr. 26, 2004)
26         (finding LIFO consistent with the proper focus of purchases and sales
           during the class period).  ***The Court agrees with . . . the majority*** of
27         courts across the country that LIFO is the appropriate methodology to
           use here as it is "the most accurate measure of actual losses suffered by

28

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THE MOTION OF NATIONAL PENSION SERVICE, ON BEHALF OF THE NATIONAL PENSION FUND, FOR CONSOLIDATION OF RELATED ACTIONS, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF SELECTION OF COUNSEL

CASE NO. 5:25-CV-06252-NW                                                                    5

stockholders in that ***it takes into account any gains*** accrued from sales ***during the class period***."

*Id.*

As recognized by *CytoDyn* and multiple other courts, because LIFO focuses on class period transactions, "sales matched with pre-class period purchases are ***not*** included in the calculation of class period losses." *Transocean*, 272 F.R.D. at 129; *see also Glavan v. Revolution Lighting Techs., Inc.*, 2019 WL 3406582, at *4 n.7 (S.D.N.Y. July 29, 2019) (explaining that "[the movant] has excluded all gains and losses from … sales [of pre-class period shares during the class period] in arriving at his [loss] figure … ***and he was right to do so***"); *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Group, Inc.*, 269 F.R.D. 291, 295 (S.D.N.Y 2010) ("losses or gains on pre-class period holdings . . . ***should not*** be a focus of this [financial interest] determination"); *In re Schering-Plough Corp. Sec. Litig.*, 2003 WL 25547564, at *9 (D.N.J. Oct. 10, 2003) ("Section 10(b) claim is based on losses that resulted from *purchases* . . . made *during* the Class Period [and] [a]ny capital gains made [from] the *sale* of shares purchased *before* the Class Period are irrelevant") (emphases in original). Accordingly, NPS appropriately excluded any gains or losses when shares originally ***purchased prior to the Class Period*** were sold during the Class Period. *See, e.g.*, *Tucker*, Dkt. No. 26-3 at 2 (excluding gains or losses on the sale of shares during the Class Period that were originally ***purchased prior to the Class Period*** by Account GDSN); Kaplan Reply Decl., Ex. D (excerpt from NPS's loss chart highlighting the foregoing).

The hypocrisy of KBC's argument is evident from KBC's filings. KBC complains that NPS did not provide information about its pre-Class Period trading while ***KBC itself did not*** provide this information and ***does not*** appear to offset gains from the more than 900,000 pre-Class Period shares that it sold during the Class Period when calculating its own LIFO losses. *Contrast, e.g.*, *Tucker*, Dkt. No. 38-3 at 9 (certification listing sale of 748 shares on June 20, 2024, prior to first purchase on June 25, 2024) *with Tucker*, Dkt. No. 38-4 at 8 (loss chart omitting sale of stock on June 20, 2024, that necessarily matches with pre-Class Period purchases given that KBC's first purchase during the Class Period was on June 25, 2024, and any resulting gains or losses). KBC's (proper) omission of

pre-Class Period information and offsets from KBC's pre-Class Period purchases here is also consistent with its loss calculations in numerous prior motions, including several recent actions in this Circuit. *See, e.g.*, Kaplan Reply Decl., Exs. E-L.

Moreover, KBC's cited cases, *see* Dkt. No. 15 at 3-4, do not provide support for offsetting gains and losses from pre-Class Period purchases under the LIFO methodology. Rather, the cases adopt non-LIFO methodologies—which, again, KBC did not apply when calculating its own losses.

For example, in *Hayes v. Enphase Energy, Inc.*, the court discussed the potential need to offset losses under a movant's proposed "recoverable losses" methodology. 2025 WL 986469, at *2 (N.D. Cal. Mar. 31, 2025) ("*Hayes*"). However, KBC fails to inform the Court that Judge Donato ultimately ***rejected*** this approach and instead analyzed movants' losses under LIFO. *Id.* (noting movants' recognition of the "primacy of the LIFO approach in our circuit"). KBC's other cited cases are likewise distinguishable and inconsistent with its own motion. *See Ruland v. InfoSonics Corp.*, 2006 WL 3746716, at *4-5 (S.D. Cal. Oct. 23, 2006) (adopting disfavored "net loss" methodology that, among other things, ignored in-and-out gains and losses, and offset gains from pre-class period purchases); *Cambridge Ret. Sys. v. Mednax, Inc.*, 2018 WL 8804814, at *6 (S.D. Fla. Dec. 6, 2018) (calculating losses based on post-verdict "damages" model rather than LIFO). KBC's "belated attempt[] to overturn this state of affairs" by now proposing non-LIFO methodologies—that, according to KBC, apply only to NPS and not itself—is without basis. *Hayes*, 2025 WL 986469, at *2; *see also Nicolow v. Hewlett Packard Co.*, 2013 WL 792642, at *4 (N.D. Cal. Mar. 4, 2013) (applying LIFO and rejecting alternative methodology not submitted with movant's initial motion).

### 3.    NPS Properly Offset Its Losses with Gains During the Class Period

Continuing its defective arguments, KBC falsely claims that NPS erred because "profitable in-and-out trades grossly inflate NPS's claimed loss." Dkt. No. 15 at 3.

As is readily observable from NPS's loss chart, NPS properly ***included*** gains from all "paired [Class Period] trades showing explicit profits," *id.*, in its LIFO calculation. *See, e.g.*, *Tucker*, Dkt. No. 26-3 at 2 (offsetting in-and-out gain in Account GDMS of $1,560.60 from the sale of 153 shares on August 30, 2024, that were originally purchased on July 30, 2024); Kaplan Reply Decl., Ex. M

1   (excerpt from NPS's loss chart highlighting the foregoing); *see also CytoDyn*, 2021 WL 3709291, at
2   *4 ("LIFO . . . 'takes into account any **gains** accrued from sales **during the class period**'"); *Hartford*,
3   269 F.R.D. at 295 ("The value of the LIFO analysis is not in comparing gains and losses relative to
4   pre-class period holdings, but rather in accounting for gains made on sales as a result of an allegedly
5   inflated stock price **during the class period**.").   As a result, NPS's total losses were actually **reduced**
6   by more than $14 million because it did include gains from shares purchased during the Class Period
7   that were sold at a profit during the Class Period.  *See generally Tucker*, Dkt. No. 26-3.  KBS's claim
8   that NPS inflated its losses by not including gains on in-and-out sales is patently false.  KBC's failure
9   to submit any calculations or other "proof" confirms this point.  *See SVB*, 2023 WL 8367938, at *2.

10  ### 4.    NPS Properly Accounted for Class Period Transfers

11          KBC also erroneously claims that "NPS's loss calculation improperly treats [its] internal
12  transfers – the functional equivalent of moving money from one's left pocket to one's right – **as new**
13  **'purchases,'** a maneuver that grossly inflates its claimed financial interest."  Dkt. No. 15 at 4.  To the
14  contrary, NPS's loss calculation utilizes only the **original purchase date** of shares that are transferred.
15  Accordingly, shares purchased prior to the Class Period (and were transferred between accounts
16  during the Class Period) are not treated as Class Period purchases and **are not included** in the loss
17  calculation.  *See, e.g.*, *Tucker*, Dkt. No. 26-3 at 3 (recording no gains or losses when 24,567 shares—
18  which were purchased "Pre-Class"—were transferred from Account NQ9F into Account NP22);
19  Kaplan Reply Decl., Ex. N (excerpt from NPS's loss chart highlighting the foregoing).

20          Conversely, shares purchased during the Class Period (and later transferred between accounts
21  during the Class Period) are not treated as new purchases when transferred, but instead retain their
22  original (actual) purchase price, and generate gains and losses **only** once (in the receiving account).
23  *See, e.g.*, *Tucker*, Dkt. No. 26-3 at 3 (recording a gain of $1,222,356.21 when 76,643 shares—which
24  were purchased during the Class Period at $194.7761—were transferred from Account NQ9F to
25  Account NP22, and were retained by Account NP22 and priced at the $210.7248 lookback price);
26  Kaplan Reply Decl., Ex. C (excerpt from NPS's loss chart highlighting the foregoing).

27          As such, NPS did not manufacture "new purchases" or double count any gains or losses.  The

28

weakness of KBC's argument is confirmed by the fact that KBC does not even attempt to "correct" what it perceives to be improper treatment of these transfers or detail how NPS's loss would be impacted if the transfers are treated differently. *See, e.g.*, *SVB*, 2023 WL 8367938, at *2 (rejecting KBC's arguments as "conjecture").

### 5. KBC's Arguments Based on an Alternative Reality Fail Under *Mersho*

KBC speculates NPS may have "experienced a $36 million profit" *if* the Court concludes only the final of five pled corrective disclosures, Dkt. No. 15 at 5; *see also* Dkt. No. 1, ¶¶ 44-46, 47-48, 49, 50, 52, is actionable. This argument, pulled out of thin air, is entirely insufficient to satisfy the PSLRA's requirement of "proof" to disqualify a movant. *See, e.g.*, *SVB*, 2023 WL 8367938, at *2.

KBC fails to explain why only its hypothetical scenario (rather than a scenario where all pled disclosures will be upheld) has any relevance at the lead plaintiff stage or should replace the actual allegations before the Court. *Cf. Kangas v. Illumina, Inc*., 2024 WL 1587463, at *3 (S.D. Cal. Apr. 11, 2024) (rejecting KBC's attempt to use a shorter class period to analyze lead plaintiff movants and noting that "KBC's request . . . is contrary to the general practice"). Indeed, when assessing arguments about disclosures at the lead plaintiff stage, "case law instructs courts to hew closely to the allegations of the complaint." *Christian v. BT Grp. PLC*, 2017 WL 3705804, at *8 (D.N.J. Aug. 28, 2017) (crediting pled partial disclosures and noting that, "[f]ocusing as I must on the allegations in the complaint, I find that the allegations present a fairly straightforward (and not atypical) case of progressive revelation of a problem that turned out to be more serious than first believed"); *see also, e.g.*, *Plumbers & Pipefitters Loc. 562 Pension Fund v. MGIC Inv. Corp.*, 256 F.R.D. 620, 625 (E.D. Wis. 2009) (applying broadest allegations and class period in the complaints "because at the outset of a case the court should view the facts in the light most favorable to the plaintiffs and should narrow the allegations only after the parties have had the opportunity to develop the record"). Here, KBC's own papers acknowledge multiple corrective disclosures without any concerns or arguments about plausibility. *See Tucker*, Dkt. No. 38 at 4. All of these disclosures are relevant at this stage.

KBC's counsel knows full well that its musings about what *may* happen, while irrelevant, also ignore the very real possibility that additional corrective disclosures will emerge, which may alter the

1    scope of the Class Period and would provide additional opportunities for class members (including

2    NPS) to recover their losses.  *See Illumina*, 2024 WL 1587463, at *3 ("the class period may change

3    due to subsequent developments").  For example, KBC's counsel has filed **four** amended complaints

4    in the UnitedHealth Group Inc. securities litigation expanding the class period before any ruling on

5    an initial motion to dismiss because additional corrective disclosures continued to emerge.  *See, e.g.*,

6    Kaplan Decl., Ex. O; *see also In re Boeing Co. Aircraft Sec. Litig.*, 2019 WL 6052399, at *10 (N.D.

7    Ill. Nov. 15, 2019) (noting that a lead plaintiff's authority includes deciding "what claims to assert").

8           Furthermore, KBC's questions regarding what NPS may ultimately may be able to recover at

9    trial under *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005), *see* Dkt. No. 15 at 4, are speculative

10   and insufficient to rebut NPS's presumptive status.  *See In re Watchguard Sec. Litig.*, 2005 WL

11   8188936, at *4 n.6 (W.D. Wash. July 13, 2005) (rejecting application of *Dura* at lead plaintiff stage

12   and explaining that "[*Dura*] recognized . . . that numerous factors may affect the price of a

13   security. . . . [and] did not suggest that a court should guess about the effect of these as-yet unknown

14   factors in selecting a lead plaintiff").  Moreover, courts refuse to engage in a *Dura*-based analysis of

15   the movants' losses at the lead plaintiff selection stage where, as is the case here, there are multiple

16   pled corrective disclosures.  *See, e.g.*, *Di Scala v. ProShares Ultra Bloomberg Crude Oil*, 2020 WL

17   7698321, at *3 (S.D.N.Y. Dec. 28, 2020) ("we reject at this phase the application of *Dura* to loss

18   calculation when the complaint alleges multiple partial disclosures").

19          KBC also fails to provide any explanation for how it calculated this purported "$36 million

20   profit" (let alone loss charts actually demonstrating the calculation) and fails to provide even an

21   estimate of how KBC would fare under the same scenario.  Dkt. No. 15 at 5; *see also SVB*, 2023 WL

22   8367938, at *2 ("KBC did not proffer any independent evidence on this score").

23          The lone case cited by KBC in support of its claim that NPS must be disqualified because it

24   may have profited if the Court someday rejects all but the final corrective disclosure—*Karp v.*

25   *Diebold Nixdorf, Inc.*, 2019 WL 5587148 (S.D.N.Y. Oct. 30, 2019)—is irrelevant.  There, the court

26   rejected a movant who belatedly corrected their loss charts only after competing movants identified

27   that they "may have accounted for the same securities transactions twice in calculating their losses"

28

1  because their error demonstrated a "certain carelessness about detail that undermines the adequacy."

2  *Id.* at 2, 3.  *Diebold* contains no discussion about partial disclosures.

3      **B.    NPS Has Standing to Represent the National Pension Fund**

4          As the movant with the largest financial interest, NPS's status as the presumptive lead plaintiff

5  can be rebutted only through "proof that the presumptive lead plaintiff is not adequate."  *Mersho*, 6

6  F.4th at 899; s*ee also* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (requiring "proof" to rebut presumption);

7  *Cavanaugh v. U.S. Dist. Court for N. Dist. of Cal.*, 306 F.3d 726, 729 n.2 (9th Cir. 2002) (same).

8  Unsupported speculation is not "proof" and "does not comport with the burden-shifting process

9  Congress established in the PSLRA," under which "competing movants must point to evidence."

10  *Mersho*, 6 F.4th at 901; *see also DocuSign*, 2022 WL 1301770, at *4 ("Proof is key—the presumption

11  may not 'be set aside for any reason that the court may deem sufficient.'" (quoting *Mersho*, 6 F.4th

12  at 899)); *Block*, 2025 WL 1274127, at *3 ("Competing movants must point to evidence . . . .")

13  (quoting *Mersho*, 6 F.4th at 901)).

14          Here, KBC does not argue that NPS actually lacks standing to assert claims on behalf of the

15  National Pension Fund.  Rather, KBC engages in a half-hearted analysis of the facts to suggest that

16  NPS might not have standing.  *See generally* Dkt. No. 15 at 5-8; *see also OFI Risk Arbitrages v.*

17  *Cooper Tire & Rubber Co*., 63 F. Supp. 3d 394, 403 (D. Del. 2014) (stating that movants "must

18  produce more than speculation to rebut the presumption" that a non-U.S. investment manager lacked

19  standing).  Musing about theoretical arguments unsupported by any evidence or expert analysis is

20  precisely the type of speculation that is routinely rejected—including by courts that have found that

21  KBC has standing to pursue claims on behalf of *its* funds.  *See, e.g.*, *Leventhal v. Chegg, Inc.*, 2022

22  WL 4099454, at *3 (N.D. Cal. Sep. 7, 2022) (holding that "speculation" about KBC's standing was

23  "insufficient to rebut the lead plaintiff presumption"); *Enphase*, 2025 WL 2410521, at *3 (rejecting

24  standing challenge to a foreign investor and explaining that "[t]he law is clear, however, that such

25  speculation is insufficient"); *Nike*, 2024 WL 4579499, at *8 (rejecting argument that a foreign

26  investment manager may not have standing to sue on behalf of its funds as "speculative at best");

27  *DocuSign*, 2022 WL 1301770, at *5 (rejecting standing challenge to a foreign manager where, "[a]t

28

1    best, [the competing movant] speculates that [the manager] will be subject to a unique defense"); *In*

2    *re: Beyond Meat, Inc. Derivative Litig.*, 2020 WL 6826482, at *3 (C.D. Cal. May 18, 2020) (holding

3    that vague concerns about the structure of a non-U.S. movant "nothing more than speculation," as

4    "opposed to ***proof***" (emphasis in original)).

5        Contrary to KBC's conjecture, the actual evidence—which includes NPS's certification,

6    evidence cited by KBC, and the Chung Declaration—establishes NPS's standing. *See Tucker*, Dkt.

7    No. 26-2, ¶ 4 (sworn certification that NPS "has full power and authority to bring suit" on behalf of

8    the National Pension Fund); *Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*, 2022 WL 3571995,

9    at *2 (N.D. Cal. July 26, 2022) (rejecting as speculative a challenge to an investment manager's legal

10    title to the shares at issue, given the manager's "sworn testimony and transaction statements").

11        NPS has standing to sue on behalf of the National Pension Fund under the well-established

12    "prudential exception," which allows investment managers to represent their funds if there is "(1) a

13    close relationship to the injured [fund] and (2) a barrier to the injured [fund]'s ability to assert its own

14    interests." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 109 (2d Cir.

15    2008). The prudential exception is not controversial and is routinely applied to non-U.S. investment

16    managers bringing claims on behalf of their funds. In fact, all three remaining movants invoke the

17    prudential exception—with KBC relying on the exception by claiming that it "has a close relationship

18    to its funds . . . and there is a barrier to the funds asserting the claims." *Tucker*, Dkt. No. 38 at 7-8;

19    *see also Tucker*, Dkt. No. 29 at 8-9 (Union noting its qualification for the prudential exception). NPS

20    satisfies these same requirements. *See Nike*, 2024 WL 4579499, at *7 (stating that there is no

21    requirement that a movant must "explicitly invoke the prudential exception in its motion").

22        First, as KBC admits, the National Pension Fund is "a pool of financial assets lacking legal

23    personality and capacity to sue." Dkt. No. 15 at 5; *see also* Chung Decl., ¶ 4 ("[T]he National Pension

24    Fund is a pool of assets that has no legal capacity."). Moreover, the National Pension Fund has no

25    employees through which it can act. *See* Chung Decl. at ¶ 5. As such, there is no doubt that there is

26    a "barrier to the [National Pension Fund]'s ability to assert its own interests," as required by the

27    prudential exception. *See, e.g.*, *City of Taylor Police & Fire Ret. Sys. v. W. Union Co.*, 2014 WL

28

4799659, at *5 (D. Colo. Sep. 26, 2014) (holding investment manager "comfortably fit within *Huff's* 'prudential exception,' given that . . . the funds are prohibited under Swedish and Luxembourg law from bringing the claims herein in their own right"); *Nike*, 2024 WL 4579499, at *7 (concluding an investment manager satisfied prudential exception where its "funds are apparently barred from bringing claims on their own behalf under German law").

Second, it is clear that—consistent with its sworn certification—NPS has "full power and authority to bring suit" on behalf of the National Pension Fund. *Tucker*, Dkt. No. 26-2, ¶ 4. Indeed, "[p]ursuant to the National Pension Act, NPS ***is required*** to manage all of the affairs of the National Pension Fund and its investments." Chung Decl., ¶ 5; *see also* Dkt. No. 15 at 5 (KBC's acknowledgment that the National Pension Act "establishes NPS as a 'juridical person' with the legal capacity to sue and be sued"). Removing any ambiguity over NPS's ability to claim standing under the prudential exception, the Chung Declaration establishes that:

> NPS is the only entity with the legal ability to represent the National Pension Fund in court or in any other proceeding. NPS routinely exercises this ability to file suit and act on behalf of the National Pension Fund in legal matters in its own name on behalf of the National Pension Fund. The National Pension Fund would be entirely without any representation or ability to protect its assets if NPS does not act on behalf of the National Pension Fund in its own name.

Chung Decl., ¶ 6. The record before the Court confirms the statutorily-created relationship between NPS and the National Pension Fund, and the National Pension Fund's inability to protect its interests without NPS. These facts establish that NPS has "a close relationship to the [National Pension Fund]." *Nike*, 2024 WL 4579499, at *7 (finding investment manager satisfied prudential exception where it "has the exclusive authority and obligation to bring claims in this action on behalf of the . . . funds").

KBC's arguments in light of these facts are particularly opportunistic given its own invocation of the prudential exception. *Contrast Tucker*, Dkt. No. 38 at 7-8 *with* Dkt. No. 15 at 5-6. Indeed, KBC's musings about the "real party in interest," Dkt. No. 15 at 6, are facially inapplicable to movants—like NPS, KBC, and Union—that rely upon the prudential exception to assert claims on behalf of their respective funds that purchased the relevant securities.

Furthermore, KBC's assertion that NPS should have somehow anticipated that a competing movant would challenge its standing puts the cart before the horse. *See OFI*, 63 F. Supp. 3d at 404. Given the sequential process required under the PSLRA, the fact that NPS's standing was not challenged in the one other case in which it sought appointment, and the fact that NPS's authority to represent to the National Pension Fund is a matter of statutory authority, it is unclear how NPS could have anticipated such speculative and unsupported arguments. *See Mersho*, 6 F.4th at 899 (outlining sequential process).

Likewise, contrary to KBC's claim, *see* Dkt. No. 15 at 7, Federal Rule of Civil Procedure 44.1—which instructs that "[a] party who intends to raise an issue about a foreign country's law must give notice"—is not relevant here. NPS's standing under the prudential exception is a matter of U.S. federal law, not Korean law. *See, e.g., Gross v. AT & T Inc.*, 2019 WL 3500496, at *2 (S.D.N.Y. July 31, 2019) (explaining that foreign law "cannot alter the legal standard by which Article III standing is determined" and is "relevant only to establish the existence of the requisite property right"). Tellingly, in *In re Twitter, Inc. Securities Litig*ation, No. 4:16-cv-05314 (N.D. Cal.)—which KBC repeatedly cites to as evidence of its and its counsel's ability to zealously represent the class, *see, e.g., Tucker*, Dkt. No. 38 at 7, 9, 10; Dkt. No. 15 at 15—KBC did not proactively detail the basis of its standing to represent its funds or give notice of its intention to raise foreign law. *See* Kaplan Reply Decl., Ex. P. Neither NPS nor KBC are required to affirmatively produce this information under the sequential process required by the PSLRA. *See OFI*, 63 F. Supp. 3d at 404 (stating that non-U.S. investors whose standing under the prudential exception is being challenged "have no burden to provide evidence at the rebuttal stage").

KBC's citations to *In re Snap Inc. Securities Litigation*, 2019 WL 2223800 (C.D. Cal. Apr. 1, 2019), and *Indiana Public Retirement System v. Rivian Automotive, Inc*., 2024 WL 5279156 (C.D. Cal. Oct. 24, 2024), also do not alter the conclusion that NPS has standing to pursue claims on behalf of the National Pension Fund. *See generally* Dkt. No. 15.

As an initial matter, *Snap* did not involve the prudential exception. Instead, the court rejected a motion because it was unclear who the actual movant was (or should be) given numerous

1  inconsistencies, including that: (1) New Mexico State Investment Council ("NMSIC") was the

2  purported party seeking appointment as lead plaintiff; (2) the motion was stylized as the "State of

3  New Mexico on behalf of [the NMSIC]"; (3) NMSIC's certification was signed by New Mexico's

4  State Investment Officer ("SIO") "on behalf of [the NMSIC]"); (4) New Mexico's Office of Attorney

5  General purportedly "authorized the NMSIC to sue on the State's Behalf"; and (5) in other cases, the

6  certification was signed by the Office of New Mexico's Attorney General, not the SIO.  2019 WL

7  2223800, at *3 (brackets in original).  NMSIC resolved these inconsistencies in subsequent motions,

8  reverting to its prior approach and securing appointment as lead plaintiff.  *See, e.g.*, Kaplan Reply

9  Decl., Exs. Q & R; *Sun v. TAL Educ. Grp.*, 2022 WL 6994479, at *4 (S.D.N.Y. Oct. 12, 2022)

10  (appointing NMSIC).  No such inconsistencies or internal confusion exists here.  NPS's motion and

11  certification in the only two cases it has filed lead plaintiff motions—here and *Rivian*—both were

12  stylized as "National Pension Service, on behalf of the National Pension Fund."  *Compare Tucker*,

13  Dkt. Nos. 26 & 26-2 *with* Kaplan Reply Decl., Exs. S (*Rivian* motion) & T (*Rivian* certification).

14    Likewise, the *Rivian* court's decision not to appoint NPS did not involve the prudential

15  exception or NPS's standing.  Rather, the court declined to appoint a lead plaintiff group.  *See Rivian*,

16  2024 WL 5279156, at *2.  Issues surrounding the appointment of a group are absent here.

17    In short, KBC's standing-based arguments—like its loss-based arguments—are not grounded

18  in the facts and law, and must be rejected.  Additionally, KBC's conspiratorial accusation that NPS

19  and Union are engaged in "a coordinated effort to secure leadership roles" by filing separate lead

20  plaintiff motions—rather than a joint motion—given the rejection of NPS's group in *Rivian*, Dkt. No.

21  15 at 14 n.9, is made up out of whole cloth.  NPS and its counsel have not entered into any agreement

22  with Union and its counsel to secure appointment.

23  **III.    CONCLUSION**

24    NPS respectfully requests that the Court grant NPS's motion and deny the competing motions.

25  DATED: September 9, 2025                Respectfully submitted,

26                    **KESSLER TOPAZ MELTZER**
                      **& CHECK, LLP**
27
                      */s/ Stacey M. Kaplan*
28

1

2                                         STACEY M. KAPLAN (Bar No. 241989)
                                          skaplan@ktmc.com
3                                         One Sansome Street, Suite 1850
                                          San Francisco, CA 94104
4                                         Tel:    (415) 400-3000
                                          Fax:    (415) 400-3001
5
                                          *Counsel for Proposed Lead Plaintiff National Pension*
6                                         *Service, on behalf of the National Pension Fund, and*
                                          *Proposed Lead Counsel for the Class*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28