**KESSLER TOPAZ MELTZER
& CHECK, LLP**
JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001

*Counsel for Lead Plaintiff National Pension Service, on behalf of the National Pension Fund, and Proposed Lead Counsel for the Putative Class*

[Additional counsel listed on signature page.]

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

NATIONAL PENSION SERVICE, on behalf of the NATIONAL PENSION FUND, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

APPLE INC.; TIMOTHY D. COOK; LUCA MAESTRI; KEVAN PAREKH; CRAIG FEDERIGHI; and KELSEY PETERSON,

Defendants.

Case No. 5:25-cv-06252-NW

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**CLASS ACTION**

DEMAND FOR JURY TRIAL

Judge: Hon. Noël Wise

# TABLE OF CONTENTS


Page

I. INTRODUCTION ....... 1

II. JURISDICTION AND VENUE ....... 9

III. PARTIES ....... 9

A. Lead Plaintiff ....... 9

B. Defendants ....... 10

C. Relevant Non-Parties ....... 12

IV. FACTUAL ALLEGATIONS ....... 14

A. The Company, the iPhone, Siri, and the App Store ....... 14

1. Apple ....... 14

2. The iPhone ....... 15

3. Siri ....... 16

4. The App Store ....... 17

5. App Store Guidelines ....... 19

B. Defendants' Fraudulent Scheme to Maintain Apple's Supracompetitive App Store Revenue ....... 21

1. Apple's App Store Revenue Has Been Increasingly Threatened by Regulators ....... 21

2. Epic's Lawsuit Against Apple and the Resulting Injunction ....... 22

3. Following Its Unsuccessful Appeals, Apple Announces Changes to Its App Store Guidelines That Purportedly Comply with the Injunction ....... 24

4. Apple Claims That the Changes to Its Guidelines "Fully Complied" with the Injunction ....... 28

5. During the Class Period, Defendants Falsely Represent to Investors That Apple Complied with the Injunction ....... 30

6. Investors and Analysts Credited Defendants' Claims That Apple Complied with the Injunction ....... 32

7. Defendants Knowingly Violated the Injunction ....... 34

a. Apple's Initial Response to the Injunction ....... 35

b. Project Wisconsin: Apple's Renewed Injunction Response ....... 37

i. 27% Commission and the Seven-Day Session Window................38

ii. Placement and Design Restrictions................50

iii. Scare Screens and Static Links................54

iv. Calls to Action................58

v. NPP and VPP Exclusions................60

c. In Violation of the Injunction, Apple Combines the Most Anticompetitive Options into the Link Entitlement Program................63

C. The Relevant Truth Regarding Apple's Knowing Violations of the Injunction Are Gradually Revealed................64

1. February 24-26, 2025: Evidence Presented at the Evidentiary Hearing Reveals That Apple Likely Knowingly Violated the Injunction................64

2. After the February 2025 Hearing, Apple Defends Its Link Entitlement Program and Insists That It Complied with the Injunction................70

3. April 30-May 1, 2025: Apple Is Found to Have Intentionally Violated the Injunction, Held in Contempt, and Sanctioned, and Acknowledges the Risk and Uncertainty Facing the App Store................71

D. Post-Class Period Events Related to Defendants' Knowing Violations of the Injunction................78

1. Apple's Motion for a Stay of the April 2025 Order Is Denied................78

2. The Ninth Circuit Affirms That Apple Knowingly Violated the Injunction and Largely Upholds the Sanctions Against Apple................79

E. Defendants' Fraudulent Siri AI Scheme................81

1. In the Lead-Up to the Class Period, Apple Struggles to Keep Pace with Its Competitors in AI Innovation................81

2. Siri, Marred by Fundamental Defects, Is Eclipsed by Alexa and Other AI Products................82

3. Apple's Tepid Efforts to Innovate Are Hampered by Missteps and Loss of Talent................83

4. Apple's Commitment to Privacy Hinders AI Development................84

5. Google and Microsoft Announce New AI Products................85

6. Apple Continues to Lose Talent and the Company's AI Efforts Stagnate, Disappointing Investors................87

7. Investors Eagerly Await the 2024 WWDC and Hope for a Big AI Announcement................89

8. Apple Announces Apple Intelligence and a "More Personalized Siri" and Represents to Investors That These Features Are Functional and Will Be Rolled Out for the New iPhone 16 .....91

a. Apple's 2024 WWDC Announcement and Press Release .....91

b. Apple Touts Apple Intelligence Ahead of the iPhone 16 Announcement .....101

c. Apple Announces iPhone 16 and iPhone 16 Plus .....102

d. Apple Releases Apple Intelligence Ads Starring Bella Ramsey .....103

e. Apple Releases iOS 18 and the iPhone 16 .....104

f. Following the Launch of the iPhone 16, Apple Continues to Tout the Soon-to-Be-Released Apple Intelligence Features, Including the AI-Upgraded Siri .....108

g. Apple's FY 2024 Earnings Call .....110

h. Apple Releases an Updated iOS 18 .....111

i. Apple's 1Q 2025 Earnings Call .....112

9. Unbeknownst to Investors, Apple Did Not Have a Working Siri AI Model and Was Nowhere Close to Releasing a "More Personalized" Siri .....112

a. Internal Accounts Confirm That Apple Had No Functional Model of Its Updated Siri with "Personal Context" at the Time of Defendants' Misrepresentations and the Company Was Still Struggling to Complete the New Software in Spring 2025 .....113

b. The Better Business Bureau's Investigation into Apple's Deceptive Advertising of Apple Intelligence Confirms that Apple Had No Functional Model for the Advertised Siri Features .....117

F. The Relevant Truth Regarding the Apple Intelligence-Powered Siri Is Gradually Revealed .....118

1. March 7, 2025: Defendants Announce a Delay in the Release of Apple's Updated Siri Features .....118

2. March 12, 2025: Morgan Stanley Report .....120

3. April 3, 2025: The Wall Street Journal Article .....122

4. May 1, 2025: Q2 2025 Earnings Call .....122

G. Post Class-Period Events Related to Defendants' Fraudulent Siri AI Scheme .....123

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS .....125

A. Defendants' False and Misleading Statements Regarding the Injunction ....................... 125

1. May 3, 2024 – 2Q 2024 Form 10-Q ........................................................... 125

2. May 2024 Evidentiary Hearing Testimony ........................................................ 133

3. August 2, 2024 – 3Q 2024 Form 10-Q ........................................................... 137

4. November 1, 2024 – FY 2024 Form 10-K ........................................................ 138

5. January 31, 2025 – 1Q 2025 Form 10-Q ........................................................ 139

6. February 24, 2025 – Bloomberg Article ......................................................... 140

B. Defendants' False and Misleading Statements Regarding Apple Intelligence and AI-Upgraded Siri ........................................................................................ 140

1. June 10, 2024 – 2024 WWDC, Press Release, and SuperSaf Interview ............. 140

2. August 1, 2024 – 3Q 2024 Conference Call ..................................................... 150

3. September 9, 2024 – Press Release ................................................................ 153

4. September 13, 2024 – Siri Advertisement ....................................................... 154

5. September 20, 2024 – Apple Website Updates ................................................ 155

6. October 22, 2024 – The Wall Street Journal Interview .................................... 157

7. October 28, 2024 – Apple Website Updates .................................................... 157

8. October 31, 2024 – 4Q 2024 Conference Call ................................................. 160

9. January 30, 2025 – 1Q 2025 Conference Call ................................................. 161

VI. DEFENDANTS' FRAUDULENT CONDUCT ............................................................ 161

A. Defendants' Fraudulent Conduct in Furtherance of Defendants' Fraudulent Injunction-Compliance Scheme ................................................................ 162

1. The Link Entitlement Program ...................................................................... 162

2. Apple's Public Statements Regarding the Link Entitlement Program and Its Compliance with the Injunction ................................................... 165

3. Discovery Delays ........................................................................................ 168

B. Defendants' Fraudulent Conduct in Furtherance of the AI-Enhanced Siri Scheme ........ 170

VII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ....................................... 173

A. Additional Allegations of Scienter for Defendants' Statements Regarding the Injunction ............................................................................................. 173

B. Additional Allegations of Scienter for Defendants' Statements Regarding the Apple Intelligence-Powered Siri ....178

C. Subsequent Events Support an Inference of Defendants' Scienter ....184

D. Defendants Cook and Maestri Were Financially Motivated to Mislead Investors ....185

E. Defendants Acted in Bad Faith in Designing the Link Entitlement Program, Lied About It, Then Attempted to Conceal Their Deliberate Violations of the Injunction from the Court ....188

VIII. LOSS CAUSATION ....193

A. February 24-26, 2025 ....194

B. March 7, 2025 ....197

C. March 12, 2025 ....199

D. April 3, 2025 ....201

E. April 30-May 1, 2025 ....201

IX. CLASS ACTION ALLEGATIONS ....204

X. A PRESUMPTION OF RELIANCE APPLIES ....206

XI. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ....207

XII. CAUSES OF ACTION ....208

COUNT ONE Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants ....208

COUNT TWO Violation of Section 20(a) of the Exchange Act Against Defendants Cook, Maestri, and Parekh ....209

XIII. PRAYER FOR RELIEF ....210

XIV. DEMAND FOR JURY TRIAL ....210

Court-appointed Lead Plaintiff National Pension Service, on behalf of the National Pension Fund ("NPS" or "Lead Plaintiff"), by and through its counsel, files this Complaint for Violations of the Federal Securities Laws individually and on behalf of a class consisting of all persons and entities who purchased or otherwise acquired the common stock of Apple Inc. ("Apple" or the "Company") between May 3, 2024 and May 1, 2025, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Lead Plaintiff asserts claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and the rules and regulations promulgated thereunder, including United States Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants (defined below).

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief are based on the ongoing investigation of its undersigned counsel. This investigation includes review and analysis of, among other things: (i) Apple's filings with the SEC; (ii) transcripts of Apple's conference calls with analysts and investors; (iii) Company presentations, press releases, and reports; (iv) filings on the public docket in *Epic Games, Inc. v. Apple Inc.*, Case No. 4:20-cv-05640-YGR (N.D. Cal.) ("*Epic Games*"); (v) information disclosed on Apple's website; (vi) research reports by securities and financial analysts; (vii) news and media reports concerning Apple and other facts related to this action; (viii) price and volume data for Apple's securities; and (ix) information provided by former Apple employees. Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This action arises from a dual-pronged scheme by Apple and its senior executives to defraud investors by lying about two of the Company's most vital revenue sources: sales of Apple's flagship product, the iPhone, and commissions from digital product sales on the App Store.

2. After a federal court enjoined Apple from engaging in certain anticompetitive practices on its U.S. App Store, Apple publicly claimed to be complying with the injunction in a manner that would

preserve its App Store revenue. In truth, Defendants were secretly orchestrating a sham compliance plan designed to protect Apple's App Store revenue through practices that they knew—and privately admitted—would make competition "economically non-viable" and carried a significant risk of non-compliance with the court's injunction. Apple then engaged in a massive coverup, only to have the truth emerge through an evidentiary hearing and subsequent court order finding Apple in contempt of the injunction.

3. Simultaneously, to address investors' concerns that Apple's iPhone sales would be weak because users had little incentive to upgrade to newer iPhones, Defendants manufactured an upgrade "supercycle" for the iPhone by touting the availability of Apple Intelligence, Apple's version of artificial intelligence ("AI") on the new iPhone. This was headlined by a "more personal" version of Siri, Apple's digital assistant. Defendants claimed these "breakthrough" technologies were "Available now" and provided a "compelling reason" for consumers to upgrade to the latest iPhone. In reality, the Company barely had a functional prototype of the new Siri and its AI division acknowledged internally that the hyped technologies could not be delivered as publicly represented. Soon after these announcements—but only *after* Apple sold millions of new iPhones—Apple announced that the AI-enhanced version of Siri would be delayed. In subsequent disclosures, investors gradually learned that a functional model of the Apple Intelligence-powered Siri simply did not exist and that the Company was nowhere close to releasing the updated Siri.

**<u>Defendants Fraudulently Feigned Compliance with the Injunction to Maintain U.S. App Store Revenue</u>**

4. In September 2021, United States District Court Judge Yvonne Gonzalez Rogers found that Apple's standard 30% commission on digital product sales in the App Store and refusal to allow application ("app") developers to steer users outside of the App Store environment to purchase digital products allowed the Company to reap supracompetitive operating margins and artificially increased Apple's market power.

5. As a remedy, Judge Gonzalez Rogers issued a nationwide permanent injunction mandating that Apple permit developers offering apps on the U.S. App Store to steer users to alternative purchase options outside the App Store, thus skirting Apple's 30% commission (the "Injunction").

6. After Apple exhausted all appeals of the Injunction, on January 16, 2024, Apple announced that it "*has fully complied with the Injunction*," which was set to take effect the following day.

7. In a same-day filing with the district court, Apple explained the changes it made to bring the U.S. App Store into compliance with the Injunction, including striking the relevant provisions of its App Store Review Guidelines ("Guidelines") that prohibited app developers from offering alternative purchase methods and instituting new Guidelines governing app developers' use of links to external purchase methods.

8. These new rules restricted the placement and design of links to external purchase options, limited the language developers could use to advertise these options, mandated the use of warning screens when a user did click on an external purchase link, and critically, imposed a new 27% commission on purchases of digital goods *outside* the App Store in the seven days after a user clicked on an external purchase link. According to Apple, these new requirements were "***designed to minimize fraud, scams, and confusion***" and "***appropriately credit[] Apple for facilitating linked transactions***."[1]

9. In Apple's quarterly SEC filings during the Class Period, Defendants claimed that "***the Company implemented a plan to comply with the injunction***," citing Apple's January 16, 2024 "statement of compliance" filed with the district court. Defendants repeated these claims *every quarter* during the Class Period.

10. Meanwhile, in filings with the district court overseeing the Injunction, Apple vigorously defended its new "***guardrails on in-app communications***," claiming that it had implemented "***a comprehensive regime that complies with the letter and spirit of the Injunction***." Apple's quarterly SEC filings during the Class Period likewise directed investors to the Company's court filings defending its purported Injunction compliance program.

11. In reality, as Judge Gonzalez Rogers found, and the U.S. Court of Appeals for the Ninth Circuit confirmed, Apple's purported compliance was a "sham" that, contrary to Apple's repeated public pronouncements, did not comply with the Injunction and was instead a "scheme to prevent developers from deploying competitive alternatives" that Apple designed to "thwart[] the Injunction's goals" and maintain the Company's supracompetitive App Store profits.

[1] Unless otherwise stated, all emphasis is added.

12. Behind closed doors, prior to the start of the Class Period, Apple's senior executives—including Defendants Tim Cook and Luca Maestri—orchestrated a bad-faith campaign, not to comply with the law, but to "limit the ruling." Internally recognizing that true alternative and accessible purchase options would create "competitive pressure" and cost Apple "hundreds of millions if not billions" in annual App Store revenue, Defendants chose the "most anticompetitive option" at every turn while the Company appealed the Injunction.

13. For instance, Defendants: (i) imposed a 27% commission they knew would "not be economically viable for developers" given the costs of payment processing and customer service; (ii) severely restricted how developers could communicate with users about alternative purchase methods; (iii) engineered additional "friction" into external transactions to reduce the number of such transactions; and (iv) as a last resort, designed "scare screens"—with Defendant Cook's personal input—to deter users who clicked on an external purchase link from following through with any purchases outside of the App Store.

14. Knowing that their true anticompetitive motivations would not withstand scrutiny by the court, as Judge Gonzalez Rogers found, Defendants "*attempted to mislead*," engaged in an "*obvious cover-up*," including fabricating a narrative that Apple's 27% commission was based on an independent study by an economic consulting firm—a justification later found to be "entirely manufactured" and a "sham"—and having Apple executives responsible for the Company's response to the Injunction "*outright lie[] under oath*" in order to delay the enforcement of the Injunction. Defendants' justifications for Apple's other restrictions on external purchase links were similarly "pretextual" and "nothing more than after-the-fact litigation posturing or *outright misrepresentations*."

15. Apple could not maintain its App Store revenue at pre-Injunction levels while also complying with the Injunction. Therefore, Defendants chose to flout the Injunction and then claim compliance with it rather than disclose this truth to investors.

16. The relevant truth began to emerge during a stunning three-day evidentiary hearing held on February 24-26, 2025. Under examination on February 24, 2025, Apple Fellow Philip Schiller admitted that he had explicitly warned his colleagues that the new 27% commission on linked purchases presented a "significant compliance risk."

17. The following day, Apple executive Carson Oliver testified that the Company viewed the "competitive pressure" mandated by the Injunction as a "risk factor" to be neutralized and that the impact on App Store revenue was a key factor in the Company's decision to charge developers the 27% commission on digital product sales made outside the App Store, also known as "link-out purchases." As Oliver's testimony revealed, Defendant Maestri personally advocated for the 27% commission despite the known compliance risks since it "*would save Apple hundreds of millions if not billions of dollars*." Oliver further testified that he informed Defendant Cook that Apple's decision to charge a commission would limit the number of link-out purchases.

18. These revelations shocked the market, causing Apple's stock price to decline by 2.7% on February 26, 2025.

19. The relevant truth concealed by Defendants' misrepresentations regarding Apple's compliance with the Injunction was further revealed beginning on April 30, 2025, when Judge Gonzalez Rogers issued a blistering order finding Apple in civil contempt ("April 2025 Order"). As Judge Gonzalez Rogers found, the "evidence clearly and convincingly demonstrates that Apple *willfully* chose to ignore the Injunction, *willfully* chose to create and impose another supracompetitive rate and new restrictions, and thus *willfully* violated the injunction." (emphasis in original). Further, Apple did so in a calculated maneuver to "protect its illegal revenue stream." Underscoring the gravity of Apple's actions, the court referred the matter to the U.S. Attorney for criminal contempt proceedings.

20. During Apple's earnings call on May 1, 2025, Defendant Cook acknowledged "there's risk associated with [the pending legal cases] and the outcome is unclear."

21. Following the April 2025 Order and May 1, 2025 earnings call, Apple's stock price plunged 6.4% between April 30 and May 5, 2025, wiping out billions in shareholder value.

22. In the wake of these revelations, analysts finally understood that Apple's actual compliance with the Injunction would likely reduce App Store revenue. Confirming these assessments, Apple argued in its appeal to the Ninth Circuit that actual "compliance will cost Apple 'hundreds of millions to billions' of dollars annually . . . which Apple can never recoup."

23. On December 11, 2025, the Ninth Circuit largely affirmed the April 2025 Order, including the finding of civil contempt. The Ninth Circuit found that while "*Apple claimed to comply with the*

*injunction*," its purported compliance was, in effect, a deliberate evasion of the Injunction's requirements. The Ninth Circuit also affirmed that Apple acted in "*bad faith*" and had "*attempted to mislead*" through its statements claiming compliance with the Injunction.

**<u>Defendants' Fraudulent Claims About an Apple Intelligence-Powered Siri</u>**

24. After Apple's early entry into the AI space with the introduction of its AI-powered virtual assistant, Siri, in 2011, Apple was quickly outpaced by its competitors with respect to the introduction of new AI technology. For years, Apple largely sat on the sidelines as Microsoft, Amazon, and Google all rolled out new AI products. At the same time, Apple's iPhone sales were stalling as iPhone users delayed upgrading their phones. Apple thus risked being relegated to a hardware company with limited opportunity for revenue generation.

25. Internally, Apple was struggling with disagreements regarding its approach to AI innovation and was bleeding talent as multiple key employees left Apple for its competitors. Apple's efforts to develop new AI technology were also hampered by its much-touted commitment to privacy.

26. The pressure on Apple to release new AI products continued to mount towards the end of 2023 as Amazon announced a new Alexa powered by generative AI and Google announced a new AI-powered update to its Google Assistant.

27. As 2024 began, investors were keenly focused on Apple, hoping for a major AI reveal at Apple's 2024 Worldwide Developers Conference ("WWDC") in June. In the weeks leading up to the WWDC, the fervor continued to build, with analysts predicting that Apple's long-awaited AI announcement would center around a "rebuilt" Siri that would leverage generative AI, and highlighting the positive impact of an AI-enabled Siri on the stagnating iPhone upgrade cycle.

28. Apple did not disappoint, unveiling Apple Intelligence—a suite of AI features headlined by a "more personal" Siri that Defendants claimed could understand "personal context" and take action across apps. During the WWDC, Defendants Craig Federighi and Kelsey Peterson detailed the features of the new Apple Intelligence-powered Siri, including on-screen awareness, the ability to take action across apps, and "personal context," claiming that Siri could draw on personal context to "find and understand things it never could before." While Federighi and Peterson made these statements, demonstrations purportedly showing the features in action were displayed on the screen behind them.

29. In the wake of the WWDC, Defendants continued to tout these new Apple Intelligence-powered Siri features, referring to them as "breakthrough" innovations that were "Coming this fall" and then "Available now" and promising investors that the features would be a "compelling reason" for consumers to upgrade to a new iPhone 16.

30. These representations were false. In truth, when Defendants stood on stage at the WWDC and demoed a seamless, context-aware Siri, that technology simply did not exist. Behind the scenes, Apple's AI division barely possessed a working prototype. Internal testing revealed that the development version new Siri provided responses that were "inaccurate on nearly one third of requests," and senior executives like Federighi had "voiced strong concerns internally that the features didn't work properly — or as advertised — in their personal testing."

31. Despite knowing they lacked a functioning AI-enhanced Siri, Defendants launched a massive marketing campaign to sell the iPhone 16 on the back of this vaporware. Defendants went so far as to run high-profile television advertisements starring actor Bella Ramsey demonstrating Siri capabilities that Defendants knew were non-existent.

32. When questioned by analysts, Defendant Cook touted the Siri rollout and claimed that the new Siri was poised to be a "killer feature" on the iPhone 16. These assurances were untrue. As a senior director later admitted in an all-hands meeting, the delays were "ugly" and "embarrassing" because "[t]his was not one of these situations where we get to show people our plan after it's done. *We showed people before*."

33. Defendants' scheme began to unravel on March 7, 2025, when Apple abruptly announced that the "more personal" Siri features—the primary selling point of the iPhone 16—would be delayed. Apple quietly pulled the Bella Ramsey Siri ad from the airwaves and admitted to the press that "it's going to take us longer than we thought."

34. The market's reaction was swift and severe. Investors, realizing they had been sold a bill of goods about Siri's AI features that did not exist, drove the price of Apple's common stock down by 4.8% between March 7 and March 10, 2025, erasing billions in market capitalization. As the Better Business Bureau's National Advertising Division ("NAD") later concluded, Apple's claims that these features were

"Available now" were misleading, conveying "the message that the updated Siri functionality was available as part of the iPhone 16 launch, *which it was not*."

35. The fallout continued on March 12, 2025, when Morgan Stanley issued a report slashing its price target for Apple by $23 and confirming that the "more personal" Siri delay had materially damaged demand for the iPhone 16. The report revealed that 50% of iPhone owners who declined to upgrade cited the delayed rollout of Apple Intelligence as their primary reason. Morgan Stanley concluded that the "delayed rollout . . . means Apple will have fewer features to accelerate iPhone upgrade rates," leading Morgan Stanley to cut its shipment forecasts for the coming fiscal year.

36. In response to this revelation that the delayed rollout of Apple's much-touted Apple Intelligence features, including the "more personal" Siri, was hampering iPhone sales growth, Apple's stock price plunged 5.1% over two trading days.

37. On April 3, 2025, The Wall Street Journal published a scathing article titled *Apple and Amazon Promised Us Revolutionary AI. We're Still Waiting*, accusing Apple of misleading consumers to drive iPhone sales. The article called out Apple's "overhype and underdeliver" strategy, stating bluntly, "*We have been misled*." The article questioned Apple's tactic of announcing products before they could "deliver them" in an "attempt to convince us these enhancements justify an expensive phone upgrade."

38. Following this article challenging Apple's deceptive marketing practices, the Company's stock price plummeted 9.2% in a single day.

39. Finally, during Apple's 2Q 2025 earnings call on May 1, 2025, Defendant Cook was forced to admit that the "more personal Siri"—the feature Defendants had spent months touting as a "killer feature" for the iPhone 16—was still nowhere near ready. Cook conceded that "we just need more time to complete the work," vaguely offering that "[i]t's just taking a bit longer than we thought." These admissions were in stark contrast to Defendants' prior statements touting the new Siri as "Available now." Analysts immediately seized on the disclosure, with Needham noting that "personalized Siri features were delayed compared with the promises made at WWDC."

40. As the reality set in that Apple's AI-driven upgrade "supercycle" was built on empty promises and investors grappled with Defendants' willful violation of the Injunction, Apple's stock price fell 6.4% between April 30 and May 5, 2025. Analysts concurrently downgraded Apple, warning of

"*Tougher Times Ahead*" due to the potential "loss of App Store commission, and underwhelming Apple Intelligence features." In the weeks that followed, analysts questioned if "the ~$7B we estimate Apple earns from charging fees to US developers" was "at risk," and observed that without the new Apple Intelligence-powered Siri, Apple lacked "revolutionary software that will spur iPhone unit sales."

41. As a result of Defendants' false and misleading statements and other fraudulent conduct, Lead Plaintiff and other Class members suffered significant damages.

## II. JURISDICTION AND VENUE

42. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5, promulgated thereunder (17 C.F.R. § 240.10b-5).

43. This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act (15 U.S.C. § 78aa). In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337.

44. Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b), because Apple's principal executive offices are located in Cupertino, California, and because many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in this District.

45. In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiff

46. Lead Plaintiff NPS, based in the Republic of Korea and established under the National Pension Act, manages the National Pension Fund, with over $900 billion in assets. NPS, on behalf of the National Pension Fund, provides old-age, disability, and survivors' benefits to more approximately 22 million contributors and approximately 7 million beneficiaries in the Republic of Korea. As set forth in the certification attached hereto as Exhibit 1, NPS purchased or otherwise acquired Apple common stock

at artificially inflated prices during the Class Period and suffered damages because of the violations of the federal securities laws alleged herein.

**B. Defendants**

47. Defendant Apple is a technology company headquartered in Cupertino, California. Apple common stock trades on the Nasdaq under the ticker symbol "AAPL." As of October 17, 2025, over 14 billion shares of Apple common stock were issued, outstanding, and owned by thousands of investors. Apple's fiscal year ("FY") extends from the beginning of October to the end of September, and its first quarter ("1Q") is roughly October 1 to December 31, second quarter ("2Q") is roughly January 1 to March 31, third quarter ("3Q") is roughly April 1 to June 30, and fourth quarter ("4Q") is roughly July 1 to September 30. For FY 2024, Apple's 1Q 2024 ended on December 30, 2023, 2Q 2024 ended on March 30, 2024, 3Q 2024 ended on June 29, 2024, and 4Q 2024 and FY 2024 ended on September 28, 2024. The corresponding end dates for FY 2025 were December 28, 2024 (1Q 2025), March 29, 2025 (2Q 2025), June 28, 2025 (3Q 2025), and September 27, 2025 (4Q 2025 and FY 2025).

48. Defendant Timothy D. Cook ("Cook") is, and was at all relevant times, Apple's Chief Executive Officer ("CEO") and a Director of the Company. Cook routinely spoke on behalf of Apple throughout the Class Period, including by signing the Company's FY 2024 Form 10-K, giving prepared remarks and answering analyst questions during quarterly and annual earnings conference calls, by appearing in the Company's 2024 WWDC keynote presentation, and by giving interviews with media. Cook routinely spoke about the forthcoming upgrades to Siri.

49. Defendant Luca Maestri ("Maestri") served as Apple's Senior Vice President and Chief Financial Officer ("CFO") from prior to the Class Period until January 1, 2025. Defendant Maestri was a named executive officer of the Company for fiscal year 2024. Maestri signed Apple's 3Q 2024 Form 10-Q and FY 2024 Form 10-K, which represented that Apple was in compliance with the Injunction.

50. Defendant Kevan Parekh ("Parekh") has served as Apple's CFO since January 1, 2025. Parekh signed Apple's 1Q 2025 Form 10-Q, which represented that Apple was in compliance with the Injunction.

51. Defendant Craig Federighi ("Federighi") is, and was at all relevant times, Apple's Senior Vice President of Software Engineering, reporting to Defendant Cook. Federighi has been with Apple since

2009 and has overseen the iOS software for mobile and desktop platforms since 2012. Due to his position, Federighi was directly involved in Apple's public statements to the market regarding Apple Intelligence and Siri, including in press releases, presentations to industry commentators, and the media. As a member of Apple's executive leadership team, Federighi was included in internal discussions regarding Apple's Injunction response plan. Federighi appeared in Apple's 2024 WWDC keynote presentation, where he unveiled Apple Intelligence and demonstrated several of its features.

52. Defendant Kelsey Peterson ("Peterson") is, and was at all relevant times, Apple's Senior Director of AI and Machine Learning. Due to her position, Peterson was directly involved in the development of Apple Intelligence and Siri, was an integral part of the presentation at Apple's 2024 WWDC, and was in a position to know which of the features advertised were actually in existence at the time. Peterson appeared in Apple's 2024 WWDC presentation, where she demonstrated Siri's new, Apple Intelligence-based features.

53. Defendants Cook, Maestri, Parekh, Federighi, and Peterson are collectively referred to herein as the "Individual Defendants."

54. The Individual Defendants, due to their positions within Apple, possessed the power and authority to control, and did in fact control, Apple's public statements to the market, including in SEC filings, press releases, the Company's website, product marketing, filings on the public docket in the *Epic Games* litigation, and presentations to securities analysts, money and portfolio managers, institutional investors, and the media. In their respective roles, the Individual Defendants were directly involved in preparing, reviewing, and approving the Company's public statements and disclosures to the market. The Individual Defendants were provided with copies of the statements alleged herein to be false and misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material, nonpublic information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

**C. Relevant Non-Parties**

55. Katherine Adams ("Adams") is, and was at all relevant times, Apple's Senior Vice President and General Counsel, reporting directly to Defendant Cook. As a member of Apple's executive leadership team, Adams was included in internal discussions regarding Apple's Injunction response plan.

56. Sean Cameron ("Cameron") is, and was at all relevant times, Senior Director, App Store Legal at Apple. Cameron participated in internal discussions regarding Apple's Injunction response plan, including with Defendants Cook, Maestri, and Federighi.

57. Eddy Cue ("Cue") is, and was at all relevant times, Apple's Senior Vice President of Services. As a member of Apple's executive leadership team, Cue was included in internal discussions regarding Apple's Injunction response plan.

58. Matthew Fischer ("Fischer") served as Apple's Vice President, Head of Worldwide App Store until October 2024, when he stepped down as part of a reorganization of the Company's App Store division. Fischer had been with Apple since 2003, and had led the App Store division since 2010. In connection with the *Epic Games* litigation, Fischer signed the declaration attached to the January 16, 2024 Notice of Compliance with UCL Injunction, attesting that Apple was in compliance with the Injunction in his capacity as Apple's Head of Worldwide App Store. Fischer also testified at the May 2024 evidentiary hearing in his capacity as Apple's Head of Worldwide App Store concerning Apple's compliance with the Injunction.

59. John Giannandrea ("Giannandrea") served as Apple's Senior Vice President of Machine Learning and Artificial Intelligence from 2018 to December 1, 2025, when the Company announced he was stepping down. As part of this role, he oversaw machine learning and Siri. At the time of his appointment, Defendant Cook commented, "Machine learning and AI are important to Apple's future as they are fundamentally changing the way people interact with technology, and already helping our customers live better lives. We're fortunate to have John, a leader in the AI industry, driving our efforts in this critical area."

60. Marni Goldberg ("Goldberg") is, and was at all relevant times, Apple's Corporate Communications Director. Goldberg testified at the February 2025 evidentiary hearing in her capacity as Apple's Corporate Communications Director concerning Apple's compliance with the Injunction.

61. Greg "Joz" Joswiak ("Joswiak") is, and was at all relevant times, Apple's Senior Vice President of Worldwide Marketing, reporting directly to Defendant Cook. As a member of Apple's executive leadership team, Joswiak participated in internal discussions regarding Apple's Injunction response plan.

62. Carson Oliver ("Oliver") was Apple's Senior Director of Business Management, App Store from prior to the Class Period to October 2024, when he took over for Fischer as Head of Worldwide App Store. Oliver testified at the May 2024 and February 2025 evidentiary hearings in his capacity as Apple's Senior Director of Business Management concerning Apple's compliance with the Injunction.

63. Rafael Onak ("Onak") is, and was at all relevant times, a User Experience Writing Manager at Apple. Onak testified at the February 2025 evidentiary hearing in his capacity as a User Experience Writing Manager at Apple concerning Apple's compliance with the Injunction.

64. Alex Roman ("Roman") is, and was at all relevant times, Apple's Vice President of Finance. In connection with the *Epic Games* litigation, Roman signed the declaration attached to Apple's April 12, 2024 opposition to Epic's motion to enforce the Injunction, attesting that Apple was in compliance with the Injunction in his capacity as Apple's Vice President of Finance. Roman also testified at the May 2024 evidentiary hearing in his capacity as Apple's Vice President of Finance concerning Apple's compliance with the Injunction.

65. Philip Schiller ("Schiller") is an Apple Fellow responsible for leading the App Store and Apple Events. Schiller has been at Apple for 30 years and previously was Senior Vice President of Worldwide Marketing. Schiller testified at the May 2024 and February 2025 evidentiary hearings in his capacity as an Apple Fellow concerning Apple's compliance with the Injunction.

66. Kunal Vij ("Vij") is, and was at all relevant times, Apple's Senior Manager of Strategic Finance at Apple Services. Vij testified at the February 2025 evidentiary hearing in his capacity as Apple Services' Senior Manager of Strategic Finance concerning Apple's compliance with the Injunction.

67. Robby Walker ("Walker") was Apple's Senior Director of Siri and Information Intelligence from October 2022 until April 2025, when Apple shifted responsibility for Siri to Federighi. Beginning in April 2025, Walker served as Senior Director of Answers, Knowledge, and Information. In

September 2025, Bloomberg reported that Walker would depart Apple in October 2025, in a move widely attributed to the delays in Siri AI development.

## IV. FACTUAL ALLEGATIONS

### A. The Company, the iPhone, Siri, and the App Store

#### 1. Apple

68. Apple was founded on April 1, 1976, by Steve Jobs and Steve Wozniak. The Company went public through an IPO on December 12, 1980. As of September 27, 2025, Apple had approximately 166,000 full-time employees.

69. Apple "designs, manufactures and markets smartphones, personal computers, tablets, wearables and accessories, and sells a variety of related services." The Company has four central product lines: iPhone, Mac, iPad, and Wearables, Home and Accessories. The Company reported total net sales of $391.035 billion for FY 2024, and total net sales of $416.161 billion for FY 2025.

70. Apple reports its financial results based on the following geographic segments: the Americas; Europe (European countries, India, the Middle East, and Africa); Greater China (mainland China, Hong Kong, and Taiwan); Japan; and Rest of Asia Pacific (Australia, New Zealand, and Asian countries not included in other segments). According to Apple, each segment is "managed separately to better align with the location of the Company's customers and distribution partners and the unique market dynamics of each geographic region."

71. Apple's reported net sales by geographic region for FY 2024 and FY 2025 are reflected below:

| Segment | FY 2025 ($ in millions) | Change | FY 2024 ($ in millions) |
|---|---|---|---|
| Americas | $178,353 | 7% | $167,045 |
| Europe | $111,032 | 10% | $101,328 |
| Greater China | $64,377 | (4%) | $66,952 |
| Japan | $28,703 | 15% | $25,052 |
| Rest of Asia Pacific | $33,696 | 10% | $30,658 |
| Total Net Sales | $416,161 | 6% | $391,035 |

**2. The iPhone**

72. The iPhone is Apple's most important product and consistently generates over 50% of the Company's annual net sales. The iPhone generated approximately 51.4% of Apple's net sales for FY 2024 and approximately 50.4% of net sales for FY 2025, totaling $201.183 billion and $209.586 billion, respectively. After recording flat sales of the iPhone from FY 2023 to FY 2024, Apple reported a 4% increase in iPhone sales from FY 2024 to FY 2025. Apple attributed the growth in net sales in the Americas segment from FY 2024 to FY 2025 "primarily . . . to higher net sales of iPhone and Services." Apple also reported that the iPhone contributed to higher net sales in Europe, Japan, and Rest of Asia Pacific, and that the decrease in net sales in Greater China from FY 2024 to FY 2025 was "primarily due to lower net sales of iPhone, partially offset by higher net sales of Mac."

73. The iPhone line is run on the iOS operating system and currently includes the iPhone 17 Pro, the iPhone Air, iPhone 17, iPhone 16, and iPhone 16e. Apple also continues to support its older iPhone models through regular software updates.

74. Apple's release of the first iPhone model in January 2007 revolutionized smartphone technology by combining a mobile phone, a music player, and internet-enabled email, web browsing, and map applications. Since 2007, Apple has released 51 iPhone models, with consistent launches of at least one new model each calendar year. After an issue with iOS 5 delayed the launch of the new iPhone model in 2011 from summer to fall, Apple has released a new iPhone in September or October every year—an annual event that has become "a global marketing juggernaut," according to TechRepublic. As TechRepublic explained in November 2025, the annual launch of the new iPhone requires a great deal of Apple's focus and detailed planning, including "synchronized manufacturing" and "consistent product marketing," which pays off in a "reliably huge holiday sales boost."

75. Although a new iPhone model is released each calendar year, iPhone users do not upgrade their devices with each release. According to a report by a Bernstein analyst in early 2019, the average upgrade interval for iPhone users was four years, up from an average of three years in 2018. The analyst commented that the lengthening upgrade interval was due in part to increased prices and in part to Apple's battery replacement program, which the Company launched in 2017 after admitting to deliberately throttling the performance of older iPhones to force consumers to upgrade their phones.

76. A 2024 Consumer Intelligence Research Partners study reported that the number of iPhone purchasers who had kept their device for more than two years rose from 66% in 2023 to 70% in 2024. AppleInsider attributed this trend to the increased reliability of iPhones, which allows users to keep their devices longer, and the failure of the upgrades introduced with new models to persuade consumers to abandon their current devices.

77. In addition to consistently accounting for over half of Apple's net sales, the iPhone also is a primary driver of Apple's other revenue streams, as many consumers own iPhones but no other Apple products, meaning the Company's revenue generation through Apple Music, Apple TV subscriptions, the App Store, Apple Care, and other products, is dependent on iPhone sales to drive users into Apple's product ecosystem. In September 2024, a Needham analyst estimated that 89% to 96% of Apple's revenues are dependent on the iPhone, through direct sales of the device and driving users to purchase other Apple products.

78. Slowing iPhone sales have been an increasing concern for Apple since FY 2022, when Apple reported a 2% decrease in sales of the device from FY 2022 to FY 2023. On May 3, 2024, Apple disclosed in its 2Q 2024 Form 10-Q that iPhone sales had declined approximately 10.46% in 2Q 2024 as compared to 2Q 2023, as well as a decline of more than 4% in total net sales. That same day, the Associated Press reported that this was the "steepest quarterly decline" in sales of the iPhone since a pandemic-related decline in 2020, and the fifth consecutive quarter in which Apple's revenue had declined from the same period the previous year. The AP observed that this put increased pressure on Apple "to spruce up its products" with AI features.

**3. Siri**

79. Siri is Apple's "voice activated intelligent assistant" and chatbot built into the Company's iPhone, iPad, iMac, AirPods, and other devices. Siri uses artificial intelligence, or AI, to help understand and execute tasks. AI refers to computer systems and other technology that simulate human learning, comprehension, problem solving, decision making, creativity, and autonomy.

80. The technology behind Siri, which uses speech and natural language processing—a subfield of AI that uses machine learning to enable computers to understand and communicate with human language—was developed by Stanford Research Institute (SRI) International, a Silicon Valley-based

research and development firm. SRI spun off the technology into Siri, Inc. in 2007 to introduce the virtual assistant to consumers, originally offering Siri as an app for the iPhone on Apple's App Store in February 2010.

81. Apple subsequently acquired Siri in April 2010 and released it as an integrated feature on the iPhone 4s on October 4, 2011. Siri's release turned the iPhone 4s launch into Apple's most successful yet, with four million devices sold in just three days. When Apple released Siri, it was relatively advanced in its ability to respond to natural-language questions with spoken responses, and placed Apple ahead of its competitors in the AI virtual assistant space. Siri's initial capabilities focused on completing basic tasks, such as checking the weather and sending texts.

### 4. The App Store

82. The App Store is Apple's marketplace for iPhone users to purchase and download apps. On the App Store, developers offer their applications, or apps, either for sale or for free download. Some developers employ a "freemium" model, where the app is free to download, but paid offerings are available inside the app, like additional digital content.

83. Apple offers developers resources to facilitate app development and in-app transactions, such as payment processing and fraud detection. Both app sales and in-app purchases of digital products, i.e., in-game currencies, game levels, or access to premium content, are subject to Apple's standard commission of 30%, though Apple offers reduced commissions for certain types of transactions.

84. The App Store is a part of Apple's Services business segment. The Services segment generates tens of billions in annual net sales for Apple and is an increasingly important part of the Company's overall business. From FY 2020 to FY 2025, Services net sales grew over 100%, from approximately $53 billion to over $109 billion. As shown below, during this period, Services net sales as a percentage of Apple's overall net sales grew from approximately 19% to over 26%.

| Fiscal Year | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|
| Services Net Sales (in millions) | $53,768 | $68,425 | $78,129 | $85,200 | $96,169 | $109,158 |
| Total Net Sales (in millions) | $274,515 | $365,817 | $394,328 | $383,285 | $391,035 | $416,161 |
| Services Net Sales as a Percentage of Total Net Sales | 19.6% | 18.7% | 19.8% | 22.2% | 24.6% | 26.2% |

85. Apple's Services segment has been a key driver of Apple's growth. From FY 2023 to FY 2026, the Services segment maintained 12-15% year-over-year revenue growth, with minimal quarterly volatility. That stability is due to recurring revenue generated by Services offerings like the App Store, which helps shield Apple from fluctuations in hardware demand due to intermittent product releases. As a result, the Services segment has helped Apple transition to a less cyclical and higher growth business. Notably, the revenue growth in the Services segment has massively outpaced Apple's hardware revenue growth. For example, in FY 2024, Services boasted 13% year-over-year growth compared to less than 1% year-over-year growth in iPhone sales.

86. The Services segment also has delivered comparatively higher gross margins than Apple's other segments. From FY 2020 to FY 2024, Services gross margins grew from 66% to approximately 74%. During the same period, the gross margin of the entire Company ranged from approximately 38% to 46%. In 2024, while Services margins averaged over 70% gross margins, Apple's hardware business had margins of around 35-40%. Given the higher gross margins in the Services segment, in 2024, this segment contributed approximately 40% of Apple's gross profit despite contributing approximately 25% of total Company revenue.

87. The App Store has been a key driver of Services segment revenue growth. While Apple does not separately report App Store revenue, internal Apple documents produced in the *Epic Games* litigation reveal that the U.S. App Store alone generated approximately $6.8 billion annually in 2023. During the Class Period, analysts similarly estimated that global App Store sales contributed approximately 18-30% of Apple's total Services revenue, or approximately $17.3 to $28.8 billion in FY 2024, and $19.6 to $32.7 billion in FY 2025. For example, a report by Oppenheimer in May 2025 estimated Apple's

calendar year 2024 App Store sales to be as high as $27 billion, indicating that the App Store generated 27% of Services revenue. This same report estimated that mobile games contributed approximately $15 billion to App Store revenue in the same calendar year.

88. In March 2025, analysts at Evercore estimated that the App Store's five-year compound annual growth rate was 11%, and that in FY 2024, the App Store boasted one of the highest gross margins of the Services segment, at 92%.

**5. App Store Guidelines**

89. Since the 2007 inception of iOS, Apple's proprietary operating system, Apple has maintained a closed platform and strictly controlled access to software available on iOS devices.

90. When it released the iPhone, Apple offered a few "native" apps developed specifically for the iPhone, but did not permit third-party developers to create iPhone apps. In response, many developers resorted to "jailbreaking" iPhones, which is a process that modifies the iOS system to allow the download of unauthorized apps. Jailbreaking devices creates severe security and privacy risks, including installation of malicious software and data leaks.

91. Apple ultimately relented and created the App Store to allow third-party developers to create iOS apps. In addition, Apple provided app developers access to software development kits and programming interfaces to facilitate the development of apps that would work on iOS.

92. Apple charges an annual fee for membership in its developer program, the Apple Developer Program License Agreement ("DPLA"), which is required for developers to offer apps on the App Store. Through the DPLA, Apple licenses its intellectual property to developers. Apple otherwise restricts unauthorized apps—apps not developed under the DPLA—from being downloaded on the iPhone.

93. Under the DPLA, Apple details programming requirements and establishes payment terms. The DPLA requires developers to create apps for Apple products that only can be distributed on the App Store, submit apps for review to ensure they comply with the DPLA, and configure apps to use Apple's in-app purchase system ("IAP") for purchases of digital goods, subject to Apple's commission.

94. Apple has long justified its strict control of iOS software in the name of privacy and security. For example, Apple's website states:

> For over a decade, the App Store has proved to be a safe and trusted place to discover and download apps. But the App Store is more than just a storefront — it's an innovative destination focused on bringing you amazing experiences. And a big part of those experiences is ensuring that the apps we offer are held to the highest standards for privacy, security, and content. All designed to help you discover your next favorite app with confidence.

95. For apps that either charge consumers to download, or offer IAP, the DPLA states that, for the majority of app developers, Apple is entitled to a 30% commission on all digital product sales by each end-user. This includes a commission on subscriptions made through IAP. Apple offers a lower commission on digital goods sales for a subset of developers, including a 15% commission for developers in Apple's Small Business Program that make less than $1 million annually, and for developers in Apple's News Partner Program ("NPP") and Video Partner Program ("VPP") (discussed below). As of FY 2023, these programs represented approximately 16% of U.S. App Store billings. App purchases related to physical goods or services (e.g., merchandise, ride-sharing, event tickets) are not required to use IAP and are not subject to Apple's commission.

96. In 2010, Apple created the App Store Review Guidelines. These Guidelines prohibited apps distributed on iOS devices from "steering" users to purchase systems other than Apple's IAP system for digital products. The anti-steering provisions within the Guidelines included the following:

> [Section 3.1.1:] If you want to unlock features or functionality within your app, (by way of example: subscriptions, in-game currencies, game levels, access to premium content, or unlocking a full version), *you must use in-app purchase*. Apps may not use their own mechanisms to unlock content or functionality, such as license keys, augmented reality markers, QR codes, etc. *Apps and their metadata may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase*.

> [Section 3.1.3:] The following apps [e.g., "Reader" Apps that "allow a user to access previously purchased content or content subscriptions"] may use purchase methods other than in-app purchase. *Apps in this section cannot, either within the app or through communications sent to points of contact obtained from account registration within the app (like email or text) encourage users to use a purchasing method other than in-app purchase*.

97. By strictly prohibiting app developers from steering users within iOS apps to third-party purchase systems, the Guidelines mandated the use of Apple's IAP system for all digital content sold on iOS apps. As a result of these provisions, app developers could not offer alternative purchase systems

within their iOS apps or direct users to external payment systems outside of their iOS apps (if the users' contact information was obtained through the app), even if such communications occurred outside the app. Together, these provisions ensured that Apple could dictate the amount of, and collect, its commission on all digital product sales generated through iOS apps, thereby protecting an important revenue and profit source for Apple.

### B. Defendants' Fraudulent Scheme to Maintain Apple's Supracompetitive App Store Revenue

#### 1. Apple's App Store Revenue Has Been Increasingly Threatened by Regulators

98. Prior to and during the Class Period, Apple has faced increasing global regulatory pressures on its massive App Store revenue, including in the U.S., E.U., South Korea, Japan, and the Netherlands. These pressures include antitrust actions and regulations targeting payments systems and anti-steering provisions like those in the Guidelines.

99. For example, 2021 amendments to the Telecommunications Business Act in South Korea banned app store operators, including Apple and Google, from requiring developers to use their in-app payment systems. As a result, developers releasing apps on the App Store in South Korea gained the ability to use "external purchase links," which are links that direct app users to a web address outside of the app to complete their purchase. However, Apple required developers seeking to release an app in South Korea with external purchase links to submit an external purchase link entitlement request form and present the app to Apple for compliance review.

100. Japan and the Netherlands introduced similar regulations. In September 2021, following an investigation by the Japanese Fair Trade Commission, Apple reached a settlement that mandated changes to Apple's anti-steering restrictions on "reader apps" like Spotify, Kindle, and Netflix, which allowed users to access, watch, read, or listen to previously purchased content on iOS apps, including content subscriptions purchased outside of the App Store. Apple also agreed to allow developers of "reader apps" to provide a link on their app to their website to help customer intake and account management. In late 2021, the Netherlands Authority for Consumers and Markets required Apple to allow external purchase links for dating apps. In response, Apple imposed similar requirements as in South Korea.

101. In the E.U., the passage of the Digital Markets Act ("DMA") in September 2022 spawned headwinds for the App Store. For instance, in September 2023, the E.U. designated Apple a "gatekeeper" under the DMA with respect to the App Store, leading to significant changes to the operation of the App Store in the E.U., including permitting third-party app stores, i.e., app stores offered by competing companies, to operate on iOS devices.

102. In response to the increasing regulatory action, analysts have expressed trepidation regarding the future of the App Store. On January 29, 2021, HSBC analysts expressed concern that Apple was facing a potential risk equivalent to $34.50 per share since "regulators across the globe keep scrutinising [sic] App Store terms and conditions while the European Commission is making progress with its digital levy." In September 2021, analysts at Bernstein noted the regulatory headwinds facing Apple, stating "the regulatory pressures and concessions made by Apple over the last month are material, highlighting inexorable pressure on the App Store." On February 20, 2023, with the DMA regulations on the horizon, Bernstein analysts stated that "**the biggest risks to Services growth**" were "**regulatory**." (emphasis in original). On January 17, 2024, analysts at Evercore cited "[r]egulatory risk to the App Store revenue model" as the primary risk to Apple. On January 22, 2024, analysts at Barclays identified "regulation across App Store" as a risk to their valuation and price target for Apple. Just one week later, the Barclays analysts posited that Services segment growth could decelerate in 2024 as "some app store investigations could intensify."

103. As discussed below, the global regulatory pressures that Apple faced propelled it to intensely fight against any restrictions on its U.S App Store practices.

### 2. Epic's Lawsuit Against Apple and the Resulting Injunction

104. Epic Games ("Epic") is a video game company with an estimated valuation of nearly $18 billion. Epic's flagship video game product, *Fortnite*, is a multiplatform product that can be purchased on the App Store and played on iOS devices.

105. *Fortnite* uses a "freemium" model, which allows players to download and play the game for free, but offers additional in-game digital products that can be purchased with V-Bucks, *Fortnite's* virtual currency. V-Bucks are available for purchase in various quantities in-app or directly from Epic's

website. Accordingly, Epic is required to pay Apple a 30% commission on all iOS in-app V-Buck purchases.

106. Epic also operates its own online store, the Epic Games Store, which carries Epic's own games as well as third-party titles. Like the App Store, the Epic Games Store operates with a commission payment structure, charging third-party developers a 12% commission on purchases within their apps.

107. On August 13, 2020, Epic filed a lawsuit in the Northern District of California asserting claims under the Sherman Act, the Cartwright Act, and California's Unfair Competition Law ("UCL") challenging Apple's strict controls over the distribution of software on iOS devices, and Apple's 30% commission on in-app purchases.

108. As part of the lawsuit, Epic argued that Apple's anti-steering provisions and 30% commission on digital product sales limited developers' ability to communicate information to consumers about the IAP payment structure and alternative payment methods. Epic also asserted that Apple should be required to allow third-party app stores, like the Epic Games Store, in the App Store. Apple responded with various business justifications for its App Store policies, including its anti-steering provisions and 30% commission.

109. Following a bench trial, on September 10, 2021, United States District Court Judge Yvonne Gonzalez Rogers issued a decision ("September 2021 Order") and the Injunction. The September 2021 Order included several key findings of fact and conclusions of law that were later upheld by the United States Court of Appeals for the Ninth Circuit in a decision on April 24, 2023.

110. *First*, the court found that Apple's 30% commission did not reflect the costs of running the App Store, such as App Store-specific operating expenses, or allocation of Apple's overall technology and research and development costs, and was not set by competition with other methods of purchasing digital goods, thereby allowing Apple to reap supracompetitive operating margins. Although not illegal, Apple's commission was thus "near the precipice of . . . monopoly power." In support of this finding, Judge Gonzalez Rogers determined that Apple never correlated the value of its intellectual property to the 30% commission and that this commission was not tied to anything in particular. Instead, the basis for Apple's commission was maintaining App Store profits, as shown by a question posed by Schiller, a senior Apple executive and Apple Fellow, in a 2011 email, asking "once [Apple is] making over $1B a year in

profit from the App Store, is that enough to then think about a model where we ratchet down from 70/30 to 75/25 or even 80/20 if we can maintain a $1B a year run rate?"

111. *Second*, the September 2021 Order found that Apple's anti-steering restrictions artificially increased Apple's market power by preventing developers from communicating about lower prices for digital products offered on other platforms. In support of this finding, Judge Gonzalez Rogers cited testimony from app developers Match Group and Down Dog that they had been unable to entice users to purchase digital goods on other platforms with lower prices. For example, "while 90% of Down Dog's Android users make purchases on the web, only 50% of its iOS users do so, even though about half of its total revenues still come from iOS users." This showed that "Apple's anti-steering provision has prevented it from directing users to the cheaper price." Judge Gonzalez Rogers found that the anti-steering provisions violated California's UCL.

112. As a remedy for Apple's violation of the UCL with respect to the anti-steering provisions, Judge Gonzalez Rogers issued the Injunction, which enjoined Apple from prohibiting "buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to IAP." The Injunction also barred Apple from prohibiting developers from "[c]ommunicating with customers through points of contact obtained voluntarily from customers through account registration within the app." This remedy, which targeted Apple's anticompetitive anti-steering restrictions, aimed to "increase competition, increase transparency, increase consumer choice and information while preserving Apple's iOS ecosystem which has procompetitive justifications."

### 3. Following Its Unsuccessful Appeals, Apple Announces Changes to Its App Store Guidelines That Purportedly Comply with the Injunction

113. Apple appealed the September 2021 Order and the Injunction to the Ninth Circuit. On April 24, 2023, the Ninth Circuit affirmed Judge Gonzalez Rogers' finding that the anti-steering provisions violated the UCL and upheld the Injunction. Thereafter, on January 16, 2024, the Supreme Court declined review. During this time, the Injunction was stayed. On January 17, 2024, the Injunction went into effect.

114. The day before the Injunction took effect, on January 16, 2024, Apple filed a Notice of Compliance with UCL Injunction ("Notice of Compliance") on the *Epic Games* docket in the Northern

District of California. In the Notice of Compliance, Apple explained what its purported compliance program entailed:

> [Apple] is striking the relevant parts of the App Store Review Guidelines applicable to apps on the U.S. storefronts of the iOS and iPadOS App Stores and implementing new rules that permit developers to (i) include in their apps buttons or links with calls to action that direct customers to purchasing mechanisms in addition to IAP and (ii) communicate with customers through points of contact obtained voluntarily from customers through account registration within the app. As a result of these changes, developers have the option of informing consumers, both within and outside the app, about alternative purchase mechanisms in addition to IAP.

115. With its Notice of Compliance, Apple attached a declaration by Fischer that outlined Apples' purported compliance program ("Fischer Declaration"). Fischer signed his declaration in his capacity as Apple's Head of Worldwide App Store on January 16, 2024, "under penalty of perjury."

116. Regarding Apple's purported compliance program, the Fischer Declaration stated:

> 4. With respect to part (i) of the injunction, Apple has modified the App Store Review Guidelines to permit developers to include in their apps buttons or external links with calls to action that direct customers to purchasing methods in addition to IAP. Specifically, Apple has created a new "StoreKit External Purchase Link Entitlement (US)" (the "Link Entitlement"), which permits any developer to include in apps on the U.S. storefronts of the iOS and iPadOS App Stores information about alternative purchase options and a link to the developer's external website.
>
> 5. With respect to part (ii) of the injunction, Apple has revised its Guidelines to permit developers to communicate with users outside of the app about purchasing methods other than IAP, including through points of contact obtained through account registration within the app and with the user's consent.

117. Fischer explained that, under the modified Guidelines, Apple's "Link Entitlement" program permitted developers to include links to their own payment methods ("External Purchase Links") in their apps on Apple's U.S. App Store. An External Purchase Link is a link in an iOS app that takes users to a website outside the app to purchase digital products ("link-out purchases"). In order to participate in the Link Entitlement program, Fischer explained that app developers needed to apply and submit their proposed app design for Apple's approval, per the modified Guidelines.

118. Apple's Link Entitlement program included five main components: (i) a 27% commission on link-out purchases; (ii) placement and design restrictions on External Purchase Links; (iii) warning

screens and static URLs; (iv) limitations on calls to action; and (v) exclusions from the Link Entitlement program for developers already participating in other reduced commission programs.

119. Apple enumerated the various requirements for participation in its new Link Entitlement program in the Fischer Declaration, including that "developers must provide Apple with details about their app, the proposed External Purchase Link, and the website to which users will be directed" and "agree to the terms and conditions of the Link Entitlement, which are set forth in an addendum to the DPLA titled the 'StoreKit External Purchase Link Entitlement Addendum for US Apps.'"

120. The Fischer Declaration also outlined the "technical requirements" to qualify for Link Entitlements, including that the developer "must continue to offer in-app purchases" and "may not discourage end users from making in-app purchases." As described by Apple in the Fischer Declaration, the Link Entitlement program included the following additional "technical requirements."

121. **System Disclosure Sheet**. To qualify for a Link Entitlement, Apple required that developers include a "system disclosure sheet" when a user clicked on an External Purchase Link that "explains to users that they are leaving the app and going to an external website to make purchases through a source other than IAP."

122. The Fischer Declaration included an example of the required "system disclosure sheet," which "also advises users that certain App Store-specific features will not be available if they proceed," such as "subscription management or process[ing] refund requests for digital goods and services":




123. **Placement and Design Restrictions**. Apple required that External Purchase Links "[b]e accompanied by language and a button adhering to the requirements provided" by Apple in "several templates—with specified language and formatting—that developers may use for External Purchase Links," "[b]e displayed . . . on no more than one app page the end user navigates to (not an interstitial, modal, or pop-up), in a single, dedicated location on such page, and may not persist beyond that page," and "[n]ot be displayed on any page that is part of an in-app flow to merchandise or initiate a purchase using in-app purchase." These requirements meant that if an iOS app had a shop where users could purchase digital products, like *Fortnite* V-Bucks, the external link could not be placed anywhere in that shop. Instead, Apple required developers to place the link on a separate dedicated page within the iOS app that the user would need to navigate to, and the External Purchase Link would need to further conform to Apple's language and design restrictions.

124. The Fischer Declaration listed the Apple-approved language that the Company required app developers to include in External Purchase Links, including: "For special offers go to [X]"; "Lower prices offered at [X]"; "To get [X%] off, go to [X]"; and "Buy for [$X.XX] at [X]." If Apple did not approve a call to action, the app developer could not include it within an iOS app. In addition, Apple mandated that

app developers use what they called a "Plain Button style" for External Purchase Links. These so-called buttons could not be enclosed in a shape that used a contrasting background (as a user would expect for a typical button in an app). Rather, the background behind the text had to match the background of the iOS app's page.

125. **Static Links**. Apple also required that External Purchase Links be "statically-defined." A static link, or static URL, sends a user to a pre-defined webpage, with no other features besides taking the user to that specific webpage. By contrast, a dynamic URL can attach data like user identity, geolocation, and session information, and automatically log that user into their account after clicking the link. This meant that after a user clicked on an External Purchase Link, they had to reenter their username and password, among other information, if they wanted to purchase a digital product outside of the app.

126. **27% Commission**. In addition to its restrictions on the design and placement of External Purchase Links, Apple "charge[d] developers a 27% commission on digital goods and services transactions that take place on a developer's website within seven days after a user taps through an External Purchase Link from the system disclosure sheet to an external website," though "[d]evelopers eligible for and participating in the App Store Small Business Program will be charged a 12% commission" on such purchases. Moreover, "[a]uto-renewals in the second year or later of an auto-renewing subscription that was purchased within seven days after a user taps through an External Purchase Link will be charged a 12% commission." Thus, with limited exceptions, Apple received a 30% commission on purchases of digital products using IAP and 27% on link-out purchases that occurred within seven days of the user clicking the External Purchase Link.

#### 4. Apple Claims That the Changes to Its Guidelines "Fully Complied" with the Injunction

127. Defendants repeatedly claimed that the components of Apple's Link Entitlement program, including the 27% commission, complied with the Injunction. Beginning with the Notice of Compliance on January 16, 2024, Defendants claimed that "***[a]s of January 16, 2024, Apple has fully complied with the Injunction***."

128. Additionally, in his declaration, Fischer stated under penalty of perjury in his capacity as Apple's Head of Worldwide App Store that "***Apple has complied with the injunction as set forth herein***."

Fischer stated that the "requirements that Apple has implemented" were "***to protect users and the integrity of iOS and iPadOS***." More specifically, he stated that "the requirements of the Link Entitlement ***help to inform users of the benefits they may be losing and the risks they are assuming when they leave the App Store ecosystem, while still allowing developers to communicate with users regarding purchase alternatives***." Fischer further claimed that Apple's External Purchase Link requirements were "***designed to minimize fraud, scams, and confusion***." Regarding the system disclosure sheet, Fischer claimed that "***[t]he purpose of this disclosure is to ensure users understand they are leaving the App Store ecosystem and accepting the risks presented by an external website on the open Internet***."

129. Fischer also attempted to justify Apple's commissions in his declaration as follows:

> All App Store developers—including those who choose to use the Link Entitlement—benefit from (among other things) Apple's platform integrity, proprietary tools and technologies protected by intellectual property, developer services and support, services that help developers acquire, retain, and reengage users, marketing and external advertising, and a safe environment for users to download and purchase apps and in-app content.
>
> * * *
>
> ***The App Store affords many more tools to developers than most platforms, and seven days also appropriately credits Apple for facilitating linked transactions***.

130. Nevertheless, on March 13, 2024, Epic filed a motion disputing Apple's compliance with the Injunction and seeking to enforce it and hold Apple in contempt. On April 12, 2024, Apple filed its opposition to Epic's motion (the "Opposition"). In the Opposition, the Company represented that it had implemented "***a comprehensive regime that complies with the letter and spirit of the Injunction***" and that "***Apple's framework for injunction compliance was implemented*** . . . ***after extensive study, for the benefit of all platform participants***."

131. With respect to the components of its Link Entitlement program, Apple stated:

> ***Apple carefully analyzed what commission structure would be fair and competitive in view of the substantial value Apple provides to developers***. . . . ***Apple also put guardrails on in-app communications, which were implemented only after considering existing entitlements for in-app links and the security and privacy issues that links present***.

132. In defending its new "guardrails on in-app communications," Apple cited the Fischer Declaration attached to the Company's Notice of Compliance, claiming that "***these requirements 'are***

***designed to minimize fraud, scams, and confusion***,'" and that "***[t]hese requirements further help Apple protect its users by making clear the point at which the user is going to leave the App Store ecosystem***."

133. Apple justified its 27% commission on link-out purchases by stating that "developers use and benefit from Apple's tools and technologies when a user taps on an external link and makes a purchase," and critically, that "***the commission amounts represent a fair estimation of the value Apple provides***."

134. Finally, the Opposition denied Epic's arguments that Apple should be held in contempt. Apple stated, "***As always, Apple prioritized the security and privacy of its users, as well as the integrity of the iOS platform***. Apple acted in good faith at every step to fulfill the letter and purpose of the Injunction."

135. In support of Apple's defense of its Link Entitlement program, Apple filed a partially sealed declaration by Roman ("Roman Declaration"). In the unredacted portion of the Roman Declaration, Roman described, "under penalty of perjury" in his capacity as Vice President of Finance at Apple, Apple's purported decision-making process with respect to the 27% commission. Apple claimed in the Roman Declaration that "***prior to determining its commission structure for Link Entitlement***," Apple engaged an outside consultant, the Analysis Group, and that Apple set the 27% commission on link-out purchases, in part, based on "certain aspects of Analysis Group's findings."

### 5. During the Class Period, Defendants Falsely Represent to Investors That Apple Complied with the Injunction

136. On April 23, 2024, Judge Gonzalez Rogers ordered an evidentiary hearing on Epic's motion to enforce the Injunction, finding that "an evidentiary hearing [wa]s necessary to explore the factual bases for [Epic's] motion." Judge Gonzalez Rogers ordered that at the hearing, among other issues, "the parties shall provide evidence concerning . . . the external link entitlement program and related requirements, technical or otherwise" and "the decision-making process relative to Apple's commission structure for out-of-app purchases and impact of such structure." Judge Gonzalez Rogers "anticipate[d] discussion of this process will touch on the Analysis Group report referenced in Alex Roman's sealed declaration," and so ordered Apple to file the Analysis Group report under seal and have Roman attend the evidentiary hearing.

137. On May 3, 2024, the first day of the Class Period, Defendants represented in the Company's 2Q 2024 Form 10-Q that "***[o]n January 16, 2024, the Company implemented a plan to comply with the injunction and filed a statement of compliance with the California District Court***." Defendants repeated this claim in each of the Company's quarterly and annual reports on Form 10-Q and Form 10-K during the Class Period, each time referencing the Notice of Compliance. Specifically, Defendants made this claim in the Company's 3Q 2024 and 1Q 2025 Forms 10-Q, filed on August 2, 2024 and January 31, 2025, respectively, and in the Company's FY 2024 Form 10-K, filed on November 1, 2024. In each of these SEC filings, in addition to directing investors to Apple's Notice of Compliance, Defendants also referenced the Opposition, stating that "[t]he Company has filed an opposition to Epic's motion."

138. On the heels of Apple's 2Q 2024 Form 10-Q, Judge Gonzalez Rogers held a six-day evidentiary hearing on Epic's motion to enforce the Injunction, commencing on May 8, 2024. Senior Apple employees with knowledge of Apple's Injunction response testified, including Schiller, Roman, Fischer, and Carson Oliver, Apple's Senior Director of Business Management, App Store.

139. On May 8, 2024, Fischer testified that "***[w]e respect the injunction and we've complied with the injunction***" and that "***we changed our guidelines to comply with the injunction***."

140. On May 10, 2024, Roman defended Apple's 27% commission on link-out purchases on the basis of "the value that the App Store provides"; in other words, Apple's proprietary tools and technologies that facilitate link-out purchases. Roman also testified that despite the application of the 27% commission to link-out purchases for a seven-day period, Apple had "***determine[d] that developers would be incentivized to proceed with such linkout entitlements***" and that "***it would be tremendously advantageous for developers***." On May 16, 2024, Oliver similarly testified that Apple's commission reflected "***the value of the services***" it provides and was "***a reasonable approach***" under the Injunction.

141. On May 22, 2024, Schiller claimed that Apple's restrictions on External Purchase Links protect users against "***fraudulent conduct***" and "***confusion***" and "***protect the privacy of consumers***."

142. Based on the testimony from Apple's executives during the May 2024 evidentiary hearing, Judge Gonzalez Rogers became concerned that Apple was withholding information regarding its response to the Injunction, including the extent to which Apple relied on the supposedly bottom-up analysis by the

Analysis Group in setting its 27% commission, as Apple claimed in the Roman Declaration and in Roman's and Oliver's testimony during the May 2024 evidentiary hearing.

143. On May 31, 2024, Judge Gonzalez Rogers ordered Apple to immediately produce "all of Apple's documents relative to its decision-making process with respect to the issues in front of the Court," explaining that "I need to understand what it was people were thinking and how you got to a 27 percent charge from a 30 percent charge that had been found to be anti-competitive." Judge Gonzalez Rogers referred discovery matters to Magistrate Judge Thomas S. Hixson, who set a deadline of September 30, 2024, for Apple to complete its production.

144. Amidst the ongoing *Epic Games* litigation, Defendants continued to claim in Apple's Form 10-Q and Form 10-K filings that "***the Company implemented a plan to comply with the injunction***," pointing investors to the Notice of Compliance and the Opposition. Defendants repeated these claims in Apple's 3Q 2024 and 1Q 2025 Forms 10-Q and FY 2024 Form 10-K.

145. In a December 16, 2024 filing on the *Epic Games* docket, Apple represented that it had "complied with the Injunction." As part of a January 2, 2025 filing, Apple again claimed that it had "complied with the Injunction," citing the Notice of Compliance.

### 6. Investors and Analysts Credited Defendants' Claims That Apple Complied with the Injunction

146. Defendants' repeated statements that Apple had complied with the Injunction had the intended effect. Market commentary both prior to and during the Class Period shows that investors credited Defendants' statements and did not believe that ongoing litigation with Epic would lead to additional changes to the App Store or a significant reduction in App Store revenue.

147. For example, in a January 17, 2024 report titled *Thinking Through Recent Supreme Court Decision In AAPL vs. EPIC*, Evercore stated that "it's worth noting that AAPL is making adjustments to their App Store rules to allow developers to link outside payment methods," but that "AAPL will still charge a commission (12% for Developers within AAPL's SMB program, 27% for others – 300bps lower than their historical take rates)." Evercore concluded that "[w]e think the current changes are a relative win for AAPL and ensure the moat remains intact. Furthermore, *we think the financial impact to AAPL broadly and even services will be largely minimal from these changes*." In support of this assessment, Evercore

"estimate[d] the App Store accounts for $16B in revenue and $0.50 in EPS," and "even if one assumes 100% adoption of this in the US (US accounts for ~25% of APP store sales), the impact will be sub $600M annually and minimal to EPS."

148. In a January 20, 2024 report, Capstone similarly reviewed Apple's new Link Entitlement policies and concluded that "[w]hile Epic Games has indicated it may contest Apple's compliance with the permanent injunction, we believe Judge Gonzalez Rogers would hesitate to take a more active role in overseeing these practices."

149. On April 16, 2024, Evercore published a report on Apple, titled *Primer on Anti-Trust Risk. Does it Go Beyond Bad Headlines?*, that discussed regulatory actions and antitrust litigation pending against the Company. Evercore described the *Epic Games* litigation as a "clear victory" for Apple:

> Apple has consistently prevailed in US courts against numerous challenges. Apple's most recent US case was against Epic Games and they were able to prevail by leveraging their user safety defense and also preventing Epic from defining iOS as a single market. Apple did lose on a couple of minor points, but overall it was a clear victory.

150. The market's assessment of the minimal risk to Services revenue was largely unchanged as a result of Epic's arguments about Apple's Link Entitlement program. After Judge Gonzalez Rogers ordered an evidentiary hearing on Epic's motion to enforce the Injunction, on May 1, 2024, Capstone stated that it believed that "further adjustments are likely to center on specific obligations that Apple requires developers to follow to receive access to 'External Purchase Link Entitlement.'" The report concluded that "[b]ased on the likely outcome, Capstone believes Apple remains well-positioned to manage any additional modifications that the judge will order and the overall impact of the order will continue to be limited."

151. Moreover, in reporting on the ongoing litigation between Epic and Apple, media outlets regularly highlighted Apple's claims that its Link Entitlement program complied with the Injunction. For example, in an April 13, 2024 report, titled *Apple denies violating US court order in Epic Games lawsuit*, Reuters cited Apple's Opposition, reporting that "[t]he Apple filing criticized what it called an attempt by Epic to make Apple's 'tools and technologies available to developers for free'" and that "Epic, it said, wanted the court 'to micromanage Apple's business operations in a way that would increase Epic's profitability.'" On April 24, 2024, in an article titled *Apple And Fortnite Maker Epic Games Are Heading*

*Back To Court Again — Here's Why*, Forbes reported that Apple "has previously denied violating the court order and accused Epic of trying to 'micromanage' its business operations to increase its own profits."

152. In a May 8, 2024 article reporting on the May 2024 evidentiary hearing, the Associated Press reported that "Fischer maintained Apple is complying with the judge's order while still trying to shield iPhone users from bad actors on the internet and enabling [Apple] to reap a return on its investments in the app store and other mobile software." Similarly, in a May 22, 2024 article, titled *Apple exec Schiller defends App Store changes in Epic Games case*, Reuters reported that "Schiller and other executives have said the new policy, which Epic cited as evidence of Apple's non-compliance, was a legal, legitimate business decision." The article quoted Schiller's May 2024 testimony that "[w]e're now competing to encourage developers to use our payment system," that "the company had worked hard following the 2021 injunction to develop its new program," and that "[w]e have an interest with the court to get this accepted and adopted."

### 7. Defendants Knowingly Violated the Injunction

153. Contrary to Defendants' statements during the Class Period, Defendants knew that Apple's Link Entitlement program, including the 27% commission on link-out purchases, did not comply with the Injunction. As Judge Gonzalez Rogers later found in the April 2025 Order, rather than simply abide by the Injunction, Apple "institute[d] a new de facto anticompetitive structure" due to its "*motive to protect its illegal revenue stream*," and "then create[d] a reverse-engineered justification to proffer to the Court."

154. As discussed below, Apple designed the Link Entitlement program to subvert the goals of the Injunction, and as implemented by Apple, the Link Entitlement program violated the Injunction. With respect to each component of the Link Entitlement program, "contemporaneous business documents reveal[ed] that Apple knew exactly what it was doing and at every turn chose the most *anti*competitive option." (emphasis in original). This internal evidence, summarized below, was initially "*hidden from the Court and not revealed until the [February] 2025 hearing*." As Judge Gonzalez Rogers found, this "evidence clearly and convincingly demonstrates that Apple *willfully* chose to ignore the Injunction, *willfully* chose to create and impose another supracompetitive rate and new restrictions, and thus *willfully* violated the injunction." (emphasis in original).

**a. Apple's Initial Response to the Injunction**

155. Within days of the September 2021 Order, Apple designated Schiller as the head of the Injunction response team. As Schiller testified in February 2025, he "led the team on the App Store that was responsible for doing the work to plan for Apple's response to the injunction." Schiller also was a member of the Pricing Committee, which made final decisions regarding Apple's response to the Injunction. Defendants Maestri and Cook both served on the Pricing Committee as final decisionmakers. Pricing Committee meetings were convened on an ad hoc basis, and as Schiller testified, a 2/3 vote was needed to approve an Injunction-compliance decision.

156. Apple initially referred to its response to the Injunction as "Project Michigan." Project Michigan leveraged ongoing work to comply with regulations impacting the App Store in other jurisdictions, including South Korea, which had required Apple to allow app developers to offer alternative payment solutions. For instance, notes from a September 13, 2021 meeting to discuss Apple's response to the South Korea regulations show that Apple considered three main approaches: (i) allow link-out purchases with no limitations; (ii) allow alternative payments but charge a commission for link-out purchases; or (iii) charge developers based on different metrics such as downloads or redownloads. Oliver, an attendee of this meeting, testified in February 2025 that Apple chose option two—charging a commission on link-out purchases—for the South Korea response.

157. The meeting notes show that members of the Injunction response team also discussed Apple's response to the Injunction during the September 13, 2021 meeting. During the meeting, the Injunction response team considered the ramifications of the South Korea decision on Apple's Injunction compliance plan, questioning whether charging a commission was possible in the U.S. in light of the Injunction. Specifically, the notes stated that "YGR [Judge Gonzalez Rogers] opinion needs to be taken into account; *charging for a commission – is it fine to do?!*"

158. As these notes demonstrate, from the very beginning of Apple's purported compliance efforts, Apple knew that charging a commission on link-out purchases in the U.S. potentially violated the Injunction.

159. Thus, Judge Gonzalez Rogers found in the April 2025 Order that "it was immediately apparent to the Apple working group that the commission issue, including whether and how much, was core to compliance with the Injunction."

160. Apple's initial response to the Injunction also included work on the warning screens that popped up when users clicked on External Purchase Links. In November 2021, Apple developed a range of warning options with increasing severity, as shown in an appendix to a draft presentation for the Injunction response team's November 15, 2021 meeting. Onak, a User Experience Writing Manager at Apple, explained these mockups in his February 2025 testimony.

161. At one end of the spectrum was no pop-up warning at all, and at the other a full-screen pop-up warning. As the mockup reproduced below shows, the option on the left, described as a "Link," simply directed the user to the external website without any other pop-up or warning. The "Dialog" option in the middle generated a small pop-up when a user clicked on an external link, simply stating that the user "will leave the app and go to the developer's website." The final option, the "Sheet," provided the most alarming warning, taking over the entire screen and telling users that any purchases made on the external site were "without any participation from Apple." The Sheet option also provided users with an option to link to an Apple website to "[l]earn more about making purchases on the web, and the benefits of paying in app through Apple."




162. Confirming that Apple's goal in designing these warnings was to deter link-out purchases, in a November 16, 2021 internal discussion among Apple designers, Onak suggested that the full-screen takeover should state that the user would be "taken to an external website" because "*'external website' sounds scary, so execs will love it*." When asked during the February 2025 hearing what he meant by "execs," Onak confirmed that he was referring to Schiller.

163. Other designers similarly suggested that replacing the app name with the developer's name would make it "*even worse*."

164. Based on this evidence, in the April 2025 Order, Judge Gonzalez Rogers referred to these warning screens as "scare screen[s]," indicating Apple's desire to deter users from completing link-out purchases.

**b. Project Wisconsin: Apple's Renewed Injunction Response**

165. Project Michigan came to an abrupt halt on December 8, 2021, when the Ninth Circuit issued a stay of the Injunction pending Apple's appeal. As the April 2025 Order explained, although Project Michigan was put on hold, Apple continued working on compliance measures, namely pop-up warning screens, for similar regulations in other countries, including in Japan and the Netherlands.

166. After the Ninth Circuit affirmed the Injunction on April 24, 2023, Apple resumed its purported compliance efforts, this time under the codename "Project Wisconsin." Apple's renewed decision-making process with respect to each component of its purported Injunction-compliance program is detailed below.

**i. 27% Commission and the Seven-Day Session Window**

167. On May 18, 2023, Schiller and other members of the Injunction response team, including Oliver, Vij, and Fischer, met to discuss Project Wisconsin, as documented by a "Wisconsin Business Update" meeting invite.

168. Oliver testified in February 2025 that he was "one of the leaders of the working group that was tasked with modeling, analyzing, and making recommendations on Apple's response to the injunction," and that "in that context, [he] prepared slides for, presented [a]t, and attended meetings with executives about Apple's planned response to the injunction." Oliver further testified that "Schiller and the rest of the executive team are the people who instructed [him] to prepare those slides for them and -- and those analyses," and "in general," he "analyzed and presented to the executive team on a variety of topics including the structure of the commission that Apple considered imposing on linked out purchases, the placement of external links, and the design of external links." Oliver confirmed that "Mr. Cook, Mr. Maestri, and Mr. Schiller, as part of something referred to as the pricing committee, ultimately decided on the parameters of Apple's response to the injunction."

169. As the internal presentation for the May 18, 2023 meeting reflects, the Project Wisconsin team discussed the contours, risks, and tradeoffs of two proposals. Proposal 1 included *no commission*, but had design and placement restrictions on External Purchase Links. With respect to Proposal 1, the team identified key risks such as creating a channel for developers without commissions and diverging from existing and future approaches (such as those being implemented outside of the U.S.).




170. Proposal 2 had a 27% commission (a 3% discount), but *no restrictions* on the design or placement of External Purchase Links. With respect to Proposal 2, Apple identified the risk of commission collection issues. In other words, both proposals involved the risk of reduced revenue, either through the absence of a commission or the difficulty in collecting a commission.



171. While the "Est. Revenue Impact" was redacted in the presentation, Judge Gonzalez Rogers later found in the April 2025 Order that in assessing the revenue impact of each of the proposals, Apple determined that Proposal 2 would result in *tens of millions* of dollars in lost revenue, while Proposal 1 risked losing potentially *billions* of dollars in revenue:

> In short, Apple estimated, and both Messrs. Schiller and Oliver acknowledged, that as of May 2023 the revenue impact of a no-commission option with placement restrictions (Proposal 1) posed a *significantly larger hit to Apple* than the impact of a 27% commission option without placement restrictions (Proposal 2).

172. On May 30, 2023, Oliver received feedback from the developer of the popular dating app Bumble regarding the viability of a 27% commission. Bumble explained that a 3% discount on Apple's standard 30% commission was not economically viable because the costs and fees associated with link-out payments exceeded 3%. In fact, Bumble specifically told Apple that their payment processing fees were already too high to take advantage of Google's link-out program that offered a 4% discount. Simply put, Bumble notified Apple that despite the 3% discount, link-out purchases would be ***less profitable*** for Bumble than IAP, as reflected in the below presentation.




173. On June 1, 2023, senior Apple executives, including Defendants Cook and Federighi, Schiller, Oliver, Vij, Fischer, Roman, and others, attended an "Epic Injunction Implementation" meeting.

174. The meeting presentation modeled the revenue impact of different discounted commission rates (3%-7.5%) and link-out billings share—i.e., the percentage of link-out purchases. Consistent with the feedback from Bumble, Apple's modeling showed that utilizing these discounts "*[m]ight not be economically viable for developer[s] to shift*" from IAP, regardless of the volume of link-out purchases.




175. The internal presentation notes reflected Apple's uncertainty as to whether it could charge a commission on link-out purchases without violating the Injunction. The notes stated that "[i]f we decided *and had the ability to charge a commission*," there would be little developer adoption with a "cost of payments discount at 3%." The presentation notes further stated that "[w]e ran the commission option through our developer decisioning model as well *but this will likely not make economic sense for the vast majority of developers with the 3% discount*." Assuming "low developer count adoption and low [link-out purchases] billings share," Apple modeled that "*the revenue impact would be closer to zero*."

176. Knowing that the higher they set Apple's commission on link-out purchases, the lower the impact on Apple's revenue, Apple executives sought to craft a commission from the top down, in the range of what they thought "*the judge will accept*," starting with the minimum permissible discount. Specifically, Apple's senior executives instructed the Finance team to come up with scenarios to "*limit the ruling*," subject to the approval of Cook, Schiller, and Apple's legal department, as reflected below.

## Wisconsin Proposals 6/1

**Next steps**
- Finance team to look at impact to the business for both Option 1 and 2. Assume we're charging a % (doesn't't' matter how much)
- Business team to define the 2-3 scenarios where we can limit the ruling where Tim, Phil, and Legal are comfortable with
    - What will we allow them to do, and where will we allow them to do it
- Figure out a system of collection from link outs
- Eddy to follow up with Luca on collections
- What will meet the spirit of the decision while making it possible to review and validate them
    - What level of restriction is reasonable on language and designs
- Come up with a couple of models in the spectrum of what we think the judge will accept. Start with the minimum.
- Who should decide? Phil, Legal, someone else on opposite ends of goal posts

**Notes**
- July 5th is the compliance date. This is when we need to go before the court and explain how we plan to comply

Attorney Client Privilege

177. In the April 2025 Order, Judge Gonzalez Rogers found that "the obvious inference to draw from these statements" is that the Injunction response team sought "to protect Apple from an anticipated loss of revenue which would naturally spring from the competition the Injunction sought to stimulate."

178. On June 13, 2023, the Project Wisconsin team, including Fischer, Oliver, and Vij, met again to discuss commission proposals from the Finance team, as reflected in a "Wisconsin: Team Commission Follow-Up" meeting invite.

179. The internal presentation for the June 13, 2023 meeting included one option, referred to as the "Standard Commission Discount," reflecting Apple's top-down approach, which Apple ultimately selected. As reflected in the presentation, under this approach, Apple would discount the commission on link-outs based on developers' cost of payments, nullifying the effect of the discount.




180. The Project Wisconsin team once again acknowledged the non-viability of a small commission discount for app developers. The presentation stated that Apple believed "*[d]evelopers will claim that a small discount will not provide enough margin to compete on price*," which was a difficulty Apple was then facing in the Netherlands. The team's internal justifications further demonstrate Apple's disregard of the goals of the Injunction. The presentation argued that the standard 30% commission, which Judge Gonzalez Rogers (and the Ninth Circuit) already found was supracompetitive, was "fair and defensible."

181. Another critical Project Wisconsin commission meeting occurred on June 20, 2023, as evidenced by a meeting invite sent to Defendants Cook, Maestri, and Federighi, as well as Fischer, Schiller, and Roman.

182. At that time, barring another stay, Apple was only about two weeks away from the go-live date (July 5, 2023) for implementing its supposed compliance plan. However, as Oliver testified in February 2025, there was still disagreement among the Project Wisconsin team about whether Apple could charge a commission under the Injunction. Oliver testified that Roman and Defendant Maestri were pushing for a commission on link-out purchases.

**Q.** *Do you remember that at meetings with Mr. Cook, there were in fact people who felt strongly that there should not be a commission and people who felt strongly that there should be a 27 percent commission?*

**A.** *I remember there was debate about that, yes.*

* * *

**Q.** *And among the people who are on the no commission, we named Mr. Schiller, correct?*

**A.** *I remember that, yes.*

* * *

**Q.** Okay. Do you remember that there were people who were advocating 27 percent?

**A.** Yes. At -- at this point in time in June 13th?

**Q.** As of June of 2023.

**A.** Yes.

**Q.** Okay. Who were those people?

**A.** *I believe that Luca Maestri and Alex Roman would have been among those people.*

**Q.** Thank you.

*And the ultimate arbiter between those two teams was Mr. Cook, correct?*

**A.** *Well, informed by legal's guidance as well about what they felt was reasonable in terms of complying with the injunction.*

183. Significantly, as the April 2025 Order noted, Schiller actually attended the trial and had read the Injunction, and advocated *against* charging a commission. In a June 16, 2023 email to Cameron, Schiller declared that "clearly I am not on team commission," stating that his concerns with the commission were well documented internally. As Schiller wrote, he "already explained [his] many issues with the commission concept so [he] won't repeat them."

184. On June 19, 2023, Cameron forwarded Schiller's June 16, 2023 email expressing his concerns with the "commission concept" to members of Apple's executive leadership team, including Defendant Federighi, and Joswiak, Cue, and Adams. Cameron's email attached an "Epic Injunction Implementation Proposal" presentation for the June 20, 2023 meeting, stating, "The team has incorporated your collective feedback into a new version of the deck, which is attached below for your review. We will

use this in tomorrow's review with Tim [Cook] at 1pm." Cameron also copied senior members of the Injunction response team, including Schiller, Roman, Oliver, and Vij, as well as Mark Perry, a partner at Weil, Gotshal & Manges LLP, Apple's outside counsel in the *Epic Games* litigation.

185. Schiller testified in February 2025 that he was "*concerned that if Apple charged a commission, it would run afoul of the injunction*." As Schiller testified, he communicated his "*many issues*" to "his colleagues."

186. Contemporaneously, other employees working on the Injunction response were attempting, without success, to manufacture rationales for different commission rates that would pass muster under the Injunction. As a June 15, 2023 email from Timothy "Timo" Kim to Jennifer Brown admitted, members of the Injunction response team "*struggled to land on ironclad pricing rationales* that would (1) *stand up to scrutinizing comparisons with defenses of the commission and existing discounting approaches in other jurisdictions* and (2) *that we could substantiate solidly on a bottoms up basis* without implicitly devaluing our IP / proprietary technology." Kim added that "[a]ll things being equal, my $0.02 is that a lower commission rate option doesn't represent a material improvement in the logical grounding relative to the 27%, continues to place the lion's share of the financial risk and calculus on Apple, and *just makes us less money*."

187. In his February 2025 testimony regarding this email, Oliver confirmed Apple's "struggle" to justify its planned commission under the Injunction.

> **Q.** *And so the Project Wisconsin team was struggling to come up with rationales for a 20 percent fee, for example, that would withstand comparisons to whatever defenses Apple was making off its commission in other countries such as the 27 and 26 percent in Korea, right?*
>
> **A.** *Yeah, justifying the -- the difference between those two.*
>
> * * *
>
> **Q.** And Mr. Kim then goes on to say that the lower commission rate option continues to place the lion's share of the financial risk and calculus on Apple, correct?
>
> **A.** Yes.
>
> **Q.** *You understand that the injunction was intended to place probably all of the financial risk on Apple, correct?*
>
> **A.** *Yes, I assume so.*

188. In the midst of Apple's internal struggle to justify charging a commission on link-out purchases, Defendants Cook and Maestri, Schiller, Oliver, and others attended the June 20, 2023 meeting, as confirmed by February 2025 testimony from Schiller. The internal presentation for the June 20, 2023 meeting reflects that, during the meeting, the Injunction response team discussed two "Compliance options,"—one with a commission on link-out purchases and one without a commission.

189. As the presentation shows, Option 1 had *no* commission, but *included* design and placement restrictions (discussed in further detail below). Option 2 had a 27% commission with a 24-hour session window, but *no* placement or design restrictions. This presentation further demonstrates that Apple internally viewed the no commission (with placement and design restrictions) *or* commission (without placement and design restrictions) options as binary, and not complementary, "Compliance options."


Compliance options

| | | Option 1: No Fee | Option 2: Fee |
|---|---|---|---|
| Different Approach | Fee | None | Commission or flat fee |
| | Style | Plain link or button | Developer-styled link or button |
| | Placement | Once per page; Not on same page as Apple IAP buy flow | Once per page |
| Same Approach | Language | Specific pricing; Template only | Specific pricing; Template only |
| | Discouragement | May not discourage or mimic IAP | May not discourage or mimic IAP |

For discussion only

190. As reflected in the below slide from the June 20, 2023 presentation, Apple identified the benefit of the commission option as being "*reduce[d] financial risk versus no-fee option*." However, as Schiller testified in February 2025, the redacted portion of the "Risks" section of this slide identified a "*significant compliance risk because of the proximity to 30 percent commission*." Apple also acknowledged the risk that "*[d]evelopers may claim that a small discount on [an] initial transaction does not allow for price competition*," i.e., that link-out purchases would not be economically viable. Listed last among the

"Risks," Apple flagged a "[s]ignificant collection risk *if* linking out adoption scales," reflecting Defendants' understanding that such widespread adoption was unlikely.




191. In fact, as Vij testified in February 2025, Apple's financial modeling showed that a 27% commission would result in little-to-no decrease in revenue because developers' costs of payments would exceed 3%, thus making link-out purchases "*more expensive to any developer and every developer . . . than an IAP transaction at 30 percent*."

192. During his February 2025 testimony, Oliver confirmed that in the June 20, 2023 presentation he gave to Defendant Cook, he specifically included talking points stating that a commission would result in far less adoption of the link-out option as compared to a no-commission option.

> **Q.** And as the talking points note -- that's in the second sentence -- the key focus of these options is the fee because whether a fee is or is not imposed would heavily influence developer decisioning about directing users out of the app to complete purchases, right?
>
> **A.** Yes, I see that.
>
> **Q.** That's, in other words, *you're telling Mr. Cook if we impose a fee, there will be far less adoption of the linkout option, correct?*
>
> **A.** *That's correct*.

193. Nevertheless, as the April 2025 Order found, the Pricing Committee—Cook, Maestri, and Schiller—decided at the June 20, 2023 meeting that Apple would charge a commission, with the exact rate still to be determined.

194. Additional evidence confirms that Apple's decision to impose a commission was based on Apple's desire to preserve its supracompetitive profits, in violation of the Injunction. As Judge Gonzalez Rogers found in the April 2025 Order, internal documents revealed that Apple knew the no-commission option would "be very attractive to developers," resulting in a large-scale adoption of link-outs that "*would create competitive pressure on IAP*," which was the specific goal of the Injunction. Oliver acknowledged this fact in his February 2025 testimony, and further admitted that he understood creating competitive pressure on IAP was one of the goals of the Injunction.

> **Q.** *And what you're saying here, or what your team was saying here back in May [2023], is that creating that competitive pressure, which is the goal of the injunction, is a risk factor, a key risk factor, correct?*
>
> **A.** *We didn't say it in those words, but yes*.

195. In other words, Apple rejected the no-commission option precisely because it would increase competition with Apple's own payment system, which was the purpose of the Injunction.

196. On June 28, 2023, Defendants Cook, Maestri, and Federighi attended an "Epic Injunction Implementation" meeting along with other members of Apple's executive leadership team, including Joswiak, Cue, and Adams, as confirmed by a meeting invite. Numerous members of the Injunction response team also attended the meeting, including Schiller, Fischer, Oliver, Vij, and Roman.

197. The presentation for the June 28, 2023 meeting shows that the Injunction response team presented three commission options: a 27% commission with a 24-hour time limit, a flat fee per link-out, and a 20% commission for the first year.

198. As Goldberg, a corporate communications director at Apple, testified in February 2025, she took notes during a June 26, 2023 meeting that was held in preparation for the June 28 meeting, and in those notes, she recorded that Defendant Maestri was pushing for the 27% commission.

> **Q.** [W]e know who said something next because it says "*Luca wanted to make it 27 percent*," right?
>
> **A.** That's what it says, yes.

> **Q.** *And that's Luca Maestri?*
>
> **A.** *Yes.*
>
> **Q.** *And so Mr. Maestri, Apple's CFO, as far as you were reflecting in real time, wanted to charge a 27 percent commission for these linkout purchases, right?*
>
> **A.** *That must have been what was relayed and that's what I wrote down.*

199. On July 5, 2023, the anticipated go-live date for the Injunction response, the Project Wisconsin team met to decide the commission question. As Schiller testified in February 2025, at the meeting, the Pricing Committee (Cook, Maestri, Schiller) decided on a 27% commission with a seven-day session window, including purchases made off of the iPhone. Schiller testified as follows:

> **Q.** Yeah. So despite all those concerns that you expressed to your colleagues, Apple nevertheless made the decision to go ahead and charge a commission on the external purchases made through the link implemented in response to this Court's injunction, correct?
>
> **A.** Yes.
>
> **Q.** All right. Who made that decision? Which person at Apple ultimately decided to charge a commission?
>
> **A.** Ultimately it was the -- the pricing committee approval that we've already talked about at length, yes.
>
> **Q.** *So that would be Mr. Cook, Mr. Maestri, and yourself made the final decision?*
>
> **A**. *Yes*, again with a lot of legal counsel involved in that same discussion, *yes*.

200. Given that Schiller opposed the commission and Defendant Maestri was for it, Defendant Cook was necessarily the tie breaking vote.

201. As Judge Gonzalez Rogers found in the April 2025 Order, "Apple selected a 3% discount on its 30% IAP commission that it *knew* was anticompetitive. In doing so, Apple *willfully* set a commission rate that in practice made all alternatives to IAP economically non-viable." Apple's commission structure plainly violated the Injunction because it "***foreclose[d] competitive alternatives***," which "appears to have been the point," as "[b]usiness documents reveal that the internal justification was to maintain the existing anticompetitive revenue stream." (emphasis in original).

### ii. Placement and Design Restrictions

202. Defendants publicly justified Apple's restrictions on the placement and design of External Purchase Links on the basis of protecting app users. For example, in the Fischer Declaration, Apple claimed that these restrictions "***are designed to minimize fraud, scams, and confusion***" and "***help ensure that users are not overloaded with duplicative information that may diminish the app experience, and are not confused about purchase options***." Fischer repeated this justification during the May 2024 hearing, testifying that "there was some concern around user confusion with having lots of different purchase options all in one place."

203. In truth, Apple knowingly engineered additional friction into link-out purchases to decrease their usage and reduce competition with in-app purchases, thereby undermining the Injunction.

204. Schiller admitted during the February 2025 hearing that the more restrictions there were on the design and placement of External Purchase Links, the less likely the links would be used.

> **Q.** Well, it is the case, sir, that the more restrictive the rules are on placement and format and language of links, the less likely it is that those links will be seen and used by users.
>
> **A.** Again, there are more variables than that, but *those certainly matter, yes*.

205. As Judge Gonzalez Rogers found in the April 2025 Order, the Injunction response team specifically "model[ed] the tipping point where external links would cease to be advantageous for developers due to friction in the purchase flow." During that process, Apple assumed that friction in the purchase flow would lead to "breakage," which is the rate at which users fail to complete link-out transactions, thus resulting in a lower percentage of purchases being diverted from IAP.

206. In addition, Apple modeled the degree to which developers would adopt link-out purchases, or "linkout share," which showed that greater design and placement restrictions would lead to lower adoption rates.

207. Talking points from a slide in the June 20, 2023 presentation to Defendants Cook and Maestri, titled *Revenue impact with breakage*, explain:

> We have run various sensitivities through our developer economic decisioning model to forecast whether or not a developer will adopt linking out.

* * *

For the share of billings linking-out, we are showing sensitivities from 10% to 50%, *which will depend where is the text and the language developers are allowed to use.*

208. The slide showed that depending on the degree of "Breakage" and "Linkout Share," the "Revenue Loss" ranged from $0.1 billion to *$3.4 billion*, reflecting 2% to *46%* of annual U.S. App Store revenue. The talking points also reveal what Apple considered a "middle ground" scenario: a 30% link-out share with 10% breakage, resulting in a *$1.7 billion* loss in revenue, "*nearly 1/4 of our U.S. App Store revenue*."




| Breakage | 10% | 20% | 30% | 40% | 50% |
|---|---|---|---|---|---|
| 0% | -$0.6B -8% | -$1.3B -17% | -$2.0B -26% | -$2.7B -36% | -$3.4B -46% |
| 5% | -$0.6B -7% | -$1.2B -16% | -$1.9B -26% | -$2.6B -35% | -$3.4B -45% |
| 10% | -$0.5B -6% | -$1.1B -14% | -$1.7B -23% | -$2.4B -32% | -$3.1B -41% |
| 15% | -$0.4B -6% | -$1.0B -13% | -$1.5B -20% | -$2.1B -28% | -$2.7B -36% |
| 20% | -$0.3B -4% | -$0.7B -10% | -$1.2B -16% | -$1.7B -22% | -$2.1B -28% |
| 25% | -$0.1B -2% | -$0.4B -5% | -$0.7B -9% | -$1.0B -13% | -$1.3B -17% |

209. As Vij testified in February 2025, he told Defendant Cook at the June 20, 2023 meeting that users would drop off during the external purchase process due to a less seamless experience as compared to Apple's IAP. Schiller's February 2025 testimony confirmed this, revealing that Apple's modeling showed that at a certain level of breakage, offering link-out options to users would be *more expensive* for developers than just using IAP and paying the standard 30% commission. Despite this knowledge, Apple adopted extreme link placement and design restrictions in order to maximize friction in link-out purchases and maintain App Store revenue.

210. **<u>Link Placement</u>**. As Schiller testified in February 2025, "placement" meant "that if the app displays something for purchase, an IAP buy button could be placed right next to that item, but the link-out option would have to be placed on some other page in the app."

211. Defendants Cook and Maestri, Schiller, and Oliver discussed this approach to link placement at the June 20, 2023 meeting. As the presentation for this meeting stated, Option 1 had no commission, but links would be restricted to "[o]nce per page" and "[n]ot on same page as Apple IAP buy flow" (in addition to other design restrictions, discussed below).

212. Apple executives understood that restricting link placement to outside the IAP flow would lead to fewer link-out purchases, and therefore, preserve Apple's IAP revenue. Nevertheless, that is precisely what Apple required through its link placement restrictions.

213. **<u>Link Design</u>**. Apple had a similar understanding and approach toward link design restrictions. In the presentation slides for the May 18, 2023 Project Wisconsin meeting, the Injunction response team acknowledged that the Injunction *required* allowing developers to format their links as "buttons or other calls to action" and "not just blue HTML links."

214. Nevertheless, Apple developed stringent restrictions on link design for the June 20, 2023 presentation, limiting developers to a "plain link or button."



215. By comparison, the "developer styled" button included in the presentation under Option 2 shows a typical button design that would be permissible only if Apple charged a commission.




216. These slides confirm Apple's internal recognition that the "plain link" could not be fairly characterized as a "button."

217. In fact, Apple's Human Interface Guidelines during the Class Period advised developers: "In general, use a button that has a visible background for the most likely action in a view. Buttons that have a fill or background shape tend to be the most visually prominent, helping people quickly identify the action they're most likely to want." Contrary to its guidance to developers, Apple's Link Entitlement program restricted the design of External Purchase Links to so-called "plain" buttons in order to discourage users from clicking on these links.

218. As Oliver confirmed in his February 2025 testimony, Defendant Cook and Schiller were the "arbiters of what Apple considered would be an acceptable level of risk *to limit the injunction in terms of placement and design*."

219. In his February 2025 testimony, Schiller confirmed that Defendants Cook and Maestri approved these anti-competitive restrictions, which directly undermined the Injunction.

**Q.** And there's a requirement that developers use what's called the plain button style.

**A.** Yes.

**Q.** *And that too, that's a restriction that you, Mr. Cook, Mr. Maestri all approved.*

**A.** *Yes*.

220. Furthermore, as the April 2025 Order found, despite Apple's knowledge that link placement and design restrictions would stifle competition, at the Pricing Committee meeting on July 5, 2023, Defendants Cook and Maestri and Schiller decided to impose *both* link placement *and* link design restrictions *on top* of Apple's 27% commission.

**iii. Scare Screens and Static Links**

221. Apple knowingly engineered additional friction in link-out transactions through its decision to employ pop-up warning screens and static URLs. As Judge Gonzalez Rogers found in the April 2025 Order, "Apple understood well that breakage increases with additional friction in the purchase flow and capitalized on that option." Knowing this, Apple deliberately engineered multiple steps into link-out purchases with the goal of discouraging such transactions.

222. **Scare Screens**. As evidenced by the warning screen mockups created for Project Michigan, Apple began working on pop-up warning screens during its initial Injunction response in 2021. Moreover, as discussed above, internal communications show that Apple designers like Onak were focused on making the pop-ups "scary" so as to deter users from completing external purchases.

223. When Project Michigan was put on hold, Apple continued to work on warning screens for other jurisdictions, including Japan and the Netherlands. These efforts further demonstrate Apple's goal of deterring link-out purchases.

224. For example, after a March 15, 2022 warning screen meeting, the Apple team, including Onak and other employees, debriefed over Slack. The messages reveal that when an Apple employee observed that the language of the current design felt "*safe*," Onak replied that they should modify the language to "*scare*" users.

225. When Apple's Injunction response resumed, so did Apple's efforts to design "scary" pop-up warning screens for the U.S. App Store. The presentation for the June 20, 2023 Project Wisconsin meeting included the following slide showing a full-page warning screen.




226. As Schiller testified in February 2025, at the June 20, 2023 meeting, Apple decided to implement a full-screen takeover warning, the "scar[iest]" option available. However, that was not sufficient for Defendant Cook, who personally directed the Injunction response team "to reference the fact that Apple's privacy and security standards do not apply to purchases made on the web."

227. On June 23, 2023, Cameron sent Defendant Cook the following email, copying Defendants Maestri and Federighi, Schiller, Fischer, Oliver, and Apple's executive leadership, including Cue and Adams. Cameron's email confirms that Defendant Cook provided his input regarding the system disclosure sheet at the June 20, 2023 meeting.

> Tim,
>
> At our meeting on Tuesday, *you asked the team to revise the customer warnings screen* (which is surfaced when a customer taps on a link to the developer's web site) *to reference the fact that Apple's privacy and security standards do not apply to purchases made on the web*.

> The team worked on updated copy – please see the original and updated versions below. We reviewed with Phil [Schiller], Matt [Fischer], and Jeff [Robbin] and believe that *the revised language in bold clearly highlights the issue for customers*.
>
> Please let us know if you have any comments, or if we are clear to move ahead with this change.

228. Cameron's email attached the modified version of the "warning screen" requested by Defendant Cook.




229. As reflected in Goldberg's notes from the June 26, 2023 meeting held in preparation for the June 28, 2023 Injunction meeting, the purpose of the new pop-up screen was to suggest that using the link and leaving the app was "dangerous." As Goldberg testified in February 2025:

> **Q.** *So the pop-up that, quote, "tells people it's dangerous." Do you see that?*
>
> **A.** *I do.*
>
> **Q.** So those were your notes?
>
> **A.** *That must have been something that someone said and I wrote down, yes.*
>
> **Q.** So you recall hearing discussion then that the purpose of the pop-up was to tell users that the link was dangerous?
>
> **A.** I view this as reflecting one moment in time where --

**Q.** That's not my question.

**A.** -- where someone said these words and I wrote them down, yes.

**Q.** *So someone said these words and you wrote them down?*

**A.** *That's right*.

230. The speaker notes to the June 28, 2023 presentation confirm that the Injunction response team adopted Defendant Cook's directive and changed the language from "[y]ou will no longer be transacting with Apple" to "Apple is not responsible for the privacy or security of purchases made on the web." The notes state, "Tim, *based on your feedback*, here is the System disclosure sheet with the updated copy on the right."

231. As Schiller testified in February 2025, Defendants Cook and Maestri approved the updated warning screen at the June 28, 2023 meeting, and Apple subsequently included it in the requirements for the Link Entitlement program.

> **Q.** The injunction response plan also includes a full-page warning screen that pops up when a user clicks on the link; is that right?
>
> **A.** Yes.
>
> **Q.** *And the format and text of the warning screen is something that you and Mr. Cook and Mr. Maestri approved?*
>
> **A.** *Yes*.

232. **<u>Static Links</u>**. Apple engineered additional link-out transaction friction through its static link requirement. Apple's Link Entitlement program required that External Purchase Links use only static URLs, which create transaction friction compared to dynamic URLs. As attested to by Benjamin Simon, CEO of the mobile app developer Down Dog, who testified at the May 2024 hearing, static URLs require users to navigate extra hurdles, like signing into a website before they can make a purchase, whereas a dynamic URL automatically completes that step.

233. As Judge Gonzalez Rogers found, Apple's attempts to justify this requirement on the basis of privacy and security concerns were baseless. Under the Link Entitlement program, Apple permitted dynamic links "for any other purpose—Apple in general only prohibits the use of dynamic links for

external links for link-out purchases." Furthermore, any links included in an app under the Link Entitlement program must be inspected and approved by Apple, alleviating any privacy or security concerns.

**iv. Calls to Action**

234. Apple's Link Entitlement program prohibited developers from using calls to action within their apps that did not conform to the specific link templates Apple provided, even if that call to action was not connected to an External Purchase Link. The Apple Link Entitlement website provided the full list of Apple-approved templates:

**Templates**

Use the templates that best fits your use case. Aside from the price, percentage off, and your website URL, the language used in your app must match the template language. Don't modify or use the template in a manner that misleads customers.

**Purchase template:**
Purchase from the website at www.example.com

**Special offer template:**
For special offers, go to www.example.com
For a special offer, go to www.example.com

**Lower price template:**
Lower prices offered on www.example.com
Lower price offered on www.example.com

**Percent off template:**
To get XX% off, go to www.example.com

**Specific price template:**
Buy for $X.XX at www.example.com

235. Like other aspects of the Link Entitlement program, Apple deliberately engineered this restriction to stifle competition. The appendix to the June 1, 2023 presentation to Defendant Cook discussing the commission and non-commission options included a third proposal—permitting developers to use non-link calls to action without any commission charged on resulting external purchases. The presentation included a "US Revenue Impact" slide that analyzed "*the incremental impact that may happen as more customers might migrate to the web with this additional information being presented to them*."







[Nate]
The table on the left is the same as Option 2. What Option 3 introduces is the additional information allowed to be presented but without a link to customers as mentioned where we would not charge a commission.

On the right side, this shows the incremental impact that may happen as more customers might migrate to the web with this additional information being presented to them.

236. When confronted with this presentation in February 2025, Schiller testified that the Finance team, who was tasked with analyzing the non-link call to action option, recognized that it could increase competition with Apple's IAP.

> **Q.** All right. And what this reflects is a recognition at Apple, at least Mr. Barton in the finance team, and we'll see who else was involved -- that if people were provided with additional information, more of them might migrate to the web, correct?
>
> **A.** (Reviewing document.)
>
> I believe so.
>
> **Q.** *In other words, there would be more competition against Apple's IAP.*
>
> **A.** *Yes.*

**Q.** *And you understand that that is exactly what this Court's injunction was intended to achieve, correct?*

**A.** *Yes*.

237. While the "US Revenue Impact" for this option is redacted in the June 1, 2023 presentation, Judge Gonzalez Rogers found in the April 2025 Order that Apple determined that even a 5% migration to the web from these non-link communications would cause Apple to lose hundreds of millions of dollars in revenue. At 25% migration, Apple determined that it would lose over a billion dollars in revenue. As Judge Gonzalez Rogers found, "Apple recognized . . . that unlinked and unrestricted calls to action could foster competition against Apple's IAP by causing customer migration to developer websites." Therefore, Apple prohibited non-link calls to action, restricting developers to a limited set of Apple-approved templates.

**v. NPP and VPP Exclusions**

238. The Link Entitlement program excluded participants in Apple's News Partner Program (NPP) and Video Partner Program (VPP), which provided a reduced 15% IAP commission to large developers like the New York Times and Disney+. Apple based these exclusions on an analysis it conducted in December 2022 in preparation for potential regulations in the E.U. as a result of the DMA. As part of that analysis, Apple determined that the NPP and VPP programs were a "*[t]ool for retaining developers exclusively on Apple IAP*." Apple's DMA analysis is shown below.

**DMA Analysis**




239. The speaker notes for this slide state that the NPP and VPP programs "*are much larger financially to apple and cover some of our largest developers*" and "*can serve as a tool for retaining developers exclusively on Apple IAP*."

240. In designing the Link Entitlement program, Apple repurposed its DMA analysis, but scrubbed any reference to how the exclusions could help preserve Apple's IAP revenue. Instead, Apple justified the NPP and VPP exclusions on the basis that these programs "[r]equire participants to maintain [a] high bar of user experience and ecosystem integration aligned with partner program goals," as shown in the below slide from the June 28, 2023 Project Wisconsin meeting.

**June 28, 2023 Slides**




241. In truth, Apple's goal in imposing these restrictions was to maintain Apple's IAP revenue. As Vij testified in February 2025, "*very large developers like the ones covered by VPP/NPP were the developers that Apple believed were the most likely to use linked purchases if Apple charged a commission*." Schiller testified in February 2025 that Apple's internal analyses showed that "*the revenue loss for including the [NPP/VPP] partners is actually quite a lot larger than the revenue loss if the partners are excluded*." Schiller also confirmed that the Project Wisconsin team presented this analysis to Defendant Cook at the June 20, 2023 meeting.

242. Furthermore, as Vij testified in February 2025, Apple knew that excluding the NPP and VPP developers would deter adoption of link-out purchases because these developers' IAP commission rates would double (from 15% to 30%) if they participated in the Link Entitlement program. Vij admitted that "the threat of the loss of [NPP/VPP] program benefits would deter adoption of linkouts in the U.S." because "*[i]t would make it much more costly to adopt linkouts*."

243. Accordingly, Apple created a flimsy excuse to hide its true intention of preserving IAP revenue. In fact, on June 28, 2023, while preparing for the June 28, 2023 presentation to Cook about the exclusions, Vij messaged Oliver via text message that "*I think our argument on vpp npp is weak*." Vij

agreed with Oliver that he was "worried about the logic" for the exclusions because Apple's high-bar-for-quality argument would apply even if Apple applied its link-out discount to NPP and VPP participants.

244. As this evidence shows, Defendants knew there was no relationship between NPP and VPP participation and the quality of user experience. Despite this knowledge, as Judge Gonzalez Rogers found in the April 2025 Order, the Project Wisconsin team simply scrubbed the slides from the DMA analysis, replacing the reference to IAP retention with the excuse about quality. As Judge Gonzalez Rogers found, Apple's true purpose in adopting these restrictions was to maintain Apple's IAP revenue.

#### c. In Violation of the Injunction, Apple Combines the Most Anticompetitive Options into the Link Entitlement Program

245. Evidence presented at the February 2025 evidentiary hearing makes clear that, internally, Apple knew that each Link Entitlement component, standing alone, would reduce the effectiveness of External Purchase Links and thereby maintain Apple's supracompetitive IAP commission. Indeed, Apple knew that a 27% commission *alone* would deter nearly all adoption of External Purchase Links due to developers' cost of payments exceeding 3%. Vij confirmed this in his February 2025 testimony, admitting that "*[a]s long as there is a 27 percent commission on a linked-out transaction, that linked-out transaction is going to be more expensive to any developer and every developer . . . than an IAP transaction at 30 percent*."

246. Nevertheless, Apple imposed *multiple barriers* to adoption, despite internally viewing the options as trade-offs. For example, at the May 18, 2023 and June 20, 2023 Project Wisconsin meetings, Apple considered two options for compliance. In both presentations, Apple considered charging a commission *or* requiring link placement and design restrictions. Instead of choosing *one set* of restrictions, the Pricing Committee adopted *both*.

247. Moreover, as Judge Gonzalez Rogers found in the April 2025 Order, Apple continuously chose the most anticompetitive option possible. The Pricing Committee selected the highest commission, the most restrictive link design, the most intrusive and alarming scare screens, the most cumbersome URLs, the most stringent language requirements, and the most protectionist program exclusions. In an effort to conceal its true rationale for adopting these anticompetitive restrictions, Apple repeatedly represented in

court filings, declarations, and sworn testimony that the components of the Link Entitlement program served legitimate, non-economic purposes.

248. As Judge Gonzalez Rogers found, the combination of *all* these measures could only be the result of a knowing effort to subvert the Injunction.

> *[A]t every step Apple considered whether its actions would comply, and at every step Apple chose to maintain its anticompetitive revenue stream over compliance. Given the repeated misrepresentations, the real-time business documents, and the proffer of a made-for-litigation expert "report," the Court reasonably concludes that Apple knew it was violating the Injunction.*

## C. The Relevant Truth Regarding Apple's Knowing Violations of the Injunction Are Gradually Revealed

### 1. February 24-26, 2025: Evidence Presented at the Evidentiary Hearing Reveals That Apple Likely Knowingly Violated the Injunction

249. The relevant truth about Apple's knowing violations of the Injunction began to emerge in late February 2025 when Judge Gonzalez Rogers held an additional three-day evidentiary hearing, beginning on February 24, 2025.

250. During the February 2025 hearing, Judge Gonzalez Rogers heard testimony from Schiller, Oliver, Onak, Vij, and Goldberg. Multiple news outlets and analysts contemporaneously reported on the February 2025 hearing, highlighting testimony by Apple executives suggesting that Apple had knowingly violated the Injunction to maintain its App Store revenue. As this testimony revealed, Apple understood that actual compliance would cost Apple "hundreds of millions if not billions" per year in App Store revenue.

251. For instance, on February 24, 2025, the first day of testimony, in response to a question regarding his "view at the time" as to "the best course of action for Apple" with respect to charging a new 27% commission on purchases made outside of the App Store, Schiller testified that he "was thinking back then about what was required by the Court's injunction and whether we could charge a commission or not." He further testified that he had "had a question of whether we would be able to charge a commission" or, in other words, whether charging the commission "was allowed under the Injunction." In response to a question as to whether he "stated to [his] colleagues out loud or in writing in June of 2023" his concern "that if Apple charged a commission, it would run afoul of the injunction," Schiller testified, "Yes."

252. Schiller also admitted that the specific 27% commission and seven-day session window Apple chose as part of the Link Entitlement program presented a "significant compliance risk," as reflected in the June 20, 2023 presentation to Defendants Cook and Maestri, and that the other restrictions that comprised the Link Entitlement program also presented a "compliance risk."

253. Moreover, Schiller admitted that Apple determined that if Apple "decided and had the ability to charge and enforce a commission," the Company "believe[d] there would be very little developer adoption of linkout [purchases], assuming a scenario where we would give a cost of payments discount at 3 percent."

254. Bloomberg published an article after market close on February 24, 2025, titled *Apple Executive Testifies App Store Fees Risked Violating Court Order*, reporting that "Apple Inc. believed there was a 'significant' risk it would fail to comply with a court order to allow mobile app developers to steer customers to payment methods outside the company's App Store when it added a new commission for those purchases." In response to the testimony, Bloomberg quoted a statement from an "Apple spokesperson" who "***said that expressions of concern about charging a commission don't indicate a lack of compliance***."

255. In an article published the evening of February 24, 2025, AppleInsider reported on Schiller's February 24, 2025 testimony, stating that "*Schiller's concerns were only made public on Monday when the Apple executive testified in court*." AppleInsider further reported that "[t]he case is set to continue with additional hearings on Tuesday and Wednesday. Carson Oliver, an Apple employee who worked under Phil Schiller, is among those scheduled to testify." Based on Schiller's testimony, AppleInsider stated that "*[i]t remains to be seen whether Judge Gonzalez Rogers will ultimately find Apple in contempt of court for violating the existing anti-steering injunction*."

256. The second day of testimony revealed the scope of Apple's willful non-compliance with the Injunction and therefore, an increasing likelihood that the Company's App Store revenue would be impacted by the court's forthcoming decision on Epic's motion to enforce the Injunction and hold Apple in contempt.

257. For instance, on February 25, 2025, Oliver testified that Apple identified "competitive pressure" as a "key risk factor" in fashioning its response to the Injunction in May 2023. Oliver also

testified that in light of Apple's compliance concerns, "there were people advocating no commission," including Schiller, "and other people advocating a 27 percent commission," including "Luca Maestri and Alex Roman." Oliver testified that he informed Defendant Cook that if "we impose a fee, there will be far less adoption of the linkout [purchase] option."

258. Oliver further testified that Apple identified "reduce[d] financial risk" as a "benefit" of charging a 27% commission on link-out purchases, and the lack of "price competition" as a "risk" to this approach. He likewise confirmed via his testimony that "price competition against IAP was the goal of the injunction."

259. Despite the conflict with the Injunction, Oliver testified that the "revenue hit to Apple" as a result of not charging a commission "would be over an order of magnitude larger . . . than under a 27 percent commission option" as of May 2023. Oliver's testimony further revealed that Apple's decision to charge a 27% commission, even temporarily, "*would save Apple hundreds of millions if not billions of dollars*," though Oliver claimed (incredibly) that "*wasn't the goal*."

260. On February 25, 2025, after market hours, Bloomberg published an article titled *Apple Prioritized Revenue for App Fee Change Despite Legal Risk*, reporting that "*[t]he impact on Apple Inc.'s bottom line was a key part of its decision to charge developers a 27% fee to steer customers outside the App Store, even if it risked defying a court order, a company executive told a judge*." The article stated that Apple "ultimately chose the [27%] commission alongside stringent restrictions" on link-out purchases even though "the company decision to charge a commission carried a risk that [Judge Gonzalez] Rogers would conclude her directive hasn't been fulfilled." Citing Oliver's testimony on February 25, 2025, the article reported that Apple executives, including "then-Chief Financial Officer Luca Maestri," "didn't want to forgo compensation completely," and were concerned setting a lower fee "would make it hard to justify preserving the store's standard 30% on most payments made in apps."

261. Washington Analysis published a report on February 26, 2025, titled *Second Day of Apple/Epic Contempt Hearing Highlights Materiality of Apple's Epic Injunction Risks*, reporting that "*[d]ay two of the resumed Epic/Apple contempt hearing provided fresh insights into the materiality of Apple's risks from the Epic litigation*." The report noted that while Oliver's "[t]estimony suggested that Apple's U.S. App Store risks measured in the 'hundreds of millions if not billions,'" "we think these figures

may low-ball the impact if Apple is both barred from collecting commissions on link-outs and also forced to allow a more developer/user-friendly link-out interface."

262. The Washington Analysis report added that the testimony on February 25, 2025 revealed "[o]ther new details includ[ing] Apple's worries about global contagion risk and vulnerabilities related to a high concentration of App Store revenue in a small cohort of large developers and high-spend users." As the report explained:

> This was underscored by testimony suggesting that much of the game in terms of developer adoption of link-outs will turn on the decisions of large developers, which comprise the lion's share of App Store revenue. Here again, we emphasize that a critical mass of those large developers, including Meta Platforms, Inc. (META), Microsoft Corp. (MSFT), X/Twitter (private), Walt Disney Co. (DIS), Spotify Technology SA (SPOT), and Match Group, Inc. (MTCH), all filed briefs in this dispute supporting Epic. This strongly suggests that large developers see a viable route to significantly reduce U.S. App Store fees via Epic's injunction.

263. Based on this new information, Washington Analysis concluded that there was "a **90%** probability that Apple will be found to have violated the injunction and a **65%** probability that Apple will be prohibited from charging [a] commission on linked-out purchases, with higher confidence now on both fronts." (emphasis in original). The report cited the "growing risk that the judge not only finds Apple in violation of the injunction but also finds the company (and possibly one or more senior executives) in contempt of court."

264. While investors were responding to the revelations during the first two days of testimony, additional Apple witnesses testified on February 26, 2025. The third day of testimony confirmed that Apple modeled that potentially billions of dollars of App Store revenue could be lost if it failed to limit link-out purchases through commissions and other restrictions. For instance, Vij testified that "[o]n the extreme range," "the sensitivities [Apple] predicted" included potentially "billions of dollars diverted from IAP to web purchases," while the "middle ground and reasonable ranges started with hundreds of millions and ended with billions diverted." In fact, Vij confirmed that "[a] more middle ground scenario" estimated a shift of "a very significant fraction of the App Store U.S. store revenue" to web purchases "on an annual basis."

265. Following this testimony from Vij, Schiller was recalled as a witness. During his testimony, Judge Gonzalez Rogers directly questioned him about Apple's purported justification for imposing a 27% commission, strongly signaling the court's skepticism that this commission reflected the value of Apple's technology and other services or that the decision had been based on the opinions of the Analysis Group.

> **THE COURT**: *I have seen no document in all of these productions that shows that Apple did any analysis whatsoever to justify that its intellectual property, at a minimum, cost it hundreds of millions of dollars*. And I guess the question is was there one and not produced? Because it hasn't been produced.
>
> **THE WITNESS**: The work on that, I believe, was the work that was discussed under -- in testimony of Mr. Roman for the -- the attempt to create a bottoms-up P&L analysis of what the total costs are at Apple for the App Store.
>
> And it was an analysis that's not our normal way of looking at it, but there was, I believe, work done on that to try to answer that very question of how to --
>
> **THE COURT**: But in terms of complying the injunction –
>
> **THE WITNESS**: Right.
>
> **THE COURT**: -- and in terms of trying to decide the value of the IP, which could then be perhaps charged --
>
> **THE WITNESS**: Yes.
>
> **THE COURT**: **--** *I've seen zero analysis that justifies, at a minimum, hundreds of millions of dollars and, at a maximum, billions of dollars*.
>
> **THE WITNESS**: The -- the -- the two things I'm aware of that were done for that question was the Analysis Group's study which have an external organization try to estimate the value of what we've created. And then the work from Mr. Roman to bottoms-up try to estimate the costs of the work to create it. Those were the two attempts to try to do that.
>
> **THE COURT**: *There was none of that discussion in the business decision documents that we've been speaking about over the last few days. None of that was in here, correct?*
>
> **THE WITNESS**: The -- both of those were included in the price committee presentations. There was data from the Analysis Group that was used in the price committee presentation. And there was the pseudo P&L bottoms-up work from Mr. Roman also in that price committee slide deck. We did try to include that, Your Honor.

266. Following these disclosures on February 24-26, 2025, the price of Apple common stock declined by $6.68 per share, or 2.7%, from a closing price of $247.04 on February 25, 2025, to a closing price of $240.36 on February 26, 2025.

267. On February 27, 2025, Washington Analysis issued a report titled *Epic/Apple Injunction Decision Coming "Quickly" and Likely Will Be a Humdinger*, that discussed the third day of the hearing. The report stated that "[s]ubtle and not-so-subtle signs abound that Apple will be dealt a harsh ruling, including the judge's general demeanor and a colloquy with Apple Fellow Phil Schiller that struck us as building the case for no commissions on link-outs."

268. Washington Analysis stated that "[w]e believe the judge is beyond frustrated with Apple's delay tactics, which has resulted in essentially *no change to the status quo for nearly three and a half years* (i.e., since her injunction decision in November 2021)." (emphasis in original). Based on the final day of the hearing, Washington Analysis stated that "we . . . increase our estimate to 70% (from prior 65%) that Apple will get zero commissions on link-outs."

269. In support of the high likelihood that Apple would be prohibited from charging commissions on link-out purchases, Washington Analysis stated that "questions the judge posed to Apple witnesses . . . struck us as an effort to box Apple in with admissions to make her ruling as bulletproof as possible." Washington Analysis stated that "the judge seemed to be locking down the concept that Apple's 'intellectual property rights' . . . didn't factor whatsoever into the high-level injunction compliance calls by the ultimate decision makers, a three-person committee comprised of Apple CEO Tim Cook, former Apple CFO Luca Maestri, and Mr. Schiller." The report concluded that the likely contempt finding by the court "support[s] our thesis that global App Store commissions will eventually land in the mid-teens percentage (vs. current 25–27%), implying an est. 8–9% annual EBIT impact to Apple."

270. In addition to the likely ruling on Apple's 27% commission, Washington Analysis highlighted "an alternative path to a material loss in U.S. App Store profits, as we see increasing likelihood that the judge orders Apple to permit in-app text 'calls to action' carrying no commission (**85% odds**)." (emphasis in original). The report explained:

> We don't think that Apple's present policy permitting only calls to actions accompanied by a link following specific templated text scripted by Apple complies with the injunction enjoining Apple from prohibiting in apps "other calls to action that direct customers to purchasing mechanisms." As a result, we see 85% odds that Apple is also required to allow strategically placed in-app calls to actions (e.g., "go to spotify.com for a 20% discount") where messaging and placement is largely controlled by developers, with Apple barred from collecting any related commissions.

271. Based on this additional risk to Apple's App Store revenue, Washington Analysis concluded that "even middle-of-the-road compliance scenarios could be a severe hit to Apple's US App Store revenues," noting that "Apple modeled '**hundreds of millions**' of revenue loss for just 5% of billings from the top 200 developers being diverted away from in-app purchasing." (emphasis in original).

### 2. After the February 2025 Hearing, Apple Defends Its Link Entitlement Program and Insists That It Complied with the Injunction

272. Following the evidentiary hearing on Epic's motion to enforce the Injunction in February 2025, on March 7, 2025, Apple filed a post-hearing brief. Notwithstanding the revelations about Apple's purported compliance efforts during the February 2025 evidentiary hearing, Apple reiterated its claims that it had fully complied with the Injunction:

> Nine days of testimony and scores of documents demonstrate the extensive efforts Apple took to develop a framework that complies with the Injunction while preserving the fundamental features of Apple's business model and safeguarding consumers.
>
> * * *
>
> The resumed evidentiary hearing made clear that the [May 2024] testimony of Apple's witnesses was consistent with and supported by the documentary record—further establishing the objective reasonableness of Apple's process and conclusions.

273. In defense of its design restrictions, Apple stated that "the technical requirements were the result of a cross-functional team's effort to develop and implement measures *to help consumers make informed decisions and protect them from fraud and scams by developers while still preserving the iOS ecosystem and experience*."

274. Apple similarly defended its decision to impose a 27% commission on link-out purchases, stating that "*[u]ltimately, after rigorous analysis and discussion, Apple determined that access to Apple's intellectual property, services, userbase and platform justify a commission*." Apple further claimed that its Pricing Committee, including Defendants Cook and Maestri, believed that the commission structure "*would incentivize developers to adopt the Entitlement*."

275. Considering Defendants' repeated claims about Apple's compliance with the Injunction, even after the February 2025 hearing, some market participants did not view forced changes to the App Store as a likely outcome. For example, in a March 18, 2025 report, Evercore discussed "Regulatory Risk

to [Apple]'s Services Business," noting "the Epic Games lawsuit in the US." However, Evercore stated that "*we think this risk is less likely to come to fruition*" and "*we generally see any forced changes to the App Store as unlikely*."

**3. April 30-May 1, 2025: Apple Is Found to Have Intentionally Violated the Injunction, Held in Contempt, and Sanctioned, and Acknowledges the Risk and Uncertainty Facing the App Store**

276. On April 30, 2025, after market close, Judge Gonzalez Rogers issued a scathing order finding Apple in willful violation of the Injunction, holding Apple in civil contempt, and referring the matter to the United States Attorney for the Northern District of California to investigate whether criminal contempt proceedings were appropriate.

277. Based on the evidence uncovered through discovery and during the February 2025 hearing, Judge Gonzalez Rogers found that "Apple, despite knowing its obligations [under the Injunction], thwarted the Injunction's goals, and continued its anticompetitive conduct solely to maintain its revenue stream." The court found that "Apple *intentionally* devised a compliance scheme to prevent developers from deploying competitive alternatives to IAP." Apple then engaged in an "*obvious cover-up*" to deceive the court. As Judge Gonzalez Rogers summarized her findings:

> Apple's lack of adequate justification, knowledge of the economic non-viability of its compliance program, *motive to protect its illegal revenue stream* and institute a new de facto anticompetitive structure, and then create a reverse-engineered justification to proffer to the Court cannot, in any universe, real or virtual, be viewed as [a] product of good faith or a reasonable interpretation of the Court's orders.

278. Judge Gonzalez Rogers classified Apple's conduct as *willful*, stating that "the evidence clearly and convincingly demonstrates that Apple *willfully* chose to ignore the Injunction, *willfully* chose to create and impose another supracompetitive rate and new restrictions, and thus *willfully* violated the injunction." (emphasis in original).

279. The April 2025 Order detailed how, in violation of the Injunction, Apple "at every turn chose the most *anti*competitive option" to ensure that alternative payment methods remained economically non-viable for developers:

> To summarize: *One*, after trial, the Court found that Apple's 30 percent commission "allowed it to reap supracompetitive operating margins" and was not tied to the value of its intellectual property, and thus, was anticompetitive. Apple's response: charge a *27 percent commission* (again tied to nothing) on off-app purchases, where it had previously charged nothing, and extend the commission for a period of seven days after the consumer linked-out of the app. Apple's goal: maintain its anticompetitive revenue stream. *Two*, the Court had prohibited Apple from denying developers the ability to communicate with, and direct consumers to, other purchasing mechanisms. Apple's response: impose *new* barriers and *new* requirements to increase friction and increase breakage rates with full page "scare" screens, static URLs, and generic statements. Apple's goal: to dissuade customer usage of alternative purchase opportunities and maintain its anticompetitive revenue stream. In the end, Apple sought to maintain a revenue stream worth billions in direct defiance of this Court's Injunction.

(emphasis in original).

280. Judge Gonzalez Rogers found that "*contemporaneous business documents reveal that Apple knew exactly what it was doing*," noting that "[i]nternally, . . . Schiller had advocated that Apple comply with the Injunction, but Tim Cook ignored Schiller and instead allowed Chief Financial Officer Luca Maestri and his finance team to convince him otherwise," and that "*[t]o hide the truth, Vice-President of Finance, Alex Roman, outright lied under oath*."

281. As a result of Apple's willful violation of the Injunction, the court held Apple in civil contempt, "enjoin[ing] Apple from implementing its new anticompetitive acts to avoid compliance with the Injunction," including prohibiting Apple from "imped[ing] developers' ability to communicate with users" by restricting the "style, language, formatting, quantity, flow or placement" of links to alternative payment systems or "levy[ing] or impos[ing] a new commission on off-app purchases." Judge Gonzalez Rogers also sanctioned Apple for its abuse of attorney-client privilege designations to delay the proceedings. Furthermore, Judge Gonzalez Rogers referred the matter to the U.S. Attorney for the Northern District of California for investigation of Apple and Alex Roman regarding potential criminal contempt sanctions.

282. Following the April 2025 Order, Well Fargo published an analyst report on April 30, 2025, titled *Shares Pressured by Judge Ruling*, stating, "**What's New?** Today (post close), Apple shares are coming under pressure following a CA judge ruling that Apple has violated a US court order to allow for greater competition for app downloads and payment methods in the company's App Store." While the report stated that "we think the comments made in the 80-page ruling . . . will be taken as being very stern,"

Wells Fargo cautioned that "it's difficult to assess the impact this may have on Apple's services revenue, or the extent of a potential appeal process — a potential focus on tomorrow's earnings call." Wells Fargo stated that "Apple's commission rate is likely to be the key focus."

283. On May 1, 2025, JP Morgan issued a report titled *Quick Thoughts on Apple vs. Epic Ruling*, stating that the April 2025 Order "means that in the US, app developers will be able to offer consumers an alternative payment option whereby Apple receives no commission (vs. prior 27%)." JP Morgan stated that "[a]ssuming the ruling is upheld, this is a material positive change for app developers, many of which did not bother to offer alternative payments at the 27% commission rate." (emphasis in original).

284. In a May 1, 2025 report titled *Apple Ruling Creates a Paradigm Shift for Mobile Games*, Wedbush similarly stated that "[e]ffective immediately Apple may no longer impede developers' ability to communicate with users and it may no longer impose any fee on developer store purchases. This ruling is highly likely to have wide-ranging impacts across the app landscape with clear positives for developers." Wedbush noted that based on the ruling, Apple "will have to make some concessions in order to retain payments within its ecosystem," stating that "[w]e expect the company to offer lower take rates for all or some apps (e.g., reducing fees for publishers that agree to use the App Store exclusively)." Highlighting the impact of the ruling, Wedbush estimated that "[i]f Apple were to cut US app store fees to 15% across the board this would translate to ≈$4.5 billion of incremental profit for developers."

285. On May 1, 2025, Oppenheimer issued a report titled *Updated Thoughts on "App Store Tax" and Its Financial Impact*, reporting on the "landmark decision" by Judge Gonzalez Rogers and stating that "[w]e believe the ruling will have a moderate negative impact on Apple's Service revenue and operating income." In support of this conclusion, Oppenheimer estimated that "Apple generated $27B in sales from App Store in CY2024 (27% of its Service revenue), of which $15B came from mobile games. Assuming 80% operating margin on App Store revenues (net of developer payout), a 20% loss of App Store payment to external service providers could result in 3% impact to Apple's operating income (CY2024)."

286. Media outlets similarly reported on the April 2025 Order, highlighting Judge Gonzalez Rogers' findings that Apple willfully violated the Injunction and made false statements to the court. For example, on May 1, 2025, the Associated Press published an article, titled *Court sides with Fortnite maker Epic as Apple sanctioned for defying order in App Store case*, that quoted the April 2025 Order, stating,

"In stark contrast to Apple's initial in-court testimony, contemporaneous business documents reveal that Apple knew exactly what it was doing and at every turn chose the most anticompetitive option." The report also noted that Judge Gonzalez Rogers "accused the company's Alex Roman, vice-president for finance, of 'outright' lying under oath," and "referred the matter to the U.S. Attorney for the Northern District of California to investigate whether criminal contempt proceedings are appropriate."

287. On May 1, 2025, TechCrunch published an article titled *Epic Games is launching webshops to allow developers to circumvent app store fees after new ruling*, reporting that "[a]fter notching a big win against Apple in a years-long legal dispute, Epic announced that its Epic Games Store will allow developers to open webshops, which can offer players out-of-app purchases to circumvent fees from Apple and Google." The article stated that "Epic is bringing its flagship game Fortnite back to the iOS App Store, where it will incentivize users to buy Fortnite's digital goods through Epic directly, since they'll get a better price," noting that "[w]ith the Epic Games Store's new webshops feature, other developers will be more easily able to follow suit." The article quoted Epic as stating, "With new legal rulings in place, developers will be able to send players from games to make digital purchases from webshops on any platform that allows it, including iOS in the European Union and United States."

288. On May 1, 2025, after market-close, Apple reported 2Q 2025 earnings and held a conference call with investors. During the question-and-answer portion of the call, an analyst with Arete Research asked about Apple's ongoing legal cases, including the April 2025 Order, noting that "investors are clearly concerned that these might have material impacts on your Services business." Defendant Cook acknowledged that "there's risk associated with [the pending legal cases] and the outcome is unclear."

289. On May 2, 2025, Apple filed its 2Q 2025 Form 10-Q, signed by Defendant Parekh. The Form 10-Q stated:

> On April 30, 2025, the California District Court found the Company to be in violation of the 2021 Injunction and enjoined the Company from imposing any commission or any fee on purchases that consumers make outside an app; restricting, conditioning, limiting, or prohibiting how developers guide consumers to purchases outside an app; or otherwise interfering with a consumer's choice to proceed in or out of an app. The California District Court also denied the Company's motion to narrow or vacate the 2021 Injunction and referred the Company to the U.S. Attorney for the Northern District of California for a determination whether criminal contempt proceedings are appropriate. The Company will continue to vigorously defend its actions and employees, including by appealing the California District Court's most recent decision.

290. On May 2, 2025, Oppenheimer issued a report titled *Tougher Times Ahead*. Oppenheimer "trimmed [its] FY25E and FY26E outlook" for Apple, citing "potential structural challenges to revenue growth on margin relating to," among things, "*loss of App Store commission, and underwhelming Apple Intelligence features*." The report linked to Oppenheimer's May 1, 2025 report, noting that "[w]e estimate . . . that a US judge ruling on App Store could have a [low-single-digit] impact on total operating profit." On May 2, 2025, TD Cowen similarly noted that "antitrust and litigation risks remain," citing the "negative ruling in Epic case update with an appeal by AAPL expected."

291. In a May 2, 2025 article titled *Judge In Apple / Epic Case Is Spitting Mad At Apple's Willful Contempt*, the legal blog Above The Law wrote that the April 2025 Order "call[ed] out what appears to be Apple's willful decision to disobey the injunction and play games to avoid doing the little bit it was required to do." The article stated that "Apple apparently decided that the best response [to the Injunction] was to design elaborate schemes to make [link-out purchases] as scary and expensive as possible, hide evidence of those schemes from the court, and then lie under oath about all of it." The article noted that "Apple has a history of engaging in malicious compliance to regulatory requirements, but this seems particularly egregious." The article summarized the scheme as "a deliberate three-part strategy by Apple": "First, design a system that would appear compliant while actually maintaining their monopoly. Second, hide evidence of this strategy through dubious privilege claims. And finally, when caught, lie about it under oath."

292. With respect to Apple's attempted fraud on the court, the article stated that "[w]hen faced with judicial scrutiny of these practices, Apple didn't just defend its actions — it launched an extraordinary campaign of document suppression and delay tactics that would ultimately backfire spectacularly." The article described how "Apple's strategy of obstruction eventually crumbled, revealing something even more serious: executives appearing to deliberately lie under oath." For example, the article stated that Apple "told the court that they used [the Analysis Group's] analysis as the basis of what to charge, even though the notes now prove that the decision was actually made about six months earlier. In other words, *Apple execs appear to have lied under oath*." The article concluded that Apple's "*executives chose to lie, obstruct, and treat the judicial system with contempt*."

293. On May 5, 2025, JP Morgan issued a report, titled *The Rules Have Changed; Who Benefits & What's Next*, that stated:

> The Apple vs. Epic court ruling last week was the most significant development to date in the multi-year battle between app stores and developers/regulators, and likely didn't receive the attention it deserved during a busy earnings week. **The punchline is that Apple is no longer allowed to charge a 27% commission on alternative payments in the US**."

(emphasis in original).

294. JP Morgan noted that "Apple has approved a Spotify app update that allows payment outside the app store at no commission," which "means economic relief for developers is more immediate than we initially anticipated, and we expect developers to flood the app store with similar updates in the coming days."

295. Following these disclosures on April 30 and May 1, 2025, Apple common stock declined 6.4%, from a closing price of $212.50 on April 30, 2025, to a closing price of $198.89 on May 5, 2025.

296. On May 7, 2025, Apple filed an appeal of the April 2025 Order with the Court of Appeals for the Ninth Circuit and concurrently filed a motion to stay the April 2025 Order pending its appeal. In the motion to stay, Apple acknowledged that "*compliance will cost Apple 'hundreds of millions to billions' of dollars annually . . . which Apple can never recoup*" and "*cause [Apple] grave irreparable harm*."

297. After the disclosure, analysts and market commentators continued to assess the implications of the April 2025 Order on Apple's Services revenue. On May 8, 2025, TechCrunch published an article titled *Appfigures: Apple made over $10B from US App Store commissions last year*. The article cited data "indicat[ing] that U.S. App Store revenue from commissions more than doubled between 2020 and 2024":

**Annual App Store Revenue (Estimated)**

January 2020 - December 2024 • United States

| Year | Gross Revenue | Net Revenue | Apple Revenue |
|---|---|---|---|
| 2020 | $15,876,397,000 | $11,113,479,000 | $4,762,918,000 |
| 2021 | $22,221,693,000 | $15,555,184,000 | $6,666,509,000 |
| 2022 | $24,571,445,000 | $17,200,012,000 | $7,371,433,000 |
| 2023 | $29,199,068,000 | $20,439,347,000 | $8,759,721,000 |
| 2024 | $33,677,046,000 | $23,573,933,000 | $10,103,113,000 |

**Source: Appfigures Intelligence**

298. TechCrunch added that "Apple made more than $27.39 billion in commissions globally last year" according to the Appfigures data. The article stated that "[e]xamining the numbers around U.S. Apple App Store revenue is more relevant than ever in the wake of the recent court ruling that now prevents Apple from charging a 27% commission on transactions that take place outside the App Store." TechCrunch explained that the April 2025 Order "forced Apple to update its U.S. App Store rules, which now allow developers to link out to other ways for consumers to make purchases, without obstacles or commissions." TechCrunch noted that "[s]ince then, several apps have taken advantage of the ability to introduce web payments, including Spotify, Amazon Kindle, and Patreon."

299. On May 9, 2025, Wells Fargo issued a report discussing the Appfigures data. Wells Fargo commented that "Appfigures' estimates imply Apple's US-only App Store revenue accounted for approximately 10.2% of Apple's total Services revenue reported in calendar 2024 (~4% via mobile games + ~6% via Apps / Other)" and "imply Apple had maintained its ~30% commission rate during each year (2020-2024)." Wells Fargo noted that "[i]n response to the recent court ruling, Apple has responded to now allow developers to link out to other ways for consumers to make purchases without obstacles or commissions (i.e., alterative app marketplaces and directly from their websites)" and that "several companies have taken advantage of this by introducing new payment methods."

300. On May 18, 2025, Evercore issued a report titled *Anti-Trust Deep Dive. Bull/Bear Perspective*, which stated that "[t]he legal and technological challenges facing Apple's Services business have never been more in focus." Evercore wrote that "[t]he growth and margin expansion driven by the Services business has been central to the multiple rerating Apple has seen in recent years, so the risks around services have meaningful implications for both forward estimates and valuation multiple." The report stated that one of the "greatest risks" facing Apple's Services revenue is "around the App Store (2% of revenue, 6% EPS)." With respect to this risk, Evercore wrote:

> **US App Store Risks**: Apple has been involved in litigation with Epic in the US that will be critical to the future of the App Store. The App store generates ~$21B in sales annually. As part of the ongoing AAPL vs. EPIC lawsuit, the judge ruled that Apple had to allow third party transactions on iOS and it was not able to charge a fee on those transactions. At risk is the ~$7B we estimate Apple earns from charging fees to US developers. Assuming that $7B fully went away, it would imply a 6% hit to EPS, but we think the actual impact will be smaller.

(emphasis in original).

301. While Evercore believed there was "some potential for the judge's decision to be overturned," the report acknowledged that "[s]ome experts have noted that success of Apple's appeal is uncertain."

### D. Post-Class Period Events Related to Defendants' Knowing Violations of the Injunction

#### 1. Apple's Motion for a Stay of the April 2025 Order Is Denied

302. On June 4, 2025, the Court of Appeals for the Ninth Circuit denied Apple's motion to stay the April 2025 Order pending Apple's appeal. Numerous analysts reported on the denial of Apple's request for a stay, highlighting the significant risk to Apple's Services revenue if the April 2025 Order was upheld.

303. On June 4, 2025, JP Morgan issued a report stating that "[t]his means app developers are able to offer alternative payments at a 0% fee in the US during the appeals process (vs. prior 27% fee). . . . **This is a big deal for app developers**, many of whom have already updated their apps to allow for credit card payments." (emphasis in original). Evercore similarly stated on June 4, 2025 that "[h]eadwinds against Apple's Services business continue to mount," noting that "[a]t risk is the payment's [sic] Apple receives from all transactions that take place within it's [sic] in app payment system. We estimate Apple generates $7B in revenue from the US App Store, which represents 2% of total revenue and 6% of EPS." Evercore further stated that "[t]he risk to the Services business has been a key factor in Apple's -19% YTD performance (S&P +1.5%) and a sizable slowdown in this segment could lead to further margin compression." On June 4, 2025, Needham downgraded Apple, "**lower[ing] estimates based on threats to AAPL's near-term revenue and EPS growth**," noting that "[e]very Big Tech competitor wants to take AAPL's 15%-30% platform tax." (emphasis in original).

304. On June 5, 2025, JP Morgan issued a report discussing the impact of the April 2025 Order on Apple's Services revenue, stating that "[i]n our view, implementation of the order from Judge Gonzalez [Rogers] translates to a ***moderation in Services revenue growth of up to 200 bps***, which translates to ***EPS headwind of 2-3%***, as highlighted in our prior report." (emphasis in original). JP Morgan noted that "[a]s a reminder, prior to the implementation of the zero-commission link-outs, we estimated US App Store to contribute $11.3 bn of revenues in FY25 (~3% of aggregate revenues)." (emphasis removed).

**2. The Ninth Circuit Affirms That Apple Knowingly Violated the Injunction and Largely Upholds the Sanctions Against Apple**

305. On December 11, 2025, the Court of the Appeals for the Ninth Circuit affirmed in part the April 2025 Order, holding that Judge Gonzalez Rogers properly found that Apple violated the Injunction and held the Company in civil contempt. The Ninth Circuit found that Apple's purported compliance was, in effect, a deliberate evasion of the Injunction's requirements. As the Ninth Circuit summarized Apple's conduct:

> *Apple claimed to comply with the injunction*, but it instead prohibited developers from using buttons, links, and other calls to action without paying a prohibitive commission to Apple, and it restricted the design of the developers' links to make it difficult for customers to use them.

306. The Ninth Circuit also affirmed Judge Gonzalez Rogers' finding that Apple acted in bad faith, which negated any potential good-faith defense to civil contempt. The Ninth Circuit stated that "even assuming that Apple's interpretation of the Injunction is reasonable (*it is not*), evidence of Apple's bad faith negates a good-faith defense." In reaching this conclusion, the Ninth Circuit rejected each of Apple's challenges to the April 2025 Order's bad-faith determinations.

307. *First*, the Ninth Circuit rejected Apple's claim that "it filed a 'transparent "Notice of Compliance"' about its compliance plans," affirming the April 2025 Order's finding that Apple's statements regarding its purported compliance with the Injunction were knowingly false. The Ninth Circuit stated that "Apple . . . ignored the district court's finding that *Apple 'attempted to mislead' in its Notice of Compliance and May 2024 hearing with 'pretextual' justifications*."

308. *Second*, the Ninth Circuit rejected Apple's defense that it merely chose "the most advantageous option for its business and shareholders," citing the April 2025 Order's findings "that 'at every step Apple considered whether its actions would comply, and at every step Apple chose to maintain its anticompetitive revenue stream over compliance,'" including by "construct[ing] a program that nullified the revenue impact of the Injunction by prohibiting any viable alternative."

309. *Third*, the Ninth Circuit held that Judge Gonzalez Rogers properly found that the Analysis Group's "recommendation of a commission rate on link-out transactions as the basis for Apple's commission determination was entirely manufactured, and Apple's reliance thereon was a sham," noting

that "the record suggests that Apple picked its commission rate in July 2023, and the report is dated January 2024." (cleaned up).

310. *Finally*, the Ninth Circuit held that the district court's bad faith determination was supported by "other reasons," including that "Apple '*willfully* chose to ignore the Injunction, *willfully* chose to create and impose another supracompetitive rate and new restrictions, and thus *willfully* violated the Injunction.'" (emphasis in original).

311. With respect to the sanctions imposed by Judge Gonzalez Rogers, the Ninth Circuit affirmed the April 2025 Order's finding that Apple's 27% commission on link-out purchases was prohibitively high and violated the Injunction. As the Ninth Circuit found, "Apple knew that processing linked-out purchases would cost developers more than 3%," and therefore, the district court correctly found that "Apple willfully set a commission rate that in practice made all alternatives to its platform economically non-viable." (cleaned up).

312. However, the Ninth Circuit reversed and remanded the district court's order prohibiting Apple from charging any commission or fee on link-out purchases, finding that this denied Apple any way to "purge its contempt" by "imposing a non-prohibitive, reasonable commission or fee." On remand, the district court was instructed to either fashion a conditional civil contempt sanction or modify the Injunction to permit Apple to charge a reasonable commission based on "costs that are genuinely and reasonably necessary for its coordination of external links for linked-out purchases, *but no more*." The Ninth Circuit instructed that "Apple should receive no commission for the security and privacy features it offers to external links, and its calculation of its necessary costs for external links should not include the cost associated with the security and privacy features it offers with its IAP."

313. The Ninth Circuit also largely affirmed the April 2025 Order's link-design sanctions. As the Ninth Circuit found, "the record shows that Apple designed the purchasing experience to make external links as hard to use as possible," which "flies in the face of the Injunction's spirit." However, the Ninth Circuit modified the April 2025 Order "so that, where both Apple and a developer offer a purchase option, Apple may restrict the developer from placing its buttons, links, or other calls to action in more prominent fonts, larger sizes, larger quantities, and more prominent places than Apple uses for its own buttons, links,

or other calls to action," and so that Apple may apply its "typical restrictions (if any) to ensure that its general content standards are upheld."

314. On December 11, 2025, Bloomberg published an article, titled *Apple Loses Appeal of Contempt Ruling in Epic App Store Row*, reporting that "a federal appeals court Thursday rejected the iPhone maker's challenge to an April ruling that it willfully defied an order from a judge who concluded the company engaged in anticompetitive conduct in violation of California law." Bloomberg noted that the "App Store generates billions of dollars annually from the commissions Apple takes from app developers on digital sales" and that "Appfigures, a mobile analytics and intelligence platform, estimated that Apple generated $10 billion in the US in 2024 from its App Store."

315. On December 12, 2025, Capstone issued a report regarding the Ninth Circuit decision, stating that "[t]he ruling would allow Apple to reimpose commission fees on developers that process transactions on alternative billing systems other than Apple's In-App Purchase (IAP) option." However, the report cautioned that "[w]hile a win for Apple, the judges ultimately agreed with the district court that Apple failed to comply with the 2021 injunction. They also ruled that Apple's policies (i.e., 27% commission fee) could violate the 2021 injunction" including "any measures that burden app developers in ways Apple is barred from doing." The report noted that "Apple will likely have to navigate other considerations that reduce the final figure, in part because the three-judge panel provided some guidance on how Judge Gonzalez Rogers should develop the methodology, suggesting it should cover only 'necessary costs,'" which cannot "account for intellectual property associated with security and privacy features, or for anything that may already be attributable to facilitating IAP transactions." In a subsequent report on January 15, 2026, Capstone stated that they believed that Apple's "commissions on linked-out payments" would ultimately be set "at 10%-15%," citing the Ninth Circuit's guidance.

## E. Defendants' Fraudulent Siri AI Scheme

### 1. In the Lead-Up to the Class Period, Apple Struggles to Keep Pace with Its Competitors in AI Innovation

316. Despite its early foray into the AI space with its Siri virtual assistant, Apple quickly fell behind its competitors with respect to AI innovation, investment in AI technology, and its ability to retain AI talent, jeopardizing the Company's future revenues. This fact was not lost on investors. As early as

2016, market commentators expressed concern that Apple's failure to keep up with its rivals, particularly Google and Microsoft, could relegate Apple to a position as a hardware company unable to generate revenue from web services.

### 2. Siri, Marred by Fundamental Defects, Is Eclipsed by Alexa and Other AI Products

317. Amazon surpassed Apple's Siri with the launch of its virtual assistant, Alexa, in 2014. Alexa, which Amazon designed primarily to work as a remote control for other smart devices, was able to perform tasks such as playing music, making calls, and conducting basic internet searches. Critically, it had an edge on Siri due to its ability to work with a wider variety of hardware, including third-party equipment. According to a May 18, 2025 Bloomberg article, Cook was frustrated that Siri was lagging behind Alexa, especially with respect to Alexa's integration in the home.

318. In May of 2016, Google unveiled its new Google Assistant that would replace Google Now, first released in July 2012. Google lauded Google Assistant as "a conversational assistant," adding "we want users to have an ongoing two-way dialog." Google also unveiled its new Google Home, a direct competitor to Alexa intended to serve as an ambient voice-recognition device for Google Assistant.

319. Alexa, Google Assistant, and Siri's other emerging competition highlighted the program's deficiencies. Siri did not improve at the pace of rival virtual assistants, and also caused issues with releases of new Apple products, including the HomePod in 2018, which launched with disappointing Siri functionality. In interviews conducted by The Information in 2018, former Apple employees explained that Siri was rushed out before it was fully ready when it was originally launched in 2011, and the internal debate over whether to continually patch Siri's issues or scrap the model altogether and start from scratch had continued ever since. This foundational defect made it difficult for Apple to keep pace with the development of other, more advanced virtual assistants that increasingly incorporated AI-based functionalities.

320. Citing a person who previously worked with Defendant Cook, a Bloomberg article from May 2025 reported that "Tim [Cook] was one of Apple's biggest believers in AI" and "[h]e was constantly frustrated that Siri lagged behind Alexa."

### 3. Apple's Tepid Efforts to Innovate Are Hampered by Missteps and Loss of Talent

321. In the years after releasing Siri, Apple appeared to gradually increase its focus on AI development. In 2018, the Company managed to woo Giannandrea, who had previously been running Google's search and AI groups, over to Apple, installing him as Senior Vice President of Machine Learning and AI Strategy, reporting directly to Cook. Giannandrea's role was to spearhead Apple's AI efforts. As Bloomberg later reported, Apple hoped this coup would jumpstart the Company's transition into an AI powerhouse. According to employees interviewed by Bloomberg, top executives believed that the Company's AI shortcomings stemmed from the disaggregated nature of its AI efforts, which had been divided between different product teams. Giannandrea, as the head of AI, would now oversee a group that united all of Apple's AI efforts, including machine learning research, testing operations, and Siri. Craig Federighi, Apple's Senior Vice President of Software Engineering, reportedly heralded Giannandrea as "exactly the kind of person we needed for AI."

322. However, a little more than a year later, in 2019, signs of internal discord within Apple's AI team were apparent when Apple lost Bill Stasior, who had been the Vice President of Siri for nearly seven years, to Microsoft's AI group. Some sources reported that Stasior was ousted to give Giannandrea more control over Siri.

323. Apple suffered another significant loss when Jony Ive, one of the Company's chief designers, left in 2019 to start his own design firm, eventually taking more than a dozen key Apple designers and engineers with him. Ive's AI hardware startup was subsequently acquired by OpenAI for around $6.4 billion in 2025. The partnership between Ive, once a close collaborator of Steve Jobs, and OpenAI underscored that Apple was losing out in AI development.

324. Exacerbating these key departures, Apple insiders reported that Giannandrea's efforts to advance the Company's AI innovation were stymied. Despite touting Giannandrea's hiring, Federighi remained reluctant to invest heavily in AI as he did not believe that AI would become a core function of personal computers or mobile devices, instead preferring to focus on the annual incremental upgrade to Apple's products. As a result of Federighi's reservations, which other Company leaders shared, Apple was caught flat-footed by the public release of ChatGPT in November 2022, as later reported by Bloomberg.

According to inside sources, Federighi did not understand ChatGPT's potential until he experimented with the tool for a personal project. One Apple insider reported that Apple Intelligence "wasn't even an idea" beforehand. After seeing ChatGPT's capabilities, however, Federighi made an about face, demanding that iOS 18, planned for release in 2024, incorporate as many AI features as possible.

325. In early 2023, Giannandrea sought permission from Cook to purchase more graphic processing units ("GPUs") for AI development use. At that point, Apple only had about 50,000 GPUs, which were all more than five years old—by comparison, Microsoft, Amazon, Google, and Meta each had purchased hundreds of thousands of advanced chips to fuel their AI efforts. Although Cook approved Giannandrea's request, Luca Maestri, then CFO, cut the number of new chips by half, instructing Giannandrea and his team to make the chips they already had more efficient. This forced the AI development team to negotiate with Google for lesser quality chips, given the high demand for NVIDIA's advanced chips. Market participants nonetheless took note of Apple's investment. The Information reported on September 6, 2023, based on insider sources, that Apple had expanded its budget for building its own AI tools to "millions of dollars a day," with the goal of developing iPhone features to allow voice commands to automate tasks involving multiple steps.

326. Interviews conducted by The Information indicated that in addition to the conflict between Apple's leadership over AI investment, the Company's AI team also was hampered by internal dysfunction. Specifically, an April 2025 article revealed that the AI and Machine Learning group was referred to internally as "AIMLess," and that Siri was a "hot potato" continually passed around between groups with little to no improvement.

#### 4. Apple's Commitment to Privacy Hinders AI Development

327. Apple's efforts to develop innovative AI technology also were impeded by the Company's claimed commitment to privacy, which is one of its most heavily advertised corporate values. For years, Apple's dedicated privacy information webpage has read: "Privacy. That's Apple." This headline is followed by the statement: "Privacy is a fundamental human right. It's also one of our core values. Which is why we design our products and services to protect it. That's the kind of innovation we believe in." When Apple eventually waded back into the AI race, technology reporters commented that the "brand-conscious Apple" was expected to be more careful with safety and privacy than other AI innovators,

particularly OpenAI. Market commentators noted that adherence to its privacy promises had the potential to give Apple a boost in the AI space by leveraging consumers' trust that the Company would not leak or sell their data.

328. In the context of developing its own AI models, however, privacy presented a foundational challenge for Apple, as the Company insisted on keeping all AI processing on-device as opposed to running its software on a cloud-based platform. To achieve on-device processing, Apple attempted to use Long Short-Term Memory ("LSTM") models, instead of other more commonly used models, which require extensive processing through web servers.

329. LSTM models are designed to retain information longer through the use of processing loops that allow information to persist, and are ideal for language translation, speech recognition, and time series forecasting. LSTM aligns with Apple's desire to keep data secure by maintaining processing activities on-device. By contrast, large language models ("LLMs") are trained using immense amounts of data that are capable of understanding and generating natural language and other types of content to perform a wide range of tasks. However, LLMs with parameters high enough to carry out many desired AI tasks cannot operate solely on an iPhone due to software storage and computing power constraints.

330. As the Siri team began working on incorporating language models to perform complex tasks in 2023 and early 2024, they also had to grapple with Apple's "black box" policy. This policy prevents even Apple's own employees from accessing user data. To train large language models, structured data containing multiple types of information must be fed into the model. This data is commonly collected from users of the models and is used to detect patterns and relationships and produce more accurate results. Apple's insistence on maintaining its public commitment to privacy complicated the efforts of the AI development team, who were also precluded from implementing other companies' models in Apple's products, even though Apple's models were inferior.

### 5. Google and Microsoft Announce New AI Products

331. While Apple's efforts to advance its AI initiatives were mired in internal conflict and the AI team was wrestling with the Company's privacy commitment, Apple fell further behind in the AI race in February 2023 when both Google and Microsoft announced major AI products. Google released Bard (later rebranded as Gemini) to a limited pool of testers on February 6, 2023. Google introduced Bard as a

search-based chatbot designed to simplify complex searches and synthesize large amounts of information into an easily digestible answer. The day of Google's announcement, UBS reported that, as "a sign the competition for AI is heating up," Microsoft was planning an event for the day before Google's Bard event. On Bard, UBS commented that the announcement indicated Google was "moving faster to commercialize generative AI tech."

332. On February 7, 2023, Microsoft announced the launch of new AI-powered Bing features (later renamed Co-Pilot), which would be integrated into the Bing search tool and Edge internet browser. The overhaul introduced a new interactive chat feature to Bing and an option to generate content based on user-entered prompts. This announcement came just weeks after Microsoft disclosed that it was making a "multiyear, multibillion dollar investment" in ChatGPT developer OpenAI. On February 10, 2023, Citi wrote that the new Copilot tools made Microsoft's search engine "more conversational, more personal, and in many ways more like a personal concierge."

333. Although the initial uses of Microsoft's AI were focused on search, Goldman Sachs wrote on February 8, 2023 that the new features would likely have long-term advantages for Microsoft's other product launches, as the company "instill[ed] itself as a leading software vendor in both commercial and consumer use-cases." Comparing Bard and Copilot, Evercore ISI wrote on February 8, 2023, that Bard's initial uses were more limited, whereas Microsoft had achieved "a more multi-dimensional workflow integration."

334. The release of both Bard and Copilot in early 2023 highlighted to analysts that Apple was lagging behind its competition, especially in providing integrated, consumer-oriented AI features. On February 14, 2023, Morningstar wrote that the recent focus on AI-enabled assistants "put pressure on Apple's Siri," which had "fallen behind its peers in efficacy."

335. The excitement generated by the Microsoft and Google announcements in early 2023 intensified investor attention on Apple's silence regarding its AI strategy. Just days before the Google and Microsoft announcements, Wells Fargo wrote in a February 2, 2023 report that it was looking for Apple to share its thoughts and insights into its "broader AI strategy" during the upcoming 1Q 2023 earnings call.

336. A few months later, Jefferies Research wrote following the Company's 2Q 2023 earnings call that Apple's lack of focus on AI was likely to be a concern for investors and noted that Apple only

mentioned AI four times in the call, as compared to 50 mentions in Google's quarterly earnings call, 49 mentions in Meta's, and 46 in Microsoft's. The following day, UBS wrote that "the absence of a clearly delineated AI strategy" was a key concern for investors and a risk to Apple's market expansion opportunities. On June 2, 2023, ahead of Apple's 2023 WWDC, Morgan Stanley wrote that "**any AI unveiling would be well-received**," which the firm speculated "would most likely be focused on improving and expanding the functionality (and associated use cases) of Siri." (emphasis in original). While no such announcement was made at the event, Morgan Stanley expressed optimism in a June 5, 2023 report that the Company's hints of new generative AI capabilities, while not "needle-moving," indicated that Apple was investing in AI. The report noted that this investment could benefit Apple both in hardware and software, specifically citing the potential of integrating a LLM into Siri.

### 6. Apple Continues to Lose Talent and the Company's AI Efforts Stagnate, Disappointing Investors

337. In 2023, with the AI race heating up, three Apple engineers who had been central to the Company's modernization of search technology left Apple for Google. The Information reported at the time that these three engineers—Srinivasan Venkatachary, Steven Baker, and Anand Shukla—were motivated to join Google in part because they believed Google would provide them a better opportunity to work on the development of LLMs, such as the technology underlying ChatGPT. These engineers were a critical component of Apple's team and their departure was a significant setback for Apple's AI efforts. Indeed, according to sources close to Venkatachary, Cook personally sought to convince the three engineers to stay at Apple, while Google CEO Sundar Pichai was involved in wooing them over to Google.

338. On July 19, 2023, Bloomberg reported that Apple was quietly developing its own AI chat tool to compete with ChatGPT and other AI tools but had not "devise[d] a clear strategy for releasing the technology to consumers." The article attributed this push for development of AI technology to the November 2022 public release of ChatGPT and the early 2023 announcements of Bard and Microsoft's new AI-powered features for Bing. The article observed that Apple had been "conspicuously absent" from the AI race and that Siri's capabilities had "stagnated." According to Bloomberg's sources inside the Company, Apple had been growing increasingly worried about missing the "paramount shift" in consumer

interaction with personal electronic devices. As the article stated, missing the AI boat could imperil Apple's huge device revenue.

339. Analysts reacted positively to Bloomberg's reporting that Apple was finally making strides in AI. On July 20, 2023, Citi commented that Siri was "the ideal spot for Apple's potential LLM," and concluded that Apple was "aiming to catch up with the AI trends across both infrastructure and applications." On August 3, 2023, Morningstar wrote that Apple would likely attempt to develop an AI "co-pilot" function, given Apple's general strategy of integration across services and devices.

340. However, investors again were disappointed when Apple announced the iPhone 15 with no discussion of major developments in AI. The day after the September 12, 2023 announcement, Bernstein wrote that any new discussion of AI had been "**notably absent**," and that retreads of Apple's non-generative-AI capabilities were "unlikely to incrementally change investors' views on the impact of AI on Apple." (emphasis in original).

341. The pressure on Apple increased further in late September and early October, with major AI announcements from Amazon and Google. On September 20, 2023, Amazon published an early preview of "a smarter and more conversational Alexa, powered by generative AI." The updated version was based on an LLM "custom-built and specifically optimized for voice interactions," and would allow users to program complex routines with multiple smart devices. Amazon also highlighted that the new Alexa would be personalized to the user and "able to deliver unique experiences" based on the user's preferences and relevant conversational context, and would have its own, less robotic personality. On October 4, 2023, Google announced the forthcoming Pixel 8 and Pixel 8 pro, as well as an AI-powered update to Google Assistant, called Assistant with Bard.

342. In the wake of these announcements, analysts once again zeroed in on Apple's AI shortcomings and the pressure on the Company to re-join the AI race with new product offerings. On October 5, 2023, Citi commented that pressure from Google's announcement could force Apple to introduce its own suite of AI and machine learning features "sooner than later." On October 25, 2023, Goldman Sachs noted that Apple had "announced relatively little in generative AI to-date despite several announcements from other leading companies," citing Copilot and Alexa as examples.

343. By the spring of 2024 Apple had not made any notable progress in its AI efforts and news outlets reported the Company had resorted to outside help to advance its AI development. For example, a March 18, 2024 Bloomberg article reported that Apple was in talks to license Google Gemini AI's models to power new iPhone features. As The Information commented the following day, these talks suggested that Apple had "doubts internally about its ability to develop conversational AI to power new iPhone features or beef up Siri." According to The Information, while Apple's reputation for being a "careful, deliberate developer of new products" may have won consumers' trust, that same deliberate pace was proving to be a hinderance in the AI arms race.

### 7. Investors Eagerly Await the 2024 WWDC and Hope for a Big AI Announcement

344. Throughout early 2024, the market was watching Apple closely for a major AI reveal, predicting that the much-anticipated announcement finally would come at the Company's 2024 WWDC. On January 7, 2024, Bloomberg reported that Apple remained "years behind" its competition in the integration of generative AI on consumer devices. The article also reported that Apple was targeting its June WWDC for the announcement of its major new AI offerings, including "a big overhaul" to Siri. The next day, Morgan Stanley wrote that it was taking a bullish stance on Apple stock due to the potential of "an LLM-powered Siri 2.0" to "catalyze an iPhone upgrade cycle." On February 11, 2024, Evercore ISI also reported that AI could potentially cause consumers to rush to upgrade, especially if Apple's AI included "a truly capable and reliable virtual assistant."

345. As June neared, analysts were acutely focused on the WWDC and Apple's anticipated announcement of AI-powered features for the iPhone. On April 5, 2024, Bernstein wrote that it was "cautiously optimistic" that an AI-enabled iPhone 16 would be an "upside catalyst for Apple." On April 11, JP Morgan reported a favorable outlook on Apple stock based on an "iPhone cycle led by AI upsides." Itau BBA, the investment banking arm of Itau Unibanco in Latin America, highlighted the pressure on Apple to make an AI announcement in a report published on April 15, writing that Apple's share of the global smartphone market had contracted in the first quarter of 2024. The report stated that this contraction increased the "**sense of *urgency for* an *AI iPhone***," and put pressure on Apple to release an AI iPhone sooner. (emphasis in original).

346. Apple built anticipation for its big AI news with the launch of a new iPad model in May 2024. The new iPad Pro featured a new, Apple-exclusive chip with a 50% faster CPU and an upgraded neural engine for AI processing. Analysts responded positively, connecting the upgraded iPad features with a forthcoming AI launch. On May 7, 2024, Citi wrote that the mentions of AI during the iPad announcement event caused Citi's analysts to "remain positive into the WWDC." The same day, Wedbush wrote that the iPad release heralded "an AI-driven supercycle," which would include the fall launch of the iPhone 16. On May 23, Wedbush raised its price target for Apple stock with the prospect of "an AI driven iPhone 16 supercycle now on the horizon." Wedbush reported that AI integration "**into the Apple ecosystem**" presented "**ample monetization opportunities**." (emphasis in original). The report further emphasized, "**Lets** [sic] **be clear we believe June 10 marks Apple's most important event in a decade for Cook & Co**." (emphasis in original).

347. The fervor continued to increase in the days leading up to the WWDC, with analysts predicting that Apple would announce a "rebuilt" Siri that would leverage generative AI and highlighting the positive impact of an AI-enabled Siri on the iPhone upgrade cycle. For example, on June 4, 2024, Morgan Stanley published a report titled *Why WWDC 2024 is a Key Catalyst For Apple, And What Matters Most Next Week*, anticipating that "Apple will preview a host of new Gen AI S[oft]W[are] features at WWDC, enabled by an overhauled, voice-activated Siri," and noting that "[w]hile investor expectations are high, we think Apple could positively surprise, helping to unlock pent-up demand, accelerate iPhone replacement cycles, and sustain recent stock outperform." Morgan Stanley explained that while **"[h]istorically, WWDC is not a material stock catalyst for Apple** . . . **we think this year is different as Apple formally enters the Gen AI race**." (emphasis in original) (ellipsis in original). Morgan Stanley wrote that it "expect[ed] Siri will be re-introduced as a next-gen, voice-activated virtual assistant capable of processing more complex commands directly on the iPhone," further noting that it expected Apple to "introduce new, Gen AI-enabled software upgrades . . . spearheaded by a rebuilt Siri . . . that will catalyze iPhone refreshes later this fall, helping to accelerate iPhone replacement cycles [and] drive a return to Y/Y unit growth for the first time since FY22." Morgan Stanley highlighted its belief that "**Apple [is] focusing primarily on an upgrade to its Siri digital assistant, turning what has historically been an underpenetrated service into a key new feature of the latest operating system**." (emphasis in original).

348. Analysts felt that whatever Apple announced at the WWDC, those products would be fully perfected and ready to get into consumers' hands. For example, in an August 4, 2023 report, Jefferies wrote that while "Apple gives very little in terms of the LT vision," "their preference is to comment as products come to market." Coupled with Apple's track record of releasing carefully developed products, analysts were confident that Apple would deliver in AI, notwithstanding its long delay in joining the AI race. On June 11, 2024, an Argus analyst wrote, "Apple in our view has always been more of a product perfecter than a product pioneer."

**8. Apple Announces Apple Intelligence and a "More Personalized Siri" and Represents to Investors That These Features Are Functional and Will Be Rolled Out for the New iPhone 16**

**a. Apple's 2024 WWDC Announcement and Press Release**

349. All eyes were on Apple as the WWDC kicked off on June 10, 2024. During the conference, Apple announced its long-awaited formal re-entry into the AI space with the release of Apple Intelligence. As part of the keynote presentation, Defendants Federighi and Peterson, Senior Director of AI and Machine Learning, previewed new Apple Intelligence features and AI upgrades to Siri that would arrive with iOS 18, the software update that Apple planned to launch with the iPhone 16 later that fall. Federighi introduced Apple Intelligence by stating, "Apple Intelligence will enable your iPhone, iPad, and Mac to understand and create language, as well as images, and take action for you to simplify interactions across your apps." Federighi promised that Apple Intelligence "***will transform your apps and experiences across iOS 18, iPadOS 18, and macOS Sequoia, from a big leap forward for Siri***, to powerful tools for writing and communication, and fun visual ways to express yourself."

350. While he spoke, Apple played video demonstrations of the new features behind him. Federighi highlighted a suite of new Apple Intelligence features, including: (i) Priority Notifications, which would read and analyze notifications and messages to prioritize the most important and minimize distractions; (ii) Writing Tools, which would be integrated systemwide and be able to rewrite, proofread, and summarize text across Mail, Notes, Pages, and Safari, among others; (iii) Photos and Images features, including creating custom emojis and images in multiple styles, and the ability to understand the people in a user's photo library and personalize photos to conversations; and (iv) Siri's ability to take action across apps. In discussing the new Apple Intelligence capabilities, Federighi highlighted responses to commands

like: “Pull up the files that Joz shared with me last week,” “Show me all the photos of Mom, Olivia, and me,” and “Play the podcast that my wife sent the other day.”

351. Peterson then took the stage to introduce in detail the new Apple Intelligence-powered version of Siri that would make it more personal and responsive, holding an iPhone in her hand while the screen behind her depicted these capabilities. First, Peterson advertised Siri’s new, deeper integration, evidenced by a glowing border on the screen. Next, she highlighted Siri’s “richer language understanding capabilities” that enabled it to retain conversational context (“Sometimes it takes me a beat to figure out what I actually want to ask Siri, and now it follows right along.”). Finally, Peterson demonstrated the ability to type or speak to Siri and switch between typing and voice.

352. Peterson also stated that with Apple Intelligence, Siri would have increased product knowledge, saying “Siri now holds a great deal of information about features and settings and can answer thousands of questions when you want to know how to do something on your iPhone, iPad, or Mac. Even if you don’t know exactly what a feature is called, you can just describe it, and Siri will find the info you’re looking for.” Peterson then demonstrated the feature, asking Siri how to schedule a message to be sent later. Siri responded with information about the new “Send Later” feature and provided step-by-step guidance. Peterson then stated, “Everything I’ve showed you so far will be available from the moment you start using Apple Intelligence,” while screenshots of the features she had highlighted—conversational context, the ability to type commands to Siri, and expanded product knowledge—were displayed on screen.



353. Peterson went on to claim that "over the course of the next year, we will be rolling out more features that make Siri even more personal and capable." Specifically, Peterson advertised the features of on-screen awareness, action across apps, and increased personal awareness. Regarding on-screen awareness, Peterson stated that "***Apple Intelligence will provide Siri with on-screen awareness so it'll be able to understand and take action with things on your screen***." Peterson then offered two examples of this feature, both accompanied by videos showing the feature in action. First, Peterson stated, "***For example, say a friend texts you his new address. Right from the messages thread, you can say, 'Add this address to his contact card,' and Siri will take care of it***."







354. Then, Peterson explained, "***Siri will also understand more of the things you get done in your apps. And with new orchestration capabilities provided by Apple Intelligence, Siri will take actions inside apps on your behalf***. Siri will have the ability to take hundreds of new actions in and across apps." As a specific example, Peterson stated:

> ***[Y]ou'll be able to say, "Show me my photos of Stacey in New York wearing her pink coat," and Siri will bring those right up***. Then you might say, "Make this photo pop," and Siri will enhance, it just like that. And Siri will be able to take actions across apps, so you could say, "Add this to my note with Stacey's bio," and it will jump from the Photos app to the Notes app to make it happen.




355. Peterson concluded, "This is going to bring us closer to realizing our vision in which Siri moves through the system in concert with you. . . . Siri will be able to understand and take more actions in more apps over time."

356. Peterson explained that these advancements were possible due to "significant enhancements" in "App Intents" technology—Apple's developer framework that allows an app's functions to be used with the Apple software on a device, including Siri, Spotlight suggestions, and Shortcuts, as well as hardware interactions such as the iPhone 16's Action button. Peterson claimed that this integration would make Siri's new Apple Intelligence-powered abilities usable across non-Apple developed apps. Peterson offered the specific examples of asking Siri to take a light trails video in Pro Camera by Moment and asking Siri to share notes summarizing a meeting in the app Superhuman. Video demonstrations of Siri being used with these two apps played on the screen while she spoke.




357. Following the discussion of App Intents, Peterson introduced the final, and most important set of "really cool and useful capabilities coming to Siri": Personal Context. Peterson stated, "***Thanks to Apple Intelligence, [Siri] has awareness of your personal context. With its semantic index of things like photos, calendar events, and files, plus information that's stashed in passing messages and emails, like hotel bookings, PDFs of concert tickets, and links that your friends have shared, Siri will find and understand things it never could before***." Peterson then emphasized Apple Intelligence's privacy, the feature that analysts and commentators had long been speculating Apple would use to set itself apart from its AI competitors, stating that Siri would be able to accomplish these tasks "without compromising your privacy."

358. Peterson stated that Siri would be able to find things when the user "***can't remember if it was in an email, a text, or a shared note, like some book recommendations that a friend sent you a while back. Or for times when you're filling out a form and need to input your driver's license, Siri will be able to find a photo of your license, extract your ID number, and type it into the form for you***." Screenshots of these features were shown on screen behind Peterson.




359. Peterson then stated that she had "one more demo" to share to demonstrate "how powerful Siri will be when it draws on personal context awareness and action capabilities built into Apple Intelligence." In this demo, Peterson showed, while holding a phone in her hand, how Siri could help her figure out what time her mother's plane would be landing, remember where they were having lunch, and figure out how long it would take to get there. While the demo played, Peterson narrated, "***[I]magine that I'm planning to pick my mom up from the airport, and I'm trying to figure out my timing. Siri is going to be able to help me do this so easily. 'Siri, when is my mom's flight landing?' What's awesome is that Siri actually cross-references flight details that my mom shared with me by email with real-time flight tracking to give me her up-to-date arrival time***." This demonstration showed Siri cross-referencing flight details shared by email and offering real-time flight tracking data.




360. Peterson then asked Siri "What's our lunch plan?" and commented "***I love that Siri can help me keep track of plans that I've made in casual conversation, like this lunch reservation my mom mentioned in a text***."






361. After the video demonstration played, Peterson touted how useful Siri's new abilities were: "***I haven't had to jump from Mail to Messages to Maps to figure out this plan. And a set of tasks that would have taken minutes on my own and honestly probably would have resulted in a call to my mom, could be addressed in a matter of seconds. That's just a glimpse of the ways in which Siri is going to become more powerful and more personal thanks to Apple Intelligence***."

362. Federighi and Peterson's statements, combined with the demonstrations of specific Apple Intelligence features including "Personal Context" for Siri, gave investors the impression that these upgrades already existed, were functional, and would be available with iOS 18, the first software update that would launch with the iPhone 16. As Apple's manufacturing timeline requires new iPhones to be loaded with software and ready to ship in August, ahead of the fall launch, Federighi's and Peterson's statements and the accompanying demonstrations led investors to believe that all of the advertised features existed, were functional, and would be rolled out with iOS 18 when the iPhone 16 launched in September 2024, or at the very latest, over the ensuing months.

363. Also on June 10, 2024, Apple published a press release on Apple Intelligence, highlighting the new features and Siri upgrades, including some of the same functions that had been demoed at the 2024 WWDC, as well as some additional features. The press release read:

> ***Siri Enters a New Era***
>
> Powered by Apple Intelligence, Siri becomes more deeply integrated into the system experience. With richer language-understanding capabilities, ***Siri is more natural, more contextually relevant, and more personal, with the ability to simplify and accelerate everyday tasks***. It can follow along if users stumble over words and maintain context from one request to the next. Additionally, users can type to Siri, and switch between text and voice to communicate with Siri in whatever way feels right for the moment. Siri also has a brand-new design with an elegant glowing light that wraps around the edge of the screen when Siri is active.
>
> * * *
>
> With onscreen awareness, Siri will be able to understand and take action with users' content in more apps over time. ***For example, if a friend texts a user their new address in Messages, the receiver can say, "Add this address to his contact card."***

364. The press release further highlighted Siri's new Apple Intelligence-powered personal context functionality, using one of the same examples demoed by Peterson during the WWDC:

> ***Siri will be able to deliver intelligence that's tailored to the user and their on-device information. For example, a user can say, "Play that podcast that Jamie recommended," and Siri will locate and play the episode, without the user having to remember whether it was mentioned in a text or an email. Or they could ask, "When is Mom's flight landing?" and Siri will find the flight details and cross-reference them with real-time flight tracking to give an arrival time***.

365. On June 10, 2024, Apple also launched its Apple Intelligence page on the Company's website, featuring a variety of images of the promised features, including Genmoji, ChatGPT integration, Writing Tools, Memory Movie, and Priority Notifications, under the text "Coming in beta this fall." The central image of a blank screen surrounded by a glowing, rainbow-colored border, represented the new, deeply integrated version of Siri.

366. In a same day interview, YouTube technology influencer "SuperSaf" asked Cook what made Apple Intelligence different from the other AI offerings in the marketplace. Cook responded:

> ***It's different in that we have personal context, and so Apple Intelligence understands you and is relevant to you, it's, it's not only world knowledge, it's also private***. . . . ***And so between having personal context and privacy, this makes it very unique and it's also integrated into the apps that you're already using, and so you don't have to think about***, "well, I want to use Intelligence and go to another app." It's embedded in Notes, it's embedded in Mail . . . Messages, . . . it's all over the place.

367. These representations reinforced investors' understanding that the advertised Apple Intelligence features, including Siri with "personal context," existed, were functional, and would be rolled out in the coming months, inducing consumers to buy the new iPhone 16.

368. Industry commentators reacted positively to the announcement of Apple Intelligence, especially the "more personal" Siri, surmising that these new features would positively impact the iPhone upgrade cycle by encouraging iPhone users to buy the new iPhone 16 to access these capabilities. On June 10, Wedbush reported that 2024's WWDC had been "the most important event for Apple in over a decade as the pressure to bring a generative AI stack of technology for developers and consumers is front and center." In the same report, Wedbush also wrote that the integration of ChatGPT into iPhones "**kick[ed] off a new frontier for Apple**," and that the addition of AI tools would unlock new revenue opportunities for the Company. (emphasis in original).

369. The same day, JP Morgan wrote that "Apple's keynote at WWDC showcased enough enhancements on the feature sets across native apps and third-party apps with integration of A(pple) I(ntelligence) to assure us of the expected upgrade cycle with the launch of the iPhone 16 and release of iOS 18 in the fall of this year." Similarly, Morningstar reported increased confidence in Apple and "a strong iPhone upgrade cycle in fiscal 2025" following the event. Morningstar further commented that it was "pleased with the newly announced Apple Intelligence suite of features," and was "particularly impressed with the ability of Siri to pull data between apps and take actions all without redirecting the user." Citi dubbed it the "[b]est WWDC [e]ver."

370. On June 11, 2024, Barron's reported that an Evercore ISI analyst came away from the 2024 WWDC "with increased confidence" that the restriction of Apple Intelligence to only the newest iPhone models would "help kick off an iPhone super cycle." The same day, DA Davidson upgraded Apple stock to "BUY," citing Apple becoming "the first to introduce a meaningful agent capability that will allow Siri (and beyond) to execute tasks on behalf of the user." Similarly, Oppenheimer wrote that the "impressive list of [new] AI features and their deep integration into iOS remove[d] concerns of Apple lagging behind other platforms on AI development." Oppenheimer further stated that the reveal "remind[ed] users that Apple is not only a leader in hardware and software technology, but also a trailblazer when it comes to designing and implementing technology in ways that are convenient, impactful, and secure for its users."

371. Throughout June 2024, analysts continued to discuss Apple's AI announcement, highlighting the positive impact that it would have on the iPhone upgrade cycle. For example, on June 21, 2024, Barron's reported that Wall Street was convinced Apple Intelligence would spur "a big iPhone upgrade cycle." On June 24, 2024, The Washington Post reported that in the two weeks since the 2024 WWDC, Apple had added more than $300 billion to its market capitalization, which it attributed to Apple's reputation for "being exceedingly good at playing catch-up" and a belief that Apple's integration of AI into iPhones could deliver on its reputation of reinventing existing technology into a product that changes the market forever. On June 28, 2024, CNET reported that an estimated 270 million iPhone users had not upgraded their devices in four years and wrote that the pool of potential customers could lead to a huge wave of iPhone sales because "the biggest software tricks that everyone is buzzing about will require the new hardware."

**b. Apple Touts Apple Intelligence Ahead of the iPhone 16 Announcement**

372. Apple continued to heavily advertise Apple Intelligence and the new "more personal" Siri over the next couple of months. On August 1, 2024, Apple filed a Form 8-K with the SEC, stating, "We were excited to announce incredible updates to our software platforms at our Worldwide Developers Conference, including Apple Intelligence, a breakthrough personal intelligence system that puts powerful, private generative AI models at the core of iPhone, iPad, and Mac." During the 3Q 2024 earnings conference call the same day, Cook stated, "***Siri also becomes more natural, more useful and more personal than ever***." During the Q&A portion of the call, Cook was asked by an analyst about the potential impact of the Apple Intelligence announcement on the iPhone upgrade cycle. In response, Cook stated, "We are very excited about Apple Intelligence and what it brings, and ***it's another compelling reason for an upgrade***. . . . ***I believe it will be a very key time for a[] compelling upgrade cycle***."

373. Analyst Atif Malik of Citigroup later asked Cook "about [the] staggered launch o[f] some" of Apple's new AI features: "So are you expecting most of the features that you announced at WWDC to be part of iOS 18? Or we should be thinking that some of these features could potentially [be] part of iOS 19 next year?" Cook responded, "Our objective that we said in June is to roll out US English starting in the fall, and that's to users and then ***proceed with more functionality, more features, if you will, and more***

***languages and regions coverage as we proceed across the next year***. And so we sort of gave a timeframe that and ***we're tracking to that***."

374. These statements reinforced Defendants' prior representations that the Apple Intelligence features announced at the WWDC, including the new Apple Intelligence-powered Siri, were fully functional and would be released for the new iPhone 16.

375. Analysts reacted positively to Defendants' statements. On August 1, 2024, DA Davidson wrote, "**[w]e believe that a much-needed upgrade cycle for the iPhone is due with the iPhone 16 as the integration of Apple Intelligence may be one of the most compelling use-cases of generative AI on the consumer-side**." (emphasis in original). Evercore ISI, citing directly to Cook's comments, reported that the expectation for a "staggered launch of AI starting this fall and with ChatGPT integration likely by year-end" would "help drive a sizable upgrade cycle through this holiday season. AAPL CEO noted the level of value AI offers presents a compelling reason to upgrade." Wedbush likewise commented that "**September guidance is just the opening act for the main event which is an AI-driven super cycle starting with iPhone 16 launching in mid-September**." (emphasis in original). On August 2, 2025, Morningstar raised its estimate for Apple based on the expectation of "strong revenue growth in fiscal 2025 as users upgrade their iPhones to take advantage of Apple's generative artificial intelligence features."

### c. Apple Announces iPhone 16 and iPhone 16 Plus

376. On September 9, 2024, Apple announced the iPhone 16 and iPhone 16 Plus, which it advertised as "built for Apple Intelligence." Apple made only minor changes to the physical design of the new model, making Apple Intelligence the central inducement to consumers to buy an updated phone. The press release announcing the new models read, "Apple intelligence will be available as a free software update, with the first set of features rolling out next month in U.S. English for most regions around the world." The press release promised that "[a]dditional Apple Intelligence features will roll out later this year and in the months following." As part of this rollout, the press release claimed, "***Siri will be able to draw on a user's personal context to deliver intelligence that is tailored to them. It will also gain onscreen awareness to understand and take action with users' content, as well as take hundreds of new actions in and across Apple and third-party apps***." Another press release issued on the same day advertising the iPhone 16 Pro and Pro Max also asserted, "[w]ith Apple Intelligence, powerful Apple-built generative

models come to iPhone in the easy-to-use personal intelligence system that ***understands personal context to deliver intelligence that is helpful and relevant*** while protecting user privacy."

377. The limited hardware changes made to the iPhone 16 highlighted Apple's reliance on Apple Intelligence to sell the device. As The Wall Street Journal wrote on September 9, 2024, analysts were still expecting iPhone sales to surge as a result of the high number of consumers due for an upgrade and demand for AI features. On September 9, 2024, Morningstar maintained its estimate for Apple stock and commented, "[w]e were pleased with the new iPhone 16 lineup and believe these models will spur a strong growth cycle for Apple in fiscal 2025 as consumers look to use generative artificial intelligence features." On the same day, Wedbush raised its price target from $285 to $300 per share and wrote that the iPhone 16 would be "the most successful iPhone unit launch in [the Company's] history as Apple Intelligence will be the launching pad for the consumer AI Revolution globally." Wells Fargo likewise stated that Apple's new AI features were "quite impressive" and would be "drivers of an eventual upgrade cycle." Wells Fargo was unconcerned with the staggered rollout schedule, writing that investor focus would be on "key feature / functionality rollouts" following the October release of iOS 18.1.

**d. Apple Releases Apple Intelligence Ads Starring Bella Ramsey**

378. A few days later, on September 13, 2024, Apple began running a trio of ads starring Bella Ramsey, the lead actor in HBO Max's hit show *The Last of Us*. The ads showcased three Apple Intelligence features, with the theme of Apple Intelligence rescuing the user from uncomfortable situations: using Siri to recall the name of a person Ramsey had met a month before, using the Memory Movie feature in Photos to create a tribute for the funeral of a child's pet fish, and using Writing Tools to summarize an email for a meeting they had forgotten about. At the end of the ad featuring Siri, the text "***More personal Siri***" was displayed.

379. The same day these ads began to air, presales of the iPhone 16 began.







**e. Apple Releases iOS 18 and the iPhone 16**

380. Three days later, on September 16, 2024, Apple released the iOS 18 software update. The update included increased home screen customization, more flexible placement for app icons, more text effects for the iMessage app, a Photos app reconfiguration, and a Passwords app, but did not include any Apple Intelligence features.

381. Analysts were chiefly concerned with how the lack of Apple Intelligence features in the initial release of iOS 18 would impact sales of the iPhone 16. Using expected wait time for the devices to be delivered as a proxy for demand, analysts commented that initial demand for the iPhone 16 was weaker than hoped and attributed this weakness to the absence of Apple Intelligence features. For instance, UBS wrote on September 17 that wait times for the iPhone 16 were "uninspiring," and that the "staged/linguistically limited rollout of AI capabilities" was a contributing factor. CBS News reported that the iPhone 16's first weekend presales were down 13% from sales of the iPhone 15 during the same period the prior year, and CNN similarly reported that "Apple sold just an estimated 37 million units in the first weekend of iPhone 16 pre-sales, down more than 12% compared to the same period last year."

382. However, analysts were still expecting that consumers would purchase the most advanced iPhone 16 model when Apple Intelligence features were rolled out over the coming months. On September 16, Evercore ISI reported that demand for the iPhone 16 Pro was highest in the United States and United Kingdom, where Apple Intelligence would be available the soonest, and commented that they expected to see iPhone 16 sales be "*stronger for longer*" as Apple Intelligence features were rolled out. (emphasis in original). Similarly, on September 18, JP Morgan wrote that the Apple Intelligence delay might have been causing consumers to delay purchase of a new device and commented that they expected "**momentum to shift**" with the introduction of AI features. (emphasis in original).

383. The iPhone 16 was officially released on September 20, 2024. As JP Morgan wrote on September 22, 2024, while demand for the base model of the iPhone 16 was tracking in line with sales of the iPhone 15 the year prior, demand for Pro models was lower, but demand overall was "healthy." Despite the lower-than-hoped-for initial sales, analysts continued to look ahead to increased demand when Apple Intelligence was released over the next few months. For example, Wedbush wrote on September 22, 2024, that, with Apple Intelligence features rolling out throughout the fall, "**the stage is set for iPhone 16 unit sales to be up high single digits and likely double digits starting with the December quarter**," and that the iPhone 16 launch was "**the beginning of an AI driven iPhone supercycle**" that would support Apple's achievement of a $4 trillion market capitalization in 2025. (emphasis in original).

384. The day Apple officially released the iPhone 16, the Company updated the Apple Intelligence webpage to insert "***Coming this fall***," over the same collection of images showing the advertised new features, including the "personal context" capabilities for Siri, once again reinforcing the impression that these features existed, were functional, and would be released over the next few months.




385. As a user scrolled through the Apple Intelligence page, Apple highlighted screenshots of different features in turn, including the same images of book recommendations and flight details that had been advertised by Peterson during the WWDC presentation. While scrolling through the images, the text "Draws on your personal context without allowing anyone else to access your personal data — not even Apple," was displayed.


Your mom's flight lands at 11:18 AM.
Re: Sunday pick-up
Photos
Create a Memory Movie
212 Opal Street
9:41


Here's what I found from Ivana about books:
9:41


Draws on your personal context without allowing anyone else to access your personal data — not even Apple.

#### f. Following the Launch of the iPhone 16, Apple Continues to Tout the Soon-to-Be-Released Apple Intelligence Features, Including the AI-Upgraded Siri

386. The Company did not release the first Apple Intelligence features until October 28, 2024, with the iOS 18.1 software update for iPhone. iOS 18.1 added some of the advertised Apple Intelligence features, but notably did not include the AI-upgraded "more personal" Siri with the ability to take action across apps.

387. In conjunction with the release of iOS 18.1, Apple updated the Apple Intelligence webpage to add the unqualified language, "***Available now***," over the same set of images. The advertised images under the text included features not actually available, such as Image Playground, custom emojis, and "more personal" Siri. This version of the page included the same Siri-related screenshots demonstrating Siri locating book recommendations from a friend and flight details from the 2024 WWDC, and also repeated the language "Draws on your personal context without allowing anyone else to access your personal data — not even Apple."




388. Further down the page, Apple advertised the Siri upgrades as if they had already been released, with the headline, "***The start of a new era for Siri***," over text touting that with "***awareness of your personal context, the ability to take action in and across apps, and product knowledge about your***

***devices' features and settings, Siri will be able to assist you like never before***." The image below this text featured the upgrades of ChatGPT integration and action across apps.




389. The same day, Apple published a press release titled *Apple Intelligence is Available Today on iPhone, iPad, and Mac*. In the press release, Apple stated the following about Siri's capabilities powered by Apple Intelligence, "***Siri will become even more capable, with the ability to draw on a user's personal context to deliver intelligence that's tailored to them. Siri will also gain onscreen awareness, as well as be able to take hundreds of new actions in and across Apple and third-party apps***."

390. The day of iOS 18.1's release, Barron's reported that while market reaction to the new Apple Intelligence features was mixed, there were positive expectations among analysts for Apple for the remainder of 2024 and into 2025. According to the article, JP Morgan was predicting better results for September than expected, and while December iPhone sales were expected to fall up to 7% relative to December 2023, that decline would be offset by higher demand in the following quarters. Overall, Barron's reported that hopeful analysts were "sticking to their view that Apple's AI efforts w[ould] pay off over the longer term." For instance, Wedbush was expecting the Apple Intelligence rollout would kick-start "a new

era" for Apple, spurred by developer investment in building AI-based apps for iPhones on the foundation of Apple Intelligence. Wedbush predicted that Apple Intelligence would "define the future for Apple with its next generation chip architecture, hardware releases and future iPhone models built around the AI foundation that many consumers will ultimately embrace."

**g. Apple's FY 2024 Earnings Call**

391. On October 31, 2024, Apple hosted its FY 2024 earnings conference call. In his prepared remarks, Cook stated, "in June, we announced ***Apple Intelligence, a remarkable personal intelligence system that combines the power of generative models with personal context to deliver intelligence that is incredibly useful and relevant***." Cook also touted the first set of Apple Intelligence features that had been made available, including "a more natural and conversational Siri," and promised that "[m]ore features will be rolling out in the coming months as well as support for more languages. And this is just the beginning."

392. Regarding the staggered rollout of Apple Intelligence, an analyst asked Cook if the staged introduction of Apple Intelligence features would result in a different "demand cadence" than usual for the iPhone upgrade cycle. In response, Cook acknowledged that the cadence of iPhone upgrades would be different but claimed that the Company was "***executing well***" on the timeline given for the release of Apple Intelligence features. Cook then repeated his statement from August 1, 2024, that "***what we believe here is that it's a compelling reason for upgrading***."

393. Analysts reacted positively to these statements. On October 31, 2024, DA Davidson reported that Apple's FY 2024 revenue was "**better than expected**," driven primarily by "**strong iPhone sales**," and commented "[w]**e continue to believe that there is still more growth to come for the iPhone as additional Apple Intelligence features roll out over the coming months**." (emphasis in original). DA Davidson interpreted the lack of currently available Apple Intelligence features as a positive, noting that "iPhone sales growth acceleration bodes well moving forward for iPhone growth considering the lack of Apple Intelligence in products over the previous quarter."

394. Similarly, Evercore ISI wrote the same day that they expected a "[s]tronger [f]or [l]onger [c]ycle," and anticipated that the staggered rollout of Apple Intelligence would support "*<u>a longer iPhone cycle that could help dampen</u>*" the typical seasonal sales slump in March and June. (emphasis in original).

On November 1, 2024, Oppenheimer wrote that the conference call did not change its "bullish view on Apple Intelligence and its positive impact on iPhone replacement in CY25." In another November 1, 2024 report, BNP Paribas highlighted management's statements of their belief that Apple Intelligence was "*compelling enough to drive a h[ardware] upgrade*." (emphasis in original).

**h. Apple Releases an Updated iOS 18**

395. On December 4, 2024, a few days before the release of Apple's second update to the iOS 18 software, Cook sat for an interview with Steven Levy of WIRED Magazine. Levy asked Cook, "I'm wondering if we're going to end up having this relationship with Siri that will be our constant companion and will do, for instance, everything we might want to do in a search, instead of going to Google we'll just ask Siri." Cook responded in part, "I think more people will [use Siri] because ***Siri will become more personally relevant and be able to take task[s] off your plate that you don't have to do and sort of a multi-step kind of approach that you saw some of the demos do***. So I couldn't be more excited about the future of Siri."

396. On December 11, 2024, Apple released iOS 18.2. This update introduced the features Image Playground, Genmoji, ChatGPT integration into Siri and Writing Tools, Image Wand, and Camera Control. The Apple Intelligence features were available only on iPhone 16 models and iPhone 15 Pro and Pro Max. The update also introduced localized English for Australia, Canada, Ireland, New Zealand, South Africa, and the United Kingdom, but Apple Intelligence continued to be limited to English only. Although the update included ChatGPT integration into Siri and an updated visual to indicate activation of Siri, those features only were available in beta form to users who were granted access by signing up for a waitlist.

397. The day of the software update, Apple published a press release titled *Apple Intelligence now features Image Playground, Genmoji, Writing Tools enhancements, seamless support for ChatGPT, and visual intelligence*. The press release reiterated, "***Siri will be even more capable, with the ability to draw on a user's personal context to deliver intelligence that's tailored to them. Siri will also gain onscreen awareness, and will be able to take hundreds of new actions in and across Apple and third-party apps***."

#### i. Apple's 1Q 2025 Earnings Call

398. On January 30, 2025, Apple released its 1Q 2025 financial results. In his prepared remarks during the Company's conference call that same day, Cook noted that iPhone revenue "came in at $69.1 billion" for the three months ended December 28, 2024—"reaching all-time iPhone revenue records in dozens of markets and regions." Cook recounted the expansion of Apple Intelligence to more languages and promised, "***we'll continue to roll out more features in the future, including an even more capable Siri***." Cook also touted the appeal of the yet-to-emerge AI-enabled Siri, stating, "I think the killer feature is different for different people. But I think for most, they're going to find that they're going to use many of the features every day. ***And certainly, one of those is Siri, and that will be coming over the next several months***."

399. Analysts reacted positively to the update. The same day, Evercore ISI commented that Apple Intelligence was expected to drive higher demand and highlighted that the iPhone 16 was selling better where Apple Intelligence was available. Similarly, JP Morgan looked ahead to further growth in iPhone revenue from the iPhone 16 cycle from markets with access to Apple Intelligence, as well as further growth in sales from the eventual iPhone 17 launch, when JP Morgan anticipated Apple would "ha[ve] rolled out Apple Intelligence across a much wider range of countries in addition to upgraded AI capabilities." Analysts still believed that Apple would deliver on its AI promises, as demonstrated by Wedbush's January 31, 2025 report that Apple's "**AI Consumer Revolution**" would happen over time, which concluded that a bullish outlook was still supported. (emphasis in original).

### 9. Unbeknownst to Investors, Apple Did Not Have a Working Siri AI Model and Was Nowhere Close to Releasing a "More Personalized" Siri

400. Unbeknownst to investors, while Apple was touting its new, Apple Intelligence-powered Siri and telling consumers that Apple Intelligence was a compelling reason to upgrade to an iPhone 16, Defendants knew that the Company lacked even a functional model of an upgraded "more personal" Siri and was nowhere close to releasing this product.

### a. Internal Accounts Confirm That Apple Had No Functional Model of Its Updated Siri with "Personal Context" at the Time of Defendants' Misrepresentations and the Company Was Still Struggling to Complete the New Software in Spring 2025

401. In an article published on March 7, 2025 Bloomberg reported that as late as spring 2025, sources within Apple's AI division believed the new Siri features "could be scrapped altogether" and needed to be rebuilt from the ground up. This was due in part to concerns that upgrading Siri would require running more powerful LLMs on Apple devices, which would strain the hardware and necessitate either downgrading the available features or slowing the functions down on older devices and would require Apple to upgrade the hardware capabilities of future products so that the features could function properly. The Apple employees believed that making these changes would result in a delay of the "initial underpinnings" of a new Siri until 2026, with the actual promised features not to be released until 2027.

402. Bloomberg's March 7, 2025 article also confirmed that Apple executives were well aware of the problems with the upgraded Siri model. Specifically, citing sources within the Company, Bloomberg reported that Federighi and other Apple executives had "voiced strong concerns internally that the features didn't work properly — or as advertised — in their personal testing."

403. Bloomberg then reported in a March 14, 2025 article that Walker, a senior director at Apple who oversaw the Siri division, commented during an all-hands meeting for the division that delays in key Siri features had been "ugly" and "embarrassing." During the all-hands meeting, Walker suggested that employees on the AI team may be "feeling angry, disappointed, burned out and embarrassed after the features were postponed," with the new features not expected until 2026 at the earliest. Walker acknowledged that the delays were particularly "ugly" because Apple had already showed the promised features publicly, stating, "This was not one of these situations where we get to show people our plan after it's done. We showed people before." Walked also reportedly stated that "[t]o make matters worse," Apple ran TV ads advertising the capabilities that were not yet ready.

404. During this all-hands meeting, Walker also said that there is "intense personal accountability" shared by Giannandrea and Federighi. Walker explained that Apple made the decision to delay the features because of quality issues, with the Company finding that the technology only worked correctly up to two-thirds to 80% of the time. Walker reportedly compared the endeavor to roll out the new

Apple Intelligence-powered Siri on the initial timeline to an attempt to swim to Hawaii, stating, "We swam hundreds of miles — we set a Guinness Book for World Records for swimming distance — but we still didn't swim to Hawaii. And we were being jumped on, not for the amazing swimming that we did, but the fact that we didn't get to the destination." Walker also recognized that some staff testing the features might feel "relieved" by the delays, noting, "If you were using these features in the build, you were probably wondering: Are these ready? How do I feel about shipping these to our customers? Is this the right choice?" Walker also acknowledged that some employees "might be feeling embarrassed."

405. Bloomberg reported in this March 14 article that when Apple demonstrated the features at the WWDC using a video mock-up, it only had a barely working protype and noted that Apple had "touted the features as a key selling point of the iPhone 16 line, which otherwise lacked major changes." Citing sources with knowledge of the matter, Bloomberg reported that it was unclear when the enhancements would actually launch.

406. According to an April 10, 2025 article published by The Information, internal disputes over the fundamental question of how Apple Intelligence's AI models would function were ongoing at the time Apple announced Apple Intelligence at the 2024 WWDC. The Information detailed that "behind the scenes" of the June 2024 announcement "and in the months that followed," Apple's strict adherence to privacy was making it difficult for the Siri team to reach consensus on how the model would perform tasks.

407. Team members were reportedly split on whether to create two models—internally dubbed "Mini Mouse" and "Mighty Mouse"—or one large model that could run every task. The Mini Mouse and Mighty Mouse approach would utilize a large language model and a small language model, with the small model running on the device and handling simple tasks and the large model running in the cloud and handling more complex tasks, like recognizing that the user was scheduled for a meeting and automatically arranging transportation. The Siri team ultimately landed on building one large language model that could handle all tasks, which necessitated running Siri operations in the cloud—a stark departure from Apple's longstanding policy against running programs in the cloud due to privacy concerns.

408. The Information article also included the account of a former Apple employee who recounted that Siri team members were surprised to see the demonstrations of Siri's new features at the 2024 WWDC, as they had never seen working versions of the advertised features. At the time of the 2024

WWDC, the only feature that Apple had successfully tested internally was the glowing, rainbow-colored ribbon around the edge of the screen that displayed when Siri was activated.

409. The New York Times published more details behind Apple's failure to deliver an upgraded Siri on April 12, 2025, which confirmed prior reporting of the lack of a functional model of the AI-enabled Siri. According to three sources familiar with the project, during internal testing, Apple had found that Siri's responses were inaccurate on nearly one third of requests. This article confirmed that while Apple was telling analysts and investors that Siri upgrades would be rolled out within a year from the June 2024 announcement and would support an iPhone upgrade supercycle, behind the scenes Apple was unable to produce even a consistently working prototype of a new Siri.

410. Former Employee 1 ("FE-1") was a Senior Engineer for Apple from prior to the Class Period until December 2025. From approximately September 2024 through approximately February 2025, FE-1 worked on a team that was responsible for training and running evaluations of the large language model for Apple Intelligence. FE-1 worked under Walker, a senior director at Apple who oversaw the Siri division. FE-1 worked in conjunction with the Apple Intelligence (Siri) team as well as other teams working on Apple AI, including the hardware and research and development teams.

411. FE-1 confirmed that Apple did not have a functional version of an AI-enabled Siri at the time of Defendants' misrepresentations. In September 2024, for approximately six months, FE-1 was placed on a boomerang team that worked in conjunction with the Apple Intelligence (Siri) team. In that role, FE-1 was responsible for many functions, including training and running evaluations of the LLM for Apple AI. FE-1 explained that the LLM is an algorithm packaged into a big library, and was the model that powered Apple AI. FE-1's team trained and evaluated the LLM for Apple AI every day until they could test it on device, which occurred for the first time in or around December 2024 or January 2025.

412. When FE-1 began working with the Apple Intelligence team in September 2024, FE-1 learned that Apple AI was only a proof of concept at that point in time. In fact, FE-1 learned that the version of Apple AI shown at the June 2024 WWDC was only a demonstration and there was no actual product at that time. FE-1 stated that what Apple presented at the 2024 WWDC was what Apple AI might look like if the LLM were to exist.

413. According to FE-1, leading up to December 2024, Apple made a huge effort to get Apple AI ready to conduct testing on devices and present it to Apple leadership. FE-1 recalled that even though Apple employees worked late every weekday, weekends and holidays, by December 2024 there was still only a 50/50 chance that the product would work on internal carry, meaning on-device testing. FE-1 explained that putting Apple AI on Apple devices for testing was a pivotal point in the work of the Apple Intelligence team and did not occur until around December 2024 or January 2025.

414. FE-1 explained that when the Apple Intelligence team reached the internal carry stage, Apple employees were given specific development iPhones for them to run Apple AI for testing. Even Apple employees that were not on one of the Apple AI development teams were given internal access to provide feedback. According to FE-1, Apple's leadership (definitely Federighi, but also likely Cook) began internal carry testing in or around December 2024/January 2025. FE-1 recalled that after Apple's leadership had a chance to test Apple AI during the internal carry stage, the word came down from Apple leadership that there was no way they could release Apple AI to the public in the state it was in at that time. FE-1 stated that Apple AI was nowhere near good enough for release as of December 2024.

415. According to FE-1, between September 2024 and February 2025, Giannandrea and Walker received weekly updates on the progress of Apple AI at leadership meetings.

416. By December 2024 or January 2025, the development of Apple AI was so far behind that FE-1's team decided to focus solely on supporting the specific features that were publicly promoted by Cook in his keynote from the June 2024 WWDC. FE-1 was personally responsible for testing those use cases named by Cook publicly. FE-1 recalled that during testing of these features, certain features would work one day but would not work the next day. FE-1's job then became to focus on figuring out what was not working and why. FE-1 believes this occurred around the same time that Federighi and Cook were first able to use Apple AI on their phones/devices and made the decision that it was not going to work. FE-1 said Federighi was on the call with employees when the decision was announced that Apple leadership had decided to delay the release of Apple AI.

417. FE-1 stated that Apple's promotion of Apple AI weighed heavily on the engineering team because they knew Apple AI was nowhere near ready for release when it was announced at the June 2024 WWDC.

### b. The Better Business Bureau's Investigation into Apple's Deceptive Advertising of Apple Intelligence Confirms that Apple Had No Functional Model for the Advertised Siri Features

418. On April 22, 2025, the NAD published the results of its investigation into Apple's advertising of various Apple Intelligence features. The NAD, founded by the U.S. advertising industry in 1971, is the advertising industry's self-regulatory body. It aims to promote consumer trust by reviewing advertisements for truth and accuracy. The NAD makes recommendations to businesses where it finds that advertisements are misleading to consumers. The NAD primarily enforces its regulatory authority through publication of its decisions and by referring cases to the Federal Trade Commission or U.S. Food and Drug Administration if companies are not compliant with its recommendations.

419. The NAD's investigation into Apple's Apple Intelligence claims focused on the express and implied claims conveyed to consumers by the content of the Apple Intelligence webpage and by Apple's Siri ads starring Bella Ramsey. With respect to the Bella Ramsey ads, NAD reported that "[d]uring the pendency of the inquiry, Apple represented to NAD that it will permanently discontinue the challenged claims in the 'More Personal Siri' commercial." Apple had pulled the ad on March 7, 2025, the same day it revealed the delay of the new Siri features. As a result of Apple's voluntary discontinuance of the ad, NAD did not review the related claims of Siri's capabilities on their merits.

420. NAD reviewed the advertisements on the Company's Apple Intelligence webpage under a "reasonable basis" standard, which considers the following factors: (i) type of product; (ii) type of claim; (iii) consumer benefit from a truthful claim; (iv) the ease of developing substantiation for the claim; (v) the consequences of a false claim; and (vi) the amount of substantiation experts in the field believe is reasonable.

421. NAD follows the FTC's rule that the reasonable basis doctrine requires advertisers to have substantiation before disseminating a claim. As to disclosures accompanying a claim, NAD applies the standard that "to be clear and conspicuous a disclosure must be close to the triggering claim, prominent and in a font size and color that is easy to read and understand." (cleaned up). The disclosure "must be noticeable and unavoidable to consumers," and must be repeated throughout the advertisement where necessary to prevent consumers from being misled. NAD "reviews the net impression created by an advertisement as a whole."

422. With respect to Apple's representations about its new Apple Intelligence-powered Siri functions, NAD investigated claims regarding Apple's display of certain features under the "Available now" text, which included onscreen awareness, personal context, and action across apps. Notably, while Apple "provided product demonstrations, technical support pages, and press releases to demonstrate the basic functionality of" the "Priority Notifications, Image [G]eneration [Tools], and . . . ChatGPT integration into Siri and Writing Tools" features at issue, it provided no such evidence with respect to the upgraded Siri features, including personal context—a tacit admission that Apple could not substantiate even the basic functionality of these features.

423. The NAD report concluded that "[t]he description of Siri's updated functionality below Apple's unqualified claim that Apple Intelligence is '[A]vailable [n]ow' . . . reasonably convey[ed] the message that the updated Siri functionality was available as part of the iPhone 16 launch, which it was not." The report also noted that Apple had advised NAD during the investigation "that the updated Siri functionality was not going to be available on its originally planned timing and that Apple was taking steps to update its promotional materials to reflect this change." As a result of the NAD's inquiry, Apple updated the webpage to include a prominent disclosure in bolded font in close proximity to each claim. This disclosure read, "This feature is in development and will be available with a future software update." NAD concluded that this disclosure was an accurate representation of the then-current status of the Siri upgrades—a far cry from the "Available now" status Apple touted on October 28, 2024.

### F. The Relevant Truth Regarding the Apple Intelligence-Powered Siri Is Gradually Revealed

#### 1. March 7, 2025: Defendants Announce a Delay in the Release of Apple's Updated Siri Features

424. On March 7, 2025, the relevant truth regarding the new Apple Intelligence-powered Siri began to emerge when an Apple spokesperson announced that the rollout of Apple's updated Siri AI features would be delayed. Specifically, Reuters and other news outlets quoted an Apple spokesperson as stating with respect to the Company's "more personalized Siri" that "[i]t's going to take us longer than we thought to deliver on these features and we anticipate rolling them out in the coming year." The full text of Apple's statement, provided by spokesperson Jacqueline Roy, was published in the tech blog Daring Fireball, written by John Gruber. The statement read:

> Siri helps our users find what they need and get things done quickly, and in just the past six months, we've made Siri more conversational, introduced new features like type to Siri and product knowledge, and added an integration with ChatGPT. We've also been working on a more personalized Siri, giving it more awareness of your personal context, as well as the ability to take action for you within and across your apps. It's going to take us longer than we thought to deliver on these features and we anticipate rolling them out in the coming year.

425. Reuters further reported that "Apple did not give a reason for the delays" and noted that "[t]he iPhone maker had previously indicated the features would come in 2025." Reuters also recounted that "[s]ome of the biggest improvements were aimed at giving its Siri assistant the ability to duck in and out of apps and complete tasks for a user by tapping into information stored on Apple devices," noting that "Apple gave examples such as asking Siri to pull up a podcast recommended by a friend or pulling up flight tracking information from a relative, all based on data held on the device." That same day, Apple quietly pulled the Bella Ramsey Siri AI ad.

426. In an article titled *Apple Delays Siri Upgrade Indefinitely as AI Concerns Escalate*, also published on March 7, 2025, Bloomberg reported with respect to the delay in the promised updates to Siri that Apple engineers had been "racing to fix a rash of bugs in the project" since mid-February 2025 but had been unsuccessful. Bloomberg further reported that people involved in these efforts now believed that the updated Siri would not be released until 2026. According to Bloomberg, these people also stated that "in the lead-up to the latest delay . . . Federighi and other executives voiced strong concerns internally that the features didn't work properly — or as advertised — in their personal testing."

427. In addition, Bloomberg reported that there were "concerns internally that fixing Siri will require having more powerful AI models run on Apple's devices," which would put strain on the hardware and mean that the Company would either have to reduce the set of features or make the models run more slowly on older devices, and would require Apple to upgrade the hardware capabilities of future products so that the features could function properly. In anticipation of customer frustration with the delay, Bloomberg reported that Apple had sent its AppleCare support staff the guidance, "If customers ask about the timing of these Siri features, reiterate that we anticipate rolling them out in the coming year."

428. Analysts reacted negatively to the announced delay in the rollout of Apple's "more personalized Siri," noting that this delay would likely result in fewer iPhone sales in calendar year 2025.

For example, in a March 10, 2025 report, Citi lowered its estimate of CY 2025 iPhone sales from +5% to +2% "to reflect a delay in the much-anticipated Siri upgrade as part of iOS 18.4 update in April." Citi explained that prior to the announcement, "[t]he expectation has been that the big update of Siri with on-screen awareness, personal context and deep app integration will be released sometime this April/May" but that "the company sees delay in these features and now expects to roll it out in the coming year, which we view as a negative as it would have been a catalyst to drive up higher refresh this year." Citi further observed that "[w]hile Apple Intelligence utility is different for different people, an upgraded Siri would have driven a higher iPhone refresh this year, in our view."

429. Following these disclosures, the price of Apple common stock declined $11.59 per share, or 4.8%, from a closing price of $239.07 on March 7, 2025, to a closing price of $227.48 on March 10, 2025.

**2. March 12, 2025: Morgan Stanley Report**

430. One week later, on March 12, 2025, Morgan Stanley reported that Apple's delay in releasing an updated Siri would negatively impact the rate that users upgraded to the iPhone 16, resulting in a lower-than-expected upgrade rate for FY 2026 and causing Morgan Stanley to reduce its price target for Apple by $23, from $275 to $252. Specifically, Morgan Stanley explained that "[t]he delayed rollout of a more advanced Siri means Apple will have fewer features to accelerate iPhone upgrade rates in FY26." The report presented evidence, based on data from Morgan Stanley's 2024 AlphaWise Smartphone survey that "~50% of iPhone owners that didn't upgrade to an iPhone 16 acknowledged that the delayed Apple Intelligence rollout had an impact on their decision not to upgrade."

431. The data gathered through Morgan Stanley's survey also showed that "an 'Upgraded Siri digital assistant' was the Apple Intelligence feature prospective new model iPhone buyers (globally) were most interested in," which Morgan Stanley observed "highlight[ed] the importance of this 'killer app' in driving AI-related iPhone upgrades." Thus, Morgan Stanley explained:

> Given our prior iPhone forecast assumed the iOS18.4 launch in April '25 would integrate a more advanced Siri alongside broader Apple Intelligence language support and accelerate upgrade rates this fall, we believe it is necessary to lower our upgrade rate assumption, and FY26 shipment forecast, as a more advanced Siri is unlikely to be available until after the iPhone 17 launch.

432. "[W]ithout a 'killer AI app' in market ahead of the iPhone 17 launch," Morgan Stanley did not "see AI features contributing to accelerating upgrade rates as meaningfully as [it] did previously."

433. Following this disclosure on March 12, 2025, the price of Apple common stock declined $11.16 per share, or 5.1%, from a closing price of $220.84 on March 11, 2025, to a closing price of $209.68 on March 13, 2025.

434. Various news outlets reported on Morgan Stanley's price-target cut. Investor's Business Daily stated in a March 12, 2025 article titled *Apple Stock Gets Price-Target Cut From Morgan Stanley*, that "[i]nvestment bank Morgan Stanley . . . cut its price target on Apple (AAPL) stock, citing a lack of compelling AI features to drive iPhone sales." Investor's Business Daily also cited Apple's announcement regarding the Siri AI delay and the related Bloomberg report and connected the delay to the subsequent stock price decline, stating, "Last Friday, Bloomberg reported that Apple has delayed the release of an artificial intelligence-powered upgrade to its Siri digital assistant. Apple stock has fallen for three consecutive trading sessions since the report." A March 12, 2025 article from Barron's titled *Apple Needs an iPhone Sales Boost. AI Delays Are a Problem, Analyst Says.*, also reported on the Morgan Stanley price-target cut, stating, "Apple has been counting on the introduction of artificial-intelligence features to get more consumers buying iPhones. A delay in that hurts those hopes, according to [a] Morgan Stanley analyst."

435. In a March 13, 2025 article titled *Apple Stock Bulls Are Losing Confidence In iPhone Upgrade Cycle*, Investor's Business Daily cited the earlier Morgan Stanley report and stated, "Wall Street analysts are cutting their forecasts for Apple (AAPL) iPhone sales this year as the consumer electronics giant delays adding artificial intelligence features. Those revisions have weighed on Apple stock." Investor's Business Daily noted that "Apple has fallen for four[] straight trading sessions."

436. In a report issued on March 14, 2025, William O'Neil removed its Buy recommendation for Apple, citing the Company's indefinite postponement of its AI enhancements for Siri and the fact that "analysts have revised their iPhone sales projections downward, with estimates reflecting a potentially weaker upgrade cycle due to the absence of AI-driven differentiation." William O'Neil further reported that "Apple shares have declined 11% this week following reports of a significant delay in AI enhancements for Siri."

**3. April 3, 2025: The Wall Street Journal Article**

437. On April 3, 2025, The Wall Street Journal published an article titled *Apple and Amazon Promised Us Revolutionary AI. We're Still Waiting.* The article discussed Apple's 2024 WWDC announcement of the AI Siri features and the TV ad highlighting these capabilities, before surmising that "[w]e have been misled," and chiding the Company that it "shouldn't announce products until they're sure they can deliver them." The article concluded that Apple had "overhype[d] and underdeliver[ed]" and had "attempt[ed] to convince us these enhancements justify an expensive phone upgrade," leaving consumers to wonder, "Why should we buy your next shiny thing? Where's that trust?"

438. Following this disclosure on April 3, 2025, the price of Apple common stock declined $20.70 per share, or 9.2%, from a closing price of $223.89 on April 2, 2025, to a closing price of $203.19 on April 3, 2025.

439. In the weeks after The Wall Street Journal article was published, analysts continued to highlight the delays in Apple's rollout of the "more personalized" Siri as a primary concern for investors. For example, in an April 23, 2025 report, Wells Fargo noted that "the progression of Apple Intelligence features remains a key focus for investors, i.e., looking for drivers / visibility into an improved AI-driven upgrade-cycle potential." Wells Fargo observed, while Apple had rolled out some of the promised Apple Intelligence features, "the <u>more powerful personalized features have been delayed</u>." (emphasis in original). Analysts also lowered their estimates for iPhone sales over the upcoming months based on the delay. For example, in an April 28, 2025 report, TD Cowen lowered its "sell-in forecast" for "Jun Q" from 48 million to 43 million, noting that "gen AI Siri delays [are] likely still hindering replacement demand." In an April 30, 2025 report, Barclays noted, "we still think that Street estimates for iPhones are too high for CY26 with . . . limited traction for AI adoption with Siri delay" and lowered its "Sep Q and FY26 unit estimates," citing "Siri delay, pushing out AI Intelligence adoption."

**4. May 1, 2025: Q2 2025 Earnings Call**

440. During Apple's May 1, 2025 earnings call to discuss Apple's financial results for 2Q 2025, Cook disclosed that the Company was still working on the promised "more personal" Siri, but failed to provide any specifics regarding the timing of the rollout. Specifically, Cook stated, "With regard to the more personal Siri features we announced [at WWDC 2024], we need more time to complete our work on

these features so they meet our high-quality bar. We are making progress and we look forward to getting these features into customers' hands." In response to an analyst question later during the call, Cook explained that the delay in rolling out the new Siri features was due to the Company needing more time to complete its work: "[W]ith regard to the more personal Siri, as you mentioned, we just need more time to complete the work so they meet our high-quality bar. And there's not a lot of other reason for it. It's just taking a bit longer than we thought."

441. Following this disclosure on May 1, 2025 as well as the disclosures related to the Epic Injunction on April 30 and May 1, 2025 discussed above, Apple common stock declined 6.4%, from a closing price of $212.50 on April 30, 2025, to a closing price of $198.89 on May 5, 2025.

442. In the wake of Apple's earnings call, analysts highlighted Cook's comment that Apple was still working on an AI-powered Siri and discussed the impact of this further delay on the iPhone upgrade cycle. In a report issued on May 2, 2025, Morningstar noted that "Cook also addressed Apple's latest delay of certain advance Apple Intelligence generative AI features. Siri with generative AI is now delayed until calendar 2026." Morningstar explained that "[w]hile Apple Intelligence officially released with iOS 18 in late 2024, the most compelling feature set to us, announced in June 2024, is not yet released" and observed, "While we like the generative AI features released so far . . . we find them to be good features, not revolutionary software that will spur iPhone unit sales. To us, this lends credence to our bearish view on iPhone growth and our expectation for a modest growth cycle arising from AI, rather than a 'supercycle.'"

443. Analysts also highlighted Cook's admission that the Company had failed to deliver its Apple Intelligence-powered Siri on the promised timeline. For example, in a May 2, 2025 report, Needham observed, "In answer to a que[s]tion, AAPL noted that personalized Siri features were delayed compared with the promises made at WWDC last year" and HSBC similarly noted in a report published the same day that, "[o]n the call, the CEO acknowledged that the development of the Siri assistant was late."

**G. Post Class-Period Events Related to Defendants' Fraudulent Siri AI Scheme**

444. One year after the announcement of Apple Intelligence at Apple's June 10, 2024 WWDC, Apple hosted its 2025 WWDC beginning on June 9, 2025. During the event, the presenters made no mention of upgraded Siri functionality beyond the statement that the Company "needed more time to reach a high-quality bar." In the wake of the conference, CNN commented that "it's unlikely that any of the

announcements made at Monday's event will change the perception that Apple is behind its competitors in AI."

445. Thereafter, on December 1, 2025, The New York Times reported that Giannandrea would be retiring from his role as Senior Vice President of Machine Learning and AI Strategy, in a move widely attributed to Apple's failure to release its updated AI-enabled Siri. Apple formally announced that Giannandrea would leave the Company in the spring of 2026. Apple stated that it would not be replacing Giannandrea and instead would break up the AI team, with staff reporting to Federighi, COO Sabih Khan, and Senior Vice President of Services Cue. As Bloomberg reported on December 6, 2025, the shakeup followed a significant exodus of employees from Apple's AI group, including its founder and lead engineer, Ruoming Pang, who departed for Meta.

446. As of the date of this Complaint, Apple still has not launched the new Apple Intelligence-powered Siri features that the Company first announced at its 2024 WWDC and has not provided any clear timeline for the release of these features.

447. Moreover, on January 12, 2026, Apple and Google jointly announced that Apple had entered an agreement with Google to use Google's Gemini models and cloud technology to power its "more personalized" Siri, thereby admitting that the Company had been unable to develop the technology on its own and that the long-awaited features Apple first advertised more than 18 months earlier still did not exist. Apple also stated that the Siri update would be "coming this year." The full joint statement read:

> Apple and Google have entered into a multi-year collaboration under which the next generation of Apple Foundation Models will be based on Google's Gemini models and cloud technology. These models will help power future Apple Intelligence features, including a more personalized Siri coming this year.
>
> After careful evaluation, Apple determined that Google's Al technology provides the most capable foundation for Apple Foundation Models and is excited about the innovative new experiences it will unlock for Apple users. Apple Intelligence will continue to run on Apple devices and Private Cloud Compute, while maintaining Apple's industry-leading privacy standards.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. Defendants' False and Misleading Statements Regarding the Injunction

448. Throughout the Class Period, Defendants claimed in the Company's SEC filings that Apple had complied with the Injunction, directing investors to the Company's January 16, 2024 Notice of Compliance and April 12, 2024 Opposition filed with the district court in the *Epic Games* litigation. Those filings, supported by sworn declarations from senior Apple executives, affirmatively stated that Apple had complied with the Injunction and provided rationales for the components of the Company's Link Entitlement program. These and other Apple executives also provided sworn testimony during the May 2024 evidentiary hearing attesting to Apple's compliance with the Injunction and defending Apple's Link Entitlement program.

449. In the April 2025 Order, Judge Gonzalez Rogers found that the evidence adduced through the February 2025 evidentiary hearing, including Apple's contemporaneous internal documents regarding its response to the Injunction and development and design of the Link Entitlement program, demonstrated that "[i]n its notice of compliance and at the May 2024 hearing . . . *Apple attempted to mislead*." Judge Gonzalez Rogers specifically found that the testimony quoted in paragraphs ¶¶ 491-92 and 494 below "*attempted to mislead*" and, with respect to Roman's testimony, was "*replete with misdirection and outright lies*."

450. The Ninth Circuit subsequently affirmed Judge Gonzalez Rogers' finding that "*Apple 'attempted to mislead' in its Notice of Compliance and May 2024 hearing with 'pretextual' justifications*."

451. The specific facts that render each of Defendants' statements materially false and misleading when made are set forth below.

#### 1. May 3, 2024 – 2Q 2024 Form 10-Q

452. On May 3, 2024, Apple filed its 2Q 2024 Form 10-Q with the SEC, which was signed by Defendant Maestri. Under a sub-heading titled "**Item 1. Legal Proceedings**," the 2Q 2024 Form 10-Q stated:

> *Epic Games*
>
> Epic Games, Inc. ("Epic") filed a lawsuit in the U.S. District Court for the Northern District of California (the "California District Court") against the Company alleging violations of federal and state antitrust laws and California's unfair competition law based upon the Company's operation of its App Store. The California District Court found that certain provisions of the Company's App Store Review Guidelines violate California's unfair competition law and issued an injunction enjoining the Company from prohibiting developers from including in their apps external links that direct customers to purchasing mechanisms other than Apple in-app purchasing. The injunction applies to apps on the U.S. storefront of the iOS and iPadOS® App Store. ***On January 16, 2024, the Company implemented a plan to comply with the injunction and filed a statement of compliance with the California District Court***. On March 13, 2024, Epic filed a motion with the California District Court disputing the Company's compliance plan and seeking to enforce the injunction. The Company has filed an opposition to Epic's motion. The Company believes it has substantial defenses and intends to vigorously defend itself.

453. The May 3, 2024 Form 10-Q directed investors to Apple's January 16, 2024 Notice of Compliance filed on the public court docket in the *Epic Games* litigation. Apple attached the Fischer Declaration to the Notice of Compliance, which extensively cited and quoted the statements contained in the Fischer Declaration in support of Apple's assertions in the Notice of Compliance.

454. Fischer executed his Declaration on January 16, 2024, under penalty of perjury in his capacity as Apple's Head of Worldwide App Store. He further confirmed that he had "personal knowledge of the facts testified to" within his Declaration. In the Fischer Declaration, Fischer made each of the following statements under penalty of perjury in his capacity as Apple's Head of Worldwide App Store.

455. In paragraph 3 of the Fischer Declaration, Fischer stated that "***Apple has complied with the injunction as set forth herein***."

456. In paragraph 6 of the Fischer Declaration, Fischer stated that there were "certain requirements that Apple has implemented ***to protect users and the integrity of iOS and iPadOS***."

457. In paragraph 19 of the Fischer Declaration, Fischer stated that "***Apps participating in the Apple Video Partner Program or the News Partner Program are not eligible for the Link Entitlement***."

458. In paragraph 22 of the Fischer Declaration, Fischer stated that "[t]he requirements of the Link Entitlement ***help to inform users of the benefits they may be losing and the risks they are assuming when they leave the App Store ecosystem, while still allowing developers to communicate with users regarding purchase alternatives***."

459. In paragraph 26 of the Fischer Declaration, Fischer stated that "***[t]he purpose of this [system] disclosure [sheet] is to ensure users understand they are leaving the App Store ecosystem and accepting the risks presented by an external website on the open Internet***."

460. In paragraph 28 of the Fischer Declaration, Fischer stated that the Link Entitlement requirements regarding the placement and design of External Purchase Links were "***designed to minimize fraud, scams, and confusion***," and "***also help ensure that users are not overloaded with duplicative information that may diminish the app experience, and are not confused about purchase options***."

461. In paragraph 29 of the Fischer Declaration, Fischer identified the "several templates—with specified language and formatting—that developers may use for External Purchase Links." In paragraph 30 of the Fischer Declaration, Fischer stated that "[t]hese templates and other requirements allow developers to communicate pricing information to users using standardized language ***to avoid misleading or confusing offers, and protect against false statements by developers***" and "***also enable Apple to more efficiently review apps***."

462. In paragraph 33 of the Fischer Declaration, Fischer stated that "Apple will charge developers a 27% commission on digital goods and services transactions that take place on a developer's website within seven days after a user taps through an External Purchase Link from the system disclosure sheet to an external website." In paragraph 35 of the Fischer Declaration, Fischer stated:

> All App Store developers—including those who choose to use the Link Entitlement—benefit from (among other things) Apple's platform integrity, proprietary tools and technologies protected by intellectual property, developer services and support, services that help developers acquire, retain, and reengage users, marketing and external advertising, and a safe environment for users to download and purchase apps and in-app content.

463. In paragraph 36 of the Fischer Declaration, Fischer stated "***[t]he App Store affords many more tools to developers than most platforms, and seven days also appropriately credits Apple for facilitating linked transactions***."

464. In the Notice of Compliance, Apple claimed that "***[a]s of January 16, 2024, Apple has fully complied with the Injunction***."

465. The Notice of Compliance cited the Fischer Declaration in support of the assertions in the Notice of Compliance as explained herein.

466. Citing paragraphs 22 and 35 of the Fischer Declaration, Apple stated in the Notice of Compliance that the "requirements" of Apple's Link Entitlement program "***are necessary to protect user privacy and security, maintain the integrity of Apple's ecosystem, promote the flow of information, avoid user confusion, and enable efficient review of developers' apps***" and "***guard against the uncompensated use of, among other things, Apple's platform, services (including but not limited to marketing and external advertising), and proprietary tools and technologies protected by intellectual property***."

467. Citing paragraphs 26 and 27 of the Fischer Declaration, Apple stated in the Notice of Compliance that the system disclosure sheet "requirements ***help ensure that users are adequately informed about alternative purchasing options***," and further claimed that these requirements were necessary because "***some developers may provide information within their apps that does not accurately reflect what users can receive or are charged on a website***."

468. With respect to Apple's restrictions on the placement and design of External Purchase Links, citing to paragraph 28 of the Fischer Declaration, Apple stated in the Notice of Compliance that "***[t]hese requirements are designed to minimize fraud, scams, and confusion***."

469. With respect to Apple's link templates, citing to paragraphs 29 and 30 of the Fischer Declaration, Apple stated in the Notice of Compliance that "[t]hese templates allow developers to advertise prices to users, but ***use curated language to avoid misleading or confusing offers***."

470. With respect to Apple's commission on link-out purchases, citing to paragraphs 33 and 36 of the Fischer Declaration, Apple stated in the Notice of Compliance that its 27% commission on link-out purchases reflected "***the substantial value Apple provides to developers***." Apple further stated that the 27% commission "***complies with the Injunction's plain terms***."

471. The May 3, 2024 Form 10-Q additionally directed investors to Apple's April 12, 2024 Opposition filed on the public court docket in the *Epic Games* litigation, though the filing was partially redacted. The Opposition extensively cited the Fischer Declaration in support of Apple's assertions in the Opposition. In addition, Apple filed the Roman Declaration in support of the Opposition, which was heavily redacted, and cited the Roman Declaration in support of the assertions in the Opposition.

472. Roman executed his Declaration on April 12, 2024 under penalty of perjury in his capacity as Apple's Vice President of Finance supporting the Company's Services business. He further confirmed that he had "personal knowledge of the facts testified to" within his Declaration.

473. In the Opposition, Apple stated that "***Apple's framework for injunction compliance was implemented*** in good faith, ***after extensive study, for the benefit of all platform participants***."

474. With respect to the components of its Link Entitlement program, Apple explained that it was "submitting" the Roman Declaration "that summarizes the bases for the commission structure adopted by Apple" and stated:

> ***Apple carefully analyzed what commission structure would be fair and competitive in view of the substantial value Apple provides to developers***. . . . ***Apple also put guardrails on in-app communications, which were implemented only after considering existing entitlements for in-app links and the security and privacy issues that links present***.

475. In defending its new "guardrails on in-app communications" in the Opposition, Apple quoted from paragraphs 28 and 30 of the Fischer Declaration, stating that "***these requirements*** '***are designed to minimize fraud, scams, and confusion***,'" "'***help ensure that users are not overloaded with duplicative information that may diminish the app experience, and are not confused about purchase options***,'" "'allow developers to communicate pricing information to users using standardized language ***to avoid misleading or confusing offers, and protect against false statements***,'" "while also '***enabl[ing] Apple to more efficiently review apps***.'"

476. Citing to paragraph 22 of the Fischer Declaration, Apple additionally claimed in the Opposition that "***[t]hese requirements further help Apple protect its users by making clear the point at which the user is going to leave the App Store ecosystem***."

477. Citing to paragraphs 26 and 27 of the Fischer Declaration, Apple claimed in the Opposition that "***the system disclosure sheet does not caution users against making external purchases or suggest that IAP is safer***. It simply makes clear that Apple cannot verify the security or privacy of the purchase, and that Apple-specific features—including Family Sharing, Ask to Buy, and global parental controls—will not be available for such a purchase."

478. With respect to its static link requirement, citing to Section 3.3 of Apple's amended Guidelines attached as an exhibit to the Fischer Declaration (setting forth Apple's link placement and

design restrictions), Apple claimed in the Opposition that "[w]hat Apple requires is that the developers' link not 'pass additional parameters,' ***in order to 'protect the end user (for example, their privacy)***.'"

479. With respect to its 27% commission on link-out purchases, Apple stated that *amici curiae* supporting Epic's motion to enforce the injunction "do not dispute" that "***the commission amounts represent a fair estimation of the value Apple provides***."

480. In the Opposition, Apple denied that Apple should be held in contempt, stating:

> Apple understands its obligation to comply with the Court's orders. That is why it invested substantial resources to develop ***a comprehensive regime that complies with the letter and spirit of the Injunction while also protecting users and allowing Apple to collect a lawful commission for developers' use of its tools and technologies***. When the Injunction became effective, Apple filed a statement with this Court detailing every aspect of its compliance efforts, with evidentiary support, even though it was not required to do so, and Apple has submitted more evidence with this Opposition. Apple [redacted]. . . . ***As always, Apple prioritized the security and privacy of its users, as well as the integrity of the iOS platform***. Apple acted in good faith at every step to fulfill the letter and purpose of the Injunction.

481. In the unredacted portion of the Roman Declaration, which Apple filed in support of the Opposition, Roman stated under penalty of perjury in his capacity as Apple's Vice President of Finance that:

> Alongside members of other Apple teams, I assisted in creating a presentation for the Price Committee responsible for determining the commission structure for Apple's "StoreKit External Purchase Link Entitlement (US)" ("Link Entitlement") program (the "Price Committee Deck"), which recommended the commission structure that the Price Committee ultimately adopted.
>
> * * *
>
> Apple's commission has always been set based on Apple's evaluation of the value of its services and the pricing of competitors or comparable platforms. In this case, ***prior to determining its commission structure for Link Entitlement, Apple also engaged an outside consultant, Analysis Group. Analysis Group*** [redacted]. I incorporated certain aspects of Analysis Group's findings in the Price Committee Deck provided to the Price Committee.
>
> * * *
>
> ***Based on the information summarized in the Price Committee Deck, Apple's Price Committee accepted the recommendation that Apple adopt a 27% standard commission rate***, and 12% commission rate for the Small Business Program, ***for transactions effected within 7 days after a user taps through an External Purchase Link from the system disclosure sheet to an external website***.

482. Apple's Opposition attached as an exhibit the "StoreKit External Purchase Link Entitlement(US)" presentation referenced in the Roman Declaration, which was dated January 16, 2024.

483. The statements set forth above in ¶¶ 452-81 were materially false and misleading when made. For instance, the statements in ¶¶ 452, 455, and 464 that on January 16, 2024, "***the Company implemented a plan to comply with the injunction***" and "***filed a statement of compliance with the California District Court***," which, in turn, stated that "***[a]s of January 16, 2024, Apple has fully complied with the Injunction***," and extensively cited the Fischer Declaration, which likewise stated that "***Apple has complied with the injunction***," were materially false and misleading when made because, unbeknownst to investors, Apple was not in compliance with the Injunction as of January 16, 2024 or May 3, 2024. Instead, as the April 2025 Order found, the Company's "real time documents" show that each component of Apple's Link Entitlement program was designed to "maintain its anticompetitive revenue stream" and "to dissuade customer usage of alternative purchase opportunities," which violated the Injunction.

484. Apple's contemporaneous business documents also reveal that the statements in ¶¶ 452-81 regarding Apple's purported compliance with the Injunction and rationale for the components of the Link Entitlement program were materially false and misleading when made because, as the April 2025 Order found, Apple's purported compliance program "prevent[ed] developers from deploying competitive alternatives to IAP." For instance, "Apple's discounted commission rate . . . foreclose[d] a developer's use of link-out purchases." Apple also added "various design restrictions and purchase-flow friction [that] arbitrarily decrease the attractiveness of competitive alternatives (if they were utilized) and increase breakage in a purchase flow." Apple likewise "prohibited developers from using buttons, links, and other calls to action without paying a prohibitive commission to Apple, and it restricted the design of the developers' links to make it difficult for customers to use them." Thus, these statements were materially false and misleading when made because they gave investors the misleading (if not false) impression that Apple was in compliance with the Injunction when in reality—and by design—it was not. In truth, as Apple recognized in a June 20, 2023 "Epic Injunction Implementation Proposal" presentation, the Company's purported compliance plan—and specifically the 27% commission—created "a *significant*" but undisclosed "*compliance risk because of the proximity to [Apple's] 30 percent commission*."

485. Additionally, the statements set forth in ¶¶ 456-61, 463, 466-70, and 473-80 concerning the specific purpose of the "requirements" of Apple's Link Entitlement program, including the 27% commission, system disclosure sheet, and External Purchase Link design and placement requirements, and including that they were "***to protect users***," "***designed to minimize fraud, scams, and confusion***," and "***appropriately credit[] Apple for facilitating linked transactions***," were materially false and misleading when made. Contrary to these statements, Apple did not, in fact, consider these purposes in designing, selecting, approving, or implementing these requirements. Rather, Apple implemented these requirements to stifle competition with IAP and/or mitigate the risk associated with and financial impact of the Injunction. For instance, contemporaneous documents demonstrate that (i) the commission rate Apple selected in July 2023 was not "economically viable for developers"; (ii) Apple's system disclosure sheet was engineered to dissuade users from following through with link-out purchases; (iii) restrictions imposed on the design and placement of External Purchase Links induced "friction" and "breakage"—to deter users from completing link-out transactions; and (iv) the NPP and VPP exclusions further limited the revenue impact of the Injunction by making it "*much more costly to adopt linkouts*" by the larger developers in these programs, which Apple viewed "*as a tool for retaining developers exclusively on Apple IAP*."

486. More specifically, with respect to the 27% commission on link-out purchases, Apple's internal modeling in June 2023 showed that because developers' payment processing costs generally exceeded 3%, a 27% commission meant that using external links would be "more expensive to any developer . . . than an IAP transaction at 30 percent" and therefore would not be "economically viable for developers." By adopting this commission rate in July 2023, Defendants ensured that "the revenue impact [from the Injunction] would be closer to zero."

487. Likewise, with respect to Apple's design and placement requirements, Apple contemporaneously discussed, approved, and implemented severe restrictions, including a "scary" system disclosure sheet, "Plain Button style" links, and restrictions on link formatting and language, to minimize app developers' adoption and deployment of External Purchase Links, deter link-out purchases, and thereby maintain Apple's App Store revenue. Contemporaneous discussion among Apple executives confirmed that "the more restrictive the rules are on placement and format and language of links, the less likely it is that those links will be seen and used by users."

488. The statements set forth in ¶¶ 463, 466, 470, 474, and 479-81 regarding Apple's "commission structure," including that it was "***fair and competitive***," based on "***the value Apple provides***," "***appropriately credits Apple for facilitating linked transactions***," necessary to "***guard against the uncompensated use of*** . . . ***Apple's platform, services*** . . . ***and proprietary tools and technologies***," and based on "***certain aspects of Analysis Group's findings in the [January 16, 2024] Price Committee Deck***," were materially false and misleading when made for additional reasons. Contemporaneous internal documents demonstrate that Apple imposed a commission because allowing link-out purchases without a commission risked potentially *billions* of dollars in U.S. App Store revenue. To avoid this financial impact, as reflected in a June 1, 2023 presentation, Apple devised a commission on link-out purchases that would "*not be economically viable for developers*" so "*the revenue impact would be closer to zero*." Further, internal notes reveal that Apple "[a]ssume[d] [it] w[as] charging a %" and sought to "limit the ruling" by fashioning a commission that "the judge will accept." At the same time, Apple executives "*struggled to land on ironclad pricing rationales* . . . *that we could substantiate solidly on a bottoms up basis*." These internal discussions show that Apple's commission was not based on any bottom-up analysis of the "***value Apple provides***." Rather, as the April 2025 Order found, Apple sought to "***foreclose[] competitive alternatives***" through its commission "to maintain the existing anticompetitive revenue stream." (emphasis in original). Finally, the Analysis Group's findings, dated January 2024, post-date the Pricing Committee's July 2023 decision to implement a 27% commission by nearly six months. Therefore, as the April 2025 Order found, the Analysis Group's "report did not materially factor into Apple's decision-making process. It was created as a show piece for the Court."

### 2. May 2024 Evidentiary Hearing Testimony

489. On May 8, 2024, during an evidentiary hearing on Epic's motion to enforce the Injunction, Fischer testified that "***[w]e respect the injunction and we've complied with the injunction***," "***we've received an injunction and we've complied with the injunction***," and that "***we changed our guidelines to comply with the injunction***."

490. Fischer also testified as follows:

**Q.** And can you explain to the Court what -- what it was the group aimed to achieve in setting up the injunction compliance program?

> **A.** Yes. We had clear goals. ***First and foremost was to comply with the injunction. Second was to provide a consistent and safe user experience***.
>
> * * *
>
> **Q.** You were on the second principle, Mr. Fischer.
>
> **A.** ***So the first principle was to comply with the injunction. The second was to provide a consistent and, as much as possible, safe user experience across apps. Third was to*** maintain the App Store's business model and to ***continue earning a commission for the value that we provide to developers. And fourth was to provide developers with a more flexible but scalable way to communicate with users both within the app and with outside -- outside of their apps around alternative purchase opportunities***.

491. On May 10, 2024, during an evidentiary hearing on Epic's motion to enforce the Injunction, Roman testified that Apple did not consider developers' costs for alternative payment solutions in determining the commission Apple would impose on link-out purchases. According to Roman, Apple "***did not include it in our benchmarking exercise***."

492. Roman testified:

> **Q.** And because Apple did not set out to assess the value of IAP, Apple also did not look at comparables to estimate the costs of alternative payment solutions that developers will need to procure to facilitate linked purchases, correct?
>
> **A.** ***That is correct***.

493. Roman testified that Apple determined that developers would be incentivized to adopt the Link Entitlement program despite Apple's 27% commission on link-out purchases:

> As we proceeded through the analysis, Your Honor, we realized that developers would have to make several choices in terms of this implementation, the implementation of the linkout entitlement. That assumption entails that they would have to enable their own payment processing.
>
> ***And based on our assumptions and our projections, it was quick for us to determine that developers would be incentivized to proceed with such linkout entitlements once they were -- once they would be able to provide all of the operational background to make such implementations. Which means that for payment processing, it would be tremendously advantageous for developers to enable, to comply with this, and to bear that cost even if it was, as mentioned before, in that range***.
>
> Therefore, what we considered is that from a benchmarking perspective, for us to align what is the value that the App Store provides, payment processing wouldn't be one of them because it's not included in the linkout entitlement.

494. On May 16, 2024, during an evidentiary hearing on Epic's motion to enforce the Injunction, Oliver testified that Apple's commission on link-out purchases was based on "***the value of the services***" that Apple provides, and that it was a "***reasonable approach***" under the Injunction:

> **Q.** And why did Apple decide to charge a commission on linked transactions?
>
> **A.** ***We determined that we -- the value of the services that we provide, independent of payments and commerce, were substantive and ongoing for developers. And we felt like it was a reasonable approach to provide a commission on linked-out transactions as long as that -- those linked-out transactions ended -- the commission ended at a certain period of time***.

495. On May 17, 2024, during an evidentiary hearing on Epic's motion to enforce the Injunction, Oliver testified about Apple's purported basis for setting its commission on link-out purchases at 27% and for applying a seven-day session window. According to Oliver, Apple's commission structure was justified by "***the services provided that were unique to Apple***" and provided developers "***a significant reduction from the commission rate that they would be paying for in-app transaction***":

> **Q.** And can you explain for the Court why you recommended -- ultimately recommended that the link entitlement bear a commission rate of 27 percent over a seven-day time period?
>
> **A.** Yes. So we looked at a variety of different factors to help triangulate here. ***Looking both at kind of what the services provided that were unique to Apple which guided us to the higher end of the commission range, things like the trust and safety, the privacy elements, the things that were not available in any of the other commission comparables that we looked at***.
>
> And then we looked at kind of what the effective rate would be based on our knowledge of customer spend that was happening within the app.
>
> And that gave us confidence that developers would have an opportunity to capture significant amount of value from the out-of-app transactions occurring after the seven-day window.
>
> **Q.** And what does the effective commission rate tell you about whether linking out is a viable option for developers?
>
> **A.** ***This gave us certainty or confidence that the commission rate that developers were going to be paying to Apple was a significant reduction from the commission rate that they would be paying for in-app transactions***. And that gave us confidence that they would have the ability to take advantage of those capabilities.

496. The statements in ¶¶ 489-95 were materially false and misleading when made.

497. Fischer's sworn testimony in ¶¶ 489-90 that Apple had "***complied with the Injunction***," "***changed [its] guidelines to comply with the Injunction***," and that Apple's goal "***[f]irst and foremost was to comply with the injunction***" was materially false and misleading when made for the reasons stated in ¶¶ 483-84.

498. Fischer's sworn testimony in ¶ 490 that Apple implemented the Link Entitlement program "***to provide a consistent***" and "***safe user experience across apps***" and "***provide developers with a more flexible but scalable way to communicate with users***" about external purchase options was materially false and misleading when made for the reasons set forth in ¶¶ 485-87.

499. Fischer's sworn testimony in ¶ 490 that the Link Entitlement program was intended "***to continue earning a commission for the value that [Apple] provide[d] to developers***" was materially false and misleading for the reasons stated in ¶ 488.

500. Roman's sworn testimony in ¶ 493 that "***developers would be incentivized to proceed with such linkout entitlements***" and that, despite Apple's commission, "***it would be tremendously advantageous for developers to enable***" External Purchase Links was materially false and misleading for the reasons stated in ¶¶ 484-86 and 488.

501. Roman's sworn testimony in ¶¶ 491-92 that Apple "did not look at comparables to estimate the costs of alternative payment solutions that developers will need to procure to facilitate linked purchases" and "***did not include it in [Apple's] benchmarking exercise***" was materially false and misleading because in setting its 27% commission, Apple specifically modeled developers' payment processing costs and determined that they generally exceeded 3%, making External Purchase Links not "economically viable for developers." Additionally, as the April 2025 Order found, Roman's May 10, 2024 testimony about Apple's purported decision-making process regarding the commission structure on link-out purchases "***was replete with misdirection and outright lies***," "***not believable***," and constituted "***outright lie[s] under oath***." The April 2025 Order specifically identified Roman's testimony quoted in ¶¶ 491-92 as false, stating that Roman "even went so far as to testify that Apple did not look at comparables to estimate the costs of alternative payment solutions that developers would need to procure to facilitate linked-out purchases," when in fact, "Apple *did* consider the external costs developers faced when utilizing

alternative payment solutions for linked out transactions, which conveniently exceeded the 3% discount Apple ultimately decided to provide by a safe margin." (emphasis in original).

502. Oliver's sworn testimony in ¶¶ 494-95 that Apple's commission on link-out purchases was justified by the "***the services provided that were unique to Apple***" and "***the value of the services that we provide***" and that it was a "***reasonable approach***" under the Injunction was materially false and misleading when made for the reasons stated in ¶ 488. Additionally, the April 2025 Order specifically identified Oliver's testimony quoted in ¶ 494 as false, stating that "during the first May 2024 hearing, Apple employees attempted to mislead the Court by testifying that the decision to impose a commission was grounded in [the Analysis Group]'s report."

503. Oliver's sworn testimony in ¶ 495 that "***the commission rate that developers were going to be paying to Apple was a significant reduction from the commission rate that they would be paying for in-app transactions***" was materially false and misleading when made for the reasons stated in ¶¶ 484-86 and 488.

### 3. August 2, 2024 – 3Q 2024 Form 10-Q

504. On August 2, 2024, Apple filed its 3Q 2024 Form 10-Q with the SEC, which was signed by Defendant Maestri. Under a sub-heading titled "**Item 1. Legal Proceedings**," the 3Q 2024 Form 10-Q stated:

> *Epic Games*
>
> Epic Games, Inc. ("Epic") filed a lawsuit in the U.S. District Court for the Northern District of California (the "California District Court") against the Company alleging violations of federal and state antitrust laws and California's unfair competition law based upon the Company's operation of its App Store. The California District Court found that certain provisions of the Company's App Store Review Guidelines violate California's unfair competition law and issued an injunction enjoining the Company from prohibiting developers from including in their apps external links that direct customers to purchasing mechanisms other than Apple in-app purchasing. The injunction applies to apps on the U.S. storefront of the iOS and iPadOS App Store. ***On January 16, 2024, the Company implemented a plan to comply with the injunction and filed a statement of compliance with the California District Court***. A motion by Epic disputing the Company's compliance plan and seeking to enforce the injunction, which the Company has opposed, is pending before the California District Court. The Company believes it has substantial defenses and intends to vigorously defend itself.

505. The statement in ¶ 504 that on January 16, 2024, "***the Company implemented a plan to comply with the injunction***" and "***filed a statement of compliance with the California District Court***," which, in turn, stated that "***[a]s of January 16, 2024, Apple has fully complied with the Injunction***," and extensively cited the Fischer Declaration, which likewise stated that "***Apple has complied with the injunction***," were materially false and misleading when made because, for the reasons in ¶¶ 483-84, unbeknownst to investors, Apple was not in compliance with the Injunction as of January 16, 2024 or August 2, 2024.

506. Additionally, the statement in ¶ 504, which expressly referenced the statements in Apple's Notice of Compliance and Opposition concerning Apple's Link Entitlement program, was materially false and misleading when made for the reasons stated in ¶¶ 485-88.

**4. November 1, 2024 – FY 2024 Form 10-K**

507. On November 1, 2024, Apple filed its FY 2024 Form 10-K with the SEC, which was signed by Defendants Cook and Maestri. Under a sub-heading titled "**Item 3. Legal Proceedings**," the FY 2024 Form 10-K stated:

> *Epic Games*
>
> Epic Games, Inc. ("Epic") filed a lawsuit in the U.S. District Court for the Northern District of California (the "California District Court") against the Company alleging violations of federal and state antitrust laws and California's unfair competition law based upon the Company's operation of its App Store. The California District Court found that certain provisions of the Company's App Store Review Guidelines violate California's unfair competition law and issued an injunction enjoining the Company from prohibiting developers from including in their apps external links that direct customers to purchasing mechanisms other than Apple in-app purchasing. The injunction applies to apps on the U.S. storefront of the iOS and iPadOS App Store. ***On January 16, 2024, the Company implemented a plan to comply with the injunction and filed a statement of compliance with the California District Court***. A motion by Epic disputing the Company's compliance plan and seeking to enforce the injunction, which the Company has opposed, is pending before the California District Court. On September 30, 2024, the Company filed a motion with the California District Court to narrow or vacate the injunction. The Company believes it has substantial defenses and intends to vigorously defend itself.

508. The statement in ¶ 507 that on January 16, 2024, "***the Company implemented a plan to comply with the injunction***" and "***filed a statement of compliance with the California District Court***," which, in turn, stated that "***[a]s of January 16, 2024, Apple has fully complied with the Injunction***," and extensively cited the Fischer Declaration, which likewise stated that "***Apple has complied with the***

***injunction***," were materially false and misleading when made because, for the reasons in ¶¶ 483-84, unbeknownst to investors, Apple was not in compliance with the Injunction as of January 16, 2024 or November 1, 2024.

509. Additionally, the statement in ¶ 507, which expressly referenced the statements in Apple's Notice of Compliance and Opposition concerning Apple's Link Entitlement program, was materially false and misleading when made for the reasons stated in ¶¶ 485-88.

**5. January 31, 2025 – 1Q 2025 Form 10-Q**

510. On January 31, 2025, Apple filed its 1Q 2025 Form 10-Q with the SEC, which was signed by Defendant Parekh. Under a sub-heading titled "**Item 1. Legal Proceedings**," the 1Q 2025 Form 10-Q stated:

> *Epic Games*
>
> Epic Games, Inc. ("Epic") filed a lawsuit in the U.S. District Court for the Northern District of California (the "California District Court") against the Company alleging violations of federal and state antitrust laws and California's unfair competition law based upon the Company's operation of its App Store. The California District Court found that certain provisions of the Company's App Store Review Guidelines violate California's unfair competition law and issued an injunction enjoining the Company from prohibiting developers from including in their apps external links that direct customers to purchasing mechanisms other than Apple in-app purchasing. The injunction applies to apps on the U.S. storefront of the iOS and iPadOS® App Store. ***On January 16, 2024, the Company implemented a plan to comply with the injunction and filed a statement of compliance with the California District Court***. A motion by Epic disputing the Company's compliance plan and seeking to enforce the injunction, which the Company has opposed, is pending before the California District Court. On September 30, 2024, the Company filed a motion with the California District Court to narrow or vacate the injunction. The Company believes it has substantial defenses and intends to vigorously defend itself.

511. The statement in ¶ 510 that on January 16, 2024, "***the Company implemented a plan to comply with the injunction***" and "***filed a statement of compliance with the California District Court***," which, in turn, stated that "***[a]s of January 16, 2024, Apple has fully complied with the Injunction***," and extensively cited the Fischer Declaration, which likewise stated that "***Apple has complied with the injunction***," were materially false and misleading when made because, for the reasons in ¶¶ 483-84, unbeknownst to investors, Apple was not in compliance with the Injunction as of January 16, 2024 or January 31, 2025.

512. Additionally, the statement in ¶ 510, which expressly referenced the statements in Apple's Notice of Compliance and Opposition concerning Apple's Link Entitlement program, was materially false and misleading when made for the reasons stated in ¶¶ 485-88.

#### 6. February 24, 2025 – Bloomberg Article

513. On February 24, 2025, Bloomberg published an article titled *Apple Executive Testifies App Store Fees Risked Violating Court Order*, that reported on the February 24, 2025 evidentiary hearing. The article cited Schiller's February 24, 2025 testimony that there was a "significant compliance risk because of the proximity to the [standard] 30% commission," reporting that Schiller "was 'concerned' [Judge Gonzalez Rogers] would find that the new fee didn't fulfill her 2021 directive that the iPhone maker expand payment options for consumers." In response to the testimony, Bloomberg quoted a statement from an "Apple spokesperson" who "***said that expressions of concern about charging a commission don't indicate a lack of compliance***."

514. The statement in ¶ 513 was materially false and misleading when made. At the time of this statement, Apple was not in compliance with the Injunction, for the reasons stated in ¶¶ 483-84. Additionally, Apple's February 24, 2025 statement was materially false and misleading because Schiller's "***expressions of concern about charging a commission***" reflected Apple's internal determination that the 27% commission would make link-out purchases not "*economically viable for developers*" and posed a "Risk[]" because "*[d]evelopers may claim that a small discount on initial transaction does not allow for price competition*." Apple also determined that the 27% commission presented a "*significant compliance risk because of the proximity to [Apple's] 30 percent commission*."

### B. Defendants' False and Misleading Statements Regarding Apple Intelligence and AI-Upgraded Siri

#### 1. June 10, 2024 – 2024 WWDC, Press Release, and SuperSaf Interview

515. During Apple's June 10, 2024 WWDC, Defendant Federighi represented that the Company's new Apple Intelligence "***will transform your apps and experiences across iOS 18, iPadOS 18, and macOS Sequoia, from a big leap forward for Siri***, to powerful tools for writing and communication, and fun visual ways to express yourself." Federighi then provided several examples of Apple Intelligence's capabilities, including responses to commands like: "Pull up the files that Joz shared with me last week,"

"Show me all the photos of Mom, Olivia, and me," and "Play the podcast that my wife sent the other day." Federighi asserted that "***Apple Intelligence is grounded in your personal information and context*** with the ability to retrieve and analyze the most relevant data from across your apps, as well as to reference the content on your screen, like an email or calendar event you are looking at."

516. During the next portion of the WWDC, Defendant Peterson made the following statements about Siri's new Apple Intelligence-based functionalities:

> ***Apple Intelligence will provide Siri with on-screen awareness, so it'll be able to understand and take action with things on your screen. For example, say a friend texts you his new address. Right from the Messages thread, you can say: "Add this address to his contact card," and Siri will take care of it. Siri will also understand more of the things you get done in your apps. And with new orchestration capabilities provided by Apple Intelligence, Siri will take actions inside Apps on your behalf.***
>
> ***Siri will have the ability to take hundreds of new actions in and across apps*. . . . *For example, you'll be able to say 'Show me my photos of Stacey in New York wearing her pink coat,' and Siri will bring those right up. Then you might say, 'Make this photo pop!," and Siri will enhance it, just like that***. And Siri will be able to take actions across apps, so you could say, ***'Add this to my note with Stacey's bio,' and it will jump from the Photos app to the Notes app to make it happen***. This is going to bring us closer to realizing our vision in which Siri moves through the system in concert with you. . . . Siri will be able to understand and take more actions in more apps over time.

517. While Peterson made these statements, depictions of the features she discussed in action were displayed on screen:






518. Peterson also discussed Siri's new awareness of "personal context" and "more personal" features:

> ***Thanks to Apple Intelligence, [Siri] has awareness of your personal context. With its semantic index of things like photos, calendar events, and files, plus information that's stashed in passing messages and emails, like hotel bookings, PDFs of concert tickets, and links that your friends have shared. Siri will find and understand things it never could before*. . . . *Siri will use this information to help you get things done*. . . . *You'll be able to ask Siri to find something when you can't remember if it was in an email, a text, or a shared note. Like some book recommendations that a friend sent you a while back*.**
>
> ***Or for times when you're filling out a form and need to input your driver's license, Siri will be able to find a photo of your license, extract your ID number, and type it into the form for you*.**
>
> * * *
>
> [I]magine that I'm planning to pick my mom up from the airport and I'm trying to figure out my timing. Siri is going to be able to help me do this so easily. ***"Siri, when is my mom's flight landing?" What's awesome is that Siri actually cross-references flight details that my mom shared with me by email with real-time flight-tracking to give me her up-to-date arrival time*.**
>
> ***"What's our lunch plan?" I don't always remember to add things to my calendar, so I love that Siri can help me keep track of plans that I've made in casual conversation, like this lunch reservation my mom mentioned in a text*.**
>
> ***"How long will it take us to get there from the airport?"***
>
> ***I haven't had to jump from Mail to Messages to Maps to figure out this plan. And a set of tasks that would have taken minutes on my own and honestly probably would have resulted in a call to my mom could be addressed in a matter of seconds. That's just a glimpse of the ways in which Siri is going to become more powerful and more personal thanks to Apple Intelligence*.**

519. While Peterson made these statements, depictions of the features she discussed in action were displayed on screen:












520. In a press release issued the same day titled *Introducing Apple Intelligence, the Personal Intelligence System That Puts Powerful Generative Models at the Core of iPhone, iPad, and Mac*, Apple made a number of representations about the new Apple Intelligence-powered Siri capabilities, accompanied by screenshots demonstrating the features in action:

***Siri Enters a New Era***

Powered by Apple Intelligence, Siri becomes more deeply integrated into the system experience. With richer language-understanding capabilities, ***Siri is more natural, more contextually relevant, and more personal***, with the ability to simplify and accelerate everyday tasks. It can follow along if users stumble over words and maintain context from one request to the next. Additionally, users can type to Siri, and switch between text and voice to communicate with Siri in whatever way feels right for the moment. Siri also has a brand-new design with an elegant glowing light that wraps around the edge of the screen when Siri is active. . . .

With onscreen awareness, Siri will be able to understand and take action with users' content in more apps over time. ***For example, if a friend texts a user their new address in Messages, the receiver can say, "Add this address to his contact card."***




With onscreen awareness, Siri makes it easy to perform an action related to information on the screen, such as adding an address received in Messages to a friend's contact card.

With Apple Intelligence, Siri will be able to take hundreds of new actions in and across Apple and third-party apps. ***For example, a user could say, "Bring up that article about cicadas from my Reading List," or "Send the photos from the barbecue on Saturday to Malia," and Siri will take care of it***.




Siri can now take hundreds of new actions in and across apps, including finding book recommendations sent by a friend in Messages and Mail.

*Siri will be able to deliver intelligence that's tailored to the user and their on-device information. For example, a user can say, "Play that podcast that Jamie recommended," and Siri will locate and play the episode, without the user having to remember whether it was mentioned in a text or an email. Or they could ask, "When is Mom's flight landing?" and Siri will find the flight details and cross-reference them with real-time flight tracking to give an arrival time*.




Siri is able to deliver intelligence that's tailored to the user and their on-device information, like locating details on an upcoming flight or keeping track of a dinner reservation.

521. During an interview with YouTube technology influencer "SuperSaf" regarding the 2024 WWDC that same day, SuperSaf asked Cook about "[w]hat makes Apple Intelligence different" from other AI offerings in the marketplace. Defendant Cook responded, "***It's different in that we have personal context, and so Apple Intelligence understands you and is relevant to you, it's, it's not only world knowledge, it's also private***. . . . ***And so between having personal context and privacy this makes it very unique and it's also integrated into the apps that you're already using*** . . . ."

522. The statements set forth in ¶¶ 515-21 that, *inter alia*, Apple Intelligence "will transform your apps and experiences across iOS 18" with Siri's "big leap forward," "[Siri] has awareness of your personal context," "Siri is more natural, more contextually relevant, and more personal," and "Apple Intelligence understands you and is relevant to you, it's, it's not only world knowledge," as well as the Company's demonstrations that purported to show the Apple Intelligence-based Siri features existed and actually functioned as described were materially false and misleading when made.

523. Specifically, the combination of the statements set forth in ¶¶ 515-21 plus the demonstrations and screenshots gave investors the misleading impression that the Apple Intelligence-powered Siri features existed, functioned, and would roll out on the stated timeline when, in reality, Apple did not have a functional model of the new Apple Intelligence-powered Siri and the Company was nowhere close to releasing the upgraded Siri, such that it would not be rolled out during the iPhone 16 upgrade cycle, as evidenced by the fact that Apple had only a barely working protype at the time it demonstrated the new Apple Intelligence-based Siri features at the 2024 WWDC using a video mock-up. Additionally, these statements omitted the following material facts about the existence and functionality of the Siri AI features: (i) as of the 2024 WWDC, Siri team members had never seen working versions of the advertised features and the only feature that had been successfully tested internally at that time was the glowing, rainbow-colored ribbon around the edge of the screen that displayed when Siri was activated; (ii) Walker admitted with respect to the Apple Intelligence-based Siri features that "[t]his was not one of these situations where we get to show people our plan after it's done. We showed people before"; and (iii) there were ongoing internal disputes over the fundamental question of how Apple Intelligence's AI models would function at the time Apple announced Apple Intelligence at the 2024 WWDC.

524. In late 2024 and into early 2025, Apple was still struggling to develop a functional model of the upgraded Siri, further confirming that the impression created by Defendants' statements—that the Apple Intelligence-powered Siri features existed, functioned, and would roll out on the stated timeline—was materially misleading. Indeed, in the spring of 2025: (i) the Apple Intelligence-based Siri features only worked correctly up to two-thirds to 80% of the time, providing inaccurate responses to nearly one-third of requests; (ii) Apple engineers had been "racing to fix a rash of bugs in the project" since mid-February 2025 but had been unsuccessful; (iii) individuals within Apple's AI division believed the new Siri features "could be scrapped altogether" and needed to be rebuilt from the ground up, resulting in a significant delay of the features; (iv) Walker acknowledged that some Apple employees testing the new Siri features might feel "relieved" by the recently-announced delay of the new features, stating, "If you were using these features in the build, you were probably wondering: Are these ready? How do I feel about shipping these to our customers? Is this the right choice?" and that employees "might be feeling embarrassed"; and

(v) Federighi and other Apple executives had "voiced strong concerns internally that the features didn't work properly — or as advertised — in their personal testing."

525. The NAD's investigation into Apple's advertising for the new Apple Intelligence-powered Siri and its subsequent findings, as well as Apple's response to the findings, also demonstrate that Defendants' statements were materially false and misleading. Among other things: (i) Apple failed to demonstrate the basic functionality of the Apple Intelligence-based Siri features in response to the NAD's investigation; (ii) the NAD ultimately found that "[t]he description of Siri's updated functionality below Apple's unqualified claim that Apple Intelligence is 'available now' . . . reasonably conveys the message that the updated Siri functionality was available as part of the iPhone 16 launch, which it was not"; and (iii) Apple subsequently updated its webpage to include a prominent disclosure in bolded font in close proximity to each claim regarding the Apple Intelligence-based Siri features that provided, "This feature is in development and will be available with a future software update."

526. Finally, the fact that Apple still has not released the Apple Intelligence-powered Siri demonstrates that the Company did not have a functional model of the product and was nowhere close to rolling out the upgraded Siri at the time of Defendants' statements.

**2. August 1, 2024 – 3Q 2024 Conference Call**

527. On August 1, 2024, Apple held a conference call to discuss the Company's 3Q 2024 financial results. During Defendant Cook's prepared remarks, he stated the following about Apple's introduction of Apple Intelligence during the 2024 WWDC:

> At our Worldwide Developers Conference, we were thrilled to unveil game-changing updates across our platforms, including Apple Intelligence. Apple Intelligence built on years of innovation and investment in AI and machine learning. It will transform how users interact with technology from writing tools to help you express yourself to Image Playground which gives you the ability to create fun images and communicate in new ways, to powerful tools for summarizing and prioritizing notifications.
>
> ***Siri also becomes more natural, more useful and more personal than ever***.

528. Following Defendant Cook's prepared remarks, analyst Michael Ng of Goldman Sachs asked Cook:

> [W]ith the focus on upgrader potential over the next several years, I was just wondering if you could talk about what you're expecting from the US promotional environment from your channel partners, whether that's US wireless carriers, given the importance of device sales for those partners during an upgrade cycle or any retail support on what could be a very strong smartphone upgrade period?

529. Cook responded to Ng's question by highlighting how important the implementation of Apple Intelligence would be to driving an upgrade cycle, stating, "We are very excited about Apple Intelligence and what it brings, and ***it's another compelling reason for an upgrade***. I'd leave the promotional question for the sort of the carriers themselves to answer, but ***I believe it will be a very key time for a[] compelling upgrade cycle***."

530. Analyst Atif Malik of Citigroup likewise asked Cook "about [the] staggered launch o[f] some" of Apple's new software features, stating, "So are you expecting most of the features that you announced at WWDC to be part of iOS 18? Or should we be thinking that some of these features could potentially be part of iOS 19 next year?" To this, Cook responded, "Our objective that we said in June is to roll out US English starting in the fall, and that's to users and then ***proceed with more functionality, more features, if you will, and more languages and regions coverage as we proceed across the next year***. And so we sort of gave a timeframe that and ***we're tracking to that***."

531. The statements set forth in ¶¶ 527-30 that, *inter alia*, "Siri . . . becomes more natural, more useful and more personal than ever," Apple Intelligence provides "another compelling reason for an upgrade," and Apple Intelligence features, including the new Siri, would be released "across the next year" were materially false and misleading when made.

532. Specifically, the statements set forth in ¶¶ 527-30 gave investors the misleading impression that the Apple Intelligence-powered Siri features existed, functioned, and would roll out on the stated timeline when, in reality, Apple did not have a functional model of the new Apple Intelligence-powered Siri and the Company was nowhere close to releasing the upgraded Siri, such that it would not be rolled out during the iPhone 16 upgrade cycle, as evidenced by the fact that Apple only had a barely working protype at the time it demonstrated the new Apple Intelligence-based Siri features at the 2024 WWDC using a video mock-up. Additionally, these statements omitted the following material facts about the existence and functionality of the Siri AI features: (i) as of the 2024 WWDC, Siri team members had never

seen working versions of the advertised features and the only feature that had been successfully tested internally at that time was the glowing, rainbow-colored ribbon around the edge of the screen that displayed when Siri was activated; (ii) Walker admitted with respect to the Apple Intelligence-based Siri features that "[t]his was not one of these situations where we get to show people our plan after it's done. We showed people before"; and (iii) there were ongoing internal disputes over the fundamental question of how Apple Intelligence's AI models would function at the time Apple announced Apple Intelligence at the 2024 WWDC.

533. In late 2024 and into early 2025, Apple was still struggling to develop a functional model of the upgraded Siri, further confirming that the impression created by Defendants' statements—that the Apple Intelligence-powered Siri features existed, functioned, and would roll out on the stated timeline—was materially misleading. Indeed, in the spring of 2025: (i) the Apple Intelligence-based Siri features only worked correctly up to two-thirds to 80% of the time, providing inaccurate responses to nearly one-third of requests; (ii) Apple engineers had been "racing to fix a rash of bugs in the project" since mid-February 2025 but had been unsuccessful; (iii) individuals within Apple's AI division believed the new Siri features "could be scrapped altogether" and needed to be rebuilt from the ground up, resulting in a significant delay of the features; (iii) Walker acknowledged that some Apple employees testing the new Siri features might feel "relieved" by the recently-announced delay of the new features, stating, "If you were using these features in the build, you were probably wondering: Are these ready? How do I feel about shipping these to our customers? Is this the right choice?" and that employees "might be feeling embarrassed"; and (iv) Federighi and other Apple executives had "voiced strong concerns internally that the features didn't work properly — or as advertised — in their personal testing."

534. The NAD's investigation into Apple's advertising for the new Apple Intelligence-powered Siri and its subsequent findings, as well as Apple's response to the findings, also demonstrate that Defendants' statements were materially false and misleading. Among other things: (i) Apple failed to demonstrate the basic functionality of the Apple Intelligence-based Siri features in response to the NAD's investigation; (ii) the NAD ultimately found that "[t]he description of Siri's updated functionality below Apple's unqualified claim that Apple Intelligence is 'available now' . . . reasonably conveys the message that the updated Siri functionality was available as part of the iPhone 16 launch, which it was not"; and

(iii) Apple subsequently updated its webpage to include a prominent disclosure in bolded font in close proximity to each claim regarding the Apple Intelligence-based Siri features that provided, "This feature is in development and will be available with a future software update."

535. Finally, the fact that Apple still has not released the Apple Intelligence-powered Siri demonstrates that the Company did not have a functional model of the product and was nowhere close to rolling out the upgraded Siri at the time of Defendants' statements.

### 3. September 9, 2024 – Press Release

536. On September 9, 2024, in a press release titled *Apple Debuts iPhone 16 Pro and iPhone 16 Pro Max*, Apple stated the following about the integration of Apple Intelligence into the newly released iPhone 16 Pro and Pro Max devices:

> **Built for Apple Intelligence**
>
> ***Apple Intelligence on the iPhone 16 lineup harnesses the power of Apple silicon and Apple-built generative models to understand and create language and images, take action across apps, and draw from personal context to simplify and accelerate everyday tasks***. . . . Apple Intelligence will be available as a free software update, with the first set of features rolling out next month in U.S. English for most regions around the world.
>
> Siri becomes more deeply integrated into the system experience and gets a brand-new design with an elegant glowing light that wraps around the edge of the screen when active. With richer language-understanding capabilities, communicating with Siri is more natural and flexible. Siri follows along when users stumble over their words, and maintains context from one request to the next. Users can type to Siri at any time, and switch fluidly between text and voice as they accelerate everyday tasks. Siri also now has extensive product knowledge to answer thousands of questions about features on iPhone and other Apple devices.
>
> Additional Apple Intelligence features will roll out later this year and in the months following, including Image Playground, which allows users to create playful images in moments. Emoji will be taken to an entirely new level with the ability to create original Genmoji by simply typing a description, or by selecting a photo of a friend or family member. ***Siri will be able to draw on a user's personal context to deliver intelligence that is tailored to them. It will also gain onscreen awareness to understand and take action with users' content, as well as take hundreds of new actions in and across Apple and third-party apps***.

537. In the same press release, Apple stated that, "***[w]ith Apple Intelligence, powerful Apple-built generative models come to iPhone in the easy-to-use personal intelligence system that understands personal context to deliver intelligence that is helpful and relevant while protecting user privacy***."

538. In another press release issued on that same day titled *Apple Debuts iPhone 16 and iPhone 16 Plus*, Apple repeated the statements set forth in ¶¶ 536-37.

539. The statements set forth in ¶¶ 536-38 that, *inter alia*, "Apple Intelligence on the iPhone 16 lineup harnesses the power of Apple silicon and Apple-built generative models to . . . draw from personal context to simplify and accelerate everyday tasks," "Siri will be able to draw on a user's personal context to deliver intelligence that is tailored to them," Siri "will also gain onscreen awareness to understand and take action with users' content" and "take hundreds of new actions in and across Apple and third-party apps," Apple Intelligence is an "easy-to-use personal intelligence system that understands personal context to deliver intelligence that is helpful and relevant," and Apple Intelligence features, including the new Siri, would be released "later this year and in the months following" were materially false and misleading when made for the reasons set forth in ¶¶ 532-35.

**4. September 13, 2024 – Siri Advertisement**

540. On September 13, 2024, Apple released an ad starring Bella Ramsey, which highlighted the advanced capabilities of Siri when leveraging Apple Intelligence. In the advertisement, Ramsey spotted a person that they had met several months earlier but whose name they could not recall. Ramsey then asked Siri: "Siri, what's the name of the guy I had a meeting with a couple of months ago at Cafe Grenel." In the advertisement, Siri responds: "***You met Zac Wingate at Cafe Grenel***."



541. Leveraging the power of Siri with Apple Intelligence, Ramsey is then able to recall Zac's name during a subsequent conversation with him, and the following text is displayed on screen: "***More personal Siri***."




542. Apple's Siri ad discussed in ¶¶ 540-41, which purported to show the "More personal Siri" features in action was materially false and misleading when made for the reasons set forth in ¶¶ 523-26.

**5. September 20, 2024 – Apple Website Updates**

543. Apple officially released the iPhone 16 on September 20, 2024. That same day, Apple updated the Apple Intelligence webpage to insert "***Coming this fall***," over the same collection of images showing the advertised new features, including the "personal context" capabilities for Siri.



544. As a user scrolled through the Apple Intelligence page, screenshots of different features were highlighted in turn, including the same images of book recommendations and flight details that had been advertised by Peterson during the 2024 WWDC presentation. While scrolling through the images, the text "Draws on your personal context without allowing anyone else to access your personal data – not even Apple," was displayed.





545. Apple's website advertising Apple Intelligence discussed in ¶¶ 543-44, which purported to show the "personal context" Siri features in action and represented that the features were "Coming this fall," was materially false and misleading when made for the reasons set forth in ¶¶ 523-26.

### 6. October 22, 2024 – The Wall Street Journal Interview

546. On October 22, 2024, during an interview with The Wall Street Journal, Defendant Federighi was asked, "Is Siri gonna finally live up to that promise [of being an intelligent assistant]?" In response, Federighi stated, "The great news is Siri's useful today . . . but ***it's getting more and more useful because this power of Apple Intelligence and large language models means that Siri can understand you better than ever before and is gonna have access to more tools on your device to do more for you than ever before***." When the journalist followed up, "Where is this smarter Siri?," Federighi answered, "Coming. It's coming in waves. So with Apple Intelligence we've created this foundation that understands personal context and the ability to take action. ***Siri is adopting that in stages and will benefit in stages over the coming year***."

547. The statements set forth in ¶ 546 that, *inter alia*, Siri would be "more useful because of this power of Apple Intelligence" and "can understand you better than ever before," and that the newly upgraded Siri would "benefit" from Apple Intelligence "in stages over the coming year" were materially false and misleading when made for the reasons set forth in ¶¶ 532-35.

### 7. October 28, 2024 – Apple Website Updates

548. On October 28, 2024, Apple released the iOS 18.1 software update for iPhone. That same day, Apple updated the Apple Intelligence webpage to insert the text "***Available now***" over the displayed set of Apple Intelligence images.




549. This version of the webpage included the Siri-related screenshots demonstrating Siri locating book recommendations from a friend and flight details that Peterson advertised during the 2024 WWDC, and also repeated the language "Draws on your personal context without allowing anyone else to access your personal data – not even Apple."

550. Further down the webpage, Apple advertised the Siri upgrades with the headline, "***The start of a new era for Siri***," stating that with "***awareness of your personal context, the ability to take action in and across apps, and product knowledge about your devices' features and settings, Siri will be able to assist you like never before***."




551. Also on October 28, 2024, in a press release titled *Apple Intelligence is Available Today on iPhone, iPad, and Mac*, Apple stated the following about Siri's Apple Intelligence-powered capabilities:

> ***Many More Features to Come***
>
> New Apple Intelligence features will be available in December, with additional capabilities rolling out in the coming months.
>
> * * *
>
> In the months to come, Priority Notifications will surface what's most important, and ***Siri will become even more capable, with the ability to draw on a user's personal context to deliver intelligence that's tailored to them. Siri will also gain onscreen awareness, as well as be able to take hundreds of new actions in and across Apple and third-party apps.***

552. Apple's website advertising Apple Intelligence discussed in ¶¶ 548-50, which purported to show the updated version of Siri that "has awareness of your personal context" in action and represented that the features were "Available now" and "[t]he start of a new era for Siri," as well as Apple's representation in ¶ 551 that, *inter alia*, the new Apple Intelligence-powered Siri would be rolled out "[i]n the months to come," were materially false and misleading when made for the reasons set forth in ¶¶ 523-26.

**8. October 31, 2024 – 4Q 2024 Conference Call**

553. On October 31, 2024, Apple held a conference call to discuss the Company's 4Q 2024 and FY 2024 financial results. During Defendant Cook's prepared remarks, he stated the following about the Company's Apple Intelligence features:

> [I]n June, we announced ***Apple Intelligence, a remarkable personal intelligence system that combines the power of generative models with personal context to deliver intelligence that is incredibly useful and relevant***.
>
> Apple Intelligence marks the beginning of a new chapter for Apple innovation and redefines privacy and AI by extending our groundbreaking approach to privacy into the cloud with Private Cloud Compute.
>
> Earlier this week, we made the first set of Apple Intelligence features available in US English for iPhone, iPad, and Mac users . . . .
>
> * * *
>
> ***More features will be rolling out in the coming months*** as well as support for more languages. And this is just the beginning.

554. Following Cook's prepared remarks, analyst David Vogt of UBS asked Cook:

> When you think about to Luca's point about the [Apple Intelligence] rollout being staged over the next several quarters across the world. Do you think that has any impact on sort of the normal historical demand cadence across different region so should we see something different, let's say, in the December quarter, the March quarter or the June quarter, et cetera, relative to history, given the timing of the rollout and where customers are probably waiting for the devices to be enable to have the operating system? Would just love to kind of get your perspective on how we think about the demand cadence, how it might be different than maybe historically.

555. Cook responded by stating:

> Yeah, David, it's clearly, as you point out, a different cadence, if you will, than we would normally do. And we -- as we talked about at WWDC, we wanted to give a comprehensive vision of Apple Intelligence. And we said then that it would roll out over time. ***And we're right on the, what we said, WWDC. And so we're executing well***.
>
> In terms of the demand curve. ***I would just say that what we believe here is that it's a compelling reason for upgrading***. And it's -- that's both my personal experience and feedback that I'm getting. And so we'll see. We're not projecting beyond the current quarter, obviously. We just don't do that.

556. The statements set forth in ¶¶ 553-55 that, *inter alia*, "Apple Intelligence . . . combines the power of generative models with personal context to deliver intelligence that is incredibly useful and

relevant," "more [Apple Intelligence] features will be rolling out in the coming months," Apple was "executing well" on the rollout of Apple Intelligence, and Apple Intelligence is "a compelling reason for upgrading" were materially false and misleading when made for the reasons set forth in ¶¶ 532-35.

**9. January 30, 2025 – 1Q 2025 Conference Call**

557. On January 30, 2025, Apple held a conference call to discuss its 1Q 2025 financial results. During his prepared remarks, Cook recounted the expansion of Apple Intelligence to more languages and promised, "***we'll continue to roll out more features in the future, including an even more capable Siri***." Cook further stated, "I think the killer feature is different for different people. But I think for most, they're going to find that they're going to use many of the features every day. ***And certainly, one of those is Siri, and that will be coming over the next several months***."

558. The statements set forth in ¶ 557 that, *inter alia*, "Siri, and that will be coming over the next several months" were materially false and misleading when made for the reasons set forth in ¶¶ 532-35.

## VI. DEFENDANTS' FRAUDULENT CONDUCT

559. As set forth above and herein, prior to and throughout the Class Period, Defendants employed devices, schemes, or artifices to defraud and/or engaged in acts, practices, or a course of business which operated as a fraud or deceit upon investors in connection with the purchase or sale of Apple common stock concerning Apple's purported compliance with the Injunction and the existence, functionality, and rollout of Siri AI features.

560. As explained herein, this fraudulent conduct included at least the following: (i) drafting, editing, approving, making, and disseminating false and misleading statements to investors concerning Apple's Injunction compliance and the existence, functionality, and timeline for Siri AI; (ii) designing, approving, implementing, and defending the Link Entitlement program, including a 27% commission, to limit the Injunction and protect Apple's App store revenues; (iii) lying about Apple's Injunction compliance and bases for the components of the Link Entitlement program in the Notice of Compliance, the Opposition, testimony during the May 2024 evidentiary hearing, and other briefing and filings in the *Epic Games* lawsuit; (iv) concealing the relevant truth concerning the genesis for and bases of the components of the Link Entitlement program and delaying the impact of the Injunction as intended by Judge Gonzalez Rogers by forestalling discovery and over-designating and withholding documents on the

basis of attorney-client privilege and confidentiality; (v) designing, approving, and using video demonstrations of Apple Intelligence-powered Siri features to give investors the misleading impression that the features existed and functioned when, in reality, they did not; and (vi) designing, approving, and launching marketing for Apple Intelligence-powered Siri features, including through press releases, updates to Apple's webpage, and advertisements featuring Bella Ramsey, that gave investors the misleading impression that the features existed and functioned when, in reality, they did not.

### A. Defendants' Fraudulent Conduct in Furtherance of Defendants' Fraudulent Injunction-Compliance Scheme

#### 1. The Link Entitlement Program

561. Defendants' fraudulent conduct in furtherance of the scheme to defraud investors included engineering restrictions on link-out purchases to undermine the purposes of the Injunction and nullify its impact on Apple's App Store revenue. Within days of the September 2021 Order, the Injunction response team—led by the Pricing Committee, comprised of Schiller and Defendants Cook and Maestri—deliberately crafted policies to circumvent the September 2021 Order. As the April 2025 Order found, these policies aimed "to protect Apple from an anticipated loss of revenue which would naturally spring from the competition the Injunction sought to stimulate."

562. Dubbed internally Project Michigan, Apple's initial efforts included questioning whether the Company could charge a commission on link-out purchases at all. In fact, per the April 2025 Order, "it was immediately apparent to the Apple working group that the commission issue, including whether and how much, was core to compliance with the Injunction."

563. Defendants' efforts also included work on the warning screens that flashed on the screen when a user clicked on an External Purchase Link. The April 2025 Order aptly referred to these warnings as "scare screen[s]," the purpose of which was to deter users from completing link-out purchases. As part of this work, Apple designed the full-screen pop-up warning, which provided the most alarming warning to users about continuing outside of the App Store.

564. Defendants put their Injunction response on ice when the Ninth Circuit issued a stay of the Injunction pending Apple's appeal on December 8, 2021. The stay lasted until April 24, 2023, when the

Ninth Circuit affirmed the Injunction. Thereafter, Defendants resumed their scheme to subvert the Injunction as part of Project Wisconsin.

565. ***27% Commission***. Central to Defendants' fraudulent scheme was the imposition of a commission on link-out purchases intended to render competition with Apple's IAP impossible. Apple executives, including Defendants Cook and Maestri, internally discussed and ultimately approved in July 2023, charging app developers a 27% commission on link-out purchases of digital products occurring within a seven-day window. Apple implemented the 27% commission in January 2024.

566. More specifically, the Pricing Committee, including Schiller and Defendants Cook and Maestri, approved the 27% commission even though it was less profitable for app developers than IAP and despite their understanding that this commission violated the Injunction.

567. Apple did this to "limit the ruling" as set forth in the Injunction by shifting the financial risk Judge Gonzalez Rogers intended to be borne by Apple to the app developers, thereby mitigating any loss of revenue tied to implementing the terms of the Injunction. As the April 2025 Order explained, "Apple selected a 3% discount on its 30% IAP commission that it *knew* was anticompetitive. In doing so, Apple *willfully* set a commission rate that in practice made all alternatives to IAP economically non-viable." Per the April 2025 Order, Apple's commission structure plainly violated the Injunction because it "***foreclose[d] competitive alternatives***," which "appears to have been the point," as "[b]usiness documents reveal that the internal justification was to maintain the existing anticompetitive revenue stream." (emphasis in original).

568. ***Placement and Design Restrictions***. In addition to charging a 27% commission for all link-out purchases occurring within the seven-day window, Apple executives, including Schiller and Defendants Cook and Maestri, approved and implemented placement and design restrictions for External Purchase Links. These restrictions were intended to discourage the use of External Purchase Links by creating additional friction for link-out purchases, thereby lowering adoption rates by app developers and reducing competition with IAP.

569. As explained in the April 2025 Order, the Injunction response team specifically "model[ed] the tipping point where external links would cease to be advantageous for developers due to friction in the purchase flow." During that process, Apple assumed that friction in the purchase flow would lead to

"breakage," which is the rate at which users fail to complete link-out transactions, thus resulting in a lower percentage of purchases being diverted from IAP. In addition, Apple modeled the degree to which developers would adopt link-out purchases, or "Linkout Share," which showed that greater design and placement restrictions would lead to lower adoption rates.

570. ***Scare Screens***. Apple executives approved and implemented the "scar[iest]" pop-up window option—a full-screen takeover that Cook himself demanded "reference the fact that Apple's privacy and security standards do not apply to purchases made on the web." According to contemporaneous Apple internal documents, the purpose of the new pop-up screen was to suggest that using the link and leaving the app was "dangerous."

571. ***Static Links and Limitations on Calls to Action***. Apple executives also approved and implemented a static link requirement that intentionally created additional friction, and prohibited app developers from utilizing calls to action that did not use one of Apple's limited templates. The April 2025 Order found that "Apple recognized . . . that unlinked and unrestricted calls to action could foster competition against Apple's IAP by causing customer migration to developer websites." Therefore, Apple prohibited non-link calls to action, restricting developers to a limited set of Apple-approved templates.

572. ***Exclusions from Link Entitlement Program***. Apple prohibited app developers enrolled in the VPP and NPP programs from participating in the Link Entitlement program because, as the April 2025 Order found, "*very large developers like the ones covered by VPP/NPP were the developers that Apple believed were the most likely to use linked purchases if Apple charged a commission*," leading to a material loss in revenue if the VPP and NPP-enrolled app developers had access to the Link Entitlement program. Apple executives attempted to bury this by referring to a need to preserve "quality," when in reality the goal was preservation of the IAP revenue stream from large VPP and NPP-enrolled app developers.

573. Thus, in violation of the Injunction, Apple executives, including Defendants Cook and Maestri, selected the most anti-competitive options—27% commission, extreme placement and design restrictions, "scare screen[s]," and other requirements and prohibitions—for the Link Entitlement program. Indeed, the April 2025 Order found, based on contemporaneous documents, that Apple continuously chose the most anticompetitive option possible. The Pricing Committee selected the highest commission, the

most restrictive link design, the most intrusive and alarming scare screens, the most cumbersome URLs, the most stringent language requirements, and the most protectionist program exclusions.

### 2. Apple's Public Statements Regarding the Link Entitlement Program and Its Compliance with the Injunction

574. Following the Supreme Court's rejection of Apple's petition on January 16, 2024, Defendants repeatedly represented that the 27% commission and the Link Entitlement program complied with the Injunction and served legitimate purposes, including seeking compensation for Apple's IP and protecting users' privacy and security. Defendants made these claims in at least the following court filings, declarations, and sworn testimony: (i) the Notice of Compliance and the Fischer Declaration; (ii) the Opposition and the Roman Declaration; (iii) the May 2024 evidentiary hearing, including through sworn testimony by Schiller, Fischer, Oliver and Roman on May 8, 10, 16, 17, and 22, 2024; and (iv) the March 7, 2025 post-evidentiary hearing brief. Apple executives drafted, reviewed, edited, approved, testified to, and ultimately disseminated or publicized to investors Apple's assertions of compliance via quarterly and annual filings with the SEC.

575. In fact, it was Defendants' plan from the outset to affirmatively misrepresent Apple's compliance with the Injunction. Notes from a June 26, 2023 meeting of Apple executives held in preparation for filing the Notice of Compliance in late June 2023 (when the anticipated go-live date for the Injunction was July 5, 2023) explained that "[i]n addition to the Wisconsin materials [i.e., Apple's new Guidelines], we will be doing a legal filing at the same time the materials go up." The notes state that "*[w]e will also have the legal filing to point reporters to*," cautioning that "*[t]his is all going to play out in public*."

576. As explained above, in Apple's quarterly and annual SEC filings, Defendants directed investors to the Notice of Compliance, the Fischer Declaration, the Opposition, and the Roman Declaration, all of which contained the false and misleading statements alleged above in Section V.A. Apple also affirmatively misrepresented its compliance with the Injunction and the bases for the components of the Link Entitlement program during the May 2024 evidentiary hearing, including the statements alleged above in Section V.A, and in legal briefs and other filings on the public docket in the *Epic Games* litigation on December 16, 2024, January 2, 2025, and March 7, 2025.

577. For instance, in the March 7, 2025 brief, Apple again reiterated its claims that it had fully complied with the injunction:

> Nine days of testimony and scores of documents demonstrate the extensive efforts Apple took to develop a framework that complies with the Injunction while preserving the fundamental features of Apple's business model and safeguarding consumers.
>
> * * *
>
> The resumed evidentiary hearing made clear that the [May 2024] testimony of Apple's witnesses was consistent with and supported by the documentary record—further establishing the objective reasonableness of Apple's process and conclusions.

578. In defense of its design restrictions, Apple stated that "the technical requirements were the result of a cross-functional team's effort to develop and implement measures *to help consumers make informed decisions and protect them from fraud and scams by developers while still preserving the iOS ecosystem and experience*."

579. Apple similarly defended its decision to impose a 27% commission on link-out purchases, stating that "*[u]ltimately, after rigorous analysis and discussion, Apple determined that access to Apple's intellectual property, services, userbase and platform justify a commission*." Apple further claimed that its Pricing Committee, including Defendants Cook and Maestri, believed that the commission structure "*would incentivize developers to adopt the Entitlement*."

580. On May 3, 2024, the first day of the Class Period, Defendants made false and misleading statements to investors about Apple's compliance with the Injunction and the basis for the 27% commission and the Link Entitlement program, including those alleged above in Section V.A.1. These statements reiterated Apple's compliance with the Injunction and referred investors to Apple's January 16, 2024 Notice of Compliance (which included the Fischer Declaration) and April 12, 2024 Opposition, which also included false and misleading statements. Defendants continued to make these statements in subsequent Forms 10-Q and 10-K filed with the SEC, including those alleged above in Sections V.A.3-5.

581. Likewise, beginning on May 8, 2024 and continuing over six days of evidentiary hearings before Judge Gonzalez Rogers, Apple's executives made false and misleading statements during their testimony. These statements include those identified above in Section V.A.2.

582. Apple also continued to file briefs and declarations in the *Epic Games* litigation intended to deceive investors, among other stakeholders, with respect to the Company's compliance with the Injunction and the purported bases for the 27% commission and the Link Entitlement program. In these documents, Apple repeatedly denied that its executives had engaged in any fraudulent conduct with respect to the Injunction.

583. Ultimately, in the April 2025 Order, Judge Gonzalez Rogers found that "Apple *intentionally* devised a compliance scheme to prevent developers from deploying competitive alternatives to [in-app purchases]." Apple then engaged in an "*obvious cover-up*" to deceive the court. As Judge Gonzalez Rogers summarized her findings:

> Apple's lack of adequate justification, knowledge of the economic non-viability of its compliance program, *motive to protect its illegal revenue stream* and institute a new de facto anticompetitive structure, and then create a reverse-engineered justification to proffer to the Court cannot, in any universe, real or virtual, be viewed as [a] product of good faith or a reasonable interpretation of the Court's orders.

584. In December 2025, the Ninth Circuit rejected Apple's claim that "it filed a 'transparent "Notice of Compliance"' about its compliance plans," affirming the April 2025 Order's finding that Apple's statements regarding its purported compliance with the Injunction were knowingly false. The Ninth Circuit stated that "Apple. . . ignored the district court's finding that *Apple 'attempted to mislead' in its Notice of Compliance and May 2024 hearing with 'pretextual' justifications*."

585. The Ninth Circuit also rejected Apple's defense that it merely chose "the most advantageous option for its business and shareholders," citing the April 2025 Order's findings "that 'at every step Apple considered whether its actions would comply, and at every step Apple chose to maintain its anticompetitive revenue stream over compliance,'" including by "construct[ing] a program that nullified the revenue impact of the Injunction by prohibiting any viable alternative." The Ninth Circuit concluded that "the record shows that Apple designed the purchasing experience to make external links as hard to use as possible," which "flies in the face of the Injunction's spirit."

586. The Ninth Circuit further held that Judge Gonzalez Rogers properly found that the Analysis Group's "'recommendation of a commission rate on link-out transactions as the basis for [Apple's] commission determination [was] entirely manufactured, and Apple's reliance thereon [was] a sham,'"

noting that "the record suggests that Apple picked its commission rate in July 2023, and the report is dated January 2024." (alterations in original). The Ninth Circuit concluded, "Apple knew that processing linked-out purchases would cost developers more than 3%," and therefore, the district court correctly found that "Apple willfully set a commission rate that in practice made all alternatives to [its platform] economically non-viable."

### 3. Discovery Delays

587. As the April 2025 Order found, Apple also "engaged in tactics to delay the" adjudication of Epic's motion to enforce the Injunction and hold Apple in contempt, including attempting to conceal evidence from Judge Gonzalez Rogers and, ultimately, investors. For instance, during the multi-day May 2024 evidentiary hearing, Apple executives repeatedly lied under oath regarding the bases for the components of the Link Entitlement program. Under examination by Epic attorneys, Apple executives repeatedly denied that the Company had violated the letter and spirit of the Injunction.

588. For example, on May 22, 2024, Schiller testified:

**Q.** Is the purchase link entitlement intended to stifle competition?

**A.** *It is not*.

589. Likewise, in response to questions from the attorneys representing the Company, Apple executives made affirmative false and misleading statements regarding compliance with the Injunction and the bases for the components of the Link Entitlement program, including those alleged above in Section V.A.2.

590. During the hearing, following the testimony of Oliver, Judge Gonzalez Rogers ordered Apple to search for and produce "the documents relative to the decision-making with respect to the issues in front of the Court" and Apple "didn't do it." Instead, Apple withheld from Epic and Judge Gonzalez Rogers documents reflecting its executives' true intentions with respect to Apple's response to the Injunction and their approval and implementation of the 27% commission and the Link Entitlement program. Apple also redacted documents on the basis of confidentiality and over-designated documents as privileged and withheld them from Epic and the district court without providing metadata or a privilege log. Additionally, Apple failed to search central locations for documents concerning Apple's efforts to comply with the Injunction, including the Company's Quip repository. As a result, Judge Gonzalez Rogers

stated unambiguously that "from the day" the Court issued the Injunction "until the present," "I want all of Apple's documents relative to its decision-making process with respect to the issues in front of the Court. All of them. All. If there is a concern, then be overly broad."

591. Apple began its production following the conclusion of the May 2024 hearing. The Court ordered Apple to substantially complete production by September 30, 2024. Four days before that deadline, Apple disclosed for the first time that it still needed to review 1.3 million documents for responsiveness. Magistrate Judge Hixson noted that this belated disclosure and extension request—which he subsequently denied—could have and should have been made in one of the seven bi-monthly status reports filed with the court regarding Apple's efforts to comply with Judge Gonzalez Rogers' discovery order. Specifically, he held that the number of documents Apple needed to review "would have been apparent to Apple weeks ago" and it was "simply not believable that Apple learned of this information only in the two weeks following the last status report."

592. Magistrate Judge Hixson further stated, "Apple knew it wasn't on track to make the substantial completion deadline and kept that a secret . . . . Waiting until four days before the substantial completion deadline to announce its *planned* noncompliance and to disclose for the first time that the scope of document review was larger than previously represented is *bad behavior*."

593. Magistrate Judge Hixson also concluded, "As Epic constantly points out, this document production is all downside for Apple because it relates to Apple's alleged lack of compliance with the Court's injunction. It is not in Apple's interest to do any of this quickly. This is a classic moral hazard, and the way Apple announced out of the blue four days before the substantial completion deadline that it would not make that deadline because of a document count that it had surely been aware of for *weeks hardly creates the impression that Apple is behaving responsibly*."

594. Nevertheless, by September 30, 2024, Apple only had produced approximately 89,000 documents out of the more than 1.5 million documents it had reviewed, and had asserted privilege over more than a third of the documents identified as responsive. As the April 2025 Order found, after Magistrate Judge Hixon "largely found Apple's privilege claims to be unsubstantiated," "Apple used this decision to delay further and 'offered' to re-review all 57,000 documents for which it claimed privilege in full or in part." Apple subsequently withdrew approximately 42% of its privilege claims, leading

Judge Gonzalez Rogers to state in the April 2025 Order "that the documents should have never been withheld in the first instance." Indeed, Judge Gonzalez Rogers found in a February 4, 2025 order that "[s]anctions are warranted" because "Apple's over-designation of privilege was inconsistent with Ninth Circuit law and was the source of the current delay."

595. Ultimately, Judge Gonzalez Rogers "concluded that delay equaled profits" for Apple by delaying compliance with the Injunction by nearly 18 months (i.e., from January 16, 2024 to April 30, 2025).

**B. Defendants' Fraudulent Conduct in Furtherance of the AI-Enhanced Siri Scheme**

596. Defendants' fraudulent conduct in furtherance of the scheme to defraud investors with respect to the existence, functionality, and rollout of Siri AI features began prior to the 2024 WWDC, at which Defendants Federighi and Peterson purportedly demonstrated forthcoming Apple Intelligence-powered upgrades to Siri, utilizing video demonstrations and screenshots appearing to demonstrate the existence and functionality of the new Siri AI features. Apple created, designed, prepared, and approved these videos and screenshots prior to the 2024 WWDC even though, at the time, Apple had a barely working prototype and there were internal disputes over the fundamental question of how Apple Intelligence's AI models would function.

597. Apple then utilized these videos and screenshots while Defendants Federighi and Peterson made materially false and misleading statements regarding the new Siri AI features at the 2024 WWDC. Specifically, while Peterson spoke in detail regarding the new Apple Intelligence-powered version of Siri, she held an iPhone in her hand as the screen behind her appeared to depict these capabilities in action. As she explained to investors and other stakeholders that Siri would have increased product knowledge, claiming "[e]ven if you don't know exactly what a feature is called, you can just describe it, and Siri will find the info you're looking for," Peterson then appeared to demonstrate the feature, asking Siri how to schedule a message to be sent later. Siri appeared to respond on the screen with information about the new "Send Later" feature and provided step-by-step guidance. Peterson then stated, "Everything I've showed you so far will be available from the moment you start using Apple Intelligence," while photos of the features she had highlighted—conversational context, the ability to type commands to Siri, and expanded product knowledge—were displayed on screen.

598. Peterson also claimed that Siri "will be able to understand and take action with things on your screen," offering two examples of this feature, both of which were accompanied by videos showing the feature in action. Peterson further claimed that the integration of the App Intents technology would make Siri's new Apple Intelligence-powered abilities usable across non-Apple developed apps, offering specific examples while video demonstrations of these actions played as she spoke.

599. Additionally, Peterson claimed that Siri would be able to find things when the user "can't remember if it was in an email, a text, or a shared note. Like some book recommendations a friend sent you a while back. Or for times when you're filling out a form and need to input your driver's license, Siri will be able to find a photo of your license, extract your ID number, and type it into the form for you," as Apple showed screenshots of these features on screen behind Peterson.

600. Finally, Peterson presented "one more demo" to show "how powerful Siri will be when it draws on personal context awareness and action capabilities built into Apple Intelligence." While the demo played, Peterson narrated, "[I]magine that I'm planning to pick my mom up from the airport and I'm trying to figure out my timing. Siri is going to be able to help me do this so easily. 'Siri, when is my mom's flight landing?' What's awesome is that Siri actually cross-references flight details that my mom shared with me by email with real-time flight-tracking to give me her up-to-date arrival time." The demonstration showed Siri cross-referencing flight details shared by email and offering real-time flight tracking data.

601. By creating these demonstrations and screenshots and presenting them while Federighi and Peterson described the purported Apple Intelligence-powered Siri capabilities at the 2024 WWDC, Defendants deceptively represented to investors and analysts alike that the Siri AI features were in existence, functional, and would be rolled out according to the timeline laid out by Apple when, in reality, this was not the case.

602. The Information provided the account of a former Apple employee who recalled that Siri team members were surprised to see the demonstrations of Siri's new features at the 2024 WWDC, as they had never seen working versions of the advertised features. During a subsequent all-hands meeting, Walker suggested that employees on the AI team may be feeling angry, disappointed, burned out, and embarrassed after the features were postponed, with the new features not expected until 2026 at the earliest. Walker acknowledged that the delays were particularly "ugly" because Apple had already showed the promised

features publicly, stating, "This was not one of these situations where we get to show people our plan after it's done. We showed people before."

603. Defendants maintained this deception by making the false and misleading statements set forth in Sections V.B.2-9 above. For instance, Defendants claimed that Siri was entering a "New Era" with AI in a press release. Defendants launched an Apple Intelligence page on the Company's website featuring a representation of the new, deeply integrated version of Siri with AI as the central image. Defendant Cook touted the Apple Intelligence-powered Siri to technology influencers who, in turn created and posted content to social media featuring Cook's statements. However, The New York Times confirmed that while Apple was telling analysts and investors that Siri upgrades would roll out within a year of the 2024 WWDC, behind the scenes Apple was unable to produce even a consistently working prototype of a new Siri.

604. Defendants also drafted, approved, filed, made, and disseminated false and misleading statements regarding the existence, functionality, and rollout of Siri AI in SEC filings and during conference calls with investors and analysts as set forth above in Sections V.B.2-3 and V.B.8-9.

605. In these statements as well as press releases and other marketing efforts, Defendants encouraged consumers to upgrade to an iPhone 16, officially announced on September 9, 2024, to have access to the new Siri AI features. In fact, the existence of Apple Intelligence, and particularly a more personal Siri, was the central inducement to consumers to buy the iPhone 16.

606. For instance, days after announcing the iPhone 16, Apple debuted an ad starring Bella Ramsey that showcased the "More personal Siri." In the same all-hands meeting reported in the March 14 Bloomberg article described above, Walker also reportedly stated that "to make matters worse," Apple ran TV ads advertising the capabilities that were not yet ready. Notably, Apple pulled these ads on March 7, 2025, when Apple announced that Siri AI features would be delayed. The subsequent investigation by NAD revealed that "[t]he description of Siri's updated functionality below Apple's unqualified claim that Apple Intelligence is 'Available [n]ow' . . . reasonably conveys the message that the updated Siri functionality was available as part of the iPhone 16 launch, which it was not."

607. Apple also updated the Apple Intelligence page on its website to further highlight the new Siri AI capabilities and, several weeks later, added that these capabilities were "Available now" to coincide with the release of iOS 18.1. These claims also were altered following the NAD investigation. Furthermore,

Apple issued a press release touting the availability of Apple Intelligence features. Per Apple's changes to its website, this was "***[t]he start of a new era for Siri***."

608. Several weeks later, in early December 2024, Cook gave an interview discussing in part the Apple Intelligence-powered Siri and Apple issued a press release reiterating the new Siri AI functionality in conjunction with the release of iOS 18.2.

609. In January 2025, Cook reiterated during the Company's 1Q 2025 earnings call that the new Apple Intelligence-powered Siri features would be "coming over the next several months."

## VII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

610. The facts detailed above and herein, when viewed together with other allegations in the Complaint, establish a strong inference that each of the Individual Defendants acted with scienter. The Individual Defendants acted with scienter in that they knew or were severely reckless in not knowing that the public statements set forth in Section V were materially false and misleading when made, and knowingly or recklessly participated in the issuance of such statements as primary violators of the federal securities laws.

611. In addition to the facts alleged in Sections IV and VI above, the Individual Defendants' scienter is evidenced by the specific facts discussed below.

### A. Additional Allegations of Scienter for Defendants' Statements Regarding the Injunction

612. ***Defendants Knew or Recklessly Disregarded That Apple Was Not in Compliance with the Injunction***. During the Class Period, Defendants Cook, Maestri, and Parekh had direct knowledge of, and access to, information showing that the components of the Link Entitlement program violated the Injunction by design.

613. As alleged above, Apple's Link Entitlement program willfully violated the Injunction by imposing a web of anticompetitive restrictions designed to render the non-IAP purchase options mandated by the Injunction economically non-viable, thereby preserving Apple's supracompetitive App Store revenue. Rather than fostering the competition the Injunction mandated, as Judge Gonzalez Rogers found, "Apple intentionally devised a compliance scheme to prevent developers from deploying competitive alternatives to IAP." In doing so, Apple acted in bad faith to "thwart[] the Injunction's goals," including by

imposing a 27% commission that "***foreclose[d] competitive alternatives***," and "impos[ing] *new* barriers and *new* requirements to increase friction and increase breakage rates with full page 'scare' screens, static URLs, and generic [External Purchase Link] statements." (emphasis in original). The Ninth Circuit affirmed that Apple's conduct violated the Injunction and that Apple acted in "bad faith."

614. The facts alleged above readily establish that Defendants Cook, Maestri, and Parekh knew about the design and intended effect of the Link Entitlement program at the time they made they false and misleading statements.

615. *First*, as members of the Pricing Committee, Defendants Cook and Maestri were responsible for signing off on the final requirements of the Link Entitlement program, and in doing so, were fully aware of both the components of the Link Entitlement program and Apple's rationale for adopting these components. As Schiller testified during the May 2024 evidentiary hearing, Apple "put a lot of time and effort into responding to the Court's injunction," devoted "significant resources in the effort," and "carefully analyzed how it intended to proceed," and this effort "involved really the most senior people at Apple . . . including the CEO."

616. *Second*, on numerous occasions, Defendants Cook and Maestri—along with numerous other senior Apple executives, including Defendant Federighi—were presented with internal modeling about the potential financial impact of different link-out commission rates. As confirmed by numerous internal documents, Defendants Cook and Maestri were shown presentations on June 1, June 20, and June 28, 2023 detailing the financial impact of the different commission rates, as well as the compliance risk associated with charging a 27% commission. In fact, the presentation for the June 20, 2023 meeting specifically identified the "*significant compliance risk because of the proximity to 30 percent commission*" as one of the "Risks" of Apple's planned 27% commission. Moreover, testimony from the February 2025 hearing exposed the hands-on approach taken by Defendants Cook and Maestri, who urged the team to "limit the ruling" in a manner that "Tim [Cook]" was "comfortable with." Defendant Maestri not only advocated for charging a commission, but personally pushed for 27%, the highest percentage considered, as confirmed by June 26, 2023 meeting notes stating that "*Luca wanted to make it 27 percent*."

617. *Third*, at various internal meetings, Defendants Cook and Maestri reviewed analyses showing how link design and placement restrictions increased friction in the purchase flow, thus reducing

adoption of the Link Entitlement program among developers. For example, in a presentation for a June 20, 2023 meeting, Defendants Cook and Maestri were shown financial analyses regarding Apple's "Revenue impact with breakage," explaining that "we are showing sensitivities from 10% to 50%, *which will depend where is the text and the language developers are allowed to use*." The presentation showed that depending on the amount of friction Apple engineered into link-out purchases, the App Store revenue impact could be reduced from as high as 46% to as low as 2% (before considering other restrictions, such as Apple's commission).

618. *Fourth*, Defendant Cook was directly involved in designing the system disclosure sheet to make it "scar[ier]" for users to link-out. Multiple internal documents confirm that Defendant Cook directed the Project Wisconsin team to redesign the system disclosure sheet to better deter users from linking out to developers' websites, including a June 23, 2023 email to Cook. Internal meeting notes in preparation for the June 28, 2023 meeting confirm that the intention of the system disclosure sheet was to make External Purchase Links sound more "dangerous." At a June 28, 2023 meeting, Defendants Cook and Maestri approved the updated disclosure sheet.

619. *Fifth*, Defendants Cook and Maestri were actively involved in the decision to narrow the range of the calls to action that were permitted in the Link Entitlement program. During the June 1, 2023 presentation to Defendants Cook and Maestri, Apple's Injunction response team presented an analysis of the "incremental [US Revenue] impact" of permitting non-linked calls to action, which showed that even a 5% migration outside of IAP from these non-link communications would cause Apple to lose hundreds of millions of dollars in revenue, and at 25% migration, Apple would lose over a billion dollars in revenue. Accordingly, Defendants Cook and Maestri rejected the proposal.

620. *Finally*, Defendants Cook and Maestri were directly involved in the decision to exclude VPP and NPP developers from participation in the Link Entitlement program. As Schiller testified in February 2025, during the June 20, 2023 presentation, the Injunction response team presented an analysis showing that "*the revenue loss for including the [NPP/VPP] partners is actually quite a lot larger than the revenue loss if the partners are excluded*." Defendants Cook and Maestri therefore decided to exclude these large developers from the Link Entitlement program.

621. ***The App Store Is One of Apple's Core Operations***. That the alleged fraud related to the Injunction concerned the App Store—a core operation of Apple's business—further contributes to a strong inference of scienter. Services is a significant growth driver of Apple's business, and revenue generated from Apple's App Store is a primary contributor to the Company's Services revenue. In fiscal year 2024, Services generated 13% year-over-year growth, dwarfing the less than 1% sales growth for the iPhone. From 2020 to 2024, Services was disproportionately profitable for Apple, boasting gross margin growth of 66% to 74%, compared to growth of 38% to 46% for the Company as a whole.

622. While Apple does not separately report App Store revenue, internal financial modeling reflected in the June 20, 2023 Project Wisconsin presentation shows that the U.S. App Store alone generated approximately $6.8 billion annually. This figure is consistent with analyst reporting during the Class Period, which estimated that global App Store sales contributed approximately 18-30% of Apple's total Services revenue, or $17.3 to $28.8 billion in FY 2024 and $19.6 to $32.7 billion in FY 2025.

623. App Store revenue was therefore central to Apple's Services revenue and a significant contributor of Apple's overall revenue.

624. In a September 2, 2020 press release, Apple acknowledged the importance of the App Store to the Company's participation into various industries, noting that apps have become critical to Americans' everyday lives by providing "support for remote ordering from restaurants, vibrant and impactful remote learning for students, telehealth for patients and doctors, and digital commerce for small businesses." A November 18, 2020 press release described the App Store as "an engine of economic growth like none other." Similarly, a June 2, 2021 press release stated there "is no more innovative, resilient or dynamic marketplace on earth than the app economy."

625. ***Defendants Repeatedly Claimed That Apple Was in Compliance with the Injunction***. As detailed above in Sections IV.B, V.A and VI.A, Defendants Cook, Maestri, and Parekh repeatedly made affirmative statements that Apple was in compliance with the Injunction. Defendants' public statements during the Class Period strongly and plausibly suggest that each had detailed knowledge of, or access to, the material facts and information misrepresented or concealed by Defendants, or that they were severely reckless in failing to investigate the very issues they spoke about publicly.

626. Defendants Cook, Maestri, and Parekh repeatedly claimed in the Company's quarterly and annual reports that Apple had "***implemented a plan to comply with the injunction***," beginning with Apple's May 3, 2024 2Q 2024 10-Q, signed by Defendant Maestri. Defendants Cook, Maestri, and Parekh repeated this claim in (i) Apple's 3Q 2024 10-Q, signed by Defendant Maestri; (ii) Apple's 2024 Form 10-K, signed by Defendants Cook and Maestri; and (iii) Apple's January 31, 2025 1Q 2025 10-Q, signed by Defendant Parekh. In each of these filings, Defendants specifically referenced Apple's Notice of Compliance, stating that Apple "***filed a statement of compliance with the California District Court***."

627. As discussed above, at the time of these statements, Defendants knew that Apple had deliberately violated the Injunction and that Epic's motion to enforce the Injunction was therefore fully justified.

628. ***Defendants Made False and Misleading Statements Regarding Apple's Compliance with the Injunction Shortly Before the Disclosures***. The temporal proximity between Defendants' false and misleading statements and subsequent disclosures exposing Apple's willful violation of the Injunction bolsters the strong inference that Defendants knew, or were deliberately reckless in not knowing, that their statements were false and misleading when made.

629. On January 31, 2025, Defendant Parekh claimed in Apple's 1Q 2025 10-Q that "***[o]n January 16, 2024, the Company implemented a plan to comply with the injunction***."

630. Less than one month later, the February 2025 hearing partially revealed that Apple's Link Entitlement program subverted the Injunction to maintain Apple's supracompetitive App Store revenue. As alleged above, the testimony and exhibits introduced at the February 2025 hearing partially revealed how Defendants had instituted multiple requirements, any one of which, imposed in isolation, would stifle the competition the Injunction was intended to promote. Apple instead imposed all these requirements to ensure virtually no revenue impact from the Injunction. Moreover, the February 2025 hearing included revelations that senior Apple executives, including Schiller, had expressed substantial doubts whether Apple's Link Entitlement program ran afoul of the Injunction.

631. Following the February hearing, Apple filed a post-hearing brief on March 7, 2025. In its brief, Apple doubled down, claiming that the hearing demonstrated "*the extensive efforts Apple took to*

*develop a framework that complie[d] with the Injunction*," and again defended the Link Entitlement requirements on the basis of user security and privacy.

632. Less than two months later, in the April 2025 Order, Judge Gonzalez Rogers meticulously detailed the falsity of those assertions. The Order found that Defendants' "extensive efforts" were focused on protecting Apple's App Store revenue, that Apple's justifications for its actions were pretextual, and that Defendants acted willfully in ignoring and violating the Injunction.

### B. Additional Allegations of Scienter for Defendants' Statements Regarding the Apple Intelligence-Powered Siri

633. ***Defendants Knew or Recklessly Disregarded That Apple Lacked a Functioning Apple Intelligence-Enabled Siri Model***. As alleged in Sections IV.E-F above, during the period of June 10, 2024 to May 1, 2025, Defendants Cook, Federighi, and Peterson misrepresented that Apple had a functioning model of the Apple Intelligence-powered Siri and that the release of the upgraded Siri was imminent. In reality, Defendants knew that Apple only possessed a barely functioning prototype of the upgraded Siri Defendants purportedly demonstrated at the 2024 WWDC and that the features were nowhere close to being ready for release during the iPhone 16 upgrade cycle.

634. *First*, FE-1 confirmed that Apple did not have a functional version of AI-enabled Siri at the time of Defendants' misrepresentations. When FE-1 began working with the Apple Intelligence team in September 2024, FE-1 learned that Apple AI was only a proof of concept at that point in time. In fact, FE-1 learned that the version of Apple AI shown at the June 2024 WWDC was only a demonstration and there was no actual product at that time. FE-1 stated that what Apple presented at the 2024 WWDC was what Apple AI might look like if the LLM were to exist.

635. According to FE-1, Apple's leadership (definitely Federighi, but also likely Cook) began internal carry testing in or around December 2024/January 2025. FE-1 recalled that after Apple's leadership had a chance to test Apple AI during the internal carry stage, the word came down from Apple leadership that there was no way they could release Apple AI to the public in the state it was in at that time. FE-1 stated that Apple AI was nowhere near good enough for release as of December 2024.

636. By December 2024 or January 2025, the development of Apple AI was so far behind that FE-1's team decided to focus solely on supporting the specific features that were publicly promoted by

Cook in his keynote from the June 2024 WWDC. FE-1 was personally responsible for testing those use cases named by Cook publicly. FE-1 recalled that during testing of these features, certain features would work one day but would not work the next day. FE-1's job then became to focus on figuring out what was not working and why. FE-1 believes this occurred around the same time that Federighi and Cook were first able to use Apple AI on their phones/devices and made the decision that it was not going to work. FE-1 said Federighi was on the call with employees when the decision was announced that Apple leadership had decided to delay the release of Apple AI.

637. *Second*, a former Apple employee recounted to The Information that Siri team members had been surprised to see the demonstrations of Siri's purported features at the 2024 WWDC, as they had never seen working versions of these features. The only feature that had been successfully tested at the time of the 2024 WWDC was the glowing, rainbow-colored ribbon around the edge of the screen that indicated Siri's activation. Indeed, internal disputes about the fundamental structure of Apple's AI models were ongoing at the time Apple Intelligence was announced at the 2024 WWDC, as revealed by The Information. During the announcement and in the following months, Apple's AI and Machine Learning team members remained divided as to whether to build one large model or one small and one large model.

638. *Third*, citing sources within Apple, Bloomberg reported on March 7, 2025 that Federighi and other Apple executives had "voiced strong concerns internally that the features didn't work properly — or as advertised — in their personal testing."

639. *Fourth*, The New York Times reported on April 12, 2025, according to internal sources close to the project, that internal testing found Siri's responses to be inaccurate on nearly one third of requests.

640. *Finally*, a March 14, 2025 article from Bloomberg reported that Apple only had a barely working protype of the Apple Intelligence-powered Siri at the time of the 2024 WWDC and confirmed that the status of the upgraded Siri was well known among Apple leadership and the Siri team. In this article, Bloomberg reported that Walker, the senior director who had long overseen Siri, commented that the technology only worked correctly up to two-thirds to 80% of the time and that the delays to Siri had been "ugly" and "embarrassing." Walker further acknowledged that Apple had advertised the features before they were ready and laid "intense personal accountability" at the feet of Federighi and Giannandrea. Further confirming the widespread knowledge of Siri's true status, Walker commented to Siri engineers

that they may feel relief at the news of the delay, noting, "If you were using these features in the build, you were probably wondering: Are these ready? How do I feel about shipping these to our customers? Is this the right choice?" Walker also admitted that the delays were particularly "ugly" because Apple had already showed the promised features publicly, stating, "This was not one of these situations where we get to show people our plan after it's done. We showed people before."

641. These reports from well-placed insiders, when considered alongside the undeniable reality that Apple still has not released the "more personal" Siri features showcased at the 2024 WWDC, support a strong inference that Defendants Cook, Federighi, and Peterson were aware at the time of their false and misleading statements that Apple did not possess even a functioning prototype of the upgraded Siri and would not be able to release it as part of iOS 18.

642. ***The iPhone Is One of Apple's Core Operations***. That the alleged fraud related to the Apple Intelligence-powered Siri concerned the iPhone—a core operation of Apple's business—further contributes to a strong inference of scienter. The iPhone is Apple's most important and profitable product, as it consistently generates over 50% of the Company's annual net sales. The iPhone generated approximately 51.4% of the Company's net sales for FY 2024 and 50.4% of net sales for FY 2025, totaling $201.183 billion and $209.586, respectively. Apple consistently releases a new iPhone each fall, a yearly rollout that has become a global event. Not only is the iPhone central to Apple's revenue, it is instrumental to driving consumers into Apple's product ecosystem. Apple is reliant on sales of the iPhone to drive revenue generation through Apple Music, Apple TV, the App Store, Apple Care, and other products. In 2024, a Needham analyst estimated that 89% to 96% of Apple's revenues are dependent on the iPhone, through direct sales of the device and driving users to purchase other Apple products.

643. Since 2007, when Apple launched the first iPhone, the device has been synonymous with Apple's brand. The yearly fall launch of an updated iPhone model has become what TechRepublic described in November 2025 as "a global marketing juggernaut." According to TechCrunch, as of July 2025, three billion iPhones had been sold since the initial launch in 2007. In a 2018 article chronicling the first 10 years of the iPhone, WIRED wrote that not only was iPhone "the best-selling gadget every created," its invention has "reimagin[ed] the way we live."

644. Apple began to record slowing iPhone sales in 2022, when the Company reported a 2% decrease in sales of the devices from 2022 to 2023. In 2Q 2024, Apple disclosed that iPhone sales had declined approximately 10.46% as compared to 2Q 2023, contributing to an overall 4% decline in net sales. The Associated Press reported that this was the steepest quarterly decline in iPhone sales since a pandemic-related dip in 2020 and the fifth consecutive quarter in which Apple's revenue had declined relative to the previous year. In addition, a 2024 Consumer Intelligence Research Partners study reported that iPhone users were increasingly delaying device upgrades for more than two years, which threatened Apple's reliable sales boost from the yearly release of the new iPhone.

645. Disappointing iPhone sales came into sharper focus for analysts in 2023 and early 2024, as Google, Microsoft, and Amazon began announcing major developments in AI product offerings. For example, on July 19, 2023, following the announcements of Google's Bard and Microsoft's Copilot, Bloomberg wrote that Apple had been "conspicuously absent" from the AI race conversation and that Siri's ability had "stagnated" in comparison to competition. Bloomberg also reported that, according to sources within the Company, Apple had been growing increasingly worried about missing the "paramount shift" in the way consumers interact with personal electronic devices. As pressure mounted on Apple to bring AI to the iPhone, Citi wrote on October 5, 2023 that competition could force Apple to release its own suite of AI and machine learning features "sooner than later."

646. The importance of a return to growth in iPhone sales is reflected in the analyst commentary leading up to the 2024 WWDC. Expectations that Apple would introduce a new version of Siri powered by AI caused huge excitement among analysts. For example, on June 4, 2024, Morgan Stanley wrote that while investor expectations were high, "Apple could positively surprise, helping to unlock pent-up demand, accelerate iPhone replacement cycles, and sustain recent stock outperformance." The report went on to note that the introduction of AI, "spearheaded by a rebuilt Siri," would "drive a return to Y/Y unit growth for the first time since FY22." In 2024, the market was laser-focused on Apple's anticipated AI announcements and how the new features would revitalize iPhone sales.

647. Sales of the iPhone in FY 2024 and FY 2025 were thus of central importance to Apple's net sales and overall revenue.

648. ***Defendants Made Repeated Statements Regarding the Apple Intelligence-Powered Siri, Including in Response to Analyst Questions***. As detailed above in Sections IV.E, V.B, and VI.B, Defendants repeatedly made public statements regarding the functionality of a new, Apple Intelligence-powered Siri and represented that these new features would be available for use on the iPhone 16, presenting a "compelling" reason for consumers to upgrade their phones. Defendants' public statements during the Class Period strongly and plausibly suggest that each had detailed knowledge of, or access to, the material facts and information misrepresented or concealed by Defendants, or that they were severely reckless in failing to investigate the very issues they spoke about publicly.

649. Apple's June 10, 2024 WWDC announcement of Apple Intelligence was heralded by analysts as the Company's most consequential announcement in a decade, and produced a wave of excitement for an iPhone upgrade supercycle. Following the 2024 WWDC, Defendants touted forthcoming Apple Intelligence features, headlined by the upgraded Siri, in press releases, interviews, and during earnings calls.

650. In a press release published June 10, 2024, titled *Introducing Apple Intelligence, the Personal Intelligence System That Puts Powerful Generative Models at the Core of iPhone, iPad, and Mac*, Apple made several explicit statements about the new, more personal functionality of Siri. Among other things, the press release stated, "With richer language-understanding capabilities, ***Siri is more natural, more contextually relevant, and more personal, with the ability to simplify and accelerate everyday tasks***."

651. During a June 10, 2024 interview with technology influencer SuperSaf, Defendant Cook touted Apple Intelligence's personal context features—the main selling point of the new Siri. In response to a question about what made Apple's AI different, Cook stated:

> ***It's different in that we have personal context, and so Apple Intelligence understands you and is relevant to you, it's, it's not only world knowledge, it's also private***. . . . ***And so between having personal context and privacy this makes it very unique*** . . . . It's embedded in Notes, it's embedded in Mail . . . Messages, . . . it's all over the place.

652. On October 22, 2024, during an interview with The Wall Street Journal, Defendant Federighi was asked, "Is Siri gonna finally live up to th[e] promise [of being an intelligent assistant]?" In response, Federighi stated, "The great news is Siri is useful today . . . but ***it's getting more and more useful***

***because this power of Apple Intelligence and large language models means that Siri can understand you better than ever before and is gonna have access to more tools on your device to do more for you than ever before***." When the journalist followed up, "Where is this smarter Siri?," Federighi answered, "Coming. It's coming in waves . . . . So with Apple Intelligence we've created this foundation that understands personal context and the ability to take action. ***Siri is adopting that in stages and will benefit in stages over the coming year***."

653. Further, analysts asked Defendant Cook directly about the potential of Siri and the iPhone upgrade cycle on multiple occasions. For example, during Apple's 3Q 2024 earnings conference call on August 1, 2024, Defendant Cook was asked by a Goldman Sachs analyst about indications of a strong iPhone upgrade cycle. In response, Cook stated, "We are very excited about Apple Intelligence and what it brings, and ***it's another compelling reason for an upgrade***. . . . ***I believe it will be a very key time for a[] compelling upgrade cycle***." During the same call, a Citigroup analyst asked Cook directly about whether the advertised features would be part of iOS 18, or if they would be delayed until the launch of iOS 19 in 2025. In response, Cook reaffirmed the timeline for the release of the AI features.

654. During Apple's FY 2024 earnings call on October 31, 2024, a UBS analyst asked Cook about the staged rollout of Apple Intelligence and the possible consequences for the iPhone upgrade cycle. Cook answered, "In terms of the demand curve. I would just say that what we believe here is that ***it's a compelling reason for upgrading***."

655. As discussed above, at the time of these statements, Defendants knew or had access to information demonstrating that Apple did not have a functional model of the Apple Intelligence-powered Siri and that the upgraded Siri was nowhere close to being released.

656. ***Defendants Made False and Misleading Statements Regarding the Apple Intelligence-Powered Siri Shortly Before the Disclosures***. The temporal proximity between Defendants' false and misleading statements and subsequent disclosures revealing that the rollout of Apple's upgraded Siri would be delayed bolsters the strong inference that Defendants knew, or were deliberately reckless in not knowing, that their statements were false and misleading when made. On January 30, 2025, Apple released its 1Q 2025 financial results. In his prepared remarks, Defendant Cook promised, "***we'll continue to roll out more features in the future, including an even more capable Siri***." Cook then touted the appeal of

this promised new version of Siri, stating, "I think the killer feature is different for different people. But I think for most, they're going to find that they're going to use many of the features every day. ***And certainly, one of those is Siri, and that will be coming over the next several months***."

657. Less than five weeks later, Apple announced that the rollout of the updated Siri AI features would be delayed. In a statement provided to a select number of media outlets by Apple spokesperson Jacqueline Roy, Apple admitted that with respect to the "more personalized Siri . . . [i]t's going to take us longer than we thought to deliver on these features and we anticipate rolling them out in the coming year," i.e., the features would not be released in 2025 as part of iOS 18 as the Company had repeatedly affirmed.

**C. Subsequent Events Support an Inference of Defendants' Scienter**

658. The sudden resignation of Fischer and demotion of Defendant Maestri during the Class Period, as well as the resignations of Giannandrea and Adams after the Class Period strengthens the strong inference of scienter.

659. On August 21, 2024, after 21 years at Apple and 15 years running the App Store, Fischer announced that he was resigning as the Vice President of the App Store, purportedly as part of a reorganization effort. According to Bloomberg, the resignation was in response to global regulatory scrutiny of the App Store. Fischer's departure came merely three months after his testimony during the May 2024 evidentiary hearing. As Goldberg testified during the February 2025 hearing, the sentiment within Apple was that Fischer should be fired because of his testimony at the May hearing.

660. On August 26, 2024, Apple announced via press release that after a decade as CFO, Defendant Maestri would be "transitioning" to instead lead the Corporate Services teams. This announcement came just three months after the May 2024 hearing, supporting the inference that Maestri was removed from his long-time role as CFO because of the Injunction proceedings. As would later be revealed, Maestri had personally advocated for Apple's anticompetitive 27% commission on link-out purchases, which both Judge Gonzalez Rogers and the Ninth Circuit found to be a clear violation of the Injunction.

661. On December 1, 2025, The New York Times reported that Giannandrea would be retiring from his role as Senior Vice President of Machine Learning and AI Strategy, in a move widely attributed to Apple's failure to release its updated AI-enabled Siri. The New York Times wrote that "[t]he change in

leadership is the latest example of Apple's nearly decade-long struggle to develop cutting-edge A.I. products." Giannandrea had already been ousted as the head of Siri in March 2025, and Bloomberg's March 14, 2025 article detailing the all-hands meeting led by Walker reported that there was "intense personal accountability" on the part of Giannandrea and Federighi.

662. On December 4, 2025, Apple announced via press release that Adams would be retiring after eight years as Apple's general counsel, effective March 1, 2026. As CNBC noted, during Adams' tenure, Apple was confronted with increasing regulatory scrutiny around the world, namely the U.S. litigation regarding the App Store. As Bloomberg noted, Adams' departure was particularly jarring, "especially considering the number of Apple legal disputes currently on her plate."

### D. Defendants Cook and Maestri Were Financially Motivated to Mislead Investors

663. Defendants Cook and Maestri were motivated to make their false and misleading statements by short and long-term performance-based incentives that were part of their compensation from Apple. These performance-based incentives were tied to Apple's net sales, operating income, and stock price such that Defendants Cook and Maestri had a personal financial motive to: (i) boost iPhone sales by falsely claiming that highly sought-after AI features would be available for use on the iPhone 16; (ii) avoid the loss of App Store revenue that the Company would suffer had it complied with the Injunction; and (iii) thereby artificially inflate the price of Apple common stock.

664. As reflected in Apple's Notice of 2025 Annual Meeting of Shareholders and Proxy statement, filed with the SEC on January 10, 2025, Cook and Maestri were each eligible for a Cash Incentive Plan award in FY 2024 that was keyed off the Company's net sales and operating income. According to the Company's FY 2024 10-K, Apple's operating income consists of net sales to third parties, related cost of sales, and operating expenses. Operating income therefore benefits from higher net sales.

665. Under the terms of the 2024 Cash Incentive Plan, both Cook and Maestri were eligible for a payout equal to 200% of their respective annual base salaries if Apple met the "maximum" result for net sales and another payout equal to 200% of their respective annual base salaries if Apple met the "maximum" result for operating income. The net sales "maximum" for FY 2024 was $390 billion and the operating income "maximum" was $118.7 billion. For FY 2024, Apple reported net sales of $391 billion

and operating income of $123.2 billion, resulting in the maximum 200% payout on each metric to both Cook and Maestri—i.e., $12 million to Cook and $4 million to Maestri.

666. By knowingly or recklessly misleading the market as to Apple's compliance with the Injunction and the true status of the Apple Intelligence-powered Siri upgrades, Defendants inflated the Company's 2024 net sales and operating income, which increased Cook's and Maestri's cash incentive payouts.

667. As described fully in Section IV.B above, Defendants' repeated claims that Apple was in compliance with the Injunction misled the market that risks to Apple's App Store revenue from forced changes to the App Store's operation were not as serious as they were in reality. By imposing anti-competitive restrictions in violation of the Injunction, Apple was able to temporarily shield its App Store revenue from forced changes that would have potentially reduced the Company's commission rate to as low as zero.

668. As detailed above in Section IV.E, slowing iPhone sales had been a major concern for analysts and industry commentators since 2022. This concern was intensified by the widening gap between Apple and its competitors in AI development. When Apple announced Apple Intelligence and a "more personal" Siri at the 2024 WWDC, analysts celebrated the announcement as the herald of an iPhone "supercycle." Analysts anticipated that the AI offerings, exclusive to the iPhone 16 and iPhone 15 Pro and Pro Max, would cause a wave of device upgrades and revitalize Apple's flagging iPhone sales. Indeed, analysts reported that the Apple Intelligence-powered Siri was "was the Apple Intelligence feature prospective new model iPhone buyers . . . were most interested in."

669. Defendants' false and misleading statements regarding Apple's compliance with the Injunction and the availability of an Apple Intelligence-powered Siri for the iPhone 16, which was released on September 20, 2024, resulted in higher net sales for 2024. Apple's FY 2024 10-K reported a 3% increase in net sales in the Americas segment over FY 2023, which the Company attributed "primarily to higher net sales of Services." In a report from September 16, 2024, just after presales of the iPhone 16 began, an Evercore ISI analyst reported that demand for the device was the strongest in the United States and United Kingdom, where Apple Intelligence features would be available the soonest. Two days after the official release of the iPhone 16, JP Morgan noted that overall demand for the new model was "healthy."

670. Defendants Cook and Maestri also benefitted from Apple's artificially inflated stock price during FY 2024 through their receipt of equity awards. For FY 2024, both Cook and Maestri were eligible for long-term equity awards that included both performance-based and time-based Restricted Stock Units ("RSUs"). Apple only awards performance-based RSUs if the Company's total shareholder return ("TSR") is above the 55th percentile of the S&P 500 during the designated performance period. To determine TSR, the change in stock price value from the beginning to the end of the performance period is divided by the stock price value at the beginning of the period. Performance-based RSUs vest as shown in the chart below.

| Relative TSR Percentile v. S&P 500 Companies | Performance-Based RSUs Vesting as a Percentage of Target |
|---|---|
| 85th Percentile or above | 200% |
| 55th Percentile | 100% |
| 25th Percentile | 25% |
| Below 25th | 0% |

671. Because of Apple's artificially inflated stock price during FY 2024 due to Defendants' fraud, the Company's TSR relative to other companies in the S&P 500 for FY 2024 was at the 70.77th percentile, helping to place Apple in the 81.20th percentile for the three-year performance period ending with the last day of Apple's FY 2024. As a result, Cook and Maestri each vested in 187% of the target performance RSUs granted in 2021—amounting to an award of 477,301 RSUs to Cook and 127,282 RSUs to Maestri.

672. On October 2, 2024, Cook sold 223,986 of the shares of Apple common stock he received through the vesting of his RSUs for proceeds of $50,276,354.68, and the remaining 253,315 shares were withheld to satisfy his tax obligations with respect to the awarded shares. Cook's October 2, 2024 sales were made pursuant to a Rule 10b5-1 plan that was entered into on May 24, 2024.

673. On October 4, 2024, Maestri sold 59,305 of the shares of Apple common stock he received through the vesting of his RSUs for proceeds of $13,433,768.60, and the remaining 67,977 shares were withheld to satisfy his tax obligations with respect to the awarded shares. Maestri's October 4, 2024 sale was made pursuant to a Rule 10b5-1 plan entered into on November 11, 2023.

674. Notably, Cook's and Maestri's stock sales came just two weeks after Apple had released the iPhone 16 on September 20, 2024, and updated its website to claim that Apple Intelligence, headlined by an updated Siri, was "Coming this fall." *See* ¶¶ 384-85 and 543.

### E. Defendants Acted in Bad Faith in Designing the Link Entitlement Program, Lied About It, Then Attempted to Conceal Their Deliberate Violations of the Injunction from the Court

675. As Judge Gonzalez Rogers found, "Apple *willfully* chose to ignore the Injunction, *willfully* chose to create and impose another supracompetitive rate and new restrictions, and thus *willfully* violated the injunction." (emphasis in original). Then, beginning with the Notice of Compliance on January 16, 2024, Defendants repeatedly lied about Apple's Link Entitlement program and compliance with the Injunction—both to the Court and to investors—only to have their fraud uncovered through the February 2025 hearing and April 2025 Order. This evidence readily establishes Defendants' scienter.

676. Defendants' true motivations are revealed in notes from a June 26, 2023 meeting held in preparation for the June 28, 2023 Epic Injunction Implementation meeting—one week before the anticipated Injunction go-live date of July 5, 2023.

677. In discussing Apple's new commission on link-out purchases, the notes state that "[i]n addition to the Wisconsin materials [i.e., Apple's new Guidelines], we will be doing a legal filing at the same time the materials go up." The notes state that "*[w]e will also have the legal filing to point reporters to*," cautioning that "*[t]his is all going to play out in public*." The notes warn that "Epic will get our legal filing," and "[t]hey will wake up on the 5th." The notes further state that "*[t]he AG group report will back up Matt Fischer's attestation*," and that "*[h]e is going to have to justify this*."

678. As these internal notes demonstrate, Defendants' plan from the outset was to affirmatively misrepresent compliance with the Injunction while fashioning after-the-fact "back up" support and ways to "justify" the anticompetitive features of the Link Entitlement program. Contrary to their public claims, Defendants knew that the Link Entitlement program "*will likely not make economic sense for the vast majority of developers with the 3% discount*," a fact expressly acknowledged in an "Epic Injunction Implementation" presentation to Defendant Cook on June 1, 2023.

679. In other words, Apple knew that the Link Entitlement program would frustrate the purpose of the Injunction, which was to *increase* competition with IAP. Oliver confirmed this in his February 2025 testimony:

> **Q.** And what you're saying here, or what your team was saying here back in May [2023], is that creating that competitive pressure, which is the goal of the injunction, is a risk factor, a key risk factor, correct?
>
> **A.** *We didn't say it in those words, but yes*.

680. As Apple anticipated, on March 13, 2024, Epic moved to enforce the Injunction and hold Apple in contempt. In response, on April 12, 2024, Apple claimed that it had implemented "***a comprehensive regime that complies with the letter and spirit of the Injunction***" and that "***Apple's framework for injunction compliance was implemented . . . after extensive study, for the benefit of all platform participants***." Defendants repeated these claims in Apple's SEC filings, in testimony during the May 2024 hearing, and in other court filings. As shown above, Apple's internal documents directly contradict Defendants' claims about Apple's compliance with the Injunction.

681. In addition to misrepresenting its compliance with the Injunction and the basis for its Link Entitlement program, Apple sought to conceal evidence of its violations of the Injunction from Judge Gonzalez Rogers. As the April 2025 Order found, "Apple engaged in tactics to delay the proceedings." For example, in a September 27, 2024 order, Magistrate Judge Hixson found that "Apple knew it wasn't on track to make the substantial completion deadline and *kept that a secret*," describing this as "*bad behavior*."

682. As part of its efforts to delay and conceal evidence, Apple asserted privilege over more than a third of responsive documents. Magistrate Judge Hixon found Apple's privilege claims to be largely unsubstantiated, and Apple eventually withdrew over 42% of its privilege claims following an extensive "re-review" of purportedly privileged documents with the assistance of three special masters. On February 4, 2025, Judge Gonzalez Rogers found that "Apple's over-designation of privilege was inconsistent with Ninth Circuit law and was the source of the current delay," and stated that the court would "consider what sanctions are warranted in the context of a full record and its overall findings."

683. In a further attempt to conceal evidence of its non-compliance with the Injunction, on October 11, 2024, Apple filed a motion "to modify the Court's witness admonitions so that witnesses required to testify at any further evidentiary hearing may be given the opportunity to review with counsel documents produced during discovery and assist with Apple's defense."

684. Judge Gonzalez Rogers had previously ordered that "witnesses [who testified in May 2024] shall refrain from discussing the decision-making process leading to the link entitlement program and associated commission rates." During a November 4, 2024 status conference, Judge Gonzalez Rogers denied the motion, rejecting Apple's attempt to influence witness testimony:

> *[Y]our folks came in here [in May 2024] and they told me how and why they did what they did, and I expect, from your perspective, the documents will be consistent with that testimony*. If it's not consistent with that testimony, they don't get to . . . avoid what the document say. . . . I need to have this proceeding done in a way that gives me the most assurance that . . . *we're getting to the truth of what happened*.

685. Based on testimony during the February 2025 hearing and the documents Apple grudgingly produced in discovery, in the April 2025 Order, Judge Gonzalez Rogers found that Apple attempted to deceive the Court regarding its response to the Injunction, including as to its true motivations and decision-making process with respect to each component of the Link Entitlement program.

686. *First*, with respect to Apple's link-out commissions, Judge Gonzalez Rogers found that "*Apple hid its decision-making process from the Court only to have it uncovered at the second evidentiary hearing in 2025*." While Apple framed its 27% commission on link-out purchases as a discount on its standard 30% IAP commission, this was only true in the "outward facing/public sense—27% is less than 30%," because "Apple also knew that any such opportunity vanishes in the face of external costs and thus was not viable for developers." As Judge Gonzalez Rogers found, "[t]he evidence uncovered in the 2025 hearing demonstrated Apple's knowledge and expectation that the restrictions would effectively dissuade any real developer participation, to Apple's economic advantage." In short, "*Apple willfully set a commission rate that in practice made all alternatives to IAP economically non-viable*," "understood [the commission] would not comply with the goal of the Injunction," but nonetheless "chose to impose a new commission representing the most anticompetitive option considered."

687. In addition to concealing its true, anticompetitive rationale for imposing the 27% commission, Judge Gonzalez Rogers found that "during the first May 2024 hearing, *Apple employees attempted to mislead the Court by testifying that the decision to impose a commission was grounded in [Analysis Group's] report*," even though "[n]o references to the study appear in any of the materials upon which Apple relied in its meetings leading up to its July 5, 2023 decision to impose a 27% commission." Contrary to Apple's claims, "[t]he [Analysis Group] report's recommendation of a commission rate on link-out transactions as the basis for its commission determination is *entirely manufactured*, and *Apple's reliance thereon is a sham*."

688. Judge Gonzalez Rogers found that "the testimony of Mr. Roman, Vice President of Finance," who testified in May 2025 and submitted a sworn declaration regarding Apple's purported reliance on the Analysis Group, "*was replete with misdirection and outright lies*" and "*manifest[ed] an intent to mislead, misdirect, and lie*."

689. For example, Roman testified in May 2024 that "Apple did not look at comparables to estimate the costs of alternative payment solutions that developers would need to procure to facilitate linked-out purchases," but the February 2025 hearing revealed that "Apple *did* consider the external costs developers faced when utilizing alternative payment solutions for linked out transactions, which conveniently exceeded the 3% discount Apple ultimately decided to provide by a safe margin." (emphasis in original). Despite ample opportunity, "[n]either Apple, nor its counsel, corrected the, *now obvious, lies*," nor sought "to withdraw the testimony or to have it stricken," so Judge Gonzalez Rogers ruled that "*Apple will be held to have adopted the lies and misrepresentations to this Court*."

690. *Second*, Judge Gonzalez Rogers found that Apple's claims "[i]n its notice of compliance and at the May 2024 hearing . . . that restrictions on link placement protect against 'security risks' . . . *attempted to mislead*" since "[n]o real-time business documents credit that view." "Given the lack of any document identifying this alleged concern," Judge Gonzalez Rogers found "these justifications pretextual; said differently, the proffered rationales are nothing more than after-the-fact litigation posturing or *outright misrepresentations to the Court*." Judge Gonzalez Rogers similarly found that Apple's defense of its link design restrictions—claiming that the goal was for External Purchase Links to resemble what consumers were used to seeing—was misleading, given that in February 2025, "Apple's own witness Mr. Fischer

testified that he could think of no other reason to require developers to use a plain-link-style 'button' other than to stifle competition."

691. *Third*, contrary to Apple's claim that it designed the system disclosure sheet to allow users to "make an informed decision," Judge Gonzalez Rogers found that its true purpose was "deterring users as much as possible from completing a linked-out transaction . . . to maintain [Apple's] revenues and stifle competition." Judge Gonzalez Rogers specifically found that Onak's testimony that "'scary' is a term of art that 'means raising awareness and caution and grabbing the user's attention'" was "*not credible* . . . given reason, common sense, and the totality of the admitted exhibits."

692. *Fourth*, while "Apple claimed the static URL requirement protects users' security and privacy," Judge Gonzalez Rogers found that "Apple understood well that breakage increases with additional friction in the purchase flow" and so "chose the most anticompetitive option to reduce the efficacy of external link-outs that compete with IAP."

693. *Fifth*, Judge Gonzalez Rogers found that, despite testimony to the contrary, "Apple chose the most anticompetitive option" in prohibiting developer calls to action beyond "one of five templates." In fact, "Apple recognized . . . that unlinked and unrestricted calls to action could foster competition against Apple's IAP" and assessed the revenue impact of allowing unrestricted calls to action at potentially over a billion dollars.

694. *Sixth*, Judge Gonzalez Rogers found that Apple "workshopped how to articulate the rationale for VPP and NPP program exclusion from the Link Entitlement" because "Apple acknowledged that excluding these developers from the program would deter adoption of link-out purchases." Once again, "Apple chose the most *anti*competitive course." (emphasis in original).

695. *Finally*, given the many anticompetitive restrictions Apple imposed, Judge Gonzalez Rogers found that Apple "*attempted . . . to mislead*" when it claimed at the May 2024 hearing that "it would take more time for developers to take advantage of the Link Entitlement and that the adoption rates could not be known." In truth, "Apple modeled the lack of adoption" and "knew it was choosing a course which would fail to stimulate any meaningful competition to Apple's IAP and thereby maintain its revenue stream."

696. Given the extensive evidence showing Apple's deliberate violations of the Injunction, Judge Gonzalez Rogers found in the April 2025 Order that Apple's "*motive [was] to protect its illegal revenue stream and institute a new de facto anticompetitive structure, and then create a reverse-engineered justification to proffer to the Court*," which "cannot, in any universe, real or virtual, be viewed as [a] product of good faith or a reasonable interpretation of the Court's orders."

697. Judge Gonzalez Rogers' finding of Apple's bad faith was affirmed by the Ninth Circuit. On appeal, the Ninth Circuit found that "*Apple's bad faith negates a good-faith defense*." In particular, the Ninth Circuit found that Apple's bad faith was shown by the fact that "*Apple 'attempted to mislead' in its Notice of Compliance and May 2024 hearing with 'pretextual' justifications*."

## VIII. <u>LOSS CAUSATION</u>

698. As a result of Defendants' materially false and misleading statements, omissions of material fact, and fraudulent course of conduct, Apple's common stock traded at artificially inflated prices during the Class Period. Relying on the integrity of the market price for Apple common stock, and public information related to Apple, Lead Plaintiff and other Class members purchased or otherwise acquired Apple common stock at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact and fraudulent course of conduct alleged herein. As a result of their purchases or acquisitions of Apple common stock during the Class Period at artificially inflated prices, and the removal of the inflation upon the disclosures set forth below, Lead Plaintiff and the Class suffered economic losses (i.e., damages) under the federal securities laws.

699. Defendants' false and misleading statements, material omissions, and fraudulent course of conduct directly and proximately caused Apple common stock to trade at artificially inflated prices during the Class Period, closing as high as $259.02 per share on December 26, 2024. Defendants' misrepresentations and omissions of material fact and fraudulent course of conduct directly and proximately caused artificial inflation in the price of Apple common stock and/or served to maintain the price of Apple common stock at an artificially inflated level.

700. Absent Defendants' misrepresentations and omissions of material fact and fraudulent course of conduct, Lead Plaintiff and other Class members would not have purchased or otherwise acquired their Apple common stock at the artificially inflated prices at which they traded. It was entirely foreseeable

to Defendants that misrepresenting and concealing material facts from the public and engaging in a fraudulent course of conduct would artificially inflate the price of Apple's common stock and/or maintain artificial inflation in the price of these securities. The economic losses (i.e., damages suffered by Lead Plaintiff and other Class members) were a direct, proximate, and foreseeable result of Defendants' materially false and misleading statements and omissions of material fact and fraudulent course of conduct, which artificially inflated the price of Apple's common stock and/or maintained artificial inflation in Apple's common stock, and the subsequent significant decline in the price of Apple's common stock when the relevant truth was revealed and/or the risks previously concealed by Defendants' material misrepresentations and omissions and fraudulent course of conduct materialized, as set forth below and in Sections IV.C and IV.F.

701. Lead Plaintiff and other Class members suffered actual economic loss and were damaged when the material facts and/or the foreseeable risks concealed or obscured by Defendants' misrepresentations and omissions and fraudulent course of conduct were revealed and/or materialized through the disclosure of new information concerning Apple on: February 24-26, 2025; March 7, 2025; March 12, 2025; April 3, 2025; and April 30-May 1, 2025. As alleged in this Section, the disclosure of the relevant truth and/or materialization of the foreseeable risks concealed by Defendants' misrepresentations and omissions and fraudulent course of conduct directly and proximately caused foreseeable declines in the price of Apple's common stock by removing the artificial inflation in the price of these securities that resulted from Defendants' fraud. The timing and magnitude of the declines in the price of Apple's common stock, as detailed herein, negate any inference that the loss suffered by Lead Plaintiff and the Class was caused by changed market conditions or other macroeconomic factors unrelated to Defendants' misrepresentations and omissions and fraudulent conduct.

**A. February 24-26, 2025**

702. On February 24-26, 2025, investors began to learn the relevant truth concealed by Defendants' misrepresentations and omissions and fraudulent course of conduct regarding Apple's violations of the Injunction, and the risks previously concealed by Defendants' fraud gradually materialized.

703. On February 24, the three-day evidentiary hearing before Judge Gonzalez Rogers began, and the court heard testimony from Schiller. Schiller testified that he was concerned that the decision to implement a new 27% commission on purchases made outside of the App Store violated the Injunction, testifying that he had stated to his Apple colleagues in June 2023 that if Apple charged a commission on external App store commissions, it would run afoul of the Injunction. Schiller also admitted that the specific 27% commission and seven-day session window Apple chose as part of the Link Entitlement program presented a "a significant compliance risk" and that internally, Apple viewed the other restrictions it imposed as part of the Link Entitlement program as a "compliance risk." Schiller further testified that Apple determined that the 27% commission on link-out purchases would lead to minimal adoption of the Link Entitlement program due to the cost of link-out payments exceeding 3%.

704. Media outlets reported on Schiller's testimony later that day. In an article published after market close on February 24, 2025, titled *Apple Executive Testifies App Store Fees Risked Violating Court Order*, Bloomberg reported that "Apple Inc. believed there was a 'significant' risk it would fail to comply with a court order to allow mobile app developers to steer customers to payment methods outside the company's App Store when it added a new commission for those purchases." The article further reported that, according to Schiller, "there were multiple people involved in the process, including Chief Executive Officer Tim Cook."

705. An article published by TechCrunch after-market hours on February 24, 2025 also reported on Schiller's testimony, stating that Schiller had testified that "he initially objected to commissions on these outside purchases," but "[d]espite the initial concerns Schiller raised, a pricing committee that included Apple CEO Tim Cook, former CFO Luca Maestri, and Apple's legal team, alongside Schiller, ultimately decided to charge developers a commission on these outside purchases." The article noted that "[d]ocuments referenced in court indicated that Apple analyzed the financial impact on developers who chose to link out to their own websites," and that "Apple worked to determine how the 'less seamless experience' of using a non-IAP method would lead customers to abandon their transactions . . . which would push them back to using IAP." The article further reported that "[l]awyers suggested Cook himself was involved with how the warning to App Store customers would appear," and that the language "was updated to subtly suggest there could be privacy or security risks with purchases made on the web."

706. In an article published in the evening of February 24, 2025, the Associated Press reported "[d]uring his testimony, Schiller also confirmed that Cook pushed for a warning screen informing consumers [of] the potential security threats posed by alternative payment options," and stated that Judge "Gonzalez Rogers is now considering whether to hold Apple in contempt of court and order the . . . company to make more drastic changes," noting that additional testimony, including from Oliver, would occur the following days.

707. An article published by AppleInsider the evening of February 24, 2025 stated that "*Schiller's concerns were only made public on Monday when the Apple executive testified in court*," and further reported that "[t]he case is set to continue with additional hearings on Tuesday and Wednesday. Carson Oliver, an Apple employee who worked under Phil Schiller, is among those scheduled to testify." AppleInsider also stated that "*[i]t remains to be seen whether Judge Gonzalez Rogers will ultimately find Apple in contempt of court for violating the existing anti-steering injunction*."

708. Then, during the second day of testimony on February 25, 2025, Oliver testified that Apple identified "competitive pressure" as a "key risk factor" in fashioning its response to the Injunction. Oliver further testified that "there were people advocating no commission," including Schiller, "and other people advocating a 27 percent commission," including "Luca Maestri and Alex Roman," and that he informed Defendant Cook that Apple's decision to charge a commission would directly impact the adoption rate of link-out purchases. Oliver also testified that Apple identified "reduce[d] financial risk" as a "benefit" of charging a 27% commission on link-out purchases, and the lack of "price competition" as a "risk" to this approach. According to Oliver, the impact on Apple's App Store revenue was a key factor in the Company's decision to charge the 27% commission and this even temporarily, "*would save Apple hundreds of millions if not billions of dollars*."

709. In the wake of the February 24 and 25 testimony, Washington Analysis published a report on February 26, 2025, titled *Second Day of Apple/Epic Contempt Hearing Highlights Materiality of Apple's Epic Injunction Risks*, stating that "*[d]ay two of the resumed Epic/Apple contempt hearing provided fresh insights into the materiality of Apple's risks from the Epic litigation*." The report noted that while Oliver's "[t]estimony suggested that Apple's U.S. App Store risks measured in the 'hundreds of millions if not billions,'" "we think these figures may low-ball the impact if Apple is both barred from

collecting commissions on link-outs and also forced to allow a more developer/user-friendly link-out interface." The report further stated that the testimony on February 25, 2025 revealed "[o]ther new details includ[ing] Apple's worries about global contagion risk and vulnerabilities related to a high concentration of App Store revenue in a small cohort of large developers and high-spend users." Washington Analysis concluded that there was "a 90% probability that Apple will be found to have violated the injunction and a 65% probability that Apple will be prohibited from charging commission on linked-out purchases, with higher confidence now on both fronts."

710. On February 26, 2025, while investors were responding to the information revealed during the first two days of testimony, additional Apple witnesses testified. In particular, Vij testified that Apple modeled that "*that there could be billions of dollars diverted from IAP to web purchases*" if it failed to limit link-out purchases through commissions and other restrictions. Even under a "middle ground" scenario, Vij testified that Apple's modeling showed that "*a very significant fraction of the App Store U.S. store revenue*" could be lost. Schiller was then recalled as a witness, during which Judge Gonzalez Rogers questioned him about Apple's purported basis for setting its 27% commission. During this questioning, Judge Gonzalez Rogers strongly indicated that she believed that Apple's 27% commission was unjustified, stating that Apple had presented "*zero analysis that justifies*" the commission.

711. Following these disclosures on February 24-26, 2025, the price of Apple common stock declined by $6.68 per share, or 2.7%, from a closing price of $247.04 on February 25, 2025, to a closing price of $240.36 on February 26, 2025.

712. On February 27, 2025, Washington Analysis issued a report, titled *Epic/Apple Injunction Decision Coming 'Quickly' and Likely Will Be a Humdinger*. The report warned that Apple "will be dealt a harsh ruling," and that the court could order "no commissions on link-outs." The report concluded that "even middle-of-the-road compliance scenarios could be a severe hit to Apple's US App Store revenues," noting that "Apple modeled 'hundreds of millions' of revenue loss for just 5% of billings from the top 200 developers being diverted away from in-app purchasing."

**B. March 7, 2025**

713. On March 7, 2025, investors began to learn the relevant truth concealed by Defendants' misrepresentations and omissions and fraudulent course of conduct regarding Apple's new Apple

Intelligence-powered Siri, and the risks previously concealed by Defendants' fraud gradually materialized. On that day, Apple spokesperson Jacqueline Roy provided a statement to several media outlets announcing that the rollout of Apple's updated Siri AI features would be delayed. The statement read:

> Siri helps our users find what they need and get things done quickly, and in just the past six months, we've made Siri more conversational, introduced new features like type to Siri and product knowledge, and added an integration with ChatGPT. We've also been working on a more personalized Siri, giving it more awareness of your personal context, as well as the ability to take action for you within and across your apps. It's going to take us longer than we thought to deliver on these features and we anticipate rolling them out in the coming year.

714. That same day, Apple pulled the Bella Ramsey Siri AI ad.

715. In an article titled *Apple Delays Siri Upgrade Indefinitely as AI Concerns Escalate* also published on March 7, 2025, Bloomberg reported with respect to the delay in the promised updates to Siri that Apple engineers had been "racing to fix a rash of bugs in the project" since mid-February 2025 but had been unsuccessful. Bloomberg further reported that people involved in these efforts now believed that the updated Siri would not be released until 2026. According to Bloomberg, these people also stated that "in the lead-up to the latest delay . . . Federighi and other executives voiced strong concerns internally that the features didn't work properly — or as advertised — in their personal testing." In addition, Bloomberg reported that there were "concerns internally that fixing Siri will require having more powerful AI models run on Apple's devices," which would put strain on the hardware and mean that the Company would either have to reduce the set of features or make the models run more slowly, and it would also have to upgrade the hardware capabilities of future products so that the features could function properly. In anticipation of customer frustration with the delay, Bloomberg reported that Apple had sent its AppleCare support staff the following guidance: "If customers ask about the timing of these Siri features, reiterate that we anticipate rolling them out in the coming year."

716. Analysts reacted negatively to the announced delay in the rollout of Apple's "more personalized Siri," noting that this delay would likely result in fewer iPhone sales in calendar year 2025. For example, in a March 10, 2025 report titled *Mid-Q Update – Lowering Estimates on Delayed Siri Upgrade*, Citi lowered its estimate of CY 2025 iPhone sales from +5% to +2% "to reflect a delay in the much-anticipated Siri upgrade as part of iOS 18.4 update in April." Citi reported that prior to the

announcement, "[t]he expectation has been that the big update of Siri with on-screen awareness, personal context and deep app integration will be released sometime this April/May" but that "the company sees delay in these features and now expects to roll it out in the coming year, which we view as a negative as it would have been a catalyst to drive up higher refresh this year." Citi further reported that "[w]hile Apple Intelligence utility is different for different people, an upgraded Siri would have driven a higher iPhone refresh this year, in our view."

717. Following these disclosures, Apple common stock declined $11.59 per share, or 4.8%, from a closing price of $239.07 on March 7, 2025, to a closing price of $227.48 on March 10, 2025.

**C. March 12, 2025**

718. On March 12, 2025, investors continued to learn the relevant truth concealed by Defendants' misrepresentations and omissions and fraudulent course of conduct regarding Apple's new Apple Intelligence-powered Siri, and the risks previously concealed by Defendants' fraud gradually materialized. On that day, Morgan Stanley issued a report titled *Fewer (A)pple (I)ntelligence Catalysts Temper Upgrade*. Morgan Stanley reported that Apple's delay in releasing an updated Siri would negatively impact the rate that users upgraded to the iPhone 16, resulting in a lower-than-expected upgrade rate for FY 2026 and causing Morgan Stanley to reduce its price target for Apple by $23, from $275 to $252. Specifically, Morgan Stanley reported that "[t]he delayed rollout of a more advanced Siri means Apple will have fewer features to accelerate iPhone upgrade rates in FY26."

719. The report presented evidence, based on data from Morgan Stanley's 2024 AlphaWise Smartphone survey that "~50% of iPhone owners that didn't upgrade to an iPhone 16 acknowledged that the delayed Apple Intelligence rollout had an impact on their decision not to upgrade." Morgan Stanley therefore reported, "Given our prior iPhone forecast assumed the iOS18.4 launch in April '25 would integrate a more advanced Siri alongside broader Apple Intelligence language support and accelerate upgrade rates this fall, we believe it is necessary to lower our upgrade rate assumption, and FY26 shipment forecast, as a more advanced Siri is unlikely to be available until after the iPhone 17 launch." "[W]ithout a 'killer AI app' in market ahead of the iPhone 17 launch," Morgan Stanley reported that it did not "see AI features contributing to accelerating upgrade rates as meaningfully as [it] did previously."

720. Following this disclosure on March 12, 2025, Apple common stock declined $11.16 per share, or ~5.1%, from a closing price of $220.84 on March 11, 2025, to a closing price of $209.68 on March 13, 2025.

721. Various news outlets reported on Morgan Stanley's price-target cut. Investor's Business Daily stated in a March 12, 2025 article titled *Apple Stock Gets Price-Target Cut From Morgan Stanley*, that "[i]nvestment bank Morgan Stanley . . . cut its price target on Apple (AAPL) stock, citing a lack of compelling AI features to drive iPhone sales." Investor's Business Daily also cited Apple's announcement regarding the Siri AI delay and the related Bloomberg report and connected this announcement to the subsequent stock price decline, stating, "Last Friday, Bloomberg reported that Apply has delayed the release of an artificial intelligence-powered upgrade to its Siri digital assistant. Apple stock has fallen for three consecutive trading sessions since the report." A March 12, 2025 article from Barron's titled *Apple Needs an iPhone Sales Boost. AI Delays Are a Problem, Analyst Says.*, also reported on the Morgan Stanley price-target cut, stating, "Apple has been counting on the introduction of artificial-intelligence features to get more consumers buying iPhones. A delay in that hurts those hopes, according to Morgan Stanley analyst."

722. In a March 13, 2025 article titled *Apple Stock Bulls Are Losing Confidence In iPhone Upgrade Cycle*, Investor's Business Daily cited the earlier Morgan Stanley report and stated, "Wall Street analysts are cutting their forecasts for Apple (AAPL) iPhone sales this year as the consumer electronics giant delays artificial intelligence features. Those revisions have weighed on Apple stock." Investor's Business Daily noted that "Apple has fallen for four[] straight trading sessions."

723. In a report issued on March 14, 2025, William O'Neil removed its Buy recommendation for Apple, citing the Company's indefinite postponement of the Company's AI enhancements for Siri and the fact that "analysts have revised their iPhone sales projections downward, with estimates reflecting a potentially weaker upgrade cycle due to the absence of AI-driven differentiation." William O'Neil further reported that "Apple shares have declined 11% this week following reports of a significant delay in AI enhancements for Siri."

**D. April 3, 2025**

724. On April 3, 2025, investors continued to learn the relevant truth concealed by Defendants' misrepresentations and omissions and fraudulent course of conduct regarding Apple's new Apple Intelligence-powered Siri, and the risks previously concealed by Defendants' fraud gradually materialized. On that day, The Wall Street Journal published an article titled *Apple and Amazon Promised Us Revolutionary AI. We're Still Waiting*. The article discussed Apple's 2024 WWDC announcement of the Apple Intelligence-powered Siri features and the ad highlighting these capabilities, before surmising that "[w]e have been misled," and asserting that Apple "shouldn't announce products until they're sure they can deliver them." The article concluded that Apple had "overhype[d] and underdeliver[ed]" and had "attempt[ed] to convince us these enhancements justify an expensive phone upgrade," leaving consumers to wonder, "Why should we buy your next shiny thing? Where's that trust?"

725. Following this disclosure on April 3, 2025, Apple common stock declined $20.70 per share, or 9.2%, from a closing price of $223.89 on April 2, 2025, to a closing price of $203.19 on April 3, 2025.

**E. April 30-May 1, 2025**

726. On April 30, 2025, investors continued to learn the relevant truth concealed by Defendants' misrepresentations and omissions and fraudulent course of conduct regarding Apple's violations of the Injunction, and the risks previously concealed by Defendants' fraud gradually materialized. On April 30, 2025, after market close, Judge Gonzalez Rogers issued an order finding Apple in willful violation of the Injunction, holding Apple in civil contempt, and referring the matter to the United States Attorney for the Northern District of California to investigate whether criminal contempt proceedings were appropriate. Specifically, Judge Gonzalez Rogers found that "Apple, despite knowing its obligations [under the Injunction], thwarted the Injunction's goals, and continued its anticompetitive conduct solely to maintain its revenue stream," "intentionally devis[ing] a compliance scheme to prevent developers from deploying competitive alternatives to [in-app purchases]," and then engaged in an "obvious cover-up" in an effort to deceive the court.

727. Judge Gonzalez Rogers further found that "the evidence clearly and convincingly demonstrates that Apple *willfully* chose to ignore the Injunction, *willfully* chose to create and impose another supracompetitive rate and new restrictions, and thus *willfully* violated the injunction," and that

"[t]o hide the truth, Vice-President of Finance, Alex Roman, outright lied under oath." (emphasis in original). As a result of these findings, the court held Apple in civil contempt, "enjoin[ing] Apple from implementing its new anticompetitive acts to avoid compliance with the Injunction," including prohibiting Apple from "imped[ing] developers' ability to communicate with users" by restricting the "style, language, formatting, quantity, flow or placement" of links to alternative payment systems or "levy[ing] or impos[ing] a new commission on off-app purchases."

728. The next day, on May 1, 2025, investors continued to learn the relevant truth concealed by Defendants' misrepresentations and omissions and fraudulent course of conduct regarding Apple's violations of the Injunction and Apple's new Apple Intelligence-powered Siri, and the risks previously concealed by Defendants' fraud gradually materialized. On that day, Apple reported its 2Q 2025 earnings after market-close and held a conference call with investors. During the question-and-answer portion of the call, an analyst with Arete Research asked about Apple's ongoing legal cases, including the April 2025 Order, noting that "investors are clearly concerned that these might have material impacts on your Services business." Defendant Cook acknowledged that "there's risk associated with [the pending legal cases] and the outcome is unclear."

729. During the 2Q 2025 conference call, Cook also disclosed that the Company was still working on the promised "more personal" Siri, but failed to provide any specifics regarding the timing of the rollout. Specifically, Cook stated, "With regard to the more personal Siri features we announced [at WWDC 2024], we need more time to complete our work on these features so they meet our high-quality bar. We are making progress and we look forward to getting these features into customers' hands." In response to an analyst question later during the call, Cook reiterated that the delay in rolling out the new Siri features was due to the Company needing more time to complete its work: "with regard to the more personal Siri, as you mentioned, we just need more time to complete the work so they meet our high-quality bar. And there's not a lot of other reason for it. It's just taking a bit longer than we thought."

730. Following these disclosures on April 30 and May 1, 2025, Apple common stock declined 6.4%, from a closing price of $212.50 on April 30, 2025, to a closing price of $198.89 on May 5, 2025.

731. Following the April 2025 Order, analysts noted the impact of the ruling on Apple's stock price and focused on the potential implications for the Company's Services revenues. For example, Wells

Fargo published an analyst report on April 30, 2025, titled *Shares Pressured by Judge Ruling*, stating, "**What's New?** Today (post close), Apple shares are coming under pressure following a CA judge ruling that Apple has violated a US court order to allow for greater competition for app downloads and payment methods in the company's App Store." (emphasis in original). Wells Fargo "highlight[ed] a few takes from this ruling," including that the court found Apple "in willful violation of the Court's 2021 Injunction." Wells Fargo reported that "it's difficult to assess the impact this may have on Apple's services revenue, or the extent of a potential appeal process — a potential focus on tomorrow's earnings call," with "Apple's commission rate . . . likely to be the key focus."

732. On May 1, 2025, JP Morgan issued a report titled *Quick Thoughts on Apple vs. Epic Ruling*, stating that the April 2025 Order "means that in the US, app developers will be able to offer consumers an alternative payment option whereby Apple receives no commission (vs. prior 27%)." JP Morgan reported that "[a]ssuming the ruling is upheld, this is a material positive change for app developers, many of which did not bother to offer alternative payments at the 27% commission rate." (emphasis in original).

733. In a May 1, 2025 report titled *Apple Ruling Creates a Paradigm Shift for Mobile Games*, Wedbush similarly reported that "[e]ffective immediately Apple may no longer impede developers' ability to communicate with users and it may no longer impose any fee on developer store purchases. This ruling is highly likely to have wide-ranging impacts across the app landscape with clear positives for developers . . . ." Wedbush noted that based on the ruling, Apple "will have to make some concessions in order to retain payments within its ecosystem," stating that "[w]e expect the company to offer lower take rates for all or some apps (e.g., reducing fees for publishers that agree to use the App Store exclusively)." Highlighting the impact of the ruling, Wedbush estimated that "[i]f Apple were to cut US app store fees to 15% across the board this would translate to ≈$4.5 billion of incremental profit for developers."

734. On May 1, 2025, Oppenheimer issued a report titled *Updated Thoughts on 'App Store Tax' and Its Financial Impact*, reporting on the "landmark decision" by Judge Gonzalez Rogers that "effective immediately, Apple cannot block iOS app developers from guiding users to alternative payment options or impose fees on transactions conducted outside the App Store." Oppenheimer stated that "[w]e believe the ruling will have a moderate negative impact on Apple's Service revenue and operating income." In support of this conclusion, Oppenheimer estimated that "Apple generated $27B in sales from App Store in

CY2024 (27% of its Service revenue), of which $15B came from mobile games. Assuming 80% operating margin on App Store revenues (net of developer payout), a 20% loss of App Store payment to external service providers could result in 3% impact to Apple's operating income (CY2024)."

735. In the wake of Apple's 2Q 2025 earnings call, Oppenheimer issued a report on May 2, 2025, titled *Tougher Times Ahead*. Oppenheimer "trimmed [its] FY25E and FY26E outlook" for Apple, citing "potential structural challenges to revenue growth on margin relating to," among things, "*loss of App Store commission, and underwhelming Apple Intelligence features*." The report linked to Oppenheimer's May 1, 2025 report, noting that "[w]e estimate . . . that a US judge ruling on App Store could have a LSD [low-single-digit] impact on total operating profit." On May 2, 2025, TD Cowen similarly noted that "antitrust and litigation risks remain," citing the "negative ruling in Epic case update with an appeal by AAPL expected."

736. Other analysts reported on Cook's representation that Apple was still working on an Apple Intelligence-powered Siri and discussed the impact of this additional delay on the iPhone upgrade cycle. In a report issued on May 2, 2025, Morningstar noted that "Cook also addressed Apple's latest delay of certain advance Apple Intelligence generative AI features. Siri with generative AI is now delayed until calendar 2026." Morningstar reported that "[w]hile Apple Intelligence officially released with iOS 18 in late 2024, the most compelling feature set to us, announced in June 2024, is not yet released" and observed, "While we like the generative AI features released so far . . . we find them to be good features, not revolutionary software that will spur iPhone unit sales. To us, this lends credence to our bearish view on iPhone growth and our expectation for a modest growth cycle arising from AI, rather than a 'supercycle.'"

737. Analysts also highlighted Cook's admission that Apple had been unable to deliver an updated Siri on the promised timeline. For example, in a May 2, 2025 report, Needham observed, "In answer to a que[s]tion, AAPL noted that personalized Siri features were delayed compared with the promises made at WWDC last year" and HSBC similarly noted in a report published the same day that, "On the call, the CEO acknowledged that the development of the Siri assistant was late."

## IX. <u>CLASS ACTION ALLEGATIONS</u>

738. Lead Plaintiff brings this action on its own behalf and as a class action, pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons

and entities who, during the Class Period, purchased or otherwise acquired Apple common stock and were damaged thereby. Excluded from the Class are Defendants, the officers and directors of Apple, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

739. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Throughout the Class Period, Apple's common stock was actively traded on the Nasdaq (an open and efficient market) under the symbol "AAPL." As of January 17, 2025, Apple had approximately 15 billion shares of common stock outstanding. Record owners and the other Class members may be identified from records maintained by Apple and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

740. Lead Plaintiff's claims are typical of the claims of the other Class members, as all Class members were similarly affected by Defendants' wrongful conduct in violation of federal laws that is complained of herein.

741. Lead Plaintiff will fairly and adequately protect the interests of the other Class members and has retained counsel competent and experienced in prosecuting class actions and securities litigation.

742. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are: (i) whether Defendants violated the federal securities laws by their acts and omissions as alleged herein; (ii) whether Defendants' statements to the investing public during the Class Period contained material misrepresentations and/or omitted material facts; (iii) whether Defendants' engaged in a fraudulent course of conduct; (iv) whether and to what extent the market price of Apple's common stock was artificially inflated during the Class Period due to the material misrepresentations and omissions alleged herein; (v) whether Apple and the Individual Defendants acted with the requisite level of scienter; (vi) whether the Individual Defendants were controlling persons of the Company; and (vii) whether

members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

743. A class action is also superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members to seek redress for the wrongful conduct alleged herein. Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## X. A PRESUMPTION OF RELIANCE APPLIES

744. At all relevant times, the market for Apple common stock was efficient for the following reasons, among others:

a. Apple stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

b. As a regulated issuer, Apple filed periodic reports with the SEC;

c. Apple regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Apple was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

745. As a result of the foregoing, the market for Apple common stock reasonably and promptly digested current information regarding Apple from all publicly available sources and reflected such information in the price of Apple common stock. Purchasers and acquirers of Apple common stock during the Class Period suffered similar injury through their purchases and acquisitions of Apple common stock at artificially inflated prices, and a presumption of reliance applies.

746. Further, at all relevant times, Lead Plaintiff and other Class members relied on Defendants to timely disclose material information and not to engage in a fraudulent course of conduct as required by law. Lead Plaintiff and other Class members would not have purchased or otherwise acquired Apple common stock at artificially inflated prices if Defendants had timely disclosed all material information as required by law. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its business, Lead Plaintiff and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XI. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

747. The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false and misleading statements alleged herein. Most, if not all, of the statements complained of herein were not forward-looking statements. Rather, they were: (i) historical statements or statements of purportedly current facts and conditions at the time the statements were made; (ii) mixed statements of present and/or historical facts and future intent; and/or (iii) statements that omitted material current or historical facts necessary to make the statements not misleading.

748. To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

749. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, or portion thereof, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, Defendants knew the statement was false and/or misleading, did not actually believe the statements, had no reasonable basis for the statements, and/or were aware of undisclosed facts tending to seriously undermine the statements' accuracy.

## XII. CAUSES OF ACTION

### COUNT ONE

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants

750. Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

751. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and the Class; and (ii) cause Lead Plaintiff and the Class to purchase or otherwise acquire Apple common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

752. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers or acquirers of Apple common stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

753. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's operations, and prospects.

754. During the Class Period, Defendants made the false and misleading statements specified above, which they knew or deliberately recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, considering the circumstances under which they were made, not misleading. Defendants had actual knowledge of the misrepresentations and omissions of material fact and fraudulent course of conduct set forth herein or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Apple's true condition from the investing public and to support the artificially inflated price of Apple common stock.

755. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid for or otherwise acquired Apple common stock at inflated prices. Lead Plaintiff and the Class would not have purchased or otherwise acquired Apple common stock at such prices, or at all, had they been aware that the market prices for Apple common stock had been artificially inflated by Defendants' material misrepresentations and omissions and fraudulent course of conduct.

756. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their respective purchases or acquisitions of Apple common stock during the Class Period.

## COUNT TWO

### Violation of Section 20(a) of the Exchange Act Against Defendants Cook, Maestri, and Parekh

757. Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

758. Defendants Cook, Maestri, and Parekh acted as controlling persons of Apple within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level position, ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, Defendants Cook, Maestri, and Parekh had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements alleged herein. Defendants Cook, Maestri, and Parekh were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Lead Plaintiff to be false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

759. In particular, Defendants Cook, Maestri, and Parekh had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same. As such, Defendants Cook, Maestri, and Parekh had regular access to nonpublic

information about Apple's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings or meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

760. As described above, Apple violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by its acts and omissions as alleged herein. By virtue of their positions as controlling persons, Defendants Cook, Maestri, and Parekh are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Lead Plaintiff and Class members suffered damages in connection with their purchases or acquisitions of Apple common stock during the Class Period.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff respectfully prays for judgment as follows:

A. Determining that this action is a proper class action maintained under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Kessler Topaz Meltzer & Check, LLP as class counsel pursuant to Rule 23(g);

B. Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C. Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

D. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

E. Granting such other and further relief as the Court deems just and proper.

## XIV. DEMAND FOR JURY TRIAL

Lead Plaintiff hereby demands a trial by jury.

Dated: January 28, 2026

**KESSLER TOPAZ MELTZER & CHECK, LLP**

*/s/ Jennifer L. Joost*
JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001

-and-

SHARAN NIRMUL*
(snirmul@ktmc.com)
NATHAN A. HASIUK*
(nhasiuk@ktmc.com)
MARGARET E. MAZZEO*
(mmazzeo@ktmc.com)
DANIEL A. FRIEDMAN**
(dfriedman@ktmc.com)
AUBRIE L. KENT*
(akent@ktmc.com)
ALEC S. GARBER**
(agarber@ktmc.com)
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

*Counsel for Lead Plaintiff National Pension Service, on behalf of the National Pension Fund, and Proposed Lead Counsel for the Putative Class*

**MARTIN LAW GROUP PLLC**
AMY C. MARTIN*
(amy@martinlawgroupllc.com)
1250 Connecticut Ave. NW, Suite 700
Washington D.C. 20036
Tel: (202) 261-3563

*Additional counsel for Lead Plaintiff National Pension Service, on behalf of the National Pension Fund*

*appearance *pro hac vice*
** appearance *pro hac vice* pending