**Exhibit 5**

THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

JULIAN W. KLEINBRODT, SBN 302085
  JKleinbrodt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.393.8306

CYNTHIA E. RICHMAN (D.C. Bar No. 492089; *pro hac vice*)
  crichman@gibsondunn.com
HARRY R. S. PHILLIPS (D.C. Bar No. 1617356; *pro hac vice*)
  hphillips2@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

MARK A. PERRY, SBN 212532
  mark.perry@weil.com
JOSHUA M. WESNESKI (D.C. Bar No. 1500231; *pro hac vice pending*)
  joshua.wesneski@weil.com
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: 202.682.7000
Facsimile: 202.857.0940

**Attorneys for Defendant APPLE INC.**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.<br><br>      Plaintiff, Counter-defendant<br>v.<br><br>APPLE INC.,<br><br>      Defendant, Counterclaimant | Case No. 4:20-cv-05640-YGR<br><br>**NOTICE OF COMPLIANCE WITH UCL INJUNCTION**<br><br>The Honorable Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................1

BACKGROUND .............................................................................................................................1

DISCUSSION ..................................................................................................................................4

    I.      APPLE NOW PERMITS DEVELOPERS WITH APPS ON THE IOS OR
            IPADOS APP STORE U.S. STOREFRONTS TO COMMUNICATE
            WITHIN THE APP REGARDING ALTERNATIVE PURCHASING
            MECHANISMS ...................................................................................................4

    II.     APPLE ALSO PERMITS DEVELOPERS TO COMMUNICATE OUTSIDE
            THE APP REGARDING ALTERNATIVE PURCHASING MECHANISMS.........15

CONCLUSION................................................................................................................................16

**INTRODUCTION**

On September 10, 2021, the Court issued an Injunction enjoining Apple from prohibiting in the United States developers from "(i) including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchas[e] ['IAP'] and (ii) communicating with customers through points of contact obtained voluntarily from customers through account registration within the app." Declaration of Mark A. Perry ("Perry Decl.") Ex. 6 ¶¶ 1–2. The Ninth Circuit affirmed the Injunction on April 24, 2023 (Perry Decl. Ex. 9, at 77), and denied Apple's petition for rehearing on June 30, 2023 (Perry Decl. Ex. 10). The Supreme Court denied Apple's petition for a writ of certiorari on January 16, 2024. Perry Decl. Ex. 20.

As of January 16, 2024, Apple has fully complied with the Injunction: It is striking the relevant parts of the App Store Review Guidelines applicable to apps on the U.S. storefronts of the iOS and iPadOS App Stores and implementing new rules that permit developers to (i) include in their apps buttons or links with calls to action that direct customers to purchasing mechanisms in addition to IAP and (ii) communicate with customers through points of contact obtained voluntarily from customers through account registration within the app. As a result of these changes, developers have the option of informing consumers, both within and outside the app, about alternative purchase mechanisms in addition to IAP. Apple respectfully makes this submission to summarize these changes for the Court.[1]

**BACKGROUND**

For over a decade, Apple has imposed certain requirements on developers that use Apple's proprietary tools and technologies protected by intellectual property to develop iOS and iPadOS apps. Those requirements are memorialized in the Apple Developer Program License Agreement ("DPLA") and the App Store Review Guidelines. Perry Decl. Ex. 5, at 31, 143. Epic Games, Inc. initiated this lawsuit to challenge two contractual and technical restrictions: Apple's requirement

---

[1] Apple incorporates by reference the definition of IAP used by the Court in its post-trial findings of fact and conclusions of law. Perry Decl. Ex. 5, at 3 n.3.

that developers distribute iOS and iPadOS apps through the App Store, and Apple's requirement that iOS and iPadOS apps use IAP for in-app purchases of digital goods and services. After a bench trial, the Court held that these requirements do not violate state and federal antitrust laws or the California Unfair Competition Law ("UCL"). *Id.* at 162, 179. The Ninth Circuit affirmed. Perry Decl. Ex. 9.

Epic also challenged two anti-steering rules in the App Store Review Guidelines, which at the time of trial provided that (i) "[a]pps and their metadata may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than [IAP]," and (ii) "[a]pps in this section cannot, either within the app or through communications sent to points of contact obtained from account registration within the app (like email or text) encourage users to use a purchasing method other than [IAP]." Perry Decl. Ex. 11.[2]

The Court concluded that the quoted parts of these two Guidelines were unfair under the UCL because they impaired information transparency, noting that "[i]n the context of technology markets, the open flow of information becomes even more critical." Perry Decl. Ex. 5, at 164. The Court expressed particular concern that these two provisions prohibited developers from "letting users know that [other payment] options exist." *Id.* at 165. Accordingly, the Court entered a Permanent Injunction enjoining Apple from prohibiting app developers from (i) "including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchasing," or (ii) "communicating with customers through points of contact obtained voluntarily from customers through account registration within the app." Perry Decl. Ex. 6 ¶¶ 1–2.

The Court described the Injunction as a "limited measure" that "balance[d] the justification for maintaining a cohesive ecosystem with the public interest in uncloaking the veil hiding pricing information on mobile devices and bringing transparency to the marketplace." Perry Decl. Ex. 5, at 166. The Court recognized, however, that while transparency and consumer choice are

---

[2] As the Court noted, Apple has other anti-steering rules that are not implicated by the Injunction. *See* Perry Decl. Ex. 5, at 32 n.194.

important, Apple and millions of iPhone users still have a substantial interest in the "integrity of the ecosystem." *Id*. at 164. The Court expressly noted that Apple could continue to require the use of IAP for in-app transactions. Perry Decl. Ex. 7, at 4. Moreover, the Court clarified that Apple could still "take steps to protect users" from new threats created by the Injunction's mandate. Perry Decl. Ex. 7, at 3. The Court stated it would not "micromanage" the new framework. *Id*. The Ninth Circuit stayed the Injunction pending issuance of the appellate mandate. *See* Perry Decl. Ex. 8.

Shortly before the Court issued the Injunction, Apple entered into a settlement in another case that resolved the antitrust and unfair competition law claims of 99% of U.S. app developers, who, like Epic, had asserted that Apple monopolized an alleged iOS app and in-app product distribution services market. As part of the settlement, Apple agreed to revise Guideline 3.1.3 and thereby allow developers to "send communications outside of the app to their user base about purchasing methods other than in-app purchase," including through points of contact obtained through account registration. *See* Perry Decl. Ex. 13. Apple has made that revision. Declaration of Matthew Fischer ("Fischer Decl.") ¶ 40. In doing so, Apple came into compliance with Paragraph 1(ii) of the Injunction. *See infra* § II. This Court approved the settlement as fair, reasonable, and adequate. *See* Perry Decl. Ex. 14.

Two additional developments have helped provide a framework for Apple's implementation of Paragraph 1(i) of the Injunction. First, in response to a December 2021 decision by the Netherlands Authority for Consumers and Markets, which is currently on appeal, Apple created an "entitlement" framework to permit dating apps on the Netherlands iOS and iPadOS App Store storefronts to inform users of other purchase options (both within and outside of the app) while still protecting user security. *See* Perry Decl. Ex. 15; *see also* note 4, *infra* (explaining "entitlement" in this context). Second, in March 2022, Apple again used an entitlement and usage requirements to implement changes to the Guidelines for reader apps as part of its effort to resolve

a competition investigation by the Japan Fair Trade Commission. *See* Perry Decl. Ex. 16.[3]

On April 24, 2023, the Ninth Circuit affirmed the Injunction in all respects. Perry Decl. Ex. 9. The Ninth Circuit stayed the mandate (and the Injunction) pending Apple's filing of a petition for a writ of certiorari with the U.S. Supreme Court. Perry Decl. Ex. 19. The U.S. Supreme Court denied Apple's petition on January 16, 2024. Perry Decl. Ex. 20.

Apple is publishing the amended Guidelines and supporting materials on January 16, 2024.

## DISCUSSION

**I.   APPLE NOW PERMITS DEVELOPERS WITH APPS ON THE iOS OR iPADOS APP STORE U.S. STOREFRONTS TO COMMUNICATE WITHIN THE APP REGARDING ALTERNATIVE PURCHASING MECHANISMS**

Paragraph 1(i) of the Injunction enjoins Apple from prohibiting developers from including in their apps buttons, links, or other calls to action that direct customers to purchasing mechanisms in addition to IAP. Apple is complying with this requirement by adopting a new Guideline that expressly permits developers with apps on the iOS or iPadOS App Store U.S. storefronts to include buttons or external links with calls to action within their apps that direct users to alternative, out-of-app purchasing mechanisms.

Apple has long required that all iOS and iPadOS apps developed using Apple's proprietary tools and technologies protected by intellectual property use IAP for in-app transactions for digital goods and services. Fischer Decl. ¶ 7. The Court rejected Epic's challenge to the IAP requirement and has made clear that its Injunction does not require Apple to change this requirement. Perry Decl. Ex. 7, at 4. In addition, developers are already permitted to (and do) include within their apps certain external links, directing customers to websites for support and other services. Fischer Decl. ¶ 9. This Court has previously noted that "[c]onsumers are quite used to linking from an app to a web browser." Perry Decl. Ex. 7, at 3. What Apple has heretofore precluded are external

---

[3] Reader apps are apps that provide digital content—i.e., magazines, newspapers, books, audio, music, or video—as the primary functionality of the app. With reader apps, people can sign into their account created outside of the app, letting them view and enjoy previously purchased media content or content subscriptions on their Apple device. This Guideline permits reader apps to link to a website that is owned or maintained by the developer for the purpose of account creation or management, subject to an entitlement and usage requirements. *See* Fischer Decl. ¶ 21.

links that direct customers to alternative *purchasing* mechanisms.  In response to the Injunction, Apple is removing that prohibition with respect to apps on the U.S. storefronts of the iOS and iPadOS App Stores.

Section 3.1.1(a) of the Guidelines will now provide:

> 3.1.1(a) Link to Other Purchase Methods
>
> - Developers may apply for an entitlement to provide a link in their app to a website the developer owns or maintains responsibility for in order to purchase such items.  Learn more about the entitlement.  In accordance with the entitlement agreement, the link may inform users about where and how to purchase those in-app purchase items, and the fact that such items may be available for a comparatively lower price.  The entitlement is limited to use only in the iOS or iPadOS App Store on the United States storefront.  In all other storefronts, apps and their metadata may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase.
>
> If your app engages in misleading marketing practices, scams, or fraud in relation to the entitlement, your app will be removed from the App Store and you may be removed from the Apple Developer Program.

Fischer Decl. ¶ 13; *see also id.* Ex. 1.  Under Section 3.1.1(a), Developers may apply for the StoreKit External Purchase Link Entitlement (US) (the "Link Entitlement").[4]  Developers who are approved for the entitlement can include within their apps buttons or links with calls to action directing users to out-of-app purchasing mechanisms other than IAP.  Fischer Decl. ¶ 14.  For convenience, we refer to the in-app communications permitted by the Link Entitlement as "External Purchase Links."

As Apple has previously explained, and Epic has never disputed, unregulated external payment links will "harm users, developers, and the iOS platform more generally."  Perry Decl.

---

[4]  An "entitlement" is a right or privilege granted to a developer to activate certain features, capabilities, technologies, or functionalities for its app not otherwise available to developers. Fischer Decl. ¶ 15.  Apple requires entitlements for many features, particularly where privacy, safety, and security concerns are heightened or where a requested feature carries additional risk to users. *Id.*

Ex. 12 ¶ 10.[5]  In order to minimize the considerable risks posed by external payment links, Apple will require developers to adhere to certain requirements to qualify for and use the Link Entitlement.  These requirements are necessary to protect user privacy and security, maintain the integrity of Apple's ecosystem, promote the flow of information, avoid user confusion, and enable efficient review of developers' apps by App Review.  They also guard against the uncompensated use of, among other things, Apple's platform, services (including but not limited to marketing and external advertising), and proprietary tools and technologies protected by intellectual property. Fischer Decl. ¶¶ 22, 35.  The requirements are informed by Apple's substantial experience.  *Id.* ¶ 21; *see also* Perry Decl. Ex. 7, at 3 (noting that Apple could look to "alternatives outside the app" like the reader rule to promote security and maintain its ecosystem); Perry Decl. Ex. 5, at 37 (recognizing that privacy and security are not "static" issues, and require Apple to respond and react to new developments and technological advancements).

*Entitlement Application*.  A developer who wants to use the Link Entitlement must complete and submit a request form to Apple providing details about its app, the External Purchase Link it wishes to include, and the website domain to which the External Purchase Link will direct users.  *See* Fischer Decl. ¶ 16; *see also id.* Ex. 4.  Developers approved for the entitlement may "provide a link in their app to a web site the developer owns or maintains responsibility for in order to purchase" digital goods and services for use within the app.  *Id.* ¶ 13.

In order to qualify for the Link Entitlement, developers must certify that the third-party payment services provider(s) they have contracted with for out-of-app purchasing mechanisms meet certain industry standards for payment processors, that the digital goods and services users purchase on their websites can be used within the apps, and that they will provide users with processes for disputing unauthorized transactions, managing subscriptions, and requesting refunds.

---

[5] Since the Injunction was entered, Epic has entered into two settlements with the Federal Trade Commission that, based on publicly available information, appear to bolster Apple's concern that developers may take advantage of children and other users.  *See* Perry Decl. Exs. 17, 18. Specifically, the FTC found that, among other things, Epic had deceptively saved users' payment information without their knowledge, thus enabling kids to make impulse purchases without their parents' knowledge or approval. *Id.* Ex. 17.

*See* Fischer Decl. ¶¶ 17–18. Apps participating in the Apple Video Partner Program or the News Partner Program are not eligible for the Link Entitlement. *Id.* ¶ 19. This application process provides notice to Apple that the developer intends to use the Link Entitlement and allows Apple to confirm whether a developer is adhering to the rules and requirements applicable to the Link Entitlement. *Id.* ¶ 20.

***Technical Requirements.*** A developer who is approved for the Link Entitlement must abide by the requirements set forth in the StoreKit External Purchase Link Entitlement Addendum for US Apps. Fischer Decl. ¶ 16; *see also* Fischer Decl. Ex. 2. These requirements serve a variety of purposes, but they all arise largely from the fact that an External Purchase Link encourages users to leave the app and the Apple ecosystem, and undertake a transaction on the open Internet. *Id.* ¶ 22. Apple has designed the App Store, iOS, and iPadOS so that it can use established and predictable mechanisms to review apps for a variety of purposes, including protecting user security and privacy and deterring fraud and scams. Apple lacks similar capabilities with respect to transactions on the open Internet, as the Court has already recognized. Perry Decl. Ex. 5, at 108–09. Accordingly, the requirements of the Link Entitlement help to inform users of the benefits they may be losing and the risks they are assuming when they leave the Apple ecosystem, while still allowing developers to communicate with users regarding purchase alternatives. Fischer Decl. ¶ 22.

These requirements include:

> **3.1** Your StoreKit External Purchase Link App (US) must continue to offer in-app purchases in accordance with the Developer Agreement and the App Store Review Guidelines. Your StoreKit External Purchase Link App (US), including any link You provide under this Addendum, may not discourage end users from making in-app purchases.

This requirement ensures that IAP remains available for in-app transactions in digital goods and services. Fischer Decl. ¶ 24. As noted above, this Court has already ruled that Apple may continue to require developers to offer IAP for in-app transactions in digital goods and services.

> **3.2** Prior to each instance of linking from Your StoreKit External Purchase Link App (US) to an external website for purchases, You must:
>
> - Call the canMakePayments API and determine that the end user may authorize payments; and
>
> - Call the StoreKit External Purchase Link API and determine that the end user is a user of the United States App Store, and if so, surface to the end user the associated system disclosure.

These requirements help ensure that users are adequately informed about alternative purchasing options. The system disclosure sheet explains (1) that the user is leaving the app and going to the open Internet to make purchases through a mechanism other than IAP, and (2) that certain App Store protections and features will not be available. *See* Fischer Decl. ¶¶ 26–27. Apple requires that users tap a button that says "Continue" before being redirected to the developer's website. *See* Fischer Decl. ¶ 26. Apple has already implemented a similar requirement for reader apps. *See* Perry Decl. Ex. 16 (Reader Apps Addendum) § 3.3. Apple is implementing this requirement because users should, in the first instance, understand that they are tapping a link that will take them outside of the Apple ecosystem and that they are assuming risks by doing so. *See* Fischer Decl. ¶ 26. The requirement is thus consistent with the underlying purpose of the Injunction—that users be apprised of their choices. Perry Decl. Ex. 5, at 179; *see also id.* Ex. 9, at 85 (Injunction helps consumers "becom[e] would-be . . . consumers" of other platforms). Additionally, the system disclosure sheet advises users that certain App Store-specific features will not be available if they proceed, such as the ability of Apple to provide subscription management or process refund requests for digital goods and services. *See* Fischer Decl. ¶¶ 26–27.



Apple is concerned that some developers may provide information within their apps that does not accurately reflect what users can receive or are charged on a website. Apple will have less ability to prevent or address fraudulent or misleading statements made by developers in connection with linked transactions than it does (and its users are used to) with IAP. Accordingly, the system disclosure sheet may require adjustment to protect the user experience and mitigate any confusion.

> **3.3**   The link You provide in Your StoreKit External Purchase Link App (US) under this Addendum must:
>
> - Go directly to Your website without any redirect or intermediate links or landing page;
> - Open a new window in the default browser on the device, and may not open a web view;

- Not pass additional parameters in the URL, to protect the end user (for example, their privacy);
- Be statically-defined in the <<SKExternalPurchaseLink>> in Your app's info.plist before submission to the App Store;
- Be submitted with Your StoreKit External Purchase Link App (US) to the App Store, and shall be resubmitted if the URL changes;
- Be accompanied by language and a button adhering to the requirements provided in the Apple Materials;
- Not mimic Apple's in-app purchase system, nor discourage end users from using it;
- Be displayed in Your StoreKit External Purchase Link App (US) on no more than one app page the end user navigates to (not an interstitial, modal, or pop-up), in a single, dedicated location on such page, and may not persist beyond that page;
- Not be displayed on any page that is part of an in-app flow to merchandise or initiate a purchase using in-app purchase; and
- Comply with any additional requirements provided in the Apple Materials.

These requirements are designed to minimize fraud, scams, and confusion. Developers must take responsibility for the linked website, send users only to that website, and inform Apple of that website so that Apple can review the app (including the destination of the proposed External Purchase Link). Fischer Decl. ¶ 28.

These requirements give developers a meaningful opportunity to "entice users to other platforms" (Perry Decl. Ex. 5, at 93), while also enabling users to make an informed choice between "the convenience of IAP" and out-of-app payment systems (Perry Decl. Ex. 7, at 4).[6] The requirements regarding placement of the External Purchase Links serve multiple purposes, including preventing users from being overloaded with duplicative information that might interrupt their app experience, ensuring a consistent user experience, minimizing confusion between options, and reducing the risk of users inadvertently leaving the app. *See* Fischer Decl. ¶ 28; *see also* Perry Decl. Ex. 5, at 164 (describing Injunction's purpose of facilitating the flow of

---

[6] Because the Court upheld Apple's IAP requirement and the Ninth Circuit affirmed (Perry Decl. Ex. 5, at 150; Perry Decl. Ex. 9), the Guidelines will still require that developers use IAP as the exclusive purchasing mechanism for in-app purchases.

information).  They also prevent developers from free-riding on Apple's reputation for creating a "seamless" purchasing mechanism and protect Apple's right to require IAP for all in-app purchases, which the Court did not enjoin.  Fischer Decl. ¶ 28; Perry Decl. Ex. 7, at 4; *see also* Perry Decl. Ex. 5, at 66 ("Creating a seamless system to manage all its e-commerce was not an insignificant feat. Further, expanding it to address the scale of the growth required a substantial investment.").

The "Apple Materials" referred to in Section 3.3 include several templates that Apple is providing to developers to include as part of their External Purchase Links.  Fischer Decl. ¶ 29.  These templates allow developers to advertise prices to users, but use curated language to avoid misleading or confusing offers.  *Id.* ¶ 30.  For example, developers may insert language stating: "To get [X]% off, go to [link to developer's website]," or "Lower price offered at [link to developer's website]."  *Id.* ¶ 29.  Users will therefore be able to price-compare across platforms, consistent with the Injunction's purpose.  *See* Perry Decl. Ex. 5, at 164 (noting "the benefit of price advertising" and the desirability of "cross-platform information" in technology markets).  These templates also make it more efficient for Apple to review developers' apps for compliance with Link Entitlement requirements and App Review Guidelines, while still preserving developers' ability to convey information to their users.  *See* Perry Decl. Ex. 7, at 4 ("Links can be tested by App Review"); Perry Decl. Ex. 5, at 179 (Injunction should "increase competition, increase transparency, [and] increase consumer choice and information while preserving Apple's iOS ecosystem which has procompetitive justifications").

These templates do not allow developers to make subjective claims within the app about competing purchasing mechanisms.  Fischer Decl. ¶ 30.  Developers will still be able to communicate information to users, in-app, such that users can make informed decisions whether to leave the app for other options.  *See* Perry Decl. Ex. 5, at 165 (noting that the main objection to the prior anti-steering provisions was that they prohibited developers from "letting users know that [other payment] options exist").  And importantly, as described below, Apple places no limitations on developers' *out-of-app* communications with users.  Fischer Decl. ¶ 30.

> **3.5**   You may not include information about purchasing on Your website or a link to Your website for purchasing on the product page of Your StoreKit External Purchase Link App (US).

This requirement limits the External Purchase Link to the app itself rather than the product page in the App Store on which the app appears.  Fischer Decl. ¶ 31.

> **3.6**   Digital purchases sold on Your website to end users after link out that are marketed as being for use in an Application must be available for use in that Application.

This requirement helps ensure that users are able to use the digital goods and services that they purchase from the developer's external website within an app.  Fischer Decl. ¶ 32.

*Commission.*  The Court did not enjoin Apple's core business model of monetizing the App Store by charging a percentage commission rate on sales of digital goods and services facilitated by its platform.  Instead, it found that "under all models, Apple would be entitled to a commission or licensing fee, even if IAP was optional."  Perry Decl. Ex. 5, at 67; *see also id.* at 150 ("Even in the absence of IAP, Apple could still charge a commission on developers.").  Accordingly, in view of the substantial value Apple provides to developers, Apple will charge a commission on certain out-of-app purchases of digital goods and services.  Fischer Decl. ¶ 33.  Epic has already recognized that this approach is consistent with the injunction entered in this case:  In a publicly available letter regarding parallel litigation against Google, Epic (represented by the same counsel as in this case) acknowledged that an "injunction such as the one ordered in *Epic v. Apple*" would "not prevent Google from . . . introducing a new fee . . . on linked out-of-app transactions."  Perry Decl. Ex. 21, at 3–4.

Apple will apply a 27% commission to transactions for digital goods and services that take place on a developer's website within seven days after a user taps through an External Purchase Link from the system disclosure sheet to an external website.  Fischer Decl. ¶ 33.  Developers eligible for and participating in the App Store Small Business Program will be charged a 12% commission on purchases made within seven days after a user taps on an External Purchase Link and continues from the system disclosure sheet to an external website.  *Id.* ¶ 34.  Auto-renewals in

the second year or later of an auto-renewing subscription that was purchased within seven days after a user taps through an External Purchase Link from the system disclosure sheet will be charged a 12% commission.  *Id.*  Apple's commission policies regarding purchases made through External Purchase Links are set forth in the StoreKit External Purchase Link Entitlement Addendum for US Apps.  *See* Fischer Decl. Ex. 2.

Charging a commission on transactions facilitated by External Purchase Links not only complies with the Injunction's plain terms (*see* Perry Decl. Ex. 21, at 3–4), but is also consistent with the Court's rationale for upholding Apple's other App Store policies.  All App Store developers—including those who place buttons or links with calls to action in their apps—benefit from (among other things) Apple's platform integrity, proprietary tools and technologies protected by intellectual property, developer services and support, services that help developers acquire, retain, and reengage users, marketing and external advertising, and a safe environment for users to download and purchase apps and in-app content.  Fischer Decl. ¶ 35.  Developers benefit from Apple's "enormous" investment in "tools and features for iOS" (Perry Decl. Ex. 5, at 113–14), including the "thousands of developer tools, SDKs, and APIs" and Apple's "constant upgrading of . . . cellphones to allow for more sophisticated apps." (*id.* at 67; *see id.* at 150 ("Apple is entitled to some compensation for use of its intellectual property.")).  Developers also benefit from "access to Apple's vast consumer base" (Perry Decl. Ex. 9, at 14), as well as "the safe environment created by the App Store," which encourages users to "download apps freely and without care" (Perry Decl. Ex. 5, at 111; *see also id.* at 145 ("Apple provides a safe and trusted user experience on iOS, which encourages users and developers to transact freely and is mutually beneficial.")); Perry Decl. Ex. 9, at 58 (Apple's provision of a "safe and trusted user experience . . . "increas[es] the per-user average number of app transactions")).  "[T]he developer's use of the App Store platform . . . and access to Apple's user base . . . justifies a commission."  Perry Decl. Ex. 5, at 118; *see also id.* at 150 n.617 (developers should not be allowed to "avoid the commission while benefitting from Apple's innovation and intellectual property free of charge").

Apple is limiting the commission to those transactions taking place on the developer's

website within seven days after a user taps on an External Purchase Link and continues from the system disclosure sheet to an external website, consistent with how other platforms address similar kinds of transactions. Fischer Decl. ¶ 36. Undoubtedly, this window will not capture all transactions that Apple has facilitated through the App Store, but it balances (1) Apple's entitlement to a commission for purchases facilitated through the App Store, even if the user waits a small amount of time after leaving the App Store to actually finalize the purchase, with (2) the fact that the longer the time between the link out and the purchase, the more attenuated the connection between the purchase and Apple's facilitation of the purchase. Through out-of-app communications (*see infra*), developers can encourage users to go directly to the website, without the use of an External Purchase Link and without incurring a commission. At all times, users remain free to select whichever purchasing method they prefer.

To help ensure collection of Apple's commission, developers are required to provide a periodic accounting of qualifying out-of-app purchases, and Apple has a right to audit developers' accounting to ensure compliance with their commission obligations and to charge interest and offset payments. Fischer Decl. Ex. 2 § 7. As both this Court and the Ninth Circuit recognized, collecting a commission in this way will impose additional costs on Apple and the developers. *See* Perry Decl. Ex. 5, at 150 n. 617 (contractual auditing "would seemingly impose both increased monetary and time costs to both Apple and the developers"); Perry Decl. Ex. 9, at 64. It also carries considerable risk to Apple: Although developers are contractually obligated to pay the commission, as a practical matter, with hundreds of thousands of developers with apps on the U.S. storefronts for the iOS and iPadOS App Stores, collection and enforcement will be exceedingly difficult and, in many cases, impossible.

***Non-Compliance***. Apple may terminate the Link Entitlement of any developer who violates the terms of the StoreKit External Purchase Link Entitlement Addendum for US Apps, and may, in its discretion, remove the offending app, terminate the developer's account with Apple, or take any other appropriate action to stop the violation of the App Store rules. *See* Fischer Decl. ¶¶ 38–39. In Apple's view, these measures are necessary to enforce the above guardrails

and protect users.  *Id.*  Apple will be monitoring the use of External Purchase Links and may modify the requirements for the Link Entitlement if issues arise that are not adequately addressed in the current requirements.  *Id.* ¶ 37.

## II.   APPLE ALSO PERMITS DEVELOPERS TO COMMUNICATE OUTSIDE THE APP REGARDING ALTERNATIVE PURCHASING MECHANISMS

Paragraph 1(ii) of the Injunction enjoins Apple from prohibiting developers from communicating with customers using contact information obtained within the app.  Apple came into compliance with this provision as part of the *Cameron* settlement, which has already been approved by this Court.  *See* Perry Decl. Ex. 14.  Guideline 3.1.3 now provides, in relevant part:

> Developers can send communications outside of the app to their user base about purchasing methods other than in app purchase

Fischer Decl. ¶ 40.  Separately, Guideline 5.1.1(x) provides:

> Apps may request basic contact information (such as name and email address) so long as the request is optional for the user, features and services are not conditional on providing the information, and it complies with all other provisions of these guidelines, including imitations on collecting information from kids.

*Id.* ¶ 42.  Accordingly, Apple does not limit developers' ability to send out-of-app communications to users regarding alternative purchasing methods.  *Id.* ¶ 41.  These Guidelines comply with the plain terms of the Injunction because developers now can "[c]ommunicat[e] with customers through points of contact obtained voluntarily from customers through account registration within the app."  Perry Decl. Ex. 6 ¶ 2.

**<u>CONCLUSION</u>**

For the foregoing reasons, Apple has timely complied with the Court's Injunction.

Dated: January 16, 2024                                     Respectfully submitted,

WEIL, GOTSHAL & MANGES LLP

By:  _/s/ Mark A. Perry_
WEL, GOTSHAL & MANGES LLP

Attorney for Apple Inc.

THEODORE J. BOUTROUS JR.,
SBN 132099
  tboutrous@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

JULIAN W. KLEINBRODT,
SBN 302085
  jkleinbrodt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.393.8306

CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
  crichman@gibsondunn.com
HARRY R. S. PHILLIPS (D.C. Bar No.
1617356; *pro hac vice*)
  hphillips2@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

MARK A. PERRY, SBN 212532
  mark.perry@weil.com
JOSHUA M. WESNESKI (D.C. Bar No.
1500231; *pro hac vice pending*)
  joshua.wesneski@weil.com
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: 202.682.7000
Facsimile: 202.857.0940

**Attorneys for Defendant APPLE INC.**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| EPIC GAMES, INC.<br><br>        Plaintiff, Counter-defendant<br>v.<br><br>APPLE INC.,<br><br>        Defendant, Counterclaimant | Case No. 4:20-cv-05640-YGR<br><br>**DECLARATION OF MATTHEW FISCHER REGARDING COMPLIANCE WITH UCL INJUNCTION**<br><br>The Honorable Yvonne Gonzalez Rogers |

I, Matthew Fischer, hereby declare as follows:

1.      I am the Vice President, Head of Worldwide App Store at Apple Inc. and am responsible for, among other things, overseeing Apple's App Store business.  Prior to my current position, I was the Director, Marketing and Partnerships, for iTunes.  Over my 20 years at Apple, I have helped guide the growth and development of Apple's key products and services, including the App Store.  In my current role, I work extensively on all matters related to the App Store and have a deep knowledge and understanding of the design and operation of the App Store.  I have personal knowledge of the facts testified to herein.

## APPLE HAS COMPLIED WITH THE INJUNCTION

2.      On September 10, 2021, this Court entered an injunction against Apple, enjoining Apple from "prohibiting developers from (i) including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchas[e] ['IAP'] and (ii) communicating with customers through points of contact obtained voluntarily from customers through account registration within the app."

3.      Apple has complied with the injunction as set forth herein.

4.      With respect to part (i) of the injunction, Apple has modified the App Store Review Guidelines to permit developers to include in their apps buttons or external links with calls to action that direct customers to purchasing methods in addition to IAP.  Specifically, Apple has created a new "StoreKit External Purchase Link Entitlement (US)" (the "Link Entitlement"), which permits any developer to include in apps on the U.S. storefronts of the iOS and iPadOS App Stores information about alternative purchase options and a link to the developer's external website.

5.      With respect to part (ii) of the injunction, Apple has revised its Guidelines to permit developers to communicate with users outside of the app about purchasing methods other than IAP, including through points of contact obtained through account registration within the app and with the user's consent.

6.      Below, I have provided a more detailed explanation of these changes as well as

certain requirements that Apple has implemented to protect users and the integrity of iOS and iPadOS.

## GUIDELINES 3.1.1 AND 3.1.3 IN CONTEXT

7. Apple has long required that all iOS and iPadOS apps developed using Apple's proprietary tools and technologies protected by intellectual property use IAP for in-app transactions for digital goods and services.

8. Developers are permitted to offer digital goods and services outside an app that can be consumed within the app. For example, a game developer may sell tokens on its website that can be redeemed during game play in its app.

9. Developers are permitted to include in their apps external links to websites for certain non-transaction purposes, such as customer support or account management.

10. Developers are permitted to communicate with customers outside the app on any subject, including alternative purchase mechanisms.

11. The App Review Guidelines at issue here prohibited developers from (i) including an external link (or button, or call to action) within an app directing customers to alternative purchase mechanisms outside the app (former Guideline 3.1.1), and (ii) using contact information obtained within the app (such as during registration) to facilitate communications outside the app (former Guideline 3.1.3).

12. The Court prohibited Apple from enforcing in the United States the two provisions just described. Accordingly, Apple is amending the Guidelines applicable to apps on the U.S. storefronts of the iOS and iPadOS App Stores as set forth below.

## PART (i) – THE LINK ENTITLEMENT

13. Apple is adopting new Guideline 3.1.1(a):

> 3.1.1(a) Link to Other Purchase Methods
>
> - Developers may apply for an entitlement to provide a link in their app to a website the developer owns or maintains responsibility for in order to purchase such items. Learn more about the entitlement. In accordance with the entitlement agreement, the link may inform users about where and how to purchase those in-app purchase items, and

> the fact that such items may be available for a comparatively lower price. The entitlement is limited to use only in the iOS or iPadOS App Store on the United States storefront. In all other storefronts, apps and their metadata may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase.
>
> If your app engages in misleading marketing practices, scams, or fraud in relation to the entitlement, your app will be removed from the App Store and you may be removed from the Apple Developer Program.

14. The Link Entitlement allows developers to include in their apps buttons or links with calls to action directing users to out-of-app purchasing mechanisms, other than IAP, for transactions for digital goods and services ("External Purchase Links"). The Link Entitlement is available only for apps on the iOS and iPadOS App Stores, in the U.S. storefronts.

15. An "entitlement" is a right or privilege granted to a developer to activate certain features, capabilities, technologies, or functionalities for its app not otherwise available to developers. Entitlements are offered only for limited uses, and developers must make a specific request that details the intended use of the entitlement. Apple requires entitlements where privacy, safety, and security concerns are heightened or where a requested feature carries additional risk to users. This is in order to understand that a developer is intending to utilize an entitlement for a specific app, and to confirm that apps do not include features that have not been approved.

16. To take advantage of the Link Entitlement, developers must provide Apple with details about their app, the proposed External Purchase Link, and the website to which users will be directed. Developers must also agree to the terms and conditions of the Link Entitlement, which are set forth in an addendum to the DPLA titled the "StoreKit External Purchase Link Entitlement Addendum for US Apps."

17. Developers applying for the Link Entitlement must certify that the third-party payment services provider(s) they have contracted with for the execution of out-of-app purchases meets Level 1 Payment Card Industry compliance. These are well-established standards, promulgated by a council of representatives from companies with global payment networks, such

as American Express, MasterCard, Visa, Discover, and JCB.

18.     Developers must further certify to Apple that the digital goods and services users purchase on their website marketed for use in an app can be used within the app, and that they will provide users with processes for disputing unauthorized transactions, managing subscriptions, and requesting refunds for purchases made through the External Purchase Link.

19.     Apps participating in the Apple Video Partner Program or the News Partner Program are not eligible for the Link Entitlement.

20.     This application process notifies Apple that a developer is attempting to include an External Purchase Link within its app, and allows Apple to confirm whether a developer is adhering to the rules and requirements applicable to the Link Entitlement and to understand the services and features the developer intends to offer through the Link Entitlement.  Apple will approve developers for the Link Entitlement if they satisfy the eligibility requirements outlined here and in the StoreKit External Purchase Link Entitlement Addendum for US Apps.

21.     The Link Entitlement includes requirements drawn from other entitlements Apple has created, namely the StoreKit External Purchase Link Entitlement (NL) and the External Link Account Entitlement.  The StoreKit External Link Entitlement (NL) allows dating app developers in the Netherlands App Store storefront to include links to external websites for purchasing digital goods and services.  The External Link Account Entitlement allows developers of reader apps to include links in their apps to external websites for account creation or management.

22.     These requirements serve a variety of purposes, but they all arise largely from the fact that an External Purchase Link encourages users to leave the app and the App Store ecosystem, and undertake a transaction on the open Internet.  Apple has designed the App Store, iOS, and iPadOS so that it can use established and predictable mechanisms to review apps for a variety of purposes, including protecting user security and privacy, and deterring fraud and scams related to the sale of digital goods and services.  Apple lacks similar capabilities with respect to transactions on the open Internet.  Accordingly, the requirements of the Link Entitlement help to inform users of the benefits they may be losing and the risks they are assuming when they leave the App Store

DECLARATION OF MATTHEW FISCHER                   4                   CASE NO. 4:20-CV-05640-YGR
REGARDING INJUNCTION COMPLIANCE

ecosystem, while still allowing developers to communicate with users regarding purchase alternatives.

23.     The Link Entitlement technical requirements are listed in the StoreKit External Purchase Link Entitlement Addendum for US Apps and include the following:

> **3.1**     Your StoreKit External Purchase Link App (US) must continue to offer in-app purchases in accordance with the Developer Agreement and the App Store Review Guidelines. Your StoreKit External Purchase Link App (US), including any link You provide under this Addendum, may not discourage end users from making in-app purchases.

24.     The requirement in **3.1** ensures that IAP remains available for in-app transactions for digital goods and services.  As the Link Entitlement makes clear, developers must continue to offer IAP for such transactions.

> **3.2**     Prior to each instance of linking from Your StoreKit External Purchase Link App (US) to an external website for purchases, You must:
> - Call the canMakePayments API and determine that the end user may authorize payments; and
> - Call the StoreKit External Purchase Link API and determine that the end user is a user of the United States App Store, and if so, surface to the end user the associated system disclosure.

25.     The requirements in **3.2** help ensure that users are adequately informed about alternative purchase options, including through the "system disclosure" sheet described below.

26.     The system disclosure sheet referred to explains to users that they are leaving the app and going to an external website to make purchases through a source other than IAP.  Apple requires that users tap a button that says "Continue" before being redirected out of the app.  The purpose of this disclosure is to ensure users understand they are leaving the App Store ecosystem and accepting the risks presented by an external website on the open Internet.



27. The system disclosure sheet also advises users that certain App Store-specific features will not be available if they proceed. For example, once a user leaves the App Store ecosystem, Apple can no longer provide subscription management or process refund requests for digital goods and services.

> **3.3** The link You provide in Your StoreKit External Purchase Link App (US) under this Addendum must:
>
> - Go directly to Your website without any redirect or intermediate links or landing page;
> - Open a new window in the default browser on the device, and may not open a web view;
> - Not pass additional parameters in the URL, to protect the end user (for example, their privacy);
> - Be statically-defined in the <<SKExternalPurchaseLink>> in Your app's info.plist

> before submission to the App Store;
>
> - Be submitted with Your StoreKit External Purchase Link App (US) to the App Store, and shall be resubmitted if the URL changes;
>
> - Be accompanied by language and a button adhering to the requirements provided in the Apple Materials;
>
> - Not mimic Apple's in-app purchase system, nor discourage end users from using it;
>
> - Be displayed in Your StoreKit External Purchase Link App (US) on no more than one app page the end user navigates to (not an interstitial, modal, or pop-up), in a single, dedicated location on such page, and may not persist beyond that page;
>
> - Not be displayed on any page that is part of an in-app flow to merchandise or initiate a purchase using in-app purchase; and
>
> - Comply with any additional requirements provided in the Apple Materials.

28.     The requirements in **3.3** are designed to minimize fraud, scams, and confusion. Developers must take responsibility for the linked website, send users only to that website, and inform Apple of that website so that Apple can review the app (including the External Purchase Link).   These requirements also help ensure that users are not overloaded with duplicative information that may diminish the app experience, and are not confused about purchase options. They also protect Apple's continued investment in its commerce and payment services, including the IAP option—which Apple will continue to require developers to use for in-app transactions for digital goods and services.

29.     The "Apple Materials" referred to in **3.3** include several templates—with specified language and formatting—that developers may use for External Purchase Links, including: "For special offers go to [X]"; "Lower prices offered at [X]"; "To get [X%] off, go to [X]"; and "Buy for [$X.XX] at [X]."  Apple also specifies the style of the links on the developer support page for the Link Entitlement.

30.     These templates and other requirements allow developers to communicate pricing information to users using standardized language to avoid misleading or confusing offers, and protect against false statements by developers.   These templates also enable Apple to more efficiently review apps.  These limitations apply only to External Purchase Links; Apple does not

limit the content of developers' out-of-app communications to users, as detailed below.

> **3.5**    You may not include information about purchasing on Your website or a link to Your website for purchasing on the product page of Your StoreKit External Purchase Link App (US).

31.    The requirement in **3.5** limits the External Purchase Link to the app itself rather than the product page (which appears on the App Store itself).

> **3.6**    Digital purchases sold on Your website to end users after link out that are marketed as being for use in an Application must be available for use in that Application.

32.    The requirement in **3.6** helps ensure that users are able to use the digital goods and services that they purchase from the developer's external website within an app.

33.    Apple will charge developers a 27% commission on digital goods and services transactions that take place on a developer's website within seven days after a user taps through an External Purchase Link from the system disclosure sheet to an external website.

34.    Developers eligible for and participating in the App Store Small Business Program will be charged a 12% commission on purchases made within seven days after a user taps on an External Purchase Link and continues from the system disclosure sheet to an external website. Auto-renewals in the second year or later of an auto-renewing subscription that was purchased within seven days after a user taps through an External Purchase Link will be charged a 12% commission.

35.    All App Store developers—including those who choose to use the Link Entitlement—benefit from (among other things) Apple's platform integrity, proprietary tools and technologies protected by intellectual property, developer services and support, services that help developers acquire, retain, and reengage users, marketing and external advertising, and a safe environment for users to download and purchase apps and in-app content. Apple monetizes its significant investments in its ecosystem by charging a commission on specified transactions.

36.    Apple will charge a commission on purchases made within seven days after a user taps on an External Purchase Link and continues from the system disclosure sheet to an external

website. Many platforms charge a commission or other fee for similar transactions, with windows ranging from 24 hours to 30 days, or even longer. The App Store affords many more tools to developers than most platforms, and seven days also appropriately credits Apple for facilitating linked transactions.

37. Apple will be monitoring the use of External Purchase Links and may modify the requirements for the Link Entitlement if issues arise that are not adequately addressed in the current guidance.

38. Developers that breach their obligation to timely pay Apple a commission on specified transactions or otherwise violate the requirements of the Link Entitlement may lose access to the Link Entitlement, may have their app(s) removed from the App Store, and/or may have their developer account with Apple terminated, among other remedies and/or penalties.

39. More generally, 8.4 of the StoreKit External Purchase Link Entitlement Addendum for US Apps informs developers that misleading practices, scams, or fraud will not be tolerated:

> If Your StoreKit External Purchase Link App (US) engages in misleading, fraudulent, improper, unlawful or dishonest acts or practices such as bait and switch, scams, or payment fraud, it will be removed from the App Store and You may be removed from the Apple Developer Program.

**PART (ii) – OUT-OF-APP COMMUNICATIONS**

40. Apple has complied with part (ii) of the injunction by revising Guideline 3.1.3 so that it now reads, in relevant part:

> Developers can send communications outside of the app to their user base about purchasing methods other than in-app purchase.

41. Pursuant to this new Guideline, Apple does not limit developers' ability to send out-of-app communications to users regarding alternative purchasing methods, regardless of how developers obtain that contact information. Apple also does not limit the content of developers' out-of-app communications to users.

42. Separately, Apple added Guideline 5.1.1(x), which provides:

> Apps may request basic contact information (such as name and email address) so long as the request is optional for the user, features and services are not conditional on providing the information, and it complies with all other provisions of these guidelines, including imitations on collecting information from kids.

43.     This provision helps ensure that developers only collect information from users with their full consent.  Once they have done so, however, Apple does not limit the content of out-of-app marketing materials or other communications developers may send to users.

**EXHIBITS**

44.     Attached to this Declaration are copies of the amended Guidelines, the StoreKit External Purchase Link Entitlement Addendum for US Apps, the developer support page regarding the StoreKit External Purchase Link Entitlement (US), and the Entitlement Request Form.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 16, 2024

By: _____
Matthew Fischer