# Exhibit 9

UNITED STATES DISTRICT COURT

*ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | **Evidentiary Hearing** |
| | ) | |
| Plaintiff, | ) | **Volume 3** |
| | ) | |
| vs. | ) | NO. C 20-05640 YGR |
| | ) | |
| APPLE, INC., | ) | Pages 408 - 561 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Thursday, May 16, 2024 |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          Cravath, Swaine & Moore LLP
                        825 Eighth Avenue
                        New York, New York  10019
                    BY:  GARY A. BORNSTEIN,
                        M. BRENT BYARS,
                        YONATAN EVEN,
                        LAUREN A. MOSKOWITZ,
                        BENJAMIN WYLLY,
                        MICHAEL J. ZAKEN, ATTORNEYS AT LAW

(Appearances continued next page)

Reported By:          Raynee H. Mercado, CSR No. 8258

Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

App Store.

For all other digital goods and services sold outside the App Store, there was no commission. And the basic principle there was that if we provided a user to a developer, that we were commissioned on those users that purchased within -- within the app, and where the developer was able to guide a user outside of the store to a sale of the digital goods or service, they were welcome to use that within their own app.

Q. When transactions that may be facilitated through the link entitlement, were those transactions that Apple previously monetized?

A. They were, yes.

Q. Okay. Did Apple, in crafting its injunction compliance plan, consider charging no commission on linked transactions?

A. We did, yes.

Q. And why did Apple decide to charge a commission on linked transactions?

A. We determined that we -- the value of the services that we provide, independent of payments and commerce, were substantive and ongoing for developers. And we felt like it was a reasonable approach to provide a commission on linked-out transactions as long as that -- those linked-out transactions ended -- the commission ended at a certain period of time.

Q. And what was your understanding as to whether the Court's

injunction allowed Apple to charge a commission for the services it provides to developers?

A.   It was our understanding that we -- the Court found that we would be able to charge a fee for our tools, technologies and intellectual property even if we weren't offering in-app purchase.

Q.   Did you understand that in its post trial order, the Court found that even in the absence of IAP, Apple could still charge a commission on developers?

A.   Yes.

Q.   And did that understanding inform your recommendation --

THE COURT:   Well, I don't recall seeing any slide so far that identifies the value to a single developer.

THE WITNESS:   The value to a single developer of...?

THE COURT:   Of whatever it is the value is.

THE WITNESS:   So that --

THE COURT:   Your model has one group of developers subsidizing everyone else.  Right?  Because you don't charge many developers anything other than the application fee or the developer fee.

THE WITNESS:   That's correct.

THE COURT:   So is there any -- there was no analysis done about the value given to an independent developer, right?

THE WITNESS:   I would point to the Analysis Group's report where they looked at the different --

**THE COURT:** For an individual developer?

**THE WITNESS:** Well --

**THE COURT:** Not for all developers. For an individual developer.

**THE WITNESS:** We were trying to represent what individual developers received from that value analysis.

**THE COURT:** What page?

**THE WITNESS:** If you go to Slide 6 of the Analysis Group report, that looks at the different components of value in terms of distribution discovery.

I'm also happy to provide more clarity as to what those buckets represent.

**THE COURT:** I don't see any numbers on that slide.

**THE WITNESS:** 14.7?

**THE COURT:** I don't see any reference to IP or anything.

**THE WITNESS:** Platform technology developer tools and services distribution --

**THE COURT:** The 30 percent number came out of thin air. That was the testimony from the -- from Apple. So that number is meaningless.

**THE WITNESS:** Okay.

**THE COURT:** You read -- you read that, right? That's what people testified to from Apple.

**THE WITNESS:** Yes, I read that.

THE COURT:  So where is the analysis?

THE WITNESS:  So the ranges that are shown below the 30 percent number represent the Analysis Group's understanding of what it would cost to go out and acquire comparable services across discovery, distribution, and other tools and services, and then looked at that across both large and small developers and game and nongame developers to try to understand what was the value of the services that Apple provides.

THE COURT:  Where is the value of the IP?

THE WITNESS:  The way that IP is charged for -- and I'm not -- not an intellectual property expert -- is through a variety of different models, business models.  And that could include SaaS models that charge for a per-seat model as many developer tools do.  It could be a commission model as many kind of marketplaces or payments in commerce service providers use.

But it could also be on a per -- per-user model as -- or per-call model as certain API libraries use.

THE COURT:  Go ahead.

BY MS. RICHMAN:

Q.  Well, why don't we step back and talk about the process that Apple went through with respect to setting a commission on linked transactions.

You were part of that process, correct?

**A.** I was, yes.

**Q.** And you -- I think you mentioned earlier, but who did you work with on that process?

       **THE COURT:** He's already said. Let's move on. We have 15 minutes today. That's it.

       **MS. RICHMAN:** Thank you, Your Honor.

**Q.** Mr. Oliver, can you explain why Apple decided to engage Analysis Group as an outside consultant here?

**A.** Yes. It was clear that we needed to do more work to justify the fees that we were charging, and so we wanted to make sure that we had additional perspectives on different ways to approach the pricing of the commission for linkout.

**Q.** And I think you said this, but just to be clear, are you aware that in its post trial order the Court found that Apple had not adequately justified its 30 percent rate?

**A.** Yes, I am.

**Q.** And did that inform your decision to retain AG?

**A.** It did, yes.

**Q.** And there was extensive discussion of your prior work with AG. Do you remember that?

**A.** I do.

**Q.** Why did you choose to retain Analysis Group for this project specifically?

**A.** Yes. Analysis Group had specific expertise in terms of their understanding of the app ecosystem, as well as the

specific components of value that Apple provided to developers, based on their prior work. And so we felt like they were in the best position to go deeper in some of those areas for this analysis.

Q. Okay. Mr. Oliver, I'm going to hand up a binder of documents -- oh, you have it already. I think it's the smaller version. It has the same documents as Mr. Even's but it's a little bit more manageable because it's not as voluminous.

Okay. We're going to talk about the documents at tab 1 and 2.

I believe the report at tab 1 has already been entered into evidence and that you spoke to Mr. Even about that.

Could you just turn to tab 2 for a moment?

A. Yes.

Q. And do you recognize this document?

A. I do, yes.

Q. And what is this document?

A. This document is the short form of the report provided by Analysis Group.

MS. RICHMAN: And, Your Honor, I'm not sure that this one has been entered into evidence so I would offer it. It's CX-0015.1.

THE COURT: It's admitted.

(Defense Exhibit CX-0015.1 received in evidence.)

**BY MS. RICHMAN:**

**Q.** Okay. Let's look at Slide 2 of the long deck which you spoke to Mr. Even about.

**A.** Yes.

**Q.** And can you summarize what the key question was that you asked AG to explore here?

(Exhibit published.)

**THE WITNESS:** Yeah, the key question was how can Apple fairly charge for the value that it provides to developers through a -- while implementing a linkout to allow them to purchase from the web.

**BY MS. RICHMAN:**

**Q.** Okay. And I'm going to just walk through the goals so you can provide explanation to the Court as to why you set these three goals.

So, number one, if you can just read that aloud.

**A.** Yes. The first goal was to estimate the value of services provided by the Apple ecosystem to developers, focusing on digital goods and services.

**Q.** And why did you ask AG to do that?

**A.** Again we wanted to take a more robust approach to justifying the rate that we were going to charge for linking out. And so we decided that we wanted to take both a bottoms-up approach that looked at the subcomponents of value as well as taking another look at the comparisons that other

marketplaces would demonstrate.

Q.  And what about the -- the second goal?

A.  The second is to compare Apple's commission with those of other app marketplaces and digital marketplaces.  Sorry.  App stores and digital marketplaces.

Q.  And why did you ask AG to examine on that issue?

A.  While this is work that they had done previously, we wanted to make sure that we had all the latest relevant information from the market.

Q.  And then the third goal, the economic framework, can you explain what that was intended to do?

A.  Yes.  Again, I mentioned that there was a novel element to this in terms of basically driving users from within an app to outside of an app for the purposes of making up a transaction. And so we wanted to understand if other markets or other parties had dealt with similar problems.

Q.  Okay.  Thank you.

Let's go ahead and walk through the -- the short deck that Analysis Group prepared.  So could you please turn to tab 2.

A.  Yes.

Q.  And if you go to Slide 1.

(Exhibit published.)

BY MS. RICHMAN:

Q.  What does this slide show?

A.  Slide 1 shows a summary of the valuation for the different

subcomponent buckets that Analysis Group defined.

Q. And what are those buckets?

A. Platform technology, developer tools and services, distribution, discovery, care and support.

Q. And are -- these are the value buckets that you asked AG to analyze?

A. Yes. We worked with them to define the specific buckets, but they had already done prior work here that helped to articulate these buckets.

Q. And I think you tried to explain this earlier, but could -- is there some degree of overlap among these buckets?

A. Yes.

Q. And can you elaborate on that?

A. So some of these buckets and the business models associated with them end up crossing over into buckets. For example, most providers of platform technology also provide tools and services to allow developers or other parties to interoperate with that platform technology. So oftentimes the AG team found that there was overlap in the way that -- that those service providers charged.

Q. Did Analysis Group reach any conclusions about the cost to developers of substituting these services that are provided by Apple?

A. They did, yes.

Q. And what were their findings, broadly speaking?

**A.** Broadly speaking they found that the reasonable cost of replacing these or paying for them from other service providers was between 3 percent -- or actually .3 percent and 25 percent, depending on the bucket.

**Q.** And do you have an understanding as to why these findings are reported as ranges?

**A.** Yes. So the methodology that the Analysis Group team used converted a variety of other business models into a comparable fee per developer revenue. And so that allowed -- or percentage of developer revenue -- to allow us to more easily compare the fees to the commission that we charge traditionally for sales of in-app goods and purchases -- or digital goods and purchases.

And so they -- using that methodology, they looked at different cohorts of developers including small and large developers and game and nongame developers, which led to the ranges that you see here.

**Q.** Do these ranges reflect costs to individual developers?

**A.** This is a cost that a developer would assume based on their revenue.

**Q.** Okay. Are there any -- well, you spoke about this earlier. You did not ask Analysis Group to evaluate the value of IAP and the commerce stack, correct?

**A.** We did not.

**Q.** And why was that?

A.    That was because we knew that as part of this linkout transaction that was occurring, we would not be providing payment and commerce services for those sales.

Q.    And did you -- do you have any understanding as to what developers would have to pay to replace the commerce services that Apple provides to developers through IAP?

A.    Yes, we do.

Q.    And where does that information come from?

A.    A variety of different data points.  I talked earlier about one datapoint available to us which was provided as part of this report where AG found that the reasonable range of offer or using a service provider as payment options was between one and four percent.  But we also looked at other analysis and data points that had been gathered in other instances.

Q.    And you did not estimate -- ask AG to estimate the cost of value for care and support; is that correct?

A.    That's correct.

Q.    And why was that?

A.    Well, actually AG determined that it was too hard to independently quantify the value of care and support.  And they instead suggested that we consider that as part of the elements that would guide us within a range of the other buckets.

Q.    Okay.  Why don't we walk through each of the value buckets

that AG did identify and attempt to value.

The first one is platform technology. Do you see that on -- on Slide 2?

(Exhibit published.)

**THE WITNESS:** I do, yes.

**BY MS. RICHMAN:**

Q. Can -- can you explain to the Court what AG means by platform technology here?

A. Sure. So AG's definition of platform technology is common technology infrastructure that both consumers and merchants, in this case, developers, can use to expand the capabilities that developers can offer, and that in certain cases actually create specific demand for the goods and services being sold by those merchants or developers.

Q. Do you have a understanding as to why AG focused on these three examples of platform technology on -- on Slide 2?

A. Yes. We wanted them to take as broad a view of market comparables as possible, again in -- with the goal of providing as much justification about how our fee that we were approaching would be considered reasonable.

Q. And does -- is this an exhaustive list of all the possible benchmarks for platform technology?

A. These were three that they found and were able to specifically value. They note a couple of other examples including cloud services that they were not able to

independently value in this way.

Q. And Mr. Even asked you about operating systems, macOS, Microsoft. Did you consider those as potential benchmarks for valuing platform technology?

A. Those were considered, but they were largely captured in other areas of the report.

Q. Okay. What does AG conclude about the value of platform technology on this slide?

A. They conclude that there is a significant value in platform technology though it often overlaps with the business models of the other value buckets and that that can range anywhere from .3 percent to 6 percent of -- for platform technology with no demand generation, in between 5 and 20 percent for those with demand generation.

Q. What do you mean by no demand generation and demand generation?

A. Sure. So one key element from AG's work was clarifying that they believe there was different value if the common infrastructure served to bring in customers for merchants.

So part of the reason, a key reason why developers began purchasing iPhone were the capabilities that were completely independent of the App Store and third-party developers. In fact, those didn't exist when we launched the iPhone.

It was things like the camera and access to Safari and other first-party technologies that drove initial demand for

the iPhone. And so they wanted to acknowledge that there was value associated with that demand generation.

Q. Is there a relationship between the estimated value to developers of platform technology and whether or not the platform generates demand or not?

A. Yeah. Based on AG's findings, they saw an increase in the amount paid by developers for platform technology where there was demand generation.

Q. Now, I think you said that the -- the range here was between .3 and 20 percent; is that correct?

A. That's correct, yes.

Q. The first -- the first row, game consoles, includes a percentage of revenues of 30 percent; is that right?

A. That's correct, yes.

Q. And why did you not include that in the range you provided?

A. Well, as I referenced earlier, that 30 percent is unique in that it is something that cuts across every other value bucket. And so just in terms of refining the range relative to just the elements of platform technology, I left it out.

Q. That range, .3 to 20 percent, it's a very broad range. How -- what is that informative of, if anything?

A. It's informative of the fact that there is a variety of different ways that platform technology providers can approach the services that they offer, and there's a big disparity in

that -- in that potential value to developers.

Q. And how did you use that range to gauge the value of the platform technology that Apple provides to developers?

A. This is just one of multiple data points -- data points that we considered when trying to evaluate a reasonable commission rate for the linkout entitlement.

Q. Okay. Could you please turn to the next slide, Slide 3.

(Exhibit published.)

THE WITNESS: Yes.

BY MS. RICHMAN:

Q. Which is 15.4.

THE COURT: Can you give me an example of a developer for whom the .3 applies versus 20?

THE WITNESS: So -- so the .3 example is from Shopify and Adobe Commerce, and so those are examples where there was no demand generation. So there is a variety of tools and technologies provided to developers as part of this platform technology. In this case, those are e-commerce capabilities that allow them to build and operate specific e-commerce stores.

However, they are not actually bringing in customers to those websites. That's not part of what a developer is paying for when they're paying for Shopify or Adobe Commerce. So they will independently pay for that demand generation from other -- from other sources.

THE COURT: 20 percent?

THE WITNESS: So 20 percent in this case comes from physical retail environments where actually the creation of a high-end mall, for example, with a number of attractions like a movie theater and -- and, you know, and nice facilities, actually attracts users to that shared environment as a meeting place and as a place to -- to buy goods. And that attracts, that makes it more compelling for merchants to be a part of that environment because there's demand generation that the foot traffic provides.

THE COURT: So why not treat them differently?

THE WITNESS: Why not treat what differently?

THE COURT: Well, you don't charge a different commission.

THE WITNESS: So the comparison for us with the platform technology provided by Apple would be the iPhone and the operating system.

As I discussed previously, we -- we believe and the evidence is that customers come to Apple's phone and technology because of a variety of the offerings that we provide in addition to the value that third parties provide that are distributed through the store.

And so we would -- we believe that there is demand generation as part of the offering that Apple provides to users. So that would put us at a higher end of this range.

(Proceedings were concluded at 1:30 P.M.)

--o0o--

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

_____

Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

Thursday, May 16, 2024